N3o3ashc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADEEL ASHRAF, et al.,

               Plaintiffs,          New York, N.Y.

           v.                 22 Civ. 9864 (ER)

MINISO GROUP HOLDING LIMITED,
et al.,

               Defendants.

------------------------------x       Teleconference

                                   March 24, 2023
                                   10:00 a.m.

Before:

                      HON. EDGARDO RAMOS,

                                District Judge

APPEARANCES

POMERANTZ, LLP
    Attorneys for Plaintiff Nova Scotia Health Employees
Pension Plan
BY:  MATTHEW L. TUCCILLO

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    Attorneys for Defendant MINISO
BY:  MICHAEL C. GRIFFIN
      ROBERT A. FUMERTON

LATHAM & WATKINS
    Attorneys for Defendants Goldman Sachs and BofA Securities
BY:  JEFF G. HAMMEL
      ALEXANDER MILLS

N3o3ashc

(The Court and counsel appearing telephonically)

THE DEPUTY CLERK:  In the matter of Ashraf v. MINISO Group Holding Limited, et al.

Counsel, please state your name for the record, starting with counsel for the lead plaintiffs.

MR. TUCCILLO:  Good morning, your Honor.  This is Matthew Tuccillo, Pomerantz, LLP, on behalf of the lead plaintiff Nova Scotia Health Employees Pension Plan.

THE DEPUTY CLERK:  Counsel for MINISO?

MR. FUMERTON:  Good morning.  Robert Fumerton and Michael Griffin from Skadden Arps.

THE DEPUTY CLERK:  And counsel for Goldman Sachs?

MR. HAMMEL:  Good morning, your Honor.  This is Jeff Hammel from Latham & Watkins, and with me is Alexander Mills.

THE COURT:  Good morning to you all.  This matter is on for a premotion conference.  I note for the record it is being conducted by telephone.  I also note that this is the first time the parties have appeared before me, so although we are here at the request of defendants, Mr. Tuccillo, let me begin with you.  Why don't you tell me a little bit about your case and what has gone on so far.

MR. TUCCILLO:  Sure.  Thank you, your Honor.

As the Court is aware, the lead plaintiff process resulted in the appointment of our client, the Nova Scotia Health Employees Pension Plan, serving as lead plaintiff.  They

are a large Canadian-based pension plan with considerable securities litigation experience, and are keenly interested in the case.  I presented to their board in February about the substance, and answered questions, etc., so they are aware of the case and very attentive to it.

The case was originally filed under Section 11 of the Securities Act.  Our amended pleading expanded the allegations to include Section 10(b) of the Exchange Act, as is evidenced both from the pleading itself and the letters that resulted. That is a somewhat cumbersome undertaking, because there is case law that exists whereby if you do not disaggregate those two claims, the Section 11 claim, which normally is not subject to Rule 9b, because, among other things, it doesn't have a scienter requirement, it is not based on fraud, etc.

If you fail to plead those things separately, courts have held that the claims wind up being in the same boat as the more difficult to plead 10(b) claim.  So our pleading on its face took efforts to separate the two and plead them accordingly.

The gist of the case boils down, has to do with, first, the use of a British Virgin Islands joint venture, ostensibly to purchase land for a Chinese headquarters of a China-based company.  On its face sounds very unusual and it was.  A short seller report --

THE COURT:  I'm sorry.  Why was it unusual?  What's

unusual about it?

MR. TUCCILLO:  It is not at all customary for a China-based company purchasing land in China for a headquarters to form an offshore joint venture in the Caribbean to funnel the money to do that.

And the allegations in the short seller report, which our China-based investigation confirmed, as pled in the complaint, is the moneys funneled into and out of that joint venture appear to have gone from the proceeds of the initial public offering into the joint venture, and out again to the CEO of the company, to buy out his large stake in the joint venture, which does not appear to have been acquired based on actual consideration.

I will note for the record, we've been unable to serve this gentleman.  So despite the fact that the company has operations in the U.S., and in fact we've pled instances where he's visited the U.S. operations, we are still attempting under the Hague Convention to track him down and serve him.  This is not an instance where the CEO is racing to the courthouse to be heard, to have his day in court and to self-vindicate.  Quite the opposite.

So one core part of the complaint allegations is the use of this British Virgin Islands joint venture to syphon IPO proceeds from the company to this gentleman's pocket.

Another part of the case has to do with the company's

N3o3ashc

franchise model.  On paper, MINISO was an asset-leaning operation.  It licensed out its name and it had a bunch of franchisees, almost think of like a Subway chain, for example, the food chain, where the franchisees took on a lot of the operating cost, from running the store, hiring the employees, etc., and kick a portion of the proceeds to the sale back to the company.  It seems sort of lean and profitable.

It turns out, not only in the U.S. and Canada, which were easy to confirm, but also in China, that was not the case.  A massive number of the franchises are in fact not franchises.  They are stores directly owned by the company or owned by the chairman and insiders closely aligned with them.

So, the revenue structure of the company, the profitability, the ability to open and maintain store footprint, all were off.  And the key here, the fulcrum point, is the IPO.  Because prior to this, the company was essentially a closely held majority shareholder, private interest.  It went through an IPO process, listed its American depository shares based on these representations, which later were revealed through the short seller report and through our own investigation to have been false.

We've pled other corrective events having to do with operational setbacks, and as we'll discuss later in the call, I'm sure we've identified others.  Some of the analyst reports, for example, are foreign language.  We've identified one in

N3o3ashc

Chinese and had it translated that we believe is corrective. That sort of thing.

So, that's an overview of the complaint.

The only defendants that have appeared and are represented on the line today are MINISO, the company, which, again, has operations in North America and China, the U.S. representatives of the company, the gentleman named Puglisi, and a corporate entity.

THE COURT:  Thank you.

Mr. Fumerton, what does MINISO do?

MR. FUMERTON:  Your Honor, if it may please the Court, Mr. Griffin will be presenting for the company today.

THE COURT:  That's fine.

Mr. Griffin.

MR. GRIFFIN:  Yes.  This is Michael Griffin for MINISO.

MINISO is essentially a small franchise store. Knickknacks.  I think of it as like the Claire's of the old malls.  But it is an assortment of retail goods in stores all over the world, but primarily based in China.

THE COURT:  What is it you want to do?

MR. GRIFFIN:  So, we're here today, your Honor, seeking permission to file a motion to dismiss all of plaintiff's claims in their entirety for several independent reasons, including failure to allege any misstatement or

N3o3ashc

omission, failure to allege scienter, and failure to allege loss causation.

This case follows a very common pattern as of late where a short seller attacks a company, lodges a bunch of accusations and innuendo based on already public information, and securities plaintiffs turn around, copy those same allegations, and file a claim for securities fraud.

Notably here, the company immediately refuted these allegations in a press release two days after the short seller report, and two months later, announced the results of an independent investigation that also confirmed they had no merit.  Nevertheless, plaintiffs continued to file this action thereafter in October.

The only other thing I'll note at the outset is today the company is trading at triple what it was trading even right before the short seller report.  So in short, this is just not the stuff of fraud.

But turning to plaintiff's specific allegations, first, this issue with the joint venture.  You know, you could be mistaken for wondering what the misrepresentation was here. Plaintiffs alleged a lot of things about this transaction that they say sound fishy.  But at the core, this is a disclosed based securities claim.  Plaintiffs do not dispute that the joint venture was disclosed in full, all of its terms.  That the company's subsequent buyout of Mr. Ye's stake, which

N3o3ashc

occurred after the IPO, was fully disclosed, that was approved by the company's board, by its independent audit committee, with the help of an independent appraiser who valued Mr. Ye's stake in that transaction.  All of this is disclosed.

And plaintiffs also don't dispute that the company did in fact build a new headquarters with the land that it purchased through the joint venture using proceeds from the IPO, exactly as it said it would in the registration statement.

THE COURT:  Was that headquarters built in China?

MR. GRIFFIN:  Correct.  That's correct.

THE COURT:  Okay.

MR. GRIFFIN:  So what this claim really boils down to is what your Honor first asked about, is plaintiff's assertion that there is just something inherently fishy about the company using a British Virgin Islands entity for this project.

As a threshold matter, there is no disclosure violation there.  The company disclosed it was a British Virgin Islands entity.  There is no dispute about that.  So from a securities law perspective, that should be the end of the matter.

But additionally, they don't allege any facts that would indicate there was anything unusual or suspicious or fishy about the structure.  All kinds of companies use entities in all kinds of places, including the Virgin Islands, the Cayman Islands, for tax purposes, for all kinds of purposes,

and plaintiffs don't allege any specific nefarious reason that it was structured that way in this particular case.

Now, the other aspect of the joint venture claim that counsel mentioned is their assertion that the chairman never actually committed any funds to this venture.  So when he was bought out, his interest, that was essentially money for nothing, as the short seller put it.

But if you actually look at the allegations that plaintiffs make to support that claim, they point only to a single what they call a Chinese corporate record that purportedly doesn't show any evidence of Mr. Ye's capital contributions.

The problem with that analysis -- and this is crediting everything that they allege.  The problem with that analysis is that, on its face, that corporate record is for a subsidiary of a subsidiary of the British Virgin Islands entity that was the joint venture.

So the fact that that particular record doesn't show any evidence of a capital contribution from Mr. Ye doesn't indicate anything about whether Mr. Ye in fact contributed funds to this venture.

And in response to the short seller's report, the company actually detailed specifically to the penny the three capital contributions that Mr. Ye made, which plaintiffs just ignore in their complaint.  So that's the joint venture issue.

N3o3ashc

That's why we think there is absolutely no securities based claim there or any other claim for that matter.

THE COURT:  Thank you.

Go ahead.

MR. GRIFFIN:  Sorry.

Turning to the franchise issue, the second claim that plaintiff's counsel mentioned.  We think there is basically -- there is three bases for this claim, for the claim that the company does not actually use franchisees as the predominant model in China.

First they point to the short seller who looked at supposedly these Chinese corporate records again, that show they were registered to people affiliated or linked with, as plaintiffs put it, the company.  Plaintiffs don't allege anything about what these corporate records actually are, who prepared them, who maintains them, what purpose they're used for, or any other information that would demonstrate that they reflect ownership, as plaintiffs claim.

But again, even taking them at face value, it doesn't render off any of the company's statements, including that the franchisees bear capital expenditures, they carry the cost of inventory, they carry the cost of operation.  Plaintiffs don't allege any evidence that MINISO provided costs or capital or any other operational control to these stores.

Now, the second thing that the short seller and

plaintiffs rely on are a 2017 interview and a 2019 article where the company supposedly said that significant portions of its stores were company owned.  But the problem here is the timing.  This is in the early stages of the company.  This was years before the class period here and the IPO, which begins in October 2020.  So plaintiff simply can't use this stale information to claim that the company's disclosure years later were false.

And the third thing that plaintiffs allege in support of this theory is they claim to have spoken to a number of former employees in MINISO's North American stores -- these are in the U.S. and in Canada -- who allege that their stores were essentially owned and/or controlled by the company.  There's a host of problems with these types of anonymous former employee allegations, but again, even accepting them wholesale, they actually only confirm what the company said.  Because the registration statement expressly discloses that in North America, the company "typically enters the market by opening and operating stores on our own."  That's at page 131 of the prospectus.

So this is entirely different than the Chinese operations, which are franchised based.

All of which is to say, you know, all this alleged testimony from these former employees in North America is perfectly consistent with the company's disclosures, and says

N3o3ashc

nothing about the use of the franchise model in China.

And so that's essentially defendant's position on those two primary claims, and I'm happy to address our other issues regarding scienter and loss causation, if the Court would like.

THE COURT:  No need for that at this point.

Mr. Hammel, I take it you join in Mr. Griffin's presentation.  Is there anything you wanted to add?

MR. HAMMEL:  We certainly do join in, your Honor.  And he made those arguments better than I could have, so I appreciate him doing it.

I would just say, without going into detail, that the underwriters have a couple specific arguments they would make as well.  But unless your Honor really wants to hear about them, I think we can probably pass over them for now.

THE COURT:  Mr. Tuccillo, I take it your position is that the current complaint is sufficient to withstand the challenges put on the record in the defendant's letters and in their presentation this morning.

So should we just go ahead and set a schedule for briefing?

MR. TUCCILLO:  Your Honor, thank you.  This is Mr. Tuccillo speaking again.

As indicated in the letters that defense counsel submitted and that we then submitted in response, having

examined the letters and taken this process for what it is, we do believe a second amendment at this stage would be productive.

In particular, I would identify two areas of their letters we think would be addressed more efficiently through an amendment than briefing, than straight to briefing.

The first is the myriad loss causation arguments that were presented in the letters but not discussed today.  Those we think can be effectively mooted through a second amendment, which, among other things, would add additional corrective disclosures, and we might add one non-lead additional plaintiff, which we commonly do in our cases.

We think the amendment that I just overviewed would effectively moot most, if not all, the arguments there, therefore not require the parties to brief them, argument to be heard, and the Court to decide them.

Secondly, there is an argument about sort of the overlay of Rule 9b to the Securities Act claim.  I don't think a lot of amending is required there, but it is warranted to have a second look and just see whether there's minor changes that can be made in order to ensure that that is also an argument that either is mooted or just facially falls flat.

The core of the facts alleged, etc., that I see is relatively stable at this point.  So, my suggestion and my request, respectfully, would be that we have a reasonable

N3o3ashc

period of time to do that second amendment.  Whether your Honor requires the second set of letters or not, that's obviously at the Court's discretion.  But I suspect that the majority of the positions stated would be the same.  And then, thereafter, have a briefing schedule.

Toward that end, I did speak with counsel yesterday and we just tried to map out sort of two scenarios.  One scenario would be if the amendment was permitted, what would that briefing schedule look like, and one if it is not, what does that briefing schedule look like.  So we do have some thoughts on it.

But I would respectfully submit that the amendment would be productive and shouldn't delay the proceedings all that much.

THE COURT:  Why don't you tell me what the schedule that you spoke with defendants about if I were to allow amendment.  What does that look like?

MR. TUCCILLO:  Sure.  My suggestion in that case -- and I don't want to say they've agreed to every word.  My suggestion was an amendment around a month from now, so I suggested May 2nd.  Part of the reason for that time period is the intervening period includes spring break, etc., as well as hearing in other matters.  And then what we said after that was a schedule that was 75 days for the motion to dismiss, 75 days for the response, and 45 for the reply.  Obviously, if any of

N3o3ashc

those falls on a holiday, we can tweak it on the margins.  That was roughly the pacing we discussed.

So it was roughly a month to do the amended complaint, and then 75, 75, 45 thereafter.

THE COURT:  That's an awful --

MR. GRIFFIN:  So first, with respect to amendment, your Honor, as counsel noted in his letter, defendants oppose any further amendment at this time.  Frankly we don't think it's proper at this late juncture.  The short seller report was nine months ago, this case was filed back in October. Plaintiffs have had ample time to research and plead their claims and have not offered any explanation for why the allegations they propose adding could not have been included in the current version of the complaint.

But even setting that aside, the bigger problem here is that amendment in our view is completely futile and would only serve to delay these proceedings.

As plaintiff's counsel notes, he didn't address any of the issues that we've actually discussed on this call today, all of which are independently dispositive, regardless of this loss causation.  And we think it is the case there is no loss causation here, for the simple reason that the lead plaintiffs sold all of its shares before the short seller attack came out and supposedly revealed this fraud.  So it's certainly the case there is no way their loss could have been caused by the

N3o3ashc

alleged fraud here.

But even setting the loss causation aside here entirely, that doesn't address the failure to plead any misstatement, which again, it also, setting aside the 9b issue, right. Nothing we discussed here today turns in any way on heightened pleading standards.

So we think that, regardless of the proposed amendments, that the new complaint would fail for the exact same reasons that the current one would, and it would be more efficient just to proceed to briefing at this time.

To the extent the Court is amenable to allowing plaintiffs to amend, we would just note that should be the last bite at the apple for them, and if we proceed to a decision on full motion briefing thereafter, we would respectfully request that any dismissal would be with prejudice.

And then lastly, with respect to the schedule, again, we think the amount of time requested is gratuitous given the limited proposed amendment that plaintiffs are requesting. But we defer to the Court on that matter. We also proposed something in the neighborhood of a 60, 60, 30 schedule. Plaintiffs indicated that due to some conflicts, that maybe a longer schedule would be easier for them.

I think -- I'll let plaintiff's counsel correct me -- I think if there is an amendment, that probably moots those other issues. So if there is an amendment, we could probably

do a shorter MTD briefing schedule.  But I defer to the Court's preference on that.

MR. TUCCILLO:  If I may.  This is Mr. Tuccillo.

THE COURT:  Okay.

MR. TUCCILLO:  I just would note quickly, my non-response on the myriad motion arguments should not be interpreted as not having one.  But rather, my adhering to the request of the reporter that we allow one another to speak uninterrupted, and then at the conclusion of my colleague's remarks not being followed by a question from the Court.

We obviously do have substantive responses to all of the motions, arguments on things like falsity, some of which we've previewed in the letters.  Putting that aside, on the schedule, I do think the last question which counsel directed at me is accurate.  I think if we start the -- we have the amendment happen around early May, late April, etc., I do think that eliminates much of the conflicts we had, which were typically in June.  We would jump over that with the traditional 60, 60, 30.  That's fine.

I vehemently disagree that a second, third, or even fourth amended complaint, that just because of its number grounds for a dismissal with prejudice.  The authority we cite in our letter, Second Circuit Court of Appeals, binding authority, is instances where loss causation were litigated and there was a fourth amended complaint, so I don't think it would

N3o3ashc

be appropriate at this juncture to presuppose that we do or do not get any further amendment.  The simple fact of the matter, and the reason I'm making this point now, is because the purpose of this whole premotion to dismiss letter exchange is to preview arguments, allow them for them to be aired, and allow for a more efficient process to ensue.

In my view, that process would be far more efficient if we do a second amendment now.  Because I think there is a three legged table of argument, one leg being loss causation. I think that leg will disappear.

It just doesn't seem to make a lot of sense to me to plow ahead, brief it, maybe hit that point later, and we are asking for a Rule 15 motion down the line, when I do think there are things that can be done to address it now.

THE COURT:  I think Mr. Tuccillo has got the better of the argument with respect to any subsequent amendments.  Second Circuit authority, as far as I am aware, precludes me from giving plaintiffs a drop dead ultimatum, either they brief a motion to dismiss now or amend with no further opportunity to amend and without the opportunity of the Court to have weighed in on in what way the complaint may be deficient.

But that's neither here nor there.  I was concerned about the amount of time that you all -- certainly the 75, 75, 60 seems to me to be completely unreasonable.

So Mr. Tuccillo, can you have the complaint amended

N3o3ashc

within 30 days?

MR. TUCCILLO:  Yes.

THE COURT:  Okay.  So, 30 days to amend the complaint. Mr. Griffin and Mr. Hammel, once you review the complaint, and you think it's sufficient, then you can answer in the ordinary course.  But if you think it continues to be deficient, then you can go ahead and make the motion to dismiss.  You don't have to come back for another premotion conference or submit letters.  And it should be done on a 60-day, 60-day, 30-day schedule.

And I would ask you, Mr. Tuccillo, to submit to the court on consent the schedule for that.

MR. TUCCILLO:  Yes, your Honor.

THE COURT:  So it can be entered.

With that, so you'll be given the opportunity to amend now, Mr. Tuccillo.  And I assume that we'll be getting the motions after that.

Is there anything else we should do today, Mr. Tuccillo?

MR. TUCCILLO:  As far as I am aware today, your Honor, no.  The only sort of wrinkle that is off schedule, if you will, is if and when we are able to serve the individual defendants in China under the Hague Convention, just by way of update, those efforts are still ongoing.  There is not an imminent forecast of success.  The last we heard, maybe in late

N3o3ashc

January, we were told it could be several months or more.  And I think as counsel on the other side knows, because they represent similar companies, sometimes it is not successful at all, despite those efforts.  So I do think what we would do is note that for the record.  And if that service is successful at some point, we can then have a status conference to have it proceed.

THE COURT:  Very well.  And I have had similar cases and I agree that often those efforts are not successful.

Anything else from you, Mr. Griffin?

MR. GRIFFIN:  No, your Honor.  As discussed with counsel yesterday on that point, all the parties agree there is no reason to delay anything while we see what happens with the service.  I think everybody is on the same page that we can proceed.  Otherwise, if and when anything happens, we can address it then.

THE COURT:  Very well.

Anything more from you, Mr. Hammel?

MR. HAMMEL:  No, your Honor.  Thank you very much.

THE COURT:  In that event we are adjourned.  Mr. Tuccillo, do submit that proposed schedule, and everyone please stay well.

MR. TUCCILLO:  Thank you, your Honor.

(Adjourned)