UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE MINISO GROUP HOLDING LIMITED SECURITIES LITIGATION | Case No.  1:22-cv-09864-ER <br><br> <u>CLASS ACTION</u> <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN OPPOSITION TO
MINISO'S AND THE PUGLISI DEFENDANTS' MOTION TO DISMISS (ECF 61)
<u>AND THE UNDERWRITERS' JOINDER (ECF 64)</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.   THE SAC'S ALLEGATIONS............................................................................. 3

      A.    Securities Act Allegations (¶¶229-345)................................................. 3

            1.    Certain Securities Act Defendants Seek Dismissal ................................... 3

            2.    MINISO's Business And IPO................................................................ 3

            3.    Securities Act Defendants' False Or Misleading Statements/Omissions ... 4

                  a.    MINISO's IPO & Business Operations (¶¶264-268) ..................... 4

                  b.    Reported Results (¶¶269-274) ................................................... 5

            4.    Undisclosed Negative Facts And Red Flags (¶¶274-289) ........................ 6

            5.    The SAC Need Not Plead Loss Causation................................................. 8

      B.    Exchange Act Allegations (¶¶2-228)...................................................... 8

            1.    Certain Exchange Act Defendants Seek Dismissal ................................... 9

            2.    MINISO's Business And Operations........................................................ 9

            3.    Exchange Act Defendants' False Or Misleading Statements/Omissions . 10

                  a.    Business Operations Fraud (¶¶57-107)...................................... 10

                  b.    Reported Results Fraud (¶¶108-122) ......................................... 12

                  c.    Internal Controls Fraud (¶¶123-127) ......................................... 12

            4.    Undisclosed Negative Facts And Red Flags (¶¶41-55) ........................... 13

            5.    Exchange Act Defendants' Scienter (¶¶156-185)................................... 15

            6.    Partial Corrective Disclosures & Events Revealed The Fraud ................ 18

III.  ARGUMENT.................................................................................................... 19

      A.    Legal Standards Applicable To Fed. R. Civ. P. 12(b)(6) Motions ...................... 19

      B.    The SAC Is Not "Puzzle Pled" ........................................................... 20

      C.    Different Pleading Standards Govern The SAC's Securities Act Claims ........... 22

D.      The SAC Pleads Misstatements & Omissions In The Registration Statement..... 24

      1.      MINISO's IPO & Business Operations ..................................................... 24

      2.      MINISO's Reported Results ..................................................................... 30

E.      The SAC Pleads Post-IPO Misstatements & Omissions .................................... 32

F.      The SAC Sufficiently Pleads Scienter (Exchange Act Claims Only)................... 34

      1.      Motive & Opportunity ............................................................................. 35

      2.      Knowledge & Recklessness ..................................................................... 36

      3.      Additional Allegations ............................................................................. 37

      4.      Defendants' Competing Inference Is Not More Compelling.................... 37

G.      The SAC Should Not Be Dismissed On Loss Causation Grounds....................... 38

H.      The Control Person Claims Are Not Independently Challenged.......................... 40

IV.      CONCLUSION.................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)................................................................................................39

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..............................................................................35

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
  2021 WL 2646353 (E.D.N.Y. June 28, 2021) ..................................................................33

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ........................................................................................22

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021)...............................................................................22

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002)..............................................................................................31

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)..............................................................................................38

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)...............................................................................24

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)...............................................................................28

*City of Pontiac Policemen & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..............................................................................................24

*Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)...............................................................................21

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010)...............................................................................28

*Coronel v. Quanta Capital Holdings Ltd.*,
  2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .....................................................................29

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
  2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) (Ramos, J.)............................................20, 21

*Dura Pharm. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................................40

*Edwards v. McDermott Int'l, Inc.*,
    2021 WL 1421609 (S.D. Tex. Jan. 30, 2020)...........................................................................21

*Emps. Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).....................................................................................................33

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) .....................................................................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................................40

*Fries v. N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018) (Ramos, J.) .................................................................28

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)......................................................................................36

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................................34

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)...............................................................................................19, 20

*Gross v. GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ...............................................................................................35

*Grund v. Del.Charter Guar. & Tr. Co.*,
    788 F. Supp. 2d 226 (S.D.N.Y. 2011), *reconsideration granted in part and*
    *denied in part*, . 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011) .............................................33

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015) (*Harris I*), *aff'd*, 649 F. App'x 7 (2d
    Cir. 2016) (*Harris II*) .........................................................................................................26, 27

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................................22

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012).....................................................................................33

*Ill. State Bd. of Inv. v. Authenticate Holding Corp.*,
    369 F. App'x 260 (2d Cir. 2010) ........................................................................................30, 32

iv

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  586 F. Supp. 3d 199 (E.D.N.Y. 2022) ...............................................................24

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*,
  2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ........................................................39

*In re China Valves Tech. Sec. Litig.*,
  979 F. Supp. 2d 395 (S.D.N.Y. 2013)..................................................................23

*In re China XD Plastics Co. Sec. Litig.*,
  2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016) ....................................................33

*In re Coty, Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ....................................................22

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) .......................................................35

*In re Farfetch Ltd. Sec. Litig.*,
  2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021), *aff'd sub. nom. IAM Nat'l
  Pension Fund v. Farfetch Ltd.*, 2023 WL 2879304 (2d Cir. Apr. 11, 2023) ...........................24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)..........................................................................39, 40

*In re Forcefield Energy Inc. Sec. Litig.*,
  2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ....................................................38

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010)..................................................................22

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................32

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2013 WL 3989066 (S.D.N.Y. July 31, 2013) ......................................................25

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .......................................................33

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................................40

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..............................................................................22

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................................................40

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)..................................................................23

*In re OSI Pharms., Inc. Sec. Litig.*,
  2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007).......................................................20

*In re Pareteum Sec. Litig.*,
  2020 WL 3448526 (S.D.N.Y. June 23, 2020) ......................................................22

*In re Qudian Inc. Sec. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sept. 17, 2019)......................................................28

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................23, 35

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................38

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................26

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. June 23, 2014) ....................................21, 25, 27, 36

*In re State Street Bank & Tr. Co. Fixed Income Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)..................................................................39

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................36, 40

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..................................................................................36

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018).............................................................21

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
  2022 WL 596861 (S.D.N.Y. Feb. 25, 2022).........................................................28

*IN re TVIX Sec. Litig.*,
  25 F. Supp (S.D.N.Y. 2014), *aff'd sub nom. Elita Aviation LLC v. Credit
  Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).........................................................29

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ......................................................38

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)...........................................................................31, 34

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................36

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................23

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)............................................................39

*Jiajia Luo v. Sogou, Inc.*
    465 F. Supp. 3d 393 (S.D.N.Y. 2020).....................................................................31

*Kendall v. Odonate Therapeutics, Inc.*,
    2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ..........................................................21

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ..............................................................................39

*Lematta v. Casper Sleep, Inc.*,
    2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) .......................................................28

*Levine v. AtriCure, Inc.*,
    594 F. Supp. 2d 471 (S.D.N.Y. 2009).....................................................................39

*Lewy v. SkyPeople Fruit Juice, Inc.*,
    2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)........................................................23

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)....................................................................................22

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)...............................................................26, 31

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2017 WL 3891676 (D. Del. Sept. 6, 2017).............................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)...............................................................................38, 40

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...............................................................................................31, 35

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013).....................................................................33

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    65 F.3d 1044 (2d Cir. 1995)....................................................................................39

*Metro. Life Ins. Co. v. Totten*,
    2007 WL 9771106 (N.D.N.Y. Feb. 12, 2007) ........................................................................37

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).................................................................................................19, 31

*NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*,
    2022 WL 900604 (E.D.N.Y. Mar. 28, 2022).............................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................................26

*Perez v. Higher One Holdings, Inc.*,
    2017 WL 4246775 (D. Conn. Sept. 25, 2017) ...........................................................................37

*Philip Morris USA Inc. v. ABC Chinese Food, Inc.*,
    2009 WL 4067997 (E.D.N.Y. Nov. 18, 2009)...........................................................................37

*Plumbers and Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)............................................................................37

*Ret. Sys. v. Celestia, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ................................................................................................37

*Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)........................................................................................35

*Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................................35

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................................23, 24, 32

*Sante Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)....................................................................................................................30

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ..............................................................................25

*Shemian v. Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ...........................................................................37

*Silvercreek Mgmt. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017)..................................................................................23, 24

*Slayton v. Am. Exp. Co.*,
    604 F. 3d 758 (2d Cir. 2010).......................................................................................................32

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014) (Ramos, J.) .......................................................24

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) (abrogated on other grounds) ........................................30

*Tabor v. Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008)........................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................35, 37

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)........................................................................................34

*Touchstone Strategic Tr. v. Gen. Elec. Co.*,
   2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022)...........................................................25

*U.S. v. Kortbawi*,
   2021 WL 4931950 (2d Cir. Oct. 22, 2021).................................................................25

*Van Dongen v. CNinsure, Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013)..................................................................36, 40

*Venkataraman v. Kandi Techs. Grp., Inc.*,
   2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)...........................................................34

*Villella v. Chem. & Mining Co. of Chile, Inc.*,
   2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) (Ramos, J.).......................................21

*Walker v. Schult*,
   717 F.3d 119 (2d Cir. 2013)........................................................................................19

*Wallace v. Intralinks*,
   2013 WL 1907685 (S.D.N.Y. May 8, 2013) .............................................................23

*Wandel v. Gao*,
   590 F. Supp. 3d 630 (S.D.N.Y. 2022).........................................................................31

*Wang v. Cloopen Grp. Holding Ltd.*,
   2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ...........................................................31

*Xiang v. Inovalon Holding, Inc.*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017).........................................................................39

**Statutes**

15 U.S.C. §77k ................................................................................................ *passim*

15 U.S.C. §78j(b) .................................................................................................. *passim*

Securities Act of 1933.......................................................................................... *passim*

Securities Exchange Act of 1934 ......................................................................... *passim*

**Rules**

17 C.F.R. §229.105(a)........................................................................................... *passim*

17 C.F.R. §§229.303 ...............................................................................................12, 31

17 C.R.F. § 240.10b-5...............................................................................................8, 31

Fed. R. Civ. P. 8.............................................................................................................22

Fed. R. Civ. P. 9.........................................................................................21, 22, 23, 24

Fed. R. Civ. P. 12.............................................................................................. *passim*

Fed. R. Civ. P. 56.........................................................................................................19

Lead Plaintiff Nova Scotia Health Employees' Pension Plan and non-lead Plaintiff Adeel Ashraf ("Plaintiffs") respectfully file this Opposition to MINISO's and the Puglisi Defendants' Motion to Dismiss (ECF 61) ("Motion") and the Underwriter Defendants' Joinder (ECF 64), which seek dismissal of the Second Amended Class Action Complaint (Dkt. No. 60) ("SAC").[1]  Plaintiffs respectfully ask the Court to deny the Motion and Joinder and order the parties into discovery.[2]

## I.    INTRODUCTION

Defendant Ye, MINISO's controlling shareholder, is at the heart of this lawsuit.  Take his $108 million payout from a related party transaction initiated right after MINISO's IPO.  Its Registration Statement, signed by Ye and other Defendants, had disclosed to IPO investors that it might use up to ~$120 million of its $600 million+ in IPO proceeds for "general corporate purposes," including acquiring headquarters ("HQ") land in China.  What it did not disclose was that, under Ye's direction, MINISO would inexplicably use a multi-layered Caribbean offshore structure to do so, with it holding just 20% equity to his 80% equity and soon after paying him $108 million instead of deploying funds directly into a land purchase itself.  Despite a clear conflict of interest, MINISO omitted this scheme from the Registration Statement's listing of material related party transactions.  Indeed, it seems designed to evade Chinese law protections touted in the Registration Statement, which restricted MINISO's funding of subsidiaries only to loans or capital contributions, subject to government registration and approval.

MINISO has not ruled out Defendant Ye's wrongdoing in the scheme.  Its 9/27/2021 Form 6-K, filed during the Class Period, claimed that Ye's payout was approved by MINISO's Board, without confirming that he (as Chairman) recused himself, and said he would be paid the lower of his "actual investment," which it did not disclose, or some unstated "appraisal value" by an unnamed "third-party valuation firm."  See Exh. E.  When Blue Orca raised alarms, via an

---

[1]    Unless otherwise noted, as used herein, all "¶" references are to the SAC's paragraphs, all defined terms have the definitions assigned in the SAC, all emphasis is added, all citations omitted, "Memo" is the memorandum in support of the Motion, all numbered "Exhs." are Plaintiffs' exhibits, and all lettered "Exhs." are Defendants' exhibits. Plaintiffs respectfully request judicial notice of Exhibits 1-3, MINISO SEC filings, not for the truth of the matters asserted therein, but rather, to establish what statements they conveyed via their filing.

[2]    Defendants Ye, Zhang, and Li continue to dodge service and have not responded to the SAC.

investigation that Plaintiffs replicated, MINISO fared no better.  A subsequent "investigation" by MINISO's "independent directors" – into a transaction that they themselves had approved – yielded only mealy-mouthed, non-committal, post-Class-Period statements that Defendants now improperly cite.  Yet, instead of conclusively disproving Blue Orca's findings, the July 28, 2022 Form 6-K (Exh. G), said, "The Company believes that the [Blue Orca] Report's allegation that Chairman Ye siphoned off IPO proceeds by a series of real estate transactions is also without merit" based partly on his purported contribution to the JV of RMB 319.9 million in "load proceeds" from an undisclosed loan obtained through an unnamed company on undisclosed terms from an unidentified lender(s), representing 43% of what he purportedly "contributed" to secure an 80% equity stake.  It is unclear whether that loan was repaid, if so by whom, and if not, whether MINISO directly or indirectly assumed responsibility to repay it.  MINISO's September 15, 2022 Form 6-K (Exh. H), filed after this lawsuit began, declared the investigation "substantially complete," after unexplained "assistance" by unnamed "third-party professional advisors," but offered only the unexplained claim that the independent directors concluded that certain unidentified Blue Orca "key allegations" "were not substantiated."

MINISO's improper citation to its own post-Class Period filings likewise fails to explain away the steady Class Period misstatements by Ye and other Defendants that 99.7% of MINISO's 2,533 stores in China and 92.9% of its 1,689 stores elsewhere – 4,095 of 4,222 stores worldwide – were supposedly owned and operated by Retail Partners and distributors, leaving only 127 for MINISO or insiders.  The SAC's uncontested CW statements make clear that MINISO directly owned and operated 75-80 U.S. and Canadian stores alone.  The Blue Orca report, as corroborated by Plaintiffs' China-based investigation, revealed that in China, 620 stores were registered to MINISO's executives or Ye's close associates while 291 more were registered to one phone number used by Defendant Li and another executive to register stores.  MINISO points to its own July 28, 2022 Form 6-K (Exh. G), which concedes that a "group" of unidentified MINISO employees engaged in "unapproved practices" involving false store registrations that "became part of the registration records of a number of stores" in undisclosed market(s).  MINISO brushes off

2

these damning admissions and asks the Court to accept as true the rest of the filing, which states a lower number of affected stores – a dispute of fact wholly inappropriate for resolution now.

No one can attempt a forceful, full-throated defense of Defendant Ye's actions and statements more than Ye himself.  Yet, he, like Defendants Zhang and Li, continues to dodge service.  The avoidance is intentional – Ye and Zhang have signed multiple SEC filings disclosing the lawsuit, referencing it by name in a Form 20-F filed 10 months ago.  See Exhs. 1-3.  Plaintiffs urge the Court to deny them and the other Defendants dismissal and to sustain the SAC's claims.

## II.    THE SAC'S ALLEGATIONS

### A.    Securities Act Allegations (¶¶229-345)

The SAC pleads claims under Securities Act §§11 and 15 on behalf of a Securities Act Class encompassing all persons and entities that purchased or acquired MINISO's ADSs pursuant or traceable to its Registration Statement filed with the SEC on Form F-1 on September 23, 2020, in connection with MINISO's IPO (¶¶319, 325-345).

#### 1.    Certain Securities Act Defendants Seek Dismissal

Securities Act Defendants (¶¶237-247) MINISO, the Puglisi Defendants, and the Underwriter Defendants move to dismiss the Securities Act claims (see ECF 61, 64), while Ye, Zhang, and Li evade service in China, neither appearing nor responding to the SAC.

#### 2.    MINISO's Business And IPO

MINISO is a Chinese retailer with global operations including the U.S. and Canada.  ¶¶248-249, 253, 256, 274-281.  Defendant Ye and Yunyun Yang are its majority shareholders. ¶261.  Its stores are owned and operated in three models: (i) MINISO's direct ownership / operation; (ii) franchise-like Retail Partners; or (iii) distributors.  ¶256.  Retail Partners pay MINISO a fixed annual per-store license fee and part of sales proceeds, while shouldering store-opening capital expenditures and store-operating costs, in exchange for MINISO's brand name, operational guidance, and pre-sale inventory ownership.  Id.  Distributors take ownership of inventory faster with less MINISO involvement.  Id.  MINISO said both models reduce risk and permit rapid, asset-light growth.  ¶¶257, 263. MINISO's IPO sold ADSs representing four (Chinese) Class A ordinary

3

shares. ¶261. MINISO filed with the SEC: (a) a Registration Statement on Form F-1, with a Preliminary Prospectus, on September 23, 2020; (b) amendments via the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A; (c) a final 424B4 10/15/2020 Prospectus; and (d) a Form F-6 on October 6, 2020 and Form F-6/A on October 13, 2020. *Id.* Ye, Li, Zhang, and Puglisi signed these documents. *Id.* The IPO closed October 15, 2020, with MINISO issuing 30.4 million ADSs, plus a 4.56 million Underwriter over-allotment, raising $608 million. ¶262.

### 3. Securities Act Defendants' False Or Misleading Statements/Omissions

#### a. MINISO's IPO & Business Operations (¶¶264-268)

**Retail Partners & Distributors**. The Registration Statement said MINISO's "path to success" in China "depends on the effectiveness and scalability of our MINISO Retail Partner Model," which was "highly effective and scalable." ¶264(c). It declared, "As of June 30, 2020, apart from seven directly operated stores, substantially all of our other stores in China were operated under our innovative MINISO Retail Partner model," and said MINISO had 2,533 stores there as of June 30, 2020 – meaning Retail Partners purportedly owned and operated 99.7% of MINISO's Chinese stores. ¶264(a), (e). It said that outside China, MINISO had 1,689 stores as of June 30, 2020, with MINISO directly operating 120 versus "over 1,500 MINISO Retail Partner stores and stores under the distributor model" (92.9%). ¶264(g). It stated purported benefits of the Retail Partner and distributor models[3] and touted purported minimized costs and liabilities.[4]

---

[3]    It said Retail Partners, a/k/a "franchisee[s]," chosen for their "management ability and industry experience" and "financial strength and strong local ties," were substantial revenue streams, through product sales, a fixed license fee paid annually, management and consultation services fees, and sales-based royalties paid daily. ¶264(a), (f). It said MINISO's "store network expansion in China is primarily sustained by [its] continued success in enticing them to open more MINISO stores at optimal locations" and its "ability to expand [its] store network, especially in China, is a key driver of [its] revenue growth." ¶264(e). It said expansion elsewhere was largely via "distributors with abundant local resources and retail experiences" chosen for the same reasons as MINISO's Retail Partners. ¶264(g).

[4]    It described the Retail Partner model as "asset-light" and a "franchise-like store model with chain store characteristics, where the franchisee bears the store opening capital expenditure and store operating expenses to join our 'MINISO' branded retail store franchise." ¶264(a), (b). It said that "retail partners employ and manage their own staff to operate the stores and serve their customers…and bear the costs associated with the operation," are "responsible for the placement, physical custody and condition of the merchandise," and are liable for inventory losses over a pre-set rate. ¶264(b). It stated, "MINISO Retail Partners mobilize their resources to open and operate MINISO stores at optimal locations and shoulder the associated capital expenditure and operating expenses," "where[by] we achieve rapid store network expansion with consistent brand image and customer experience in an asset-light manner."

4

**IPO Proceeds**.  The Registration Statement said IPO funds had limited permissible uses. It said, "The primary purposes of this offering are to create a public market for our shares for the benefit of all shareholders, retain talented employees by providing them with equity incentives, and obtain additional capital."  ¶264(j).  It said MINISO would invest 30% of net IPO proceeds to expand its store network, 30% on warehouse and logistics network, 20% on technologies and information systems, and 20% (~$115 million) for "general corporate purposes," including "acquiring land to build an office building."  ¶¶264(j); 266(a)-(b).  It said Chinese laws and regulations restricted MINISO's funding of Chinese subsidiaries "only through loans or capital contributions" subject to government registration and approval.  *Id.*

**Self-Dealing**.  The Registration Statement said MINISO's Board owed fiduciary duties to MINISO to act in its best interests, to not profit based on their position, and to not "position" themselves where personal and company interests conflict.  ¶264(i).  It extensively detailed "Related Party Transactions" and "Material related party transactions," including several involving Defendant Ye, but omitted reference to a JV with him for a HQ land purchase.  ¶264(k).

### b.    Reported Results (¶¶269-274)

The Registration Statement and Prospectus reported full-year 2020 financial results: (i) total revenues ($1.2709 billion) and net loss ($36.825 million), (ii) China revenues ($855.487 million), (iii) revenues outside China ($415.406 million); (iv) license fees, sales-based royalties, management and consultation service fees ($83.176 million); (v) declining "cost of sales" (*i.e.*, cost of inventories) (6.2465 billion RMB); (vi) increasing gross profit ($386.76 million); and (vii) cash and cash equivalent holdings ($403.955 million).  ¶¶270(a), 271(a)-(b).[5]  In attributing these results, they said MINISO "primarily" derived revenues from product sales, including sales to Retail Partners and distributors, and said other sources "mainly" included "license fees from MINISO Retail Partners and distributors, and sales-based royalties and sales-based management

---

¶264(c).  It described the distributor model as even more protective, with no management or consultation services provided, less operational involvement, and ownership of inventory transferred upon delivery.  ¶264(h).

[5]      SAC ¶270(a) contains a couple of typographical errors – the figures should read $855.487 million or 6.0441 billion RMB of revenue and $403.955 million in cash / equivalents.

and consultation and service fees income from MINISO Retail Partners." *Id*. They repeated the purported store ownership levels of Retail Partners and distributors. ¶¶270(b)-(c), 271(a)-(b). They added that store expansion was "primarily sustained" by the Retail Partner model in China and distributor model in the "majority of the international markets." ¶¶270(c), 271(a)-(b). The SAC alleges violations of Regulation S-K, Item 105, 17 C.F.R. §229.105(a). ¶273.

### 4. Undisclosed Negative Facts And Red Flags (¶¶274-289)

The SAC pleads that negative information concealed from IPO investors was later revealed by: (i) eight former MINISO employee CWs (¶¶274-281);[6] (ii) the Blue Orca Report issued on July 26, 2022 (¶¶282-285; 310-314); and (iii) Plaintiffs' China-based investigation (¶¶286-289).

**CWs**. CW1, CW2, CW4, CW5, CW6, and CW8 said that of 32-38 U.S. stores, just 4-5 were franchises (one closed); CW1 said MINISO owned most of the 45-50 Canadian stores, with few franchises. ¶¶274-275, 277-279, 281. CW3 disagreed with MINISO's pre-IPO statement that 97% of its stores were franchise-owned. ¶276. MINISO opened seven franchises, owners were "miserable" and wanted to sell out, and two closed. *Id*. MINISO USA struggled to attract franchisees to open stores even after lowering franchise fees and sales royalties and completing store opening franchisee tasks. ¶¶274, 278. Per CW 3 and CW 5, neither a new North American General Manager to transition company-owned stores into franchises nor a secretive MINISO USA Franchise Department (a/k/a "business development" office) yielded results, and per CW 4 no new U.S. franchises opened. ¶¶276-278. CW3 said internal reports by MINISO's Chinese consultants compared results across countries for corporate stores, did not reflect any franchises and showed stores were all losing money, so MINISO focused on improving profitability. *Id*.

**Blue Orca Report**. The Blue Orca Report exposed facts and risks about MINISO that "undermine" its financials and "share price." ¶¶282, 311.

First, it debunked the "asset-light, high-margin independent franchise model" supposedly in 99% of China stores. ¶¶283, 311-312. It cross-checked stores against a Chinese corporate

---

[6]    The SAC describes the CWs' titles, tenures, and duties. ¶¶248-255.

6

registry, online map, and consumer data to show that 620 purportedly independent franchises were registered to MINISO executives or Ye's close associates plus 291 more were registered to one phone number that Defendant Li and MINISO's VP / Overseas COO used to register 19 stores. ¶¶283(a), 311, 312(a)-(e). It concluded that the stores were "secretly" owned and operated by MINISO, executives, or insiders, which concealed from investors higher store costs and lower profit margins. ¶¶283(a), 311. Blue Orca corroborated with a MINISO brand director's 2017 statement that it owned and operated most "tier one" stores; a November 2019 article by Chinese state-owned Shanghai Media Group stating that MINISO owned and operated 40% of its stores; and a franchisee's statement that it owned 1,000+ stores in 2019. ¶283(b), 311, 312(f).

Second, Blue Orca explained how MINISO's IPO funds were misused in a "naked transfer of shareholder money" to Defendant Ye. ¶¶284, 311, 313. It called MINISO's creation of a British Virgin Islands (BVI) joint venture (JV), shortly post-IPO, purportedly to purchase land in China, "highly unusual" with the "principal advantage" of "facilitate[ing] opaque offshore transfer of cash to insiders." *Id.*; *see also* ¶258. It criticized Ye's 80% stake in the JV, despite contributing no funds, versus MINISO's 20% stake after contributing 100% of its RMB 346 million land purchase deposit. *Id.* Blue Orca reported that Ye's stake was bought out for RMB 695 million ten months later, when Chinese government records showed the JV's paid-in capital still at RMB 346 million. *Id.* After Ye's payoff, the JV's paid-in capital rose to RMB 1.8 billion when MINISO was its sole owner. *Id.* Blue Orca said the buyout violated the land purchase agreement, posted by the Chinese government, which barred any change of ownership in the JV for 10 years. *Id.*; *see also* ¶259. It expressed concern that MINISO had four other Chinese property developments valued at RMB 23 billion, held under layered BVI offshore structures owned by Ye. ¶284.

Third, Blue Orca revealed strains on MINISO's China operations. ¶¶285, 311, 314. A deleted MINISO webpage said revenues fell 40% since 2018 despite 50% more stores and that it lowered franchising fees by 63% over two years trying to attract franchisees. *Id.* A former MINISO China Regional Manager said profitability peaked in early 2019, followed by 75%-80% drops in monthly revenue since. ¶¶285, 311, 314(a)-(b). A former MINISO China Manager said

most franchisees could not profit due to market saturation, competition, and high rent, and only 30% - 40% of new Chinese stores were barely profitable. ¶285. Blue Orca examined 620 Chinese stores from November 2021 and found 120 closed by July 2022. ¶¶285, 314. It confirmed a Chinese media report that 850 Chinese stores (1/3 of the total) closed pre-COVID. ¶¶285, 311.

**Plaintiffs' China Investigation**. Plaintiffs investigated MINISO's China operations and confirmed Blue Orca's findings. ¶¶286-289. The investigation accessed Chinese corporate registry data and confirmed extensive insider store ownership. ¶287(a). It uncovered suspicious post-Blue Orca activity listing changes and deregistrations, with 80+ stores closed. ¶¶287(a), 289. It confirmed registry data listing 630 stores (420 closed) with the same phone number Defendant Li used to register stores. *Id.* It confirmed that: (i) Chinese state-owned Shanghai Media Group, published a November 3, 2019 article stating that 40% of MINISO's China stores were directly owned and only 60% were franchises (¶287(b)); (ii) Ye, via an entity he controlled called YGF MC Limited ("YGF MC"), owned 80% of the BVI JV formed post-IPO, his stake was bought out ten months later, and the JV's paid in capital remained ~RMB 346 million contributed by MINISO until after his payoff (¶288); (iii) the Chinese government land contract barred ownership changes for 10 years (*id.*); (iv) Blue Orca's citation to a Chinese report that MINISO closed 850 stores by March 2019 and lowered franchise fees 63% over two years (¶289).

### 5.    The SAC Need Not Plead Loss Causation

The SAC need not plead loss causation, which is not an element of its Securities Act claims; absence of loss causation and/or price impact is an affirmative defense, is Defendants' burden to prove, and is not appropriately challenged at this appropriate stage. ¶290. Nonetheless, the SAC pleads that Securities Act damages are evidenced by, but not limited to, market reactions to certain revelations as seen in MINISO's correlating stock price drops. ¶¶291-318.[7]

### B.    Exchange Act Allegations (¶¶2-228)

The SAC pleads claims under Exchange Act §§10(b) and 20 and SEC Rule 10b-5, on behalf

---

[7]    They include the revelations and correlating stock declines as discussed in §II.B.6., *infra*. *See* ¶¶290-318.

of an Exchange Act Class consisting of all persons and entities who purchased or acquired MINISO's ADSs during the Exchange Act Class Period extending from October 15, 2020 through July 26, 2022, both dates inclusive (¶¶7, 204, 212-228).

### 1.    Certain Exchange Act Defendants Seek Dismissal

The "Exchange Act Defendants" are MINISO, Ye, Zhang, Li and MINISO's U.S. representatives, Puglisi and P&A.  ¶¶12-17.  MINISO, Puglisi, and P&A have moved to dismiss. Plaintiffs have tried to serve Ye, Zhang, and Li under the Hague Convention for eight months and counting.  They have failed to appear, despite MINISO's being represented by U.S. counsel in this lawsuit and Ye's prior travels to the U.S. as MINISO's CEO / Chairman.  ¶¶41, 46.

### 2.    MINISO's Business And Operations

The SAC's Exchange Act allegations separately plead the particulars of MINISO's business, including Defendant Ye's control and its three operating models.  ¶¶7, 32-34, 36, 39. It also pleads the facts and circumstances concerning MINISO's U.S. $608 million IPO in October 2020 and the use of proceeds therefrom, including just 20% allocated for "general corporate purposes" like a headquarters land purchase.  ¶¶29, 35, 57(k), 59(a).[8]  Shortly after the IPO, in December 2020, two entities controlled by Defendant Ye, MINISO and YGF MC, announced formation of YGF Investment V Limited, the BVI JV, purportedly to acquire land in China for the headquarters. ¶36. YGF MC had an 80% stake versus MINISO's 20%. *Id.*  Through a subsidiary, the JV entered into a land contract with the Chinese government barring ownership changes for 10 years. ¶37.  Yet, in September 2021, MINISO acquired YGF MC's 80% stake for about RMB 700 million (roughly $108.3 million).  ¶38.  That transaction effectively transferred to Defendant Ye substantially all of the 20% of IPO proceeds eligible for "general corporate purposes."

---

[8]    As part of the IPO, MINISO filed with the SEC, *inter alia*: (a) a Registration Statement on Form F-1, with a Preliminary Prospectus, on September 23, 2020; (b) amendments thereto via the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A, each with a Preliminary Prospectus; and (c) a final 424B4 10/15/2020 Prospectus.  ¶¶57, 59(a)-(b), 110(a)-(b).  Defendants Ye, Li, Zhang, and Puglisi signed these documents. *Id.*

9

### 3.    Exchange Act Defendants' False Or Misleading Statements/Omissions

### a.    Business Operations Fraud (¶¶57-107)

**IPO Proceeds.**  The SAC pleads Exchange Act violations arising from statements and omissions concerning use of MINISO's IPO proceeds.  ¶¶57(k), 59, 60.  The Registration Statement said the IPO's primary purposes were to create a public market "for the benefit of all shareholders," to retain talented employees, and obtain capital.  ¶57(k).  It detailed use of proceeds, in specific percentages, including just 20% (roughly $115 million) for "general corporate purposes" that included land acquisition for an office building.  ¶¶57(k), 59(a)-(b).  It said Chinese laws restricted MINISO from giving funds to subsidiaries "only through loans or capital contributions," subject to government registration and approval.  *Id.*

**Self-Dealing**.  The SAC pleads Exchange Act violations for misrepresentations and omissions regarding self-dealing.  ¶¶57(j), (l).  The Registration Statement said MINISO's Board owed fiduciary duties to MINISO to act in its best interests, to not profit based on their position without company permission, to not "position" themselves where personal and company interests conflict, and to exercise Board powers for intended purposes.  ¶57(j).  Its list of "Related Party Transactions" and "Material related party transactions," including those involving Defendant Ye, omitted any reference to a joint venture with him related to a headquarters land purchase.  ¶57(l).

When the 12/11/2020 Form 6-K announced creation of the BVI JV just two months post-IPO, it said: (i) YGF MC was jointly controlled by MINISO's controlling shareholders, Defendant Ye and Yunyun Yang; (ii) MINISO "invested RMB 356 million" in the JV and holds 20% of its shares; and (iii) YGF MC "holds the remaining 80% of the shares" but "after the formation of the joint venture company,…YGF MC will invest RMB 1,424 million."  ¶68.  The 12/18/2020 Earnings Release and 12/18/2020 Form 6-K repeated that YGF MC "will also invest RMB 1,424 million in the joint venture company" after its formation.  ¶70.

MINISO's 9/27/2021 Form 6-K announced that the JV's subsidiary acquired land use on a parcel in January 2021 for RMB 1,780; MINISO was acquiring YGF MC's 80% JV stake for RMB 700.4 million (~$108 million); it would consolidate the JV into its financials; and it would fund

10

the rest of the RMB 2,885 million in costs. ¶83. MINISO's 2nd 2021 20-F Supplement confirmed that it acquired the 80% JV interest in October 2021 "for the purpose of obtaining full ownership of the parcel of land for establishing our Company's new headquarters building." ¶102(d).

**Retail Partners & Distributors**. The SAC pleads Exchange Act violations arising from the Registration Statement and Prospectus (¶¶57-60), for statements regarding, *inter alia*: (i) the effectiveness and scalability of the Retail Partner model (¶57(d)-(e)); (ii) MINISO directly operating just 7 out of 2,533 Chinese stores as of June 30, 2020 (¶57(a), (g)); it directly operating 120 out of 1,689 stores outside of China as of then (¶57(i)); revenue streams from Retail Partners and distributors, (¶57(b), (c), (f), (i)) and the expenses and liabilities they take on (¶57(a), (d), (h)); the attributes of Retail Partners (a/k/a "franchisee[s]") and distributors, including financial strength and ability to open new stores (¶57(b), (h)); and rapid, "asset-light" store network expansion driven by Retail Partners being key to MINISO's revenue growth (¶57(d), (e), (g)).[9]

The Exchange Act Defendants' misstatements and omissions regarding the purported importance of Retail Partners and distributors to MINISO's asset-light expansion continued throughout the Class Period, and often involved express quantification of the numbers and percentages of stores that MINISO directly operated versus those operated by Retail Partners and distributors in China, in other markets, and across MINISO's global operations. ¶¶61-64, 66-75, 77-82, 85-86, 88-89, 91-92, 94-105, 107.[10] The SAC pleads impacts on analysts of these

---

[9]    The Retail Partner model and distributor model were also described in a comparable level of detail in the 2021 20-F (¶81(a)), the 2021 20-F Supplement (¶94(a)), and the 2nd 2021 20-F Supplement (¶102(a)-(b), (e)).

[10]    For instance, *inter alia*, statements that MINISO: (i) directly operates only 3% of stores (10/15/2020 Bloomberg Article; ¶¶61-62); (ii) "remain[s] confident in…[its] retail partner model," was "prudently expanding" its "domestic store network across higher- and lower-tier city markets," and directly operates only 120 out of 4,330 global stores (2,633 in China) (12/18/2020 6-K; ¶¶70-71); (iii) is "highly confident" in business model strength and directly operates 110 of 4,514 stores (2/25/2021 Form 6-K; ¶¶72-73); (iv) directly operates 112 of 4,587 total stores (5/20/2021 Form 6-K; ¶¶74(a), 75); (v) directly operates 112 of 4,749 stores, with growth in Chinese operations driving year-over-year revenues increase (8/19/2021 Form 6-K; ¶¶79(a), 80); (vi) gives "credit" to its 820 retail partners for store growth (8/19/2021 Earnings Call; ¶¶79(b), 80); (vii) attributes growth to the "highly effective and scalable MINISO retail partner model," which covered "substantially all" 2,939 Chinese stores, and directly operated 110 (five in China) of 4,700 total stores (2021 20-F; ¶¶81(a)-(c), 82); (viii) directly operated 118 of 4,943 total stores (11/19/2021 Form 6-K; ¶¶85(a), 86); (ix) has "confidence" in the business model as 161 stores added globally (11/18/2021 Earnings Call; ¶¶85(b), 86); (x) directly operates 127 of 5,134 total stores and attributes year-over-year increase in revenues primarily to growth in China, and (3/4/2022 Form 6-K; ¶¶91(a), 92); (xi) says store expansion demonstrates "retail

misstatements and omissions.  *See* ¶¶65, 76, 87, 90, 93, 106.

### b.    Reported Results Fraud (¶¶108-122)

The SAC pleads that the Exchange Act Defendants reported MINISO's financial metrics like revenues, profit, net loss, cost of sales, gross profit, available cash, and the amount and uses of offering proceeds, and operational metrics like the number of stores in China versus abroad and directly-owned versus Retail Partners and distributors, without disclosing they were generated through, artificially inflated by, and subject to undisclosed risks, setbacks, improprieties, and negative trends.  ¶¶108-120.[11]  The SAC alleges that these misstatements, as well as their accompanying discussions and attributions in MINISO's SEC filings, violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §§229.303(a)(3)(i)-(ii) and (b)(2) and Regulation S-K, Item 105, 17 C.F.R. §§229.105(a).  ¶¶108, 121-122.

### c.    Internal Controls Fraud (¶¶123-127)

The SAC alleges that Defendants Ye and Zhang made materially false and misleading statements in SOX certifications of MINISO's 2021 20-F, filed September 17, 2021.  ¶¶123-124, 127.  Specifically, they certified, *inter alia*, that the 2021 20-F did not contain any untrue statement of a material fact or omit any necessary material facts, that it fairly presented MINISO's financial information, and that Ye and Zhang had disclosed to MINISO's auditors and audit committee all

---

partners' strong confidence in our business" (3/3/2022 Earnings Call; ¶¶91(b), 92); (xii) directly operates 146 (10 in China) of 5,134 stores, as the Retail Partner model allows it to "quickly and effectively expand our store network in an asset-light manner" (2021 20-F Supplement; ¶¶94(a)-(c), 95); (xiii) directly operates 151 of 5,205 stores (5/26/2022 Form 6-K; ¶¶96(a), 97); (xiv) charges cost inflation to "corresponding retail partners, [and] distributors" and "the fundamentals of our business remain unchanged" (5/26/2022 Earnings Call; ¶¶96(b), 97); (xv) directly operates 151 stores, including a "small number" in China, out of 5,205 stores, as the "Retail Partner model has been and will continue to be our first choice when opening new stores" (2nd 2021 20-F Supplement; ¶¶102(b)-(c), 103).

[11]    These misstatements and omissions were made in MINISO's: (i) Registration Statement filed September 23, 2020 (¶109); (ii) amendments thereto in its 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and its 10/14/2020 Form F-1/A (¶110(a), (c)); (iii) Prospectus filed October 15, 2020 (¶110(b)-(c)); (iv) 12/18/2020 Form 6-K and 12/18/2020 Earnings Release (¶111); (v) 2/25/2021 Form 6-K and 2/25/2021 Earnings Release (¶112); (vi) 5/20/2021 Form 6-K and 5/19/2021 Earnings Release (¶113); (vii) 8/19/2021 Form 6-K and 8/19/2021 Earnings Release (¶114); (ix) 2021 20-F filed September 17, 2021 (¶115); (x) 11/19/2021 Form 6-K and 11/18/2021 Earnings Release (¶116); (xi) 3/4/2022 Form 6-K and 3/3/2022 Earnings Release (¶117); (xii) 2021 20-F Supplement filed March 31, 2022 (¶118); (xiv) 5/26/2022 Form 6-K and 5/26/2022 Earnings Release (¶119); and (xv) 2nd 2021 20-F Supplement filed June 27, 2022 (¶120).  These paragraphs have a few typos; the corrected figures are:  $885.487 million and RMB 6.0441 billion in revenue and $403.955 million in cash/equivalents (¶109(a)); 7.291 billion RMB in China revenue and 6.641 billion RMB in 2021 Cost of Sales (¶115(a)); and $168.508 million Sales to offline distributors (¶120(b)).

12

significant deficiencies and material weaknesses in its internal control over financial reporting and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." ¶124.

The SAC pleads that MINISO's 3/31/2022 Form 6-K admitted it is a "controlled company" under NYSE rules, and that MINISO's audit committee charter complies with SEC and NYSE rules. ¶125. MINISO's 2nd 2021 20-F Supplement and its PHIP related to its Hong Kong exchange listing, filed June 27, 2022, falsely and misleadingly described purported protections to resolve actual or potential conflicts of interest between MINISO and Defendant Ye, including, *inter alia*, that MINISO's controlling shareholders would provide all information necessary for independent non-executive directors to review potential conflicts of interest, those directors would provide impartial advice to protect the interest of minority shareholders, and "our Company will disclose decisions on matters reviewed by the independent non-executive Directors either in its annual reports or by way of announcements." ¶¶126, 127.

### 4. Undisclosed Negative Facts And Red Flags (¶¶41-55)

**CWs**. The SAC separately pleads the CW statements in the context of its Exchange Act allegations. *See* ¶¶8, 21-28, 41-48, 158. CW1, CW2, CW3 CW4, CW5, CW6, and CW8 said there were four to five U.S. franchises out of 32-38 stores, with none opening for years and "miserable" franchisees wanting to sell out, and CW1 confirmed there were few franchises among 45-50 Canadian stores. ¶¶41-46, 48. CW3 said MINISO focused on increasing profitability of company-owned stores, which CW5 said were all losing money. ¶¶43, 45. CW3 described internal spreadsheets and reports comparing results across countries and stores, with all metrics derived from corporate stores and no separate revenue stream or data for franchisee stores, and CW3 disagreed with MINISO's pre-IPO statements that 97% of stores were franchises. ¶43.

CW1, CW4, and CW5 recounted MINISO USA's struggle to attract franchisees to open stores, despite reduced franchise fees and sales royalties and MINISO's taking on franchisee store-opening tasks. ¶¶41, 44, 45. CW3 and CW5 said MINISO continued to open only company-owned and -operated stores, despite forming a Franchise Department (a/k/a "business

13

development" office) and Chinese headquarters bringing in a new North American General Manager focused on transitioning company-owned stores into franchises.  ¶¶43, 45.

As discussed in §II.B.5 *infra*, the CWs also established MINISO China's tight control over its U.S. operations, including site visits by Defendant Ye and Chinese personnel.

**Blue Orca Report**.  The SAC pleads the Blue Orca Report in its Exchange Act allegations. ¶¶9, 49-52, 147-151, 159.  First, Blue Orca debunked MINISO's claims that 99% of its China stores were franchises, exposing that true store costs were higher and profit margins lower, by using Chinese corporate registry, online map, and consumer data to show that MINISO executives or Defendant Ye's close associates registered 620 stores, while 291 more were registered to the same phone number used by Defendant Li and MINISO's VP / Overseas COO to register 19 stores. ¶50(a), 52, 148, 149(a)-(e), 151(c), 159(a), 159(c).  It cited a MINISO brand director's 2017 statement that MINISO owned and operated most stores in "tier one" Chinese cities; a November 2019 article by Chinese state media stating that MINISO owned and operated 40% of stores; and a franchisee's statement confirming MINISO owned 1,000+ stores in 2019.  ¶50(b), 148, 159(a).

Second, Blue Orca explained how, under the guise of a Chinese headquarters project, Defendant Ye siphoned IPO funds via a BVI JV shortly after the IPO, giving himself an 80% stake despite contributing no funds, leaving MINISO a 20% stake despite its contributing all the JV's RMB 346 million land purchase deposit.  ¶¶36-37, 51, 148, 150, 159(b).  Ten months later, his stake was bought out for roughly RMB 700 million ($108 million), when Chinese government records showed the JV's paid-in capital still at RMB 346 million.  *Id.*  After his payoff, MINISO increased the JV's paid-in capital to RMB $1.8 billion.  *Id.*  The buyout appeared to violate the Chinese government land agreement's ban on any ownership changes for 10 years and to be a template for future self-dealing via MINISO's four other property developments, valued at RMB 23 billion, that used BVI structures owned by Defendant Ye.  *Id.*

Third, Blue Orca revealed strains on MINISO China operations, *e.g.*: (i) MINISO's deleted website statements that revenues fell 40% since 2018 despite a 50% store count increase and that it lowered fees by 63% over two years trying to attract franchisees; (ii) statements by MINISO

14

China Managers that profitability peaked in early 2019, high-performing stores thereafter had 75%-80% drops in monthly revenue, only 30% - 40% of new Chinese stores were barely profitable, and most franchisees could not profit due to market saturation, competition, and high rent; (iii) a Chinese media report that 850 stores closed pre-COVID; and (iv) 120 stores out of a 620 store sample closed from November 2021 to July 2022.  ¶¶52, 148, 151, 159(c).

**Plaintiffs' China Investigation**.  The SAC also pleads how Plaintiffs' China investigation confirmed Blue Orca's findings.  ¶¶53-55, 159.  It confirmed widespread company and insider store ownership through Chinese corporate registry data, *e.g.*, 630 stores (210 still open) listed to the phone number Defendant Li used to register stores.  ¶¶53(a), 159(a).  It confirmed state-owned Yicai Media's November 3, 2019 report that only 60% of MINISO's China stores were franchises.  ¶¶53(b), 159(a).  It confirmed the Chinese report that MINISO closed 850 stores by March 2019, retraced Chinese corporate registry data that 420 of 630 stores registered under a shared phone number had closed, found 80+ more stores had closed since the Blue Orca Report, and confirmed that these events occurred despite MINISO lowering franchise fees by 63% over two years.  ¶¶55, 159(c).  It observed suspicious post- Blue Orca actions, like changes in listed ownership and store deregistration.  ¶53(a).  It confirmed Blue Orca's findings on Defendant Ye's JV ownership stake and buyout, including the levels and timing of the JV's paid in capital vis-à-vis his payoff, and that the Chinese contract barred land purchase ownership changes for 10 years.  ¶¶54, 159(b).

### 5.    Exchange Act Defendants' Scienter (¶¶156-185)

The SAC's Exchange Act allegations include an extensive §II.E.5. pleading the Exchange Act Defendants' scienter based on motive and opportunity, actual knowledge, recklessness, and other circumstantial evidence that must be viewed holistically.  ¶¶156-185.  Specifically:

**Knowledge or reckless disregard of red flags** (¶¶157-159):  The CWs established that MINISO owned, operated, funded, and tightly controlled nearly all 80+ North American stores.  ¶¶41-48, 158(a)-(b).  CW1 and CW6 said Defendant Ye visited MINISO USA and dined with its leadership and its Store Managers.  ¶¶41, 46, 158(a).  CW1 said Chinese headquarters approved U.S. store construction expenditures, contractor agreements, personnel / payroll decisions, hirings

and firings, and 80% of store inventory. ¶¶41, 158(a). CW3 said Chinese headquarters sent consultants to meet with U.S. management and address store performance, and they prepared spreadsheets and reports showing country-specific and store-specific data – all for corporate-owned stores with no data for any franchises. ¶¶43, 158(a). CW4 said MINISO corporate leadership was Chinese, communicated in Mandarin, hired Chinese nationals in the U.S. Accounting Department, paid U.S. employee wages and salaries, and tracked U.S. store payrolls in monthly Excels of Chinese written data. ¶¶44, 158(a). CW5 reported U.S. labor data, employee hours / overtime, and sales figures to a MINISO China operations manager. ¶45. CW3 and CW6 said MINISO's leadership and Franchise Department were secretive, and its Chinese consultants only let U.S. employees see – not download or print – documents. ¶¶43, 46, 158(a). CW7 said Chinese headquarters sent executives in February / March 2022, who were still there in October 2022, to manage costs. ¶¶47, 158(a). In this context, CW1, CW2, CW3, CW4, CW5, CW6, CW7, and CW8 all described MINISO as having few franchises in North America and serious difficulties expanding, even after lowering fees and sales payment amounts and taking on franchisee store-opening tasks, efforts that CW1, CW3, CW4, and CW5 said failed. ¶¶41-46, 48, 158(b).

The Blue Orca Report and Plaintiffs' China-based investigation support a strong scienter inference. ¶¶49-55, 159(a)-(c). Both found that Chinese corporate registry data revealed that 620+ purported independent franchises in China were company- or insider-owned and that Chinese state-owned media stated in 2019 that MINISO owned and operated 40% of stores. ¶¶50(a)-(b), 52, 53(a)-(b), 159(a). Blue Orca secured statements by MINISO employees and franchisees indicating that MINISO owned 1,000 stores in 2019, including most stores in "tier one" Chinese cities. *Id.* Blue Orca and Plaintiffs retrieved: (i) deleted MINISO corporate webpages showing that its revenues peaked in 2018 and declined 40% thereafter despite a 50% store count increase and a 63% decrease in franchise fees over two years, (ii) a 2019 report by China's largest Internet company that MINISO closed 850 stores by March 2019, and (iii) Chinese corporate registry data showing 420 of 630 stores registered under a single phone number had closed. ¶¶52, 55, 159(c). MINISO managers told Blue Orca that its profitability peaked by early 2019 and fell 75%-80%

16

thereafter and that only 30%-40% of new Chinese stores are profitable.  ¶¶52, 159(c).  Plaintiffs found that 80+ stores closed after the Blue Orca Report.  ¶55.  Both Blue Orca and Plaintiffs confirmed via the Chinese National Enterprise Credit Information Publicity System that the BVI JV's paid-in capital stayed at RMB 346 million until after Defendant Ye was bought out in violation of the government contract, at which point it rose to RMB 1.8 billion.  ¶¶51, 54, 159(b).

**Motive & opportunity** (¶¶160-171):  Despite less-stringent reporting standards that applied given MINISO's status as a foreign issuer filing Form F-1 (¶160), the SAC pleads motive and opportunity scienter for Defendants Ye, Zhang, Li, and MINISO.  ¶¶161-171.

It methodically describes the complex web of entities Defendant Ye used to hold MINISO shares (¶161), traces the changes in their holdings (¶¶162-163), and concludes that he sold 5.645 million MINISO shares during just one year of the Class Period extending from December 31, 2020 to December 31, 2021, when its securities prices were allegedly artificially inflated by the alleged multi-prong fraud (¶164).  It explains that these sales compare suspiciously in timing and amount against Defendant Ye's pre-Class Period actions when he sold no shares.  *Id.*

MINISO also had to disclose some executive compensation data when it sought to trade on the Hong Kong exchange.  ¶168.  The data shows that Defendants Ye, Zhang, and Li were paid more than MINISO's other Board members and received sizable, suspicious increases in their salaries, bonuses, and total compensation from 2021 to 2022, particularly Defendant Zhang's enormous $2.47 million equity-settled, share-based payment in 2021.  *Id.*

The SAC also details Defendant Ye's self-dealing enrichment via the BVI JV transaction, drawing from the Blue Orca Report and Plaintiffs' investigation.  ¶¶51, 54, 148, 150, 165-167. The JV was omitted from the Registration Statement's list of related party transactions.  ¶57(l). Yet, just after the IPO closed, the JV was formed, with Defendant Ye holding 80% equity (through YGF MC Limited) versus MINISO's 20% equity after contributing all the JV's RMB 346 million in capital.  ¶¶51, 54, 148, 150, 165.  Ye was paid RMB 695 million (roughly $108 million) just ten months later.  ¶¶54, 150, 165.  The SAC pleads how the transaction was unusual in process, timing, and amount.  ¶¶51, 54, 148, 150, 166.  It pleads that the transaction siphoned IPO funds to Ye

17

(¶¶51, 54, 148, 150, 167) and appeared to be a template for future siphoning.  ¶¶51, 150.

The SAC also supports MINISO's corporate scienter through allegations that it raised funds through suspicious offerings, including both the IPO on October 15, 2020 that raised over $600 million and MINISO's offering of 41.1 million shares on the Hong Kong exchange, which it announced on March 31, 2022, priced on July 6, 2022, and closed on July 13, 2022, raising roughly $72 million less than two weeks before the Blue Orca Report was published.  ¶¶169-171.

**Additional allegations** (¶¶172-185):  The SAC pleads implication of the core operations doctrine for Ye, Zhang, and Li, given how integral the Retail Partner and distributor models are to MINISO's global business and growth.  ¶¶172-173.  It alleges that Ye, Zhang, Li, and Puglisi violated duties to speak truthfully and to familiarize themselves with the subject matter of statements they signed, were quoted in, or orally made.  ¶174.  It pleads that Ye and Zhang violated duties to inquire, investigate, familiarize, and reassure themselves as to the subject matter of their SOX certifications of MINISO's SEC filings.  ¶175.  It pleads that MINISO's Code of Conduct applied to Ye, Zhang, Li, and Puglisi and was filed, pursuant to SOX §406(c), as an attachment to the Registration Statement and was published on MINISO's website.[12]  ¶¶176-177, 185.

### 6.    Partial Corrective Disclosures & Events Revealed The Fraud

The SAC pleads that MINISO's ADS price was affected by the alleged fraud (¶¶128-129, 131, 133, 135, 137, 139, 146), until incrementally revealed by a series of partial corrective disclosures and ADS price drops (¶9): (i) a December 28, 2020 Bloomberg article discussing a Chinese state media report that called for increased government oversight of a key MINISO product category given its dangers, which caused a 17.43% ADS price drop (¶¶130, 132); (ii) MINISO's 11/29/2021 Form 6-K and 11/18/2021 Earnings Release disclosing falling gross margin, cash and equivalents, and rising selling, distribution, and administrative costs, which

---

[12]    The Code of Conduct required disclosure of accurate and complete information (¶178); required "full, fair, accurate, timely, and understandable" financial disclosures (¶179); required accurate, reliable company records (¶180); barred any action to "coerce, manipulate, mislead or fraudulently influence" MINISO's auditors (¶181); required employees to report any violations of the Code or laws (¶182); required them to comply with the law (¶183); and imposed disciplinary measures for violations (¶184).

18

caused an 11.17% drop (¶¶134, 136); (iii) a November 25, 2021 analyst report advising sale of MINISO securities after noting its tight post-IPO stock price adjustment and elevated comparative valuation, which caused a 5.8% drop (¶¶137-138); (iv) a February 14, 2022 analyst report lowering projections given concerns about MINISO's "bumpy recovery in China and overseas stores near term" and its "higher investments in branding in the coming 12 months," which caused a 3.1% drop (¶¶140-141); (v) March 4, 2022 analyst reports noting MINISO's falling Chinese single-store revenues and income, slowing store expansion, and "downside risks" to its ADS price target including "failure to maintain good relationship with major distributors and retail partners," which caused a 7.6% drop (¶¶142-143); (vi) a March 9, 2022 analyst ratings cut on MINISO's ADSs, which caused a 4.2% drop (¶¶144-145); (vii) the July 26, 2022 Blue Orca Report, which caused a 14.98% drop (¶¶147-152); and (viii) MINISO's 7/27/2022 Press Release and 7/27/2022 Form 6-K disclosing the Blue Orca Report and announcing an investigation, which caused a 7.67% drop (¶¶153-154). These disclosures and drops inflicted huge losses on investors. ¶¶9, 155, 195-200.

## III.    ARGUMENT

### A.    Legal Standards Applicable To Fed. R. Civ. P. 12(b)(6) Motions

A Rule 12(b)(6) motion "challenges only the 'legal feasibility' of a complaint," and "the test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure'" under Fed. R. Civ. P. 56 after discovery. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016). The court's "task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'" *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). It must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff" and should dismiss only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).

"Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials," normally only the complaint, documents its appends or incorporates

by reference, or appropriate judicial notice materials. *Goel*, 820 F.3d at 559. Documents are not "integral" to a complaint and cannot be considered at the Rule 12(b)(6) stage, even when "mention[ed]" or providing "limited quotations." *Id.* Otherwise, "relying on materials outside the pleadings in deciding defendants' motions to dismiss" are grounds for reversal. *Id.* at 560.[13] Thus, the Court should reject Defendants' impermissible attempts to use MINISO's self-serving post-Class-Period public statements to retroactively achieve exoneration-by-hindsight.

## B.    The SAC Is Not "Puzzle Pled"

Defendants' "puzzle pleading" argument (Memo at 9 n.4; Joinder at 3-6) lacks merit.[14] "Puzzle pleadings are those that include lengthy block quotes followed by *pro forma* statements that the quotes are false" or refer to 'Defendants' generally instead of specifying their personal involvement. *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2022 WL 912965, *5 (S.D.N.Y. Mar. 29, 2022) (Ramos, J.). By contrast, the SAC organizes misstatements into five categories (three in the Exchange Act section, two in the Securities Act section),[15] and within each, identifies all alleged misstatements by dates, speaker(s), type (*e.g.*, SEC filing, interview, etc.), and specific challenged language that is set apart in bolded, italicized font from any surrounding, block-quoted, contextual text.[16] For efficiency, the SAC uses central paragraph(s), located at the start and/or end of each

---

[13]    Here, *e.g.*, Defendants use judicial notice (Memo at 5 n.2) to proffer an article (Exh. K) not cited in the SAC. *NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*, 2022 WL 900604, *7 n.7 (E.D.N.Y. Mar. 28, 2022) (reliance on articles to support a finding misplaced at motion to dismiss stage). They also proffer three earnings call transcripts (Exhs. O, Q, and Z) that appear to differ from the versions cited in the SAC; any such deviations, at this stage, should be resolved in Plaintiffs' favor. *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, *5 (E.D.N.Y. Mar. 31, 2007) (declining to take judicial notice of document where facts surrounding it were disputed, noting "such documents are best left for consideration at later stages of the proceedings where their accuracy can be established").

[14]    This "puzzle pleading" argument was presented in pre-motion letter briefing. *See* ECF 50 at 1-2. At the pre-motion hearing on March 24, 2023, the parties argued whether a second amendment before Rule 12(b)(6) briefing would be permitted. Defendants failed to press the argument then, and the Court did not instruct Plaintiffs to restructure their pleadings or otherwise advise of any related concerns when it granted leave to file the SAC.

[15]    *See* SAC Exchange Act §§II.E.4.a. (Business Operations Fraud), II.E.4.b. (Reported Results Fraud), and II.E.4.c. (Internal Controls Fraud); SAC Securities Act §§III.D.3.a. (IPO & Business Operations Misstatements And Omissions) and III.D.3.b. (Reported Results Misstatements And Omissions).

[16]    *See* SAC Exchange Act §II.E.4.a. ¶¶57, 59, 61, 63, 66, 68, 70, 72, 74, 77, 79, 81, 83, 85, 88, 91, 94, 96, 98, 100. 102, 104; §II.E.4.b. ¶¶109-120; and §II.E.4.c. ¶¶123-126. *See also* SAC Securities Act §III.D.3.a. ¶¶264, 266; §III.D.3.b. ¶¶270-271.

20

category,[17] to explain concisely the reasons why that category's misstatements were false or misleading in light of underlying cross-cited facts and legal authority.[18]  It thus pleads the "who, what, when, where, and how" of the alleged violations and passes muster – even under the Rule 9(b) and the PSLRA standards that apply to Exchange Act claims.  *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile, Inc.*, 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) (Ramos, J.).[19]  Defendants' "detailed and targeted motion to dismiss betrays this point." *Constr. Laborers*, 433 F. Supp. 3d at 530 n.3.[20]  Plaintiffs respectfully ask the Court to reject this argument, following other courts that upheld Lead Counsel's pleading approach.[21]  Defendants' cherry-picked lines from the SAC (Joinder at 5)[22] and their cited cases (Memo at 9 n.4; Joinder at 4-5)[23] do not counsel otherwise.

---

[17]     As needed, the SEC intersperses guidepost paragraphs.  *See* SAC Exchange Act §II.E.4.a. ¶¶58, 60, 62, 64, 67, 69, 71, 73, 75, 78, 80, 82, 84, 86, 89, 92, 95, 97, 99, 101, 103, 105; SAC Securities Act §III.D.3.a. ¶¶265, 267.

[18]     *See* SAC Exchange Act §II.E.4.a. ¶107 (citing SAC §II.E.3.a.-d.); §II.E.4.b. ¶108 (citing Regulation S-K, Item 303, 17 C.F.R. §§229.303(a)(3)(i)-(ii) and (b)(2)), ¶121 (citing SAC §II.E.3.a.-d. and Regulation S-K, Item 303, 17 C.F.R. §§229.303(a)(3)(i)-(ii) and (b)(2)), and ¶122 (citing Regulation S-K, Item 105, 17 C.F.R. §229.105(a)); and §II.E.4.c. ¶127.  *See also* SAC Securities Act §III.D.3.a. ¶¶268 (citing SAC §III.D.4.a.-c.); §III.D.3.b. ¶269, ¶272 (citing SAC §III.D.4.a.-c.), ¶273 (citing SAC §III.D.4.a.-c. and Regulation S-K, Item 105, 17 C.F.R. §229.105(a)).

[19]     *See also, e.g.*, *Digilytic*, 2022 WL 912965, *5 (no puzzle pleading where the complaint "indicates the names, dates, amounts, documents, and locations at issue in these claims," provides details of "[defendant's] personal involvement," is not "confusing" and "is not drafted in a manner that gives rise to an inference of bad faith"); *Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (no puzzle pleading where complaint, while "not a model of clarity," "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading" by "describ[ing] 'what portion of each quotation constitutes a false representation'" and "avoid[ing] 'placing the burden on the court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.'").

[20]     Indeed, it is easy to predict Defendants' arguments had Plaintiffs reduced the SAC's block quotes to just the challenged sentences ("*Plaintiffs cherry-pick snippets out of context…*") or ballooned its size by including a tailored, largely redundant explanation of falsity after every paragraph with topically similar alleged misstatements ("*Plaintiffs inefficiently resort to excessively long pleading that wastes party and judicial resources…*").

[21]     *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, *8 (D.N.J. Dec. 6, 2018) (motion to dismiss multi-fraud complaint denied after court expressly rejected puzzle pleading argument); *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, *8 (S.D. Cal. Aug. 4, 2021) (same); *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609 (S.D. Tex. Jan. 30, 2020) (motion to dismiss multi-fraud complaint denied after defendants argued puzzle pleading in their motion to dismiss briefing (*see* No. 18-cv-04330, ECF 125 at 27)); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. June 23, 2014) (motion to dismiss denied as to corporate defendant after puzzle pleading was argued in the briefing (*see* No. 12-cv-09456-JR, ECF 38 at 13 n.12)).

[22]     The Underwriter Defendants seek dismissal of the SAC's Securities Act allegations in their entirety based on just five cherry-picked snippets from ¶264, several of them not bolded/italicized, that they claim are not shown to be "false" (as opposed to *misleading*).  *See* Joinder at 5.  They had 19 more unused pages of available briefing to identify *which* alleged misstatements *they* claim were insufficiently pled, yet they failed to do so, leaving it to the Court and Plaintiffs to extrapolate and guess.  The Court should reject such a "puzzle pled" argument.

[23]     Defendants' cases are distinguishable and make clear that courts typically address "puzzle pleading" by

21

### C.    Different Pleading Standards Govern The SAC's Securities Act Claims

Securities Act §11 imposes liability on issuers and signatories of a registration statement that contains "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).    Section 11 imposes "virtually absolute" liability for material misstatements, "even for innocent misstatements" and "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *see also Litwin*, 634 F.3d at 716 (Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering" that is "absolute"); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (Section 11 "give(s) rise to liability more readily" than Exchange Act §10(b)).    Materiality is assessed by "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Id.* at 360.    On a Section 11 claim, "[plaintiffs] need not allege scienter, reliance, or loss causation. *Id.* at 359.    Instead, "a plaintiff need allege no more than negligence to proceed under Section 11" "subject only to the 'short and plain statement' requirements" of Fed. R. Civ. P. 8.    *Litwin*, 634 F.3d at 715.

The SAC is sufficiently pled to avoid application of Fed. R. Civ. P. 9(b) to its Securities Act claims.    First, its Securities Act claims (¶¶229-345) are separately pled  as a "separate complaint" (¶229) from its Exchange Act claims (¶¶2-228), which has an isolated scienter section

---

granting further amendment. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (statements allegedly false and misleading because of the "factual detail contained throughout this complaint" or a bullet point list over a page long); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2021) (complaint often bolded almost the entirety of a multi-paragraph block quotation and clamed falsity due to the same five generalized, conclusory statements); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676 (D. Del. Sept. 6, 2017) (dismissing with leave to amend where complaint did organize misstatements by category and often did not identify what portions of the statements were allegedly false or misleading); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) (dismissing with leave to amend where complaint pled large block quotes were false based on "vague and conclusory statements that are not supported by any specific factual allegations"); *In re Pareteum Sec. Litig.*, 2020 WL 3448526, at *1-2 (S.D.N.Y. June 23, 2020) (dismissing with leave to amend where complaints had multi-page block quotes without explanations as to "if or why" the quoted language was false or misleading).    *In re Coty, Inc. Sec. Litig.*, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) and *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120 (S.D.N.Y. 2010) did not address "puzzle pleading."

22

(¶¶156-187).[24]  Second, its Securities Act claims are based on a negligence theory (*i.e.*, failure to make a reasonable investigation) (*e.g.*, ¶¶245, 247, 341) and expressly disclaim any allegations of fraud, scienter, or recklessness (¶¶229, 328).[25]  Third, that the same operative facts, in whole or in part, give rise to both Securities Act and Exchange Act claims against certain Defendants is not dispositive.  *See, e.g.*, *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) (§11 claims not subject to Rule 9(b) though premised on same alleged facts, same "materially false and misleading" statements, and allegations defendants "knew or should have known" of them).[26] Thus, the mere fact that the same underlying facts (CW statements, the Blue Orca Report, and Plaintiffs' investigation) establish that various misstatements were made in violation of both the Securities Act and Exchange Act (Joinder at 2 n.3) does not subject the Securities Act claims to Rule 9(b).[27]  That is particularly true for the Underwriter Defendants, who are not Exchange Act Defendants and against whom the claims clearly do not sound in fraud (*see, e.g.*, ¶¶245-247) – as the Underwriter Defendants' own cited authority makes clear.  *See Rombach v. Chang*, 355 F.3d

---

[24]    *See, e.g.*, *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 415 n.134 (S.D.N.Y. 2013) (isolation of fraud allegations from other allegations in a "separable two-part complaint" sufficiently separated Securities Act from Exchange Act claims to avoid Rule 9(b)) (citing *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374-375 (S.D.N.Y. 2011) (attempt to separate Securities Act from Exchange Act claims, even if complaint not "carefully structured," sufficient to avoid Rule 9(b))).

[25]    *See, e.g.*, *Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 448 (S.D.N.Y. 2017) (expressly disclaiming allegations of fraud and affirmatively alleging negligence in §11 claims relieves plaintiff of Rule 9(b)'s requirements; *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *8-9 (S.D.N.Y. Sept. 10, 2012) (Securities Act claims not subject to Rule 9(b) where segregated from Exchange Act claims and based on negligence-type theory))

[26]    *See also, e.g.*, *Wallace v. Intralinks*, 2013 WL 1907685, at *11-12 (S.D.N.Y. May 8, 2013) (applying Rule 8(a) standard to §11 claims premised on same facts as §10(b) claim because complaint offered different liability theory that defendants negligently failed duty to investigate and ensure truth of statements in registration statement and plaintiffs "may plead [§]10(b) fraud and [§11] negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) ("[I]t is clear that plaintiffs believe that Refco and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud. This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence"); *Wachovia Equity*, 753 F. Supp. 2d at 374-75 (Rule 8(a) standard applies to complaint alleging similar facts but segregating Securities Act claim: "The fact that the [Complaint] elsewhere alleges that Wachovia and the Individual Defendants engaged in massive fraud actionable pursuant to Section 10(b) does not strip Plaintiffs of the right to plead negligence in the alternative under Section[] 11").

[27]    To be clear, the two SAC paragraphs - ¶¶283, 311 – that both briefs highlight (*see* Memo at 8-9 ("plainly sound in fraud" argument); Joinder at 2 n.2 ("wording and imputation" argument)) merely quote the Blue Orca report and do not, as Defendants claim, present the theory or theme of the SAC's Securities Act claims.

164, 178 (2d Cir. 2004) (claims against underwriter defendants not subject to Rule 9(b) because they alleged a "duty to make a reasonable and diligent investigation of the statements contained in the Prospectus" and thus "sound" in negligence").[28]  For all these reasons, Defendants' arguments in the Memo at 8-9 and Joinder at 2-3 should be rejected.[29]

### D.    The SAC Pleads Misstatements & Omissions In The Registration Statement

The SAC separately pleads IPO misstatements under the Securities Act (¶¶229-345) and the Exchange Act (¶¶2-228).  Defendants offer no differing arguments (Memo at 8-18), so this brief will oppose in lockstep, while opposing application of Rule 9(b) to the Securities Act claims.

### 1.    MINISO's IPO & Business Operations

Defendants argue that the SAC fails to plead false or misleading statements in violation of the Securities Act.  *See* Memo at 9-18, Joinder at 1, 3.[30]

**Retail Partners & Distributors**.  Defendants argue that dismissal is warranted because the SAC fails to sufficiently plead that MINISO was not "operating *primarily* through franchises as of the IPO."  Memo at 10.  They set the bar too low.  The Registration Statement declared that as of June 30, 2020, 2,526 out of 2,533 (99.7%) of Chinese stores were Retail Partner stores and 1,569 out of 1,689 (92.9%) of stores outside China were Retail Partner or distributor stores, as

---

[28]    *See also, e.g.*, *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010) (§11 claims against underwriters not subject to Rule 9(b) where complaint alleges not intentional fraud but rather failure to disclose known facts, *i.e.* omissions); *Silvercreek*, 248 F. Supp. 3d at 448 (§11 claims against underwriters not subject to Rule 9(b), because allege negligence and failure to make a reasonable investigation, plaintiff "expressly disclaims allegations of fraud and recklessness in connection with the claim," and the "presence of fraud allegations elsewhere in the complaint does not poison the well"); *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 227 (E.D.N.Y. 2022) (not applying Rule 9(b) standard to underwriters alleged only to have violated Securities Act)

[29]    The Underwriter Defendants' cited cases (Joinder at 2-3) do not counsel otherwise, as the SAC's Securities Act claims here are not "identical" to its Exchange Act claims (*City of Pontiac Policemen & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)), do not arise under Securities Act §18 or repeatedly reference Defendants' "recklessness" (*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 440 (S.D.N.Y. 2014) (Ramos, J.)), were not fully incorporated by reference within the Exchange Act claims (*Rombach*, 355 F.3d at 175) (discussing §11 claims against individual defendants)).  Moreover, Plaintiffs dispute Rule 9(b)'s proposed application, unlike the plaintiffs in *In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, *8 n.3 (S.D.N.Y. Sept. 29, 2021), *aff'd sub. nom. IAM Nat'l Pension Fund v. Farfetch Ltd.*, 2023 WL 2879304 (2d Cir. Apr. 11, 2023).

[30]    MINISO and the Puglisi Defendants expressly briefed their dismissal arguments concerning whether the SAC pled false or misleading statements or omissions in the Registration Statement simultaneously for the Securities Act and Exchange Act claims.  *See* Memo at 9.  Organizationally, Plaintiffs will primarily address those arguments within the Securities Act section of the Argument herein.

24

versus corporate stores.   ¶¶57(a), (g), (i); 264(a), (e), (g).   Contrary to the Memo at 2, 9-13, the SAC adequately pleads that these and similar statements were materially false or misleading.

**Stores In China**.   Defendants attack the SAC's reliance on extensive alleged facts both predating and postdating the IPO, claiming neither can demonstrate the state of MINISO's operations "at the time" of the IPO.   Memo at 2, 10, 12-13.   In the stroke of a pen, they ask the Court to disregard Chinese corporate registry data, articles published by Chinese state-owned media, and even the financial and operational data that the Registration Statement itself said existed shortly before the IPO on June 30, 2020. *See* Memo at 10 & n.5.[31]   To credit their temporal argument would mean the Registration Statement (and others like it) could be challenged *only* by facts date-stamped on the *exact* date an IPO closes.   Their one cited case (Memo at 10) articulates no such requirement or blanket immunity.[32]   None exists.   Instead, these materials, identified by Blue Orca and reconfirmed by Plaintiffs' China-based investigation,[33] establish a consistent state

---

[31]    Defendants' Memo at 2 & 12 questions the reliability of some of these materials.   It says the November 2019 article fails to quote a source for its reporting that MINISO owned and operated 40% of stores.   They ignore that the publisher was the financial news arm of Chinese state-owned Shanghai Media Group, Yicai Media (¶¶53(b), 287(b)), meaning it conveyed the official Chinese government position.   U.S. courts routinely credit Chinese "official" documents against Chinese companies sued here. *Silvercorp*, 26 F. Supp. 3d at 270-71.   They call "conclusory" Blue Orca's citation to a MINISO brand director's 2017 statement at a conference that most "tier one" city stores are company-owned.   Memo at 12.   They ignore that Blue Orca corroborated by interviewing a long-time MINISO franchisee who confirmed MINISO owned 1,000+ stores in 2019.   ¶¶50(b), 283(b).   Moreover, courts have held that witness statements taken from news articles are even *more* reliable than those taken from other pleadings. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, *4 (S.D.N.Y. July 31, 2013); *Touchstone Strategic Tr. v. Gen. Elec. Co.*, 2022 WL 4536800, *2 (S.D.N.Y. Sept. 28, 2022) ("Plaintiffs' reliance on investigative reporting is not inherently suspect or problematic") (citing *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F. 4th 145, 150-151 (2d Cir. 2021) (allegations from news articles taken with other sources were sufficient to adequately allege misstatements and omissions)).   Last, they claim none of these concealed facts "contradicts" a variety of Registration Statement statements. *See* Memo at 13 n.7.   To the contrary, the concealed facts render the quoted statements at least materially *misleading*, *e.g.*, stating the costs and responsibilities borne by Retail Partners is misleading when you say that 99% of Chinese stores are operated in that model but the actual number is closer to 60%.

[32]    In *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, *7 (S.D.N.Y. Jan. 18, 2018), the court simply noted that the complaint resorted to conclusory allegations because a pre-class-period email between two employees failed to even mention the defendant company.

[33]    Defendants falsely claim that Plaintiffs "primarily rely," "parrot," or "regurgitate" the Blue Orca Report, for the most part ignoring the SAC's allegations of Plaintiffs' own China-based investigation, which retraced, corroborated, and even expanded the Blue Orca research and analysis.   Under black-letter law, they have waived argument at this stage as to the sufficiency of Plaintiffs' corroborating investigation. *See, e.g.*, *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 n.4 (2d Cir. 2023) (arguments not raised in opening brief, even if pursued at lower court or raised in reply brief, waived); *U.S. v. Kortbawi*, 2021 WL 4931950, at *1 n.1 (2d Cir. Oct. 22, 2021) (arguments not raised in opening brief are waived, even if raised in a reply brief).

of affairs from 2017 through 2021, including when the IPO closed in October 2020. They are exactly the sort of alleged facts that the Second Circuit routinely credits. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant.").[34]

Defendants' Memo at 11 also seeks to discredit the Blue Orca report solely because it was issued by a short seller. Yet, their own authority (Memo at 11) observes that short sellers "can perform a useful function by bringing information that securities are overvalued to the market" and rejects any argument that a "complaint's reliance on a short-seller report inherently requires dismissal." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).[35] Moreover, Defendants largely ignore the SAC's extensive pleading (¶¶53-55; 286-289) as to the steps Plaintiffs' own investigation undertook to retrace and confirm Blue Orca's approach and findings.

Defendants question whether the Qichacha website (available at www.qcc.com), disclosed in the SAC, reliably presents Chinese corporate registry data. Memo at 2, 11. However, they do not credibly dispute any actual reported data point, all of which Plaintiffs' investigation confirmed.[36] For instance, despite copiously augmenting the record on judicial notice, they have proffered no alternative registration data they claim is more accurate. Instead, they merely question (Memo at 11-12) whether the fact that 911 Chinese stores are registered to MINISO

---

[34]     *See also, e.g.*, *Scholastic,* 252 F.3d 63 at 72 ("Pre-class data" relevant to establish what defendants should have known at class period start "[j]ust as our cases have relied on post-class period data to confirm what a defendant should have known during the class period.") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (allegations in a separate complaint that post-date class period relevant because they refer to failures during the class period) and *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) (complaint pled facts about post-class period inventory write-off, which supported contention that inventory seriously overvalued when alleged misstatements made).

[35]     Rather, the court in *Long Miao* found that the short seller report contained "significant factual errors" and was based only on interviews with insufficiently identified anonymous sources, and that the complaint "does not allege any independent corroborative facts [or] any independent investigation by counsel." 442 F. Supp. 3d at 802-04. Their other cited case, *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159-160 (S.D.N.Y. 2015) (*Harris I*), aff'd, 649 F. App'x 7 (2d Cir. 2016) (*Harris II*), is also distinguishable, in that the plaintiff relied "almost entirely" on a short seller report that the plaintiff conceded was wrong in some respects and that was proven wrong in others.

[36]     Quichacha uses non-manual retrieval to pull legally disclosed information and data, including from, but not limited to, Chinese government registries, like the National Enterprise Credit Information Publicity System (https://www.gsxt.gov.cn/) and State Administration For Market Regulation (SAMR) (https://www.samr.gov.cn). Plaintiffs' investigation was conducted first by using Qichacha's fee-based access, thereby retracing the Blue Orca Report, and then by cross-checking the Qichacha-reported data against the Chinese government websites it references.

executives or Defendant Ye's close associates, including 291 registered to a single phone number that Defendant Li and MINISO's VP / Overseas COO used to register 19 stores, means those stores are not somehow owned and operated by independent Retail Partners.[37] They instead claim (Memo at 12) that MINISO's own self-serving SEC filing made two days *after* the Blue Orca Report should *instead* be credited to exonerate them. However, that *very same* SEC filing describes the employee actions to which they now point as "unauthorized practices" that had to be "substantially curtailed" (Exh. G at 4), putting Defendants in the untenable position of proposing that one flavor of misconduct exonerates another. Moreover, contrary to the Memo at 11's citation to *Harris I*, 135 F. Supp. 3d at 170-71, when faced with a "mismatch," courts routinely credit Chinese registry data over SEC filings, particularly self-serving ones issued by companies after short seller reports. *See, e.g.*, *Silvercorp*, 26 F. Supp. 3d at 270-71 (denying mining company's motion to dismiss a §10(b) securities class action after crediting allegations concerning a Chinese regulatory filing, revealed by a short seller report, over the company's prior conflicting SEC filings and its press release challenging the short seller report's reliability a day after its publication).

**Stores Elsewhere.** Outside China, the Registration Statement claimed MINISO directly operated about 120 stores while Retail Partners and distributors owned "over 1,500" of 1,689 total stores as of June 30, 2020. ¶¶57(i), 264(g). Both briefs (Memo at 2, 13; Joinder at 6) wrongly criticize the SAC's use of the CWs because they worked for MINISO USA – which is undeniably part of MINISO's global operations. CW1, CW2, CW4, CW5, CW6, and CW8, corroborated by CW7, said that MINISO directly owned and operated 75-80 stores in the U.S. and Canada alone, representing nearly all stores there. ¶¶41-42, 44-46, 48, 274-275, 277-279, 281. That highly elevated rate leaves just 40-45 company stores unaccounted for among 1,500+ global stores. Yet, CW3 viewed internal reports by MINISO's Chinese consultants with results across stores and

---

[37] The Memo at 12 n.6 raises factual disputes inappropriate for resolution at this stage. In doing so, it miscasts the SAC, which alleges, *inter alia*, that 291 stores were registered to a single phone number used by Defendant Li to register stores. *See* ¶¶50(a), 149(e), 283(a), 312(e). Even assuming, *arguendo*, Defendants' position was fully credited, boiled down, they oddly claim that having "only" 359 Chinese stores (MINISO and Top Toy) registered to company executives or Defendant Ye's controlled entities is somehow exonerating, when the Registration Statement said that *seven* stores were not owned and operated by independent Retail Partners. ¶¶57(a), 264(a).

27

countries, which reflected zero global franchises, prompting CW3 to disagree with MINISO's stated rate of such stores. ¶¶43, 276. Both briefs' citation to Registration Statement (Memo at 2, 6, 13; Joinder at 6) is unavailing, because the full quote says that in certain larger "strategic markets" like "North America," "we typically *enter* the markets by opening and operating stores on our own, which are meant to serve as *pioneer stores*." *See* Exh. B at 130-131. But CW3, CW4, and CW5 made clear that MINISO opened no new U.S. franchises, its few existing U.S. franchises were "miserable" and either closed or wanted to sell, and MINISO could not attract franchisees to transition company-owned stores, despite lowering fees and royalties, taking on store opening tasks, appointing a new North American General Manager, and forming a MINISO USA Franchise Department. ¶¶43-45, 276-278. The Underwriter Defendants' conclusory claim (Joinder at 6) that CW3 and CW6 must be disregarded due to their tenures lacks merit.[38] *See, e.g.*, *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) (several pre-IPO CWs used to establish §11 claim).[39] Thus, Contrary to the Memo at 13 n.8 and Joinder at 5-6 n.5, the CWs did reveal omitted facts contradicting the Registration Statement and rendering its discussion of MINISO operations in North America and outside of China materially false or misleading.[40]

---

[38]    CW3 was MINISO's U.S. National Operations Inspector and part of district management from 2017 – 2020 and again from April 2021 – July 2022 (before and after its IPO), whose duties included interacting with MINISO's Chinese consultants and reviewing internal spreadsheets detailing operational results from its global operations. ¶¶23, 43, 250, 276. CW6 described circumstances a year before MINISO's IPO, including direct interactions with Defendant Ye, who terminated CW6 (and should not benefit now from having done so). ¶¶26, 46, 253, 279. By contrast, the confidential witnesses in the Underwriter Defendants' only cited case, *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376 (S.D.N.Y. Sept. 17, 2019), spoke "only" of events two years prior to the IPO there at issue or provided only a "conclusory description of his own responsibilities … without 'facts that might corroborate' the implication that those responsibilities reflected a widespread policy." *Id.* at *6.

[39]    *See also, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 411 (S.D.N.Y. 2020) (rejecting motion to dismiss argument that CWs who left company pre-class period should be discounted after noting "there is no bright-line rule prohibiting courts from considering" pre-class period allegations and "courts in this Circuit frequently consider such allegations in denying motions to dismiss"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (allegations concerning pre-class period reports identified problems that remained pertinent to Defendants' class period statements); *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, *2, *8 (S.D.N.Y. Feb. 25, 2022) (crediting two CWs who joined the company post-IPO).

[40]    Thus, *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 719 (S.D.N.Y. 2018) (Ramos, J.), cited in the Joinder at 5-6 n.5, does not support dismissal. Moreover, contrary to the Joinder at 6, the CWs including CW2 lend support to the SAC's allegations, based on the Blue Orca Report and Plaintiffs' China investigation, that the Registration Statement's description of MINISO's Chinese operations were likewise false or misleading concerning the topic of company versus Retail Partner store numbers / percentages. Joinder's other cited cases (*id.* at 3) are distinguishable

28

**Self-Dealing**.  The SAC pleads that Defendant Ye, MINISO's controlling shareholder, steered it through its IPO, then shortly after, led it into a complex JV in which he was also the majority stakeholder, with an 80% interest despite his failure to contribute capital or to articulate any need for the entire setup, that was bought out for an improper $108 million.  *See* §II.A.3.a., *supra*; *see also* §II.B.3.a., *supra*.  Defendants raise three challenges.  *See* Memo at 2-3, 9, 13-15.

First, they wrongly declare it undisputed that "a portion of the IPO proceeds *was used*" to acquire land for MINISO's headquarters, citing SAC paragraphs that merely quote the Registration Statement as to what MINISO claimed it *would* do with a portion of the IPO funds – not what it *did* do.  *Id.* at 14 (quoting ¶¶57(k), 264(j).  In actuality, the Registration Statement said only 20% of IPO proceeds (roughly $115 - $120 million) could be used for "general corporate purposes," broader than but including acquiring headquarters land.  ¶¶57(k) 59(a)-(b), 264(j), 266(a)-(b).  The SAC claims MINISO wrongly paid $108 million *to Defendant Ye* via the buyout of his JV interest.  ¶¶51, 148, 150, 284, 311, 313.  Thus, nearly all the IPO funds available to buy headquarters land wound up in Defendant Ye's pockets instead of being used to do so.  The facts are indeed disputed.

Second, Defendants' Memo at 14 argues that Ye's waiting until just after the IPO closed to form the JV and take an 80% stake – a classic bait-and-switch and a textbook concealment of material facts from IPO investors – is a fact that, contrary to the Rule 12(b)(6) standard, should be construed in *Defendants'* favor.  They imply that forming an offshore Caribbean JV for the purpose of allegedly siphoning off company funds was a new idea that first formed in the weeks after the IPO closed – when the SAC pleads that Ye had formed such a structure in *four* other MINISO deals worth RMB 23 million, a fact the Blue Orca Report highlighted as a concern.  ¶¶51, 284.[41] Construing the facts in the *Plaintiffs'* favor, as must occur at the Rule 12(b)(6) stage, Defendant

---

and do not support dismissal, because the SAC does not plead claims arising from an estimate that later turned out to be incorrect (*Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, *14 (S.D.N.Y. Jan. 26, 2009)) or from statements regarding the appropriate holding periods for exchange traded notes given the mechanics of daily rebalancing (*IN re TVIX Sec. Litig.*, 25 F. Supp, 3d 444, 456 (S.D.N.Y. 2014), *aff'd sub nom. Elita Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014)).

[41]     Defendants also wrongly state that MINISO did not buy out Defendant Ye's stake in the JV until two years after the IPO (Memo at 14), when in actuality, his September 2021 buyout was just 11 months after the IPO.

Ye had planned to do so all along. Either way, a duty to update a prior statement arises where it has "become misleading as the result of intervening events." *Ill. State Bd. of Inv. v. Authenticate Holding Corp.*, 369 F. App'x 260, 263 (2d Cir. 2010).

Third, Defendant Ye was MINISO's Chairman and there is no indication he recused himself from the Board vote to approve the JV transaction – on the front or back end. The Registration Statement's touting of the Board's fiduciary obligations is at least materially misleading given Defendant Ye's complete disregard for them.[42]

For these reasons, Plaintiffs respectfully request that Defendants' arguments be rejected.

### 2.    MINISO's Reported Results

Defendants claim that the Registration Statement's reporting of MINISO's financial and operating results is inactionable. Memo at 3, 9, 15-18. As they concede (Memo at 15-16, 18), it attributed MINISO's declining sales, falling revenues, and store closures "primarily" to the 2020 onset of COVID (Exh. A at 27-28) – an excuse that, if true, meant that those issues were recent and temporary and that weaknesses in MINISO's business, particularly its risk-shifting / revenue-generating Retail Partner and distributor models, were not to blame. However, the SAC pleads that Blue Orca and Plaintiffs' investigation revealed negative trends in MINISO's business that started *long before* COVID emerged in 2020, due to *unrelated, undisclosed* causes.[43] [44]

---

[42]    For Plaintiffs' Exchange Act claims, where the SAC alleges deception, Defendants' citation to *Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977), is unavailing. *See Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001) (*Sante Fe* rule does not apply where plaintiffs allege deception by defendants) (abrogated on other grounds).

[43]    Blue Orca and Plaintiffs' investigation uncovered: (i) deleted MINISO webpages saying revenues fell 40% since 2018 despite a store count increase (*i.e.*, per-store and overall revenues fell) causing it to lower franchising fees 63% to attract franchisees; (ii) a former MINISO China Regional Manager told Blue Orca profitability peaked in early 2019 and high-performing stores had 75%-80% revenue drops ever since; (iii) a former MINISO China Manager told Blue Orca most franchisees did not profit given market saturation, competition, and high rent, and only 30% - 40% of new Chinese stores were barely profitable; (iv) Tencent Media (China's largest Internet company)'s August 2019 report, including screenshot data from a MINISO employee, that 850 stores closed (1/3 of MINISO's footprint) by 2019. ¶¶52, 55, 148, 151(a)(-(b), 159(c), 285, 289, 311, 314. Notably, all these facts regarding MINISO's pre-IPO Chinese operations are consistent with the parallel negative trends in MINISO USA's operations as described by the CWs (*e.g.*, ¶¶41-48, 274-281) and with its post-IPO Chinese store closure trends in 2020-2022 (¶¶52, 55, 285, 289).

[44]    Defendants ignore most of these allegations (Memo at 16-17), instead questioning what "data" the MINISO employee provided – when the SAC includes a copy of the screenshot as Figure 13 (¶55) / Figure 14 (¶289) – and to wrongly claim, without citation, that the SAC had to give precise closure dates for the 850 store closures. Their

Having chosen to speak about trends in MINISO's sales, revenues, and store closures and purported causes, Defendants had a duty to speak the whole truth. *Meyer*, 761 F.3d at 250.[45] Disclosure is required "when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants violated that duty by disclosing the quarter-end total store counts (Memo at 16), revenues earned from license fees (*id.* at 17), or revenues (*id.* at 18)[46] while concealing the underlying negative trends.[47] The SAC also pleads that doing so violated Regulation S-K, Item 105, 17 C.F.R. §229.105(a), which requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." ¶¶122, 273.[48] Defendants quote just four snippets of cautionary language from the Registration Statement

---

challenge to the MINISO employee statements in the Blue Orca report (Memo at 17) is based on a misreading of the *Long Miao* decision, given the other cross-corroborating facts that Blue Orca cites. *See* n.35, *supra*. Their attempt to discredit the employee account in the Tencent Media report (Memo at 17) again ignores that courts hold witness statements in news articles are even *more* reliable than those taken from other pleadings. *See* n.31, *supra*.

[45] *See also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information' on the issue or topic."); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not … a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues.").

[46] Contrary to the Memo at 17, the SAC's allegation shows that the lowering of license fees began in 2020, due to the company's plummeting revenues since 2018. ¶¶52, 55, 148, 151, 285, 289, 311, 314.

[47] For instance, Retail Company X would mislead investors by reporting 100 total stores at the end of Q1, then 200 at the end of Q2, implying a straightforward doubling, instead of disclosing that the actual numbers were 200 stores opened with 100 stores closed in Q1, and 800 stores opened with 700 closed in Q2, leading to the 200 remaining at the end of Q2, due to widespread store unprofitability caused by market saturation, competition, and high rents that led to sales/revenues pressures and lowered franchise fees to attract new franchisees in a distressed environment.

[48] As discussed in §II.B.3.b., *supra,* the Exchange Act allegations, in alleging a broader Reported Results Fraud that includes both MINISO's Registration Statement and certain of its post-IPO SEC filings (¶¶108-122), alleges that the Exchange Act Defendants violated both Regulation S-K Item 105 (¶122) and Regulation S-K, Item 303, 17 C.F.R. §§229.303(a)(3)(i)-(ii) and (b)(2). Defendants limit their arguments about the application Regulation S-K (Memo at 17 & n.10) to *only* Item 303, claiming it does not apply to registration statements on Form F-1 and may not apply to foreign issuers at all. They are wrong regarding the overall application of Item 303 to foreign issuers, given that SEC guidance says that Item 5 of Form 20-F imposes the same obligations on foreign issuers as Regulation S-K, Item 303, which is, in turn, incorporated into Form F-1 as well. *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, *13 n. 7 (S.D.N.Y. Mar. 16, 2023) (Second circuit courts have "treated Form F-1 as calling for the same disclosure as Item 303 of Regulation S-K"). Defendants' authority agrees on that point. *See Jiajia Luo v. Sogou, Inc.*465 F. Supp. 3d 393, 413 n.9 (S.D.N.Y. 2020). Defendants fail to raise – and waive at this stage – any application argument regarding Item 105. *See* n.33, *supra*. In any event, Item 3 of Form F-1 imposes the same obligations as Regulation S-K Item 105. *See Wandel v. Gao*, 590 F. Supp. 3d 630, 646 n.10 (S.D.N.Y. 2022) ("Similarly, Item 3 of Form F-1 regulates foreign issuers' registration statements and incorporates by reference Item 105 of Regulation S-K.").

that either speculate on what MINISO or its Retail Partners "may" do or vaguely allude to risks or non-assurances regarding "business strategies" or "growth strategies." *See* Memo at 17-18 (quoting ¶¶25-26, 31). These warnings are legally deficient, as the negative trends and risks had already materialized. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Slayton v. Am. Exp. Co.*, 604 F. 3d 758, 769-770 (2d Cir. 2010) (cautions not "meaningful" if "misleading in light of historical fact[s]...that were established at the time the statement was made.").[49]

### E.     The SAC Pleads Post-IPO Misstatements & Omissions

The three-prong fraud pled in the SAC's Exchange Act allegations (*see* §II.B.3., *supra*) extends past the Registration Statement and includes a post-IPO Business Operations Fraud (¶¶61-107), a post-IPO Reported Results Fraud (¶¶111-122), and an Internal Controls Fraud (¶¶123-127), which have no overlap, factual or otherwise, with the Securities Act allegations. Defendants raise a handful of challenges (Memo at 19-21), which lack merit.[50]

**Self-Dealing**. Contrary to the Memo at 2-3, 19-20, Plaintiffs plead MINISO's statements regarding Defendant Ye's JV scheme to be false and misleading, including, *inter alia*, its delayed post-IPO disclosure and any purported confirmation of undeclared buyout value by an unnamed "third-party" valuation firm (*see* ¶¶68, 83), which are disputed given Blue Orca's and Plaintiffs' investigations. The Registration Statement assured investors MINISO could provide IPO funds to Chinese subsidiaries only via loans or capital contributions, subject to government registration and approval. ¶¶57(k), 59(a)-(b). To avoid these restrictions, Defendant Ye formed the BVI JV after the IPO and, as Defendants concede, formed multiple layers of Chinese subsidiaries beneath the

---

[49]     Moreover, given that the alleged statements at issue were not forward-looking ones, the PSLRA safe harbor provision is not even triggered. *Ill. State Bd. of Inv.*, 369 F. App'x at 264 (safe harbor applies only to forward-looking statements and not statements of then-present fact). Defendants' cited case, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) is distinguishable because there, the allegedly undisclosed material was "readily accessible in the public domain."

[50]     Defendants' Memo at 19 includes a passing observation that that dozens of alleged misstatements are pled to be actionable "for largely the same reasons as the Offering Materials" and "fail for largely the same reasons." This puzzle pled argument, which cross-references 26 SAC paragraphs, 22 defense exhibits, and an earlier section of their brief, lacks sufficient substance or clarity and should be disregarded.

JV (instead of directly beneath MINISO). *See* Memo at 20. It was all a shell game. Skirting government oversight, Defendant Ye had MINISO contribute the full RMB 346 million land purchase deposit to the JV. ¶¶51, 148, 150, 159(b). After Ye received a $108 million buyout, MINISO contributed the rest of the JV's RMB 1.8 billion in capital to pursue its headquarters project. ¶51. Contrary to the Memo at 20, the SAC properly pleads fraud based on Blue Orca's and Plaintiffs' investigation of the Chinese subsidiary filings.[51]

Defendants' reference (Memo at 3, 20) to MINISO's self-serving, post-Class Period SEC filings to secure dismissal is improper. *See* §III.A., *supra*. For instance, they improperly ask the Court not only to take judicial notice of the July 28, 2022 Form 6-K, they ask the Court to fully credit the truth of its contents, and to resolve a conflict between its contents and the SAC's alleged facts in *Defendants'* favor, which would prejudicially invert the Rule 12(b)(6) standard. *McIntire*, 927 F. Supp. 2d at 123 ("The truth of the [short-seller reports] is a factual dispute not appropriate for resolution at this stage.").[52]

**Lowered Fees**. From among the entire post-IPO Reported Results Fraud, Defendants fixate on one omission – MINISO's lowering of franchise fees 63% over two years in an attempt to attract franchisees – where huge numbers of MINISO's existing franchisees were unprofitable,

---

[51]    *See, e.g.*, *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 568 (S.D.N.Y. 2012) (plaintiffs could compare SEC filings of consolidated company with Chinese SAIC filings of two subsidiaries for substantial discrepancies to allege fraudulent motive to overstate revenues in U.S.); *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, *11 (E.D.N.Y. June 28, 2021) (drastic difference between SEC filings and representations of defendant's subsidiary to Chinese court during bankruptcy proceedings demonstrate corporate scienter); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123-27 (S.D.N.Y. 2013) (drastically different filings— by defendants' wholly owned subsidiary—with the SEC and Chinese SAIC provide adequate basis for plaintiffs' claim and reasonable conclusion of defendants' fraudulent motive). Defendants' cited authority (Memo at 20) is not in conflict, as neither *Harris II*, 649 F. App'x at 9-10 & 10 n.3 nor *In re China XD Plastics Co. Sec. Litig.*, 2016 WL 1241522, at *5-6 (S.D.N.Y. Mar. 23, 2016) preclude use of subsidiary filings to establish falsity. In those cases, plaintiffs simply lacked sufficient information regarding the subsidiary filings (*China XD*) or offered only a conclusory interpretation as to discrepancies (*Harris II*).

[52]    *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, *6 (S.D.N.Y. Jan. 27, 2014) (defendants' implication that short-seller report's revelations were in fact untrue not properly evaluated on motion to dismiss); *Emps. Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306-07 (2d Cir. 2015) (defendant's proffered reason for its revenue gap to rebut plaintiffs' allegation of a misleading statement entitled to "little weight" at motion to dismiss stage); *Grund v. Del.Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 245 (S.D.N.Y. 2011) (defendants' disputes and denials of complaint's alleged facts improper for Rule 12(b)(6) motion where allegations taken as true and viewed in light most favorable to plaintiffs), *reconsideration granted in part and denied in part*, . 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011).

struggling, or closing stores and MINISO increasingly shouldered store-opening and store-operating burdens.[53]  ¶¶52, 55, 148, 151(c), 159(c).  As pled in the SAC, franchise fees were a primary revenue stream in the Retail Partner model (¶¶32-34), and MINISO reported revenues and license fees, with misleading attributions, in violation of Regulation S-K.  *See* §II.B.3.b., *supra*; ¶108, 111-122.  Once Defendants chose to speak on the issue of license fees and revenues, they were obligated to speak the whole truth.  *See* §III.D.2. & n.45, *supra*.  Defendants cite to MINISO's post-Class Period SEC filing fails for the reasons set forth in the preceding paragraph.

**Internal Controls Fraud**.  Defendants' Memo at 21 barely addresses the Internal Controls Fraud (¶¶123-127) and apparently concede that if the SAC sufficiently pleads a false or misleading statement and management's participation in a fraud, this entire section must be upheld.[54] [55]

### F.        The SAC Sufficiently Pleads Scienter (Exchange Act Claims Only)

As Defendants concede, scienter is pled via allegations of motive and opportunity *or* "strong circumstantial evidence of conscious misbehavior or recklessness."  Memo at 22. "[A]accepting all factual allegations in the complaint as true" in the SAC's 17-page section (¶¶156-

---

[53]        They waive argument as to the rest.  *See* n.33, *supra.*

[54]        Notably, the post-Class Period SEC filings to which Defendants cite admit that MINISO's employees engaged in "unauthorized practices," such as unauthorized store registrations, that had to be "substantially curtailed." Exh. G at 4. *Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, *6 (S.D.N.Y. Sept. 13, 2022) (defendant's post-class period admission that it discovered material weaknesses in internal controls during the class period that were not fully remediated when no disclosure about material weaknesses was made during the class period was not "'fraud by hindsight,' but rather an admission by [defendant] that earlier statements were false when made").

[55]        The analyst reports in SAC ¶¶65, 76, 87, 90, 93, 106 are not alleged to have conveyed false or misleading statements; rather, they are plead to demonstrate the effect of Defendants' alleged frauds.  Otherwise, Defendants' footnoted catch-all arguments (Memo at 21 n.11) are insufficiently developed puzzle pleading and should be rejected. Defendants' nod at 13 paragraphs of allegations fails to establish that any portions thereof are puffery.  *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297-98 (S.D.N.Y. 2018) ("Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law.").  Same goes for their wave at five paragraphs of allegations they claim contain some unidentified opinion. *See Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) ("[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor" and "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at [the] time.'") (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015)).  Likewise, Defendants fail to make clear what statements or portions thereof were forward-looking and accompanied by cautionary language; in any event, the warnings to which they point elsewhere in the brief are legally deficient. *See* §III.D.2. & n.49, *supra*. *See also Vivendi*, 838 F.3d at 246 (mixed present/future statement not entitled to safe harbor for part of statement that refers to the present).

187), "[t]he inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.   Scienter is adequately pled if, on review of "all the allegations holistically," "a reasonable person would deem the inference … cogent and at least **as compelling** as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 38, 48 (quoting *Tellabs*, 551 U.S. at 324, 326). "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) (quoting *City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008)).

Defendants' challenges (Memo at 3-4, 21-24) lack merit.

### 1.      Motive & Opportunity

**Stock sales**. As Defendants concede (Memo at 4, 22-23), despite lower reporting standards for foreign issuers, the SAC pieced together a *portion* of Defendant Ye's Class Period sales, totaling 5.6 million shares. ¶¶160-164. It alleges they were suspicious in timing and amount, because Ye, MINISO's controlling shareholder, had never sold any shares before, and he used the IPO to monetize part of his holdings at fraud-inflated prices. ¶164. These allegations suffice.[56]

**Self-Dealing**. As detailed in §III.D.1. (pre-IPO) and §III.E. (post-IPO) *supra*, Ye engaged in a self-dealing scheme whereby he formed the previously undisclosed JV two months post-IPO and cashed out of it via a $108 million payoff eight months later, with no articulated need or benefit to MINISO. By contrast, in Defendants' cited case (Memo at 23), *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 31 (2d Cir. 2019), *seven pages* of disclosures *notified* investors *before* the transaction

---

[56]      *See, e.g.*, *Refco*, 503 F. Supp. 2d at 646-47 (strong motive pled where defendants' fraud drove up demand, resulting in share purchases from which defendants would be directly compensated); *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, *12-14 (S.D.N.Y. Jan. 20, 2015) (IPO provided motive for fraud and allowed defendants to raise millions in funds); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011) (fact that defendants' sales were through an IPO is "not dispositive" on question of motive, which was pled where they used IPO to reduce holdings).

(a merger) of self-dealing and oversight by a "special committee comprised solely of independent and disinterested directors," which further flagged risk.  Defendants' resort to disputed facts first made public in self-serving post-Class-Period filings (Memo at 23) lacks merit.

**Suspicious Compensation**.  The fiscal year of MINISO's IPO at issue, Defendant Zhang received $2.46 million in equity-settled bonus and total compensation nine times higher than an adjacent year (which had no such bonus), while Defendants Ye, Zhang, and Li received outsized Board pay compared to independent Directors.  ¶168.  The SAC sufficiently pleads these payments were suspicious in timing and amount.  *Id.*[57]  Contrary to the Memo at 4, 23 & n.13, disclosure of these payments *two years later* in October 2022 (*id.*) does not undermine the scienter inference.[58]

**Corporate scienter / offerings**.  Contrary to the Memo at 22-23 & n.13, even if, *arguendo*, scienter was not pled for an individual, the Court can still find corporate scienter sufficiently pled for MINISO, given *inter alia*, the IPO and its Hong Kong offering (¶¶169-171).  *Silvercorp*, 26 F. Supp. 3d at 271, 277 (denying motion to dismiss corporate defendant, despite dismissing all individual defendants, where corporate scienter evidenced, *inter alia*, by $117 million offering).[59]

### 2.    Knowledge & Recklessness

The SAC pleads an extensive knowledge and recklessness section, drawn from the Blue Orca Report, Plaintiffs' investigation, and the CW statements.  ¶¶157-159.  Defendants do not argue that they did not know about the underlying alleged facts – they merely repeat that those facts did not make their statements false or misleading.  *See* Memo at 24.  As such, they waive at this stage any counterargument to their knowledge.  *See* n.33, *supra*.

---

[57]    *See, e.g.*, *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (unusual bonus evidenced scienter); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008) (suspicious executive compensation sufficient where plaintiffs alleged a concrete and particularized benefit).

[58]    Defendants' cited case, *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772 (S.D.N.Y. 2019) concerned insider sales, not suspicious executive compensation / bonuses.

[59]    *See also, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive to commit fraud survives motion to dismiss where misstatements allegedly increased stock price, permitting capital raise at higher offering price, with less shares issued and less dilution); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ($109.6 million secondary offering can provide motive for fraud).

### 3.    Additional Allegations

Defendants do not dispute (Memo at 24) that MINISO's Retail Partners, JV transaction, and other key facts at issue were "core operations" (¶¶172-173).  They instead declare the doctrine "adds nothing" and might not apply.  Memo at 24 & n.14.  Not so.[60]  They declare without support that code of conduct violations (*see* ¶¶176-185) cannot support scienter.  Memo at 24.  They are wrong.[61]  They ignore the allegation that Defendants Ye, Zhang, Li, and Puglisi had and violated a duty to familiarize themselves with the subject matter of statements they signed, were quoted in, or orally made and to speak truthfully (¶174) and waive argument at this stage.  *See* n.33, *supra*.  They concede SOX certifications can bolster a scienter inference,[62] but question whether a lack of honest and reasonable belief by Defendants Ye and Zhang was pled (Memo at 24), ignoring the SAC's pleading an entire Internal Controls Fraud about those certifications.  ¶¶123-127, 175.

Defendants' recent conduct reinforces the scienter inference.  Despite Defendants Ye and Zhang expressly discussing its existence by name in SEC filings, Defendants have continued to evade service, refusing to appear or to answer for their actions before this Court.[63]

### 4.    Defendants' Competing Inference Is Not More Compelling

Defendants do not articulate an actual competing inference, despite bearing the burden under *Tellabs* to present one that is *more* compelling that the one alleged in the SAC.  Even if, *arguendo*, one is distillable from their brief's introduction (Memo at 1-4), it hinges on disputes of

---

[60]    Defendants' cited case, *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, *17-18 (S.D.N.Y. Mar. 29, 2013), merely stands for the proposition that the core operations doctrine, alone, cannot evidence scienter.  To the contrary, in the Second Circuit, "allegations of a company's core operations…can provide supplemental support for allegations of scienter." *New Orleans Emps.' Ret. Sys. v. Celestia, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011).

[61]    *See, e.g.*, *Perez v. Higher One Holdings, Inc.*, 2017 WL 4246775, *8 (D. Conn. Sept. 25, 2017) (upholding scienter pleading based on briefing that included code of conduct allegations).

[62]    *See, e.g.*, *Plumbers and Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, *14 (S.D.N.Y. Apr. 14, 2020) (SOX certifications support scienter).

[63]    *See, e.g.*, *Philip Morris USA Inc. v. ABC Chinese Food, Inc.*, 2009 WL 4067997, *1 (E.D.N.Y. Nov. 18, 2009) (finding that "defendants' attempt to hide their behavior and evade service of process underscores the willful element of their actions" and granting default judgment); *Metro. Life Ins. Co. v. Totten*, 2007 WL 9771106, *2 (N.D.N.Y. Feb. 12, 2007) ("New York courts have traditionally and wisely had little tolerance for the type of gamesmanship that involves evading service of process" and where it was purposeful, the court "can deem service completed on the date the defendant attempted to evade service").

fact, many arising from self-serving, post-Class-Period (and even post-lawsuit) filings, being fully credited and resolved in their favor, despite unanswered, troubling questions regarding, *e.g.*, the "unauthorized practices" by MINISO employees concerning store registrations or the lack of accounting for the purported loan that Defendant Ye retroactively used to justify his JV stake.  The Court need not credit such a deficient, illogical inference,[64] and it is not *more* compelling than the one Plaintiffs plead in the SAC.  *Compare* §I., *supra*.

### G.    The SAC Should Not Be Dismissed On Loss Causation Grounds

Plaintiffs do not face a great burden to plead Exchange Act §10(b) loss causation; "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 347, (2005)).  "[T]o plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition was corrected,' and that the market reacted negatively to the corrective disclosure." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (quoting *In re Omnicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) and citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  The SAC pleads seven partial corrective disclosures / events and stock drops impacting Class Period investors (¶¶128-155).  *See* §II.B.6.  Lead Plaintiff and Plaintiff Ashraf purchased shares during the Class Period, which they held past three and five correctives, respectively, per Certifications / transactions lists (ECF 47; ECF 13-2), which the SAC incorporates by reference (¶¶10-11).  These allegations plus the SAC's loss causation section (¶¶195-200) suffice.

By contrast, per SAC ¶290, loss causation is not even an element of its Securities Act

---

[64]    *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, *33 (S.D.N.Y. Mar. 23, 2017) ("opposing inference rests on the illogical premise" and therefore is "less persuasive on its face"); *In re Forcefield Energy Inc. Sec. Litig.*, 2017 WL 1319802 at *9 (S.D.N.Y. Mar. 29, 2017) (crediting plaintiff's inference as the "most logical one"); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, *16 (S.D.N.Y. Apr. 22, 2016) (defendants' scienter arguments fail, in part, because they do not present a "cogent non-fraudulent inference" or "any rational inferences of benign intent").

claims.[65] *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) (Under §11, "any decline in value is presumed to be caused by the misrepresentation" and "defendant … bears the burden of proving that the price decline was not related to the misrepresentations"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35-36 (2d Cir. 2009) (same, noting defendants' burden is "heavy").  The affirmative defense of negative causation is not properly raised on a Rule 12(b)(6) motion and is an issue for summary judgment.  *Xiang v. Inovalon Holding, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017) (collecting cases); *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 473 (S.D.N.Y. 2009) (denying reconsideration and interlocutory appeal of motion to dismiss denial where defendants claimed plaintiff's selling his shares before alleged corrective negated causation).  Defendants' loss causation arguments directed at the Securities Act claims (Memo at 25) should be rejected outright at this stage.[66]

Defendants' arguments (Memo at 4, 24-25) lack merit.[67]  Courts routinely hold that analyst or short seller reports are proper correctives.  *See, e.g.*, *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (loss causation adequately pled where analyst report revealed fraudulent transactions via non-public information like interviews with former employees and less-accessible information like Chinese SAIC filings and court judgments).[68]  Defendants cite no authority requiring a plaintiff to hold its shares through every alleged corrective in order to represent a class

---

[65]     The SAC also pleads that the Securities Act damages are evidenced by, but not limited to the market reactions to the disclosures and price drops applicable to the Exchange Act claims.  ¶¶291-318.

[66]     Defendants' cited case, *In re State Street Bank & Tr. Co. Fixed Income Inv. Litig.*, 774 F. Supp. 2d 584, 590-91, 596 (S.D.N.Y. 2011) is distinguishable because its loss causation ruling flowed from the fact that the lawsuit concerned the price of mutual fund shares, which are determined not by trading activity but by a fund's net asset value.

[67]     Defendants' observation that MINISO's stock recovered post-Class Period (Memo at 1, 7) is a red herring. Aside from the PSLRA's 90-day lookback period, post-Class Period movement is irrelevant. *See, e.g.*, *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012) (on motion to dismiss, court does not resolve why company's "share price rose after its initial fall" and instead, drawing all reasonable inferences plaintiffs' favor, "assume that the price rose for reasons unrelated to its initial drop").

[68]     *See also, e.g. In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, *9 n.12 (S.D.N.Y. Mar. 7, 2016) (short seller report contained information not readily accessible, including financial filings in Chinese); ‼ *In re Winstar Commc'ns*, 2006 WL 473885, *14-15 (S.D.N.Y. Feb. 27, 2006) (short seller reports based on published financials rather than non-public information were proper correctives).

of investors, each of whom held their stock through at least one of them.[69]  Rulings as to whether alleged disclosures/events are sufficiently "corrective" are improper at the Rule 12(b)(6) stage.  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, *18 (S.D.N.Y. Mar. 28, 2018) (deferring questions about "robustness" of corrective disclosures to a later stage after discovery).[70]

**H.      The Control Person Claims Are Not Independently Challenged**

Defendants' lone challenge to the control person claims is a lack of underlying primary violation.  Memo at 8.  If the §11 and/or §10(b) claim are upheld, in whole or in part, then the correlating §15 and/or §20(a) control person claims must survive.

**IV.    CONCLUSION**

Plaintiffs respectfully ask that Defendants' Motion and Joinder (ECFs 61, 64) be denied.[71]

---

[69]      Moreover, it is apparent that Plaintiff Ashraf held past the Blue Orca Report publication.  *See* ECF 13-2.

[70]      *See also, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 283, 285-86 (loss causation can be pled via correctives that do not "precisely mirror" the fraud's substance so long as they "somehow reveal to the market some part of the truth"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("[N]either the Supreme Court in *Dura,* nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud."); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013) (loss causation adequately alleged even if corrective disclosure did not "explicitly disclose in flashing neon lights" the alleged fraud).

[71]      Contrary to the Memo at 4, 25 and Joinder at 7, Plaintiffs respectfully request that if the court orders dismissal, it be without prejudice and with leave to further amend.  *See, e.g.*, *Loreley*, 797 F.3d at 191 (Second Circuit encourages amendments, particularly when case "combines a complex commercial reality with a long, multi-prong complaint," and district court's denial of amendment "violated the liberal spirit of Rule 15"); *In re Flag Telecom*, 574 F.3d at 33 (noting the lower court permitted a fourth amended complaint where loss causation extensively litigated); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 312-13 (granting leave to amend twice-amended complaint and noting "general policy that leave to amend should be granted liberally in cases alleging securities fraud"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 518 (S.D.N.Y. 2009) (granting leave to amend where "the Court had not previously evaluated the merits of Plaintiffs' pleadings and Plaintiffs had not had the benefit of a full adversarial briefing for their pleadings").  Indeed, the Court already rejected Defendants' request, at the pre-motion conference, that it proactively bar further amendment before the Court has provided guidance as to any pleading deficiencies.  *See* March 24, 2023 Tr. at 15:6-16:15, 17:20-18:21.

40

Dated: August 28, 2023

Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*
Jeremy A. Lieberman
Matthew L. Tuccillo
J. Alexander Hood II
Jennifer Banner Sobers
Brandon M. Cordovi
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
ahood@pomlaw.com
jsobers@pomlaw.com
bcordovi@pomlaw.com

*Counsel for Lead Plaintiff the Nova Scotia Health Employees' Pension Plan and Lead Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
275 Madison Avenue
40th Floor
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Additional Counsel for Plaintiff Adeel Ashraf*

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo