UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MINISO GROUP HOLDING
LIMITED SECURITIES LITIGATION

**OPINION AND ORDER**

22-cv-9864 (ER)

RAMOS, D.J.

      This class action concerns MINISO Group Holding Ltd. ("MINISO" or "the Company"), a Chinese retailer of toys and lifestyle products, and is brought by class of individuals or entities who purchased or otherwise acquired MINISO American Depository Shares ("ADS") between October 15, 2020 and July 26, 2022 (the "class period"). According to the Second Amended Complaint ("SAC"),[1] during the class period, MINISO made false and misleading statements about: (1) its franchise model (the "Retail Partner model"); (2) a joint venture with its chief executive officer, Guofu Ye, to build a new company headquarters; and (3) its business results as reported in publicly filed documents.

      Lead Plaintiff, Novia Scotia Health Employees' Pension Plan ("Novia Scotia") filed this action individually and on behalf of those who purchased MINISO securities during the class period. Novia Scotia asserts claims against MINISO and four of its individual officers: (1) Guofu Ye, the Company's chief executive officer; (2) Saiyin Zhang, the Company's chief financial officer; (3) Minxin Li, the Company's executive vice president; and (4) Donald Puglisi, the managing director of Puglisi & Associates, MINISO's authorized U.S. representative at the time of MINISO's initial public offering ("IPO") on the New York Stock Exchange. Novia Scotia also asserts claims against

---

[1] Unless otherwise noted, citations to "¶ _" refer to the SAC, Doc. 60.

Puglisi & Associates, as well as Goldman Sachs (Asia) LLC and BofA Securities, Inc.,[2] the investment banks who served as underwriters for the IPO.[3]

Defendants MINISO, Ye, Zhang, Li[4], Puglisi, Puglisi & Associates, Goldman Sachs (Asia) LLC, and BofA Inc. (collectively, "Defendants") bring this motion to dismiss the SAC pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6); as well as § 101(b) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(2).  For the reasons set forth below, the motion is GRANTED.

## I.   BACKGROUND[5]

### A.  Factual Background

#### 1.  The Company

MINISO is incorporated in the Cayman Islands.  ¶ 12.  The majority of its operations are based in China.  ¶ 30.  MINISO is an "asset light" retail company built around the Retail Partner model.  ¶ 57.  The Retail Partner model is "a franchise-like store model with chain store characteristics."  ¶ 33.  Under this model, Retail Partners open and operate MINISO stores at different locations, while shouldering the associated capital expenditure and operating expenses.  *Id*.  MINISO allegedly provides value under this model by allowing its Retail Partners to use its brand and providing them with "valuable guidance" on store operation, in exchange for a pre-agreed portion of in-store sale

---

[2] Formerly known as Bank of America Merrill Lynch.

[3] Count One of the SAC alleges violations of § 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934 ("Exchange Act") against MINISO, Ye, Zhang, Li, Puglisi, and Puglisi & Associates.  Count Two asserts violations of § 20(a) of the Exchange Act against Ye, Zhang, and Li.  Count Three alleges violations of § 11 of the Securities Act of 1933 ("Securities Act") against MINISO, Ye, Zhang, Li, Puglisi, Puglisi & Associates, Goldman Sachs (Asia) LLC, and BofA Securities, Inc.  Count Four asserts violations of § 15 of the Securities Act against Ye, Zhang, and Li.

[4] After being served in China, Ye, Zhang, and Li notified the Court that they join MINISO's motion to dismiss the SAC.  Doc. 93.

[5] The facts are drawn from the SAC, together with "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman Law, P.C.*, No. 16-cv-6627 (AMD), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017*), aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

proceeds and an annual license fee, based on the quality of the store location and the number of stores owned by the Retail Partner.  *Id*.  MINISO Retail Partners keep the remaining sales proceeds, while MINISO retains ownership of inventory until in-store sales to customers are completed.  *Id*.  According to Novia Scotia, MINISO's success is highly dependent upon its Retail Partner model.  *Id*.

MINISO primarily derives revenue from sales of lifestyle products (such as home décor, small electronics, textile, accessories, beauty tools, toys, cosmetics, personal care, perfumes, stationary, and gifts) through sales to MINISO Retail Partners, sales to distributors, and retail sales in directly-operated stores and through online channels.  Doc. 63-1 at 91, 99.  Other sources of revenue include franchisee license fees, royalties, as well as management and consultation service fees.  *Id*. at 252.  Ye and Yang are the controlling shareholders of MINISO.  ¶ 261.  The Company launched an IPO on the New York Stock Exchange on October 15, 2020.  ¶ 7.

   2.  *The Company's Alleged Misrepresentations*

   a.  *Representations During The IPO*

As part of the IPO process, MINISO filed several documents with the Securities Exchange Commission ("SEC").  The Company filed a Form F-1 registration statement (The Registration Statement) on September 23, 2020.  ¶ 261(a).  It filed its first amended Registration Statement on October 7, 2020, a second amended Registration Statement on October 13, 2020, and a third amended Registration Statement on October 14, 2020.  *Id*. at ¶ 261(b).  Ye, Zhang, Li, and Puglisi all signed the Registration Statement.  ¶ 261(a), (b).  MINISO also filed a prospectus ("Prospectus") with the SEC on October 15, 2020.  ¶ 261(c).

MINISO's Prospectus and Registration Statement (collectively, the "Offering Materials") made a number of disclosures.  First, they made the following disclosures about the Retail Partner model:

- That "[a]s of June 30, 2022" there were 122 directly-operated stores in overseas markets . . . [and] 7 directly operated stores in China. *See* Doc. 63-2 (Registration Statement) at 135.

- "In strategic markets with large population [*sic*] and huge market potential such as North America and India, we typically enter the markets by opening and operating stores on our own." *Id.* at 138.

- MINISO uses a "[f]lexible business model" that is an "asset-light franchising business model," *id.* at 122, where the "franchisee bears the store opening capital expenditure[s] and store operating expenses," *id.* at 15.

Second, they made the following disclosures about the use of the anticipated IPO

proceeds and related party transactions:

- "We plan to use the net proceeds of this offering to expand our business operations as follows:  approximately 30% to expand our store network; approximately 30% to invest in our warehouse and logistics network; approximately 20% to invest in technologies and information systems; and the balance for general corporate purposes, which may include . . . expanding and upgrading our office space and facilities by acquiring land to build an office building . . . ." *Id.* at 85.

- Disclosed eleven related party transactions occurring in 2019–2022, all of which involved loans borrowed from Ye, interest free cash advances given to (and associated repayments made by) Ye or companies controlled by Ye, the "dispos[al] of certain loss-making subsidiaries" to companies controlled by Ye, and goods purchased from companies controlled by Ye or where Ye had "significant influence." *Id.* at 169–70.

Third, they made the following disclosures about the fiduciary duties of the MINISO Board[6] pursuant to Cayman Islands law, which is where MINISO is incorporated:

- "As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he owes the following duties to the company—a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his personal interest or his duty to a third party, and a duty to exercise powers for the purpose for which such powers were intended." *Id.* at 178.

Fourth, they made the following disclosures about MINISO's business operations:

---

[6] Ye, Zhang, and Li are members of the Board of Directors.  ¶¶ 238–240.

- The "[n]egative impact of COVID-19 on our business operations in China has resulted in a decrease in our revenue." *Id*. at 34.

- "[U]nplanned store closures [due to COVID–19] . . . resulted in peak closures of over 60% of MINISO stores in China in early February . . . . As of June 30, 2020, over 20% of MINISO stores in overseas markets were closed." *Id.*

- "Our revenue per MINISO store has fluctuated significantly historically with a decrease of 19.8% from the fiscal year ended June 30, 2019 to the fiscal year ended June 30, 2020. The decrease was primarily due to the outbreak of COVID-19, and an increasing number of new stores being opened in lower-tier cities . . . as well as increased competition issues we faced in 2019 and 2020." *Id.* at 35.

- "We plan to further expand and upgrade our store network both in China and globally and enhance our product development and supply chain capabilities. We face certain risks in executing these strategies and we cannot assure you that we will be able to execute our growth strategies successfully and realize our expected growth." Doc. 63-1 (Prospectus) at 36.

- "If we fail to maintain the relationship with our MINISO Retail Partners or our local distributors or fail to attract new MINISO Retail Partners or local distributors to join our store network, our business, results of operations and financial condition could be materially and adversely affected." Doc. 63-2 (Registration Statement) at 32.

- "The impacts of COVID-19 and intensifying market competition resulted in a negative growth of same-store sales, while our store expansion led to a change in store mix. Same-store sales of MINISO stores in China decreased by 3.8% in the second half of 2019, compared to that in the second half of 2018, primarily due to increased competition in China. Same-store sales of MINISO stores in China decreased by 32.6% in the first half of 2020, compared to that in the first half of 2019, primarily due to the impact of COVID-19." Doc. 63-1 (Prospectus) at 33.

Pursuant to the requirements of Section 406(c) of the Sarbanes Oxley Act, MINISO also filed its Code of Business Conduct and Ethics ("Code of Conduct") with the SEC as an attachment to the Registration Statement. ¶ 176. It was signed by Ye, Zhang, Li and Puglisi. *Id.* The Code of Conduct required employees to "strictly comply with all applicable standards, laws, regulations and policies for accounting and financial reporting of transactions, estimates and forecasts," and required employees to report any suspected compliance violations. ¶¶ 176–185.

MINISO filed a Form F-6 registration statement to register 500 million ADS on October 6, 2020.  ¶ 261.  On October 15, 2020, MINISO launched its IPO on the New York Stock Exchange, ¶ 7, issuing 30.4 million ADS to the general public in the aggregate principal amount of $608 million.  ¶ 262.  Goldman Sachs (Asia) LLC and BofA Securities, Inc. agreed to purchase 30.4 million total ADS—which were separate from the shares available to the general public— and were granted the right to purchase up to an additional 4.56 million ADS.  *Id.*

b.  *Representations After The IPO*

On December 11, 2020, MINISO announced the formation and terms of a joint venture with Ye (in the form of an entity, YGF MC, which was "controlled" by Ye) to purchase a parcel of land to build a new headquarters in Guangzhou, China.  ¶ 258; Dec. 11, 2020 Form 6-K.  When YGF Investment ("the joint venture") was formed, MINISO disclosed that it held a 20% share of the joint venture while Ye held the remaining 80%.  ¶ 258.  On September 26, 2021, MINISO announced that it bought out Ye's 80% stake in the joint venture for "roughly" $108.3 million,[7] ¶ 260, with the approval of the board of directors and the audit committee.  ¶ 260; Sept. 27, 2021 Form 6-K.  MINISO further explained that Ye was paid using non-IPO funds, and that the payment was determined with the assistance of a third-party valuation firm.  ¶¶ 83, 84, 260.  MINISO issued press releases reporting the joint venture as well.  ¶¶ 68, 83.[8]  The joint venture had a Hong Kong subsidiary, YGF Investment Hong Kong Limited, which in turn owned a Chinese subsidiary, Mingyou Industrial Investment (Guangzhou) Co. Ltd. ("Mingyou Industrial").  ¶ 150.  In January 2021, the joint venture used Mingyou Industrial to acquire a parcel of land in Guangzhou, China, for the new headquarters.  ¶¶ 37, 150.  Specifically, Mingyou Industrial entered into a land contract with the Chinese government, which limited the

---

[7] Based on the Chinese Yuan to United Stated Dollar currency conversation on that date.  The exact price is not alleged.

[8] The SAC cites the December 11, 2020 Form 6-K and September 27, 2021 Form 6-K.

use of the land to the construction of MINISO's regional headquarters and prohibited the purchaser's change of ownership structure for 10 years after the contract was executed. ¶ 37,150.

On January 25, 2021, MINSO reduced the license fee rates it charged to its Retail Partners.  ¶ 55.  On September 17, 2021, MINISO filed its annual report with the SEC by filing Form 20-F ("2021 Form 20-F").  ¶ 81; Doc. 63-4.  The 2021 Form 20-F set forth MINISO's financial operating results and metrics for fiscal year 2021, and reported the Company's net loss.  ¶ 115(a).  It also reported decreases in its revenues from operations and same-store sales, as well as increases in store closures.  Doc. 63-4 at 105–06, 113–14. The report also contained a required Sarbanes–Oxley Act of 2002 ("SOX") certification, signed by Ye and Zhang.  ¶¶ 123–24.  As part of the SOX certification, Ye and Zhang swore that the annual report did not contain any "untrue statement of a material fact" or "omit to state a material fact necessary to make the statements made . . . not misleading[.]"  ¶ 124.  They also certified that, based on the "most recent evaluation of internal control over financial reporting," they had disclosed to the Company's auditors (1) "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting"; and (2) "any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  *Id.*

MINSIO filed quarterly and annual earnings releases with the SEC from 2020– 2021.  ¶¶ 70, 72, 74, 79, 81, 85, 91, 94, 96, 124.  Financial analysts commented more generally on MINISO's business strategy and practices following the IPO.  ¶¶ 65, 76, 87, 90, 93, 106.[9]  Various financial analysts also provided commentary on MINISO's 2021–

---

[9] The SAC cites a November 9, 2020 Bank of America analyst report; a May 20, 2021 Bank of America analyst report; a Bank of America analyst report "following the 11/18/2021 earnings call;" a January 11, 2022 Credit Suisse analyst report; a March 3, 2022 Bank of America analyst report; and a July 20, 2022 Jefferies Group analyst report.

2022 earning releases.  ¶¶ 137, 140, 142, 144.  Certain other press releases during that time period mentioned MINISO's "massive store network worldwide."  ¶¶ 88, 98, 100, 104.[10]

On December 23, 2021, MINISO announced it authorized a share repurchase program of up to $200 million of ADS.  ¶ 88.  On January 27, 2022 MINISO again reduced the license fee rates charged to its Retail Partners.  ¶ 55.  MINISO also issued an earnings press release on May 26, 2022, which described, among other items, the impacts of inflation, administrative expenses, and land use rights regarding its new headquarters. ¶ 96.  On June 27, 2022, MINISO filed a Form 6–K with the SEC which included public filings for MINISO's application to the Hong Kong Stock Exchange.  ¶¶ 118–20, 125–26.

From 2020–2022, MINISO issued numerous press releases and statements affirming its confidence and optimism in the Company, which were also included in various 6-K Forms filed with SEC.  ¶¶ 70, 72, 73, 74, 77, 79, 85(b), 88, 94, 96, 98, 99, 102, 104.[11] Finally, it made forward-looking statements in various 6-K Forms and news articles from 2020–2022.[12]  ¶¶ 61, 66, 74(a), 94(b), 96(b), 102(e).

*c.  Blue Orca Report*

On July 26, 2022, a short seller, Blue Orca Capital, issued a report regarding MINISO's business.  ¶¶ 147; 282–285, 310–314.  The Blue Orca Report claimed that,

---

[10] The SAC cites the December 23, 2021 Form 6-K; June 7, 2022 Form 6-K; June 21, 2022 Form 6-K; and the July 7, 2022 Form 6-K.

[11] The SAC cites the December 18, 2020 Form 6-K; the February 25, 2021 Form 6-K; the May 20, 2021 Form 6-K; the August 14, 2021 news article published by China Daily, "Miniso 4th quarter revenue reaches 2.47b yuan [*sic*];" the August 9, 2021 Form 6-K; the November 18, 2021 earnings call; the December 23, 2021 Form 6-K; the March 31, 2022 Form 6-K; the May 26, 2022 Form 6-K; the June 7, 2022 Form 6-K; the June 21, 2022 Form 6-K; the June 27, 2022 Form 6-K; and the July 11, 2022 Form 6-K.

[12] The SAC cites the October 15, 202 Bloomberg News article, "Former Pipe Factory Worker Becomes a Budget Store Billionaire;" The December 3, 2020 Bloomberg News article, "China's Budget Store King Takes on Toys 'R' Us;" the May 20, 2021 Form 6-K; the March 31, 2022 Form 6-K; May 26, 2022 Form 6-K; and the June 27, 2022 Form 6-K.

contrary to MINISO's representation that the vast majority of stores in China employ the Retail Partner model, a "Chinese corporate registry" and two pre-IPO articles revealed that MINISO directly owned and operated hundreds of stores in China.  ¶¶ 50(a)-(b), 283(a)-(b).  In the corporate registry, Blue Orca claimed to have found 620 MINISO stores in China that "are registered under the names of MINISO executives or individuals closely connected to the Company's chairman."  ¶ 50(a).  Blue Orca also cited (1) a 2017 article that claimed a MINISO brand director "said in an interview that most MINISO stores in Tier 1 cities in China are operated by the Company and that franchising is only limited to lower tier cities" and (2) a 2019 article from Yicai Media, the financial news arm of Shanghai Media Group (a state-owned media conglomerate), that claimed "40% of MINISO stores are owned by the Company."  ¶¶ 149(f), 312(f).  Blue Orca also interviewed a Chinese franchisee who said MINISO had 1,000 company-owned stores in 2019.  ¶ 159(a).  Finally, the Blue Orca Report claimed to have reviewed Chinese "credit reports" for Mingyou Industrial that showed that Ye did not contribute any capital to the joint venture project.  ¶¶ 51, 54, 150.

On July 27, 2022, MINISO announced that an independent committee of its board of directors would investigate the allegations in the Blue Orca Report.  ¶ 153.  On July 28, 2022, MINISO issued a press release refuting the allegations.  Doc. 63-7.  On September 15, 2022, MINISO announced that the audit committee's independent investigation was substantially complete and determined that key allegations made in the Blue Orca Report were not substantiated.  Doc. 63-8.

### d.  Novia Scotia's Investigative Efforts

Before bringing this action,[13] Novia Scotia also conducted an independent investigation that "confirmed the core factual bases" of the Blue Orca Report.  ¶¶ 53;

---

[13] Novia Scotia does not specify the date of their investigation.

286–289.  Specifically, Novia Scotia accessed Chinese corporate registry data[14] and "confirmed extensive insider store ownership," ¶ 287(a); found "suspicious activity" listing store changes and de-registrations, ¶¶ 287(a), 289; and concluded that 291 stores were registered to a single phone number allegedly used by Li, MINISO's executive vice president.  *Id.*  According to Novia Scotia, the investigation also confirmed:

- That "Chinese state-owned Shanghai Media Group[15] published a November 3, 2019 article stating that 40% of MINISO's China stores were directly owned and only 60% were franchises"

- That "Ye . . . owned 80% of the [joint venture] formed post-IPO, his stake was bought out ten months later, and the [joint venture's] paid in capital remained [roughly] 346 million [Chinese Yuan] contributed by MINISO until after his payoff"

- That "through a subsidiary, the joint venture entered into a land contract with the Chinese government barring ownership changes for 10 years"

- "Blue Orca's citation to a Chinese report that MINISO closed 850 stores by March 2019 and lowered franchise fees 63% over two years"

Doc. 73 at 19.  Novia Scotia also alleges that certain confidential witnesses ("CWs"), who worked in MINISO's North American stores, confirmed that MINISO misrepresented its Retail Partner model because their stores were owned and/or operated directly by MINISO.  ¶¶ 21–28, 41–48, 248–255, 274–281.

### B.  Procedural Background

The initial complaint in this action was filed by plaintiff Adeel Ashraf in the Central District of California on August 17, 2022.  Doc. 1.  After reviewing two plaintiff motions as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Central District of California appointed Novia Scotia as lead plaintiff.

---

[14] Novia Scotia used the Quichacha website, which Novia Scotia states "uses non-manual retrieval to pull legally disclosed information and data, including from, but not limited to, Chinese government registries." Doc. 73 at 37 n. 36.

[15] According to Novia Scotia, the article was published by Yicai Media, "the financial news arm of Chinese state-owned Shanghai Media Group."  Doc. 73 at 36 n.31.

Doc. 22.  The Central District of California certified the class action on November 8, 2022.  Nov. 8, 2022 Minute Entry.  Parties stipulated to transfer the case to the Southern District of New York, pursuant to a forum selection clause in the depository agreement governing the MINISO ADS.  Doc. 32.  This transfer was ordered on November 15, 2022.  Doc. 33.  Novia Scotia filed its first amended complaint on February 2, 2023, and filed the SAC on April 24, 2023.  Docs. 47, 60.  MINISO, Puglisi, and Puglisi & Associates filed their motion to dismiss on June 23, 2023.  Doc. 61.  That same day, BofA Securities, Inc., and Goldman Sachs (Asia) joined the existing motion to dismiss, and filed their own motion to dismiss.[16]  Doc. 64.  Novia Scotia filed its opposition to the motions to dismiss on August 28, 2023.  Doc. 73.  Defendants filed their joint reply on September 28, 2023.

## II.   LEGAL STANDARDS

### A.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to

---

[16] In their joint memorandum of law, BofA Securities, Inc., and Goldman Sachs (Asia) note they "write separately to address the SAC's sole claim against [them]." Doc. 65 at 2.  Their eight-page memorandum argues that Novia Scotia's § 11 claim is subject to Rule 9(b) and the PSLRA's heightened pleading requirements, and that the SAC is impermissibly puzzle-pled—or in other words, makes allegations without showing why and how each each statement is materially false or misleading.  Doc. 65 at 2–8.  Since these arguments are substantially identical to the arguments made in the instant motion to dismiss, the Court will address the claims in both motions together.

show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

### B. Heightened Pleading Standard under Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'"); *see also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) (applying particularity standards to Securities Act claims notwithstanding plaintiffs' separation of claims and disclaimers of fraud).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).

Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v.*

*Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); s*ee also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (same).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

### C.  External Documents

The Court may consider documents that are "referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. App'x. 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  The Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. App'x. 93 (2d Cir. 2014) (summary order).  Defendants attach the following documents to their motions to dismiss:

- ▪ Prospectus dated October 14, 2020
- ▪ Registration Statement dated October 14, 2020

- Bloomberg interview, "Former Pipe Factory Worker Becomes a Budget Store Billionaire," dated October 15, 2020

- Bloomberg article, "U.S. Market 'Big' Part of Miniso's Growth Plan, CFO Says," dated October 16, 2020

- Bloomberg article, "China's Budget Store King Takes on Toys 'R' Us," dated December 3, 2020

- Form 6-K dated December 11, 2020 (press release, "MINISO Announces Joint Venture for Headquarters Building Project in Guangzhou")

- Form 6-K dated December 18, 2020 (press release, "MINISO Announces Unaudited Results for the 2021 First Fiscal Quarter Ended September 30, 2020")

- Form 20-F dated September 17, 2021 (2021 annual report)

- Form 6-K dated September 27, 2021 (press release, "MINISO Group Announces Acquisition of Remaining Stake in a Joint Venture for its Headquarters Building Project")

- Blue Orca Report dated[17] July 26, 2022

- Form 6-K dated July 28, 2022 (press release, "MINISO Refutes Blue Orca's Short Seller Report")

- Form 6-K dated September 15, 2022 (press release, "MINISO Announces Substantial Completion of Independent Investigation")

- Chart showing MINISO stock prices from October 15, 2020 – June 22, 2023

- Form 6-K dated February 25, 2021 (press release, "MINISO Announces Unaudited Results for the Second Quarter of Fiscal Year 2021")

- Transcript of third fiscal quarter 2021 earnings call, dated May 29, 2021

- Form 6-K dated May 20, 2021 (press release, "MINISO Announces Unaudited Results for the Third Quarter of Fiscal Year 2021")

- Transcript of fourth fiscal quarter 2021 earnings call, dated August 19, 2021

- Form 6-K dated August 19, 2021 (press release, "MINISO Group Announces June Quarter and Full Fiscal Year 2021 Results")

- China Daily article, "Miniso 4th quarter revenue reaches 2.47b yuan [*sic*]," dated August 24, 2021

- Transcript of first fiscal quarter 2022 earnings call, dated November 18, 2021

- Form 6-K dated November 19, 2021 (press release, "MINISO Group Announces September Quarter 2021 Results")

---

[17] As stated by the SAC. ¶ 147.

- Form 6-K/A dated November 19, 2021(correcting clerical error in previous version)

- Form 6-K dated December 23, 2021(press release, "MINISO Announces US $200 Million Share Repurchase Program")

- Form 6-K dated March 4, 2022 (press release, "MINISO Group Announces December Quarter 2021 Results")

- Form 6-K dated March 31, 2022 (first supplemental disclosures to 2021 Form 20–F)

- Transcript of third fiscal quarter 2022 earnings call, dated May 26, 2022

- Form 6-K dated May 26, 2022 (press release, "MINISO Group Announces March Quarter 2022 Results")

- Form 6-K dated June 7, 2022 (press release, "MINISO Group to Hold Annual General Meeting on July 11, 2022")

- Form 6-K dated June 21, 2022 (press release, "MINISO Group Makes Further Announcement about Annual General Meeting to Be Held on July 11, 2022")

- Form 6-K dated June 27, 2022 (second supplemental disclosures to 2021 Form 20–F dated 2021)

- Form 6-K dated July 11, 2022 (press release, "MINISO Group Announces Results of Annual General Meeting").

*See* Doc. 63.  The SAC cites the vast majority of the attached documents.[18]  A district court is entitled to consider "the full text of those documents" partially quoted in a complaint but considered integral to ruling on a motion to dismiss.  *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc*., 75 F.3d 801, 809 (2d Cir. 1996).  Here, partially quoted securities filings are integral to a

---

[18] The SAC cites the Registration Statement; Prospectus; Bloomberg interview dated October 15, 2020; Bloomberg article dated December 3, 2020; Form 6-K dated December 11, 2020; Form 6-K dated December 18, 2020; Form 20–F dated September 17, 2021; Form 6-K dated September 27, 2021; Form 6-K dated February 25, 2021; Form 6-K dated May 20, 2021; Form 6-K dated August 19, 2021; China Daily article dated August 24, 2021; Form 6-K dated September 27, 2021; Form 6-K dated November 19, 2021; Form 6-K dated December 23, 2021; Form 6-K dated March 4, 2022; Form 6-K dated March 31, 2022; Form 6-K dated May 26, 2022; Form 6-K dated June 7, 2022; Form 6-K dated June 21, 2022; Form 6-K dated June 27, 2022; Form 6-K dated July 11, 2022; and the Blue Orca Report dated July 26, 2022.

complaint based on securities fraud.  Accordingly, the SAC incorporates these documents by reference and the Court will consider them in deciding the present motion.[19]

Regarding the documents not cited in the SAC—the Form 6-K dated July 28, 2022, Form 6-K dated September 15, 2022, a chart showing MINISO stock prices from October 15, 2020–June 22, 2023, and the transcripts of four earnings calls—the Court may "take judicial notice of public disclosure documents that must be filed with the SEC" as well as documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law,'" *Silsby*, 17 F. Supp. 3d at 354, and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008)).  Novia Scotia also does not raise any objection to the Court's consideration of the majority of the attached documents.[20]  Accordingly, this Court may take judicial notice of the majority[21] of the documents attached to the Defendants' motions to dismiss.

## III.   DISCUSSION

In short, the core allegations of Novia Scotia's action are that MINISO made misrepresentations about:  (1) its reliance on the Retail Partner model by allegedly secretly owning and operating stores directly; (2) the joint venture with Ye, to build a new company headquarters, which Novia Scotia claims was a sham to funnel "money for

---

[19] Novia Scotia also argues that Defendants' Exhibit K is "not cited in the SAC."  Doc. 73 at 31 n.13.  Novia Scotia is mistaken, since Defendants' Exhibit K is the same October 16, 2020 Bloomberg interview already cited in the SAC, albeit with a different title.  *Compare* ¶ 63 (describing that "on October 16, 2020, Exchange Act Defendant Zhang was interviewed, via video conferencing, on 'Bloomberg Markets: China Open'") *with* Doc. 63-11 (Exhibit K stating "Zhang . . . speaks [] on 'Bloomberg Markets: China Open.'").  Therefore, the Court will consider the October 16, 2020 Bloomberg interview.

[20] Novia Scotia does raise objections to the transcripts of the May 19, 2021, August 19, 2021, and May 26, 2022 earnings calls, stating these "appear to differ from the versions cited in the SAC."  Doc. 73 at 31 n.13.  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  Accordingly, the Court will use the versions cited in the SAC.

[21] With the exception of the transcripts of the May 19, 2021, August 19, 2021 and May 26, 2022 earnings calls.

nothing" to Ye through a later buyout of his stake; and (3) various challenges to MINISO's business, such as declines in revenue and profitability and increases in store closures.  Doc. 73 at 12–14; 17–19.  Accepting the allegations in the SAC as true, the Court considers whether Novia Scotia has adequately pleaded securities law violations.

To state a claim under § 10(b) of the Exchange Act, "a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss." *In re Express Scripts Holding Co. Sec. Litig*., No. 16-cv-3338 (ER), 2017 WL 3278930, at *10 (S.D.N.Y. Aug. 1, 2017).  "A violation of [§] 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (citations omitted).  Furthermore, the Second Circuit has indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

Novia Scotia's Securities Act claims similarly require it to allege facts showing that "the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig*., 592 F.3d 347, 358-59 (2d Cir. 2010).

With respect to material omissions, a defendant's silence is not misleading absent a duty to disclose.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  "Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Rather, "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 268 (2d Cir. 1993).

### A.  Novia Scotia Fails to Allege Any Material Misstatement or Omission

Novia Scotia's Exchange Act claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, which require stating the circumstances constituting fraud with particularity.  *See ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 196 (citations omitted).  When Securities Act claims sound in fraud, they are also subject to the heightened pleading requirements of Rule 9(b).  *See Rombach*, 355 F.3d at 171.

Novia Scotia insists that its Securities Act claims do not sound in fraud because they are based on a negligence theory.  ¶¶ 245, 247, 229, 341, 382.  Defendants dispute this, arguing that these claims "are based on allegations that the 'foundational narrative' of MINISO's business model is a 'lie' meant to 'trick' the markets and 'conceal' that stores are 'secretly owned and operated by the Company."  Doc. 62 at 14–15 (quoting SAC ¶ 283, 311).  The Court agrees with Defendants.

First, Novia Scotia's claims plainly contain "the wording and imputations . . . classically associated with fraud," *Rombach*, 355 F.3d at 172, including allegations that MINISO lied, concealed, tricked, and otherwise harmed ADS purchasers.  Second, Novia Scotia's Securities Act and Exchange Act claims rest on the same theory that MINISO knowingly misrepresented its Retail Partner model, joint venture with Ye, and store closure and revenue declines.  In cases involving nearly identical Securities Act and Exchange Act claims, such as the claims here,[22] courts in this District apply the heightened pleading standard.  *See In re HEXO Corp. Sec. Litig* , 524 F. Supp. 3d at 300

---

[22] Novia Scotia's cases are inapposite.  *See Wallace v. IntraLinks*, No. 11-cv- 8861 (TPG), 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013) ("[P]laintiffs go beyond merely disclaiming . . . fraud" and "offer[] a different theory for liability"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Securities Act claims do not "contain even a hint of fraud"); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 415 (S.D.N.Y. 2013) (similar); *Lewy v. SkyPeople Fruit Juice, Inc*., No. 11-cv-2700 (PKC), 2012 WL 3957916, at *9 (S.D.N.Y. Sept. 10, 2012) (plaintiffs use "a negligence-type theory to support their Section 11 claim"); *Silvercreek Mgmt., Inc. v. Citigroup, Inc*., 248 F. Supp. 3d 428, 448 (S.D.N.Y. 2017) (plaintiff "affirmatively alleges negligence"); *In re Wachovia Equity Sec. Litig*., 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011) ("mere use of [] statutory language . . . insufficient" to trigger Rule 9(b)); *In re OSG Sec. Litig*., 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) (similar).

(applying heightened pleading standard to all defendants where Securities Act and Exchange Act claims were "almost a mirror image" of one another); *In re Farfetch Ltd. Sec. Litig.*, No. 19-cv-08657 (AJN), 2021 WL 4461264, at *8 n.3 (S.D.N.Y. Sept. 29, 2021) (applying heightened standard to all defendants because "[e]very statement that [p]laintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act."), *aff'd sub nom. IAM Nat'l Pension Fund v. Farfetch Ltd.*, No. 21-cv-2752, 2023 WL 2879304 (2d Cir. Apr. 11, 2023); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015) (similar).

Third, although Novia Scotia does attempt to separate its claims pursuant to the Securities and Exchange Acts, this dissociation is insufficient. "Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient to avoid Rule 9(b) standards when Securities Act claims sound in fraud." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009). *See also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. at 300 n.17 (applying particularity standards to Securities Act claims notwithstanding plaintiffs' separation of claims and disclaimers of fraud). Regardless of which legal claims are asserted against which entities, Novia Scotia accuses all Defendants of fraud. Therefore, the heightened pleading standard applies to all of Novia Scotia's claims.

> *1. Novia Scotia Does Not Allege Any Material Misstatement or Omission in MINISO's IPO Materials*

Novia Scotia asserts claims pursuant to the Securities Act and the Exchange Act based on the Offering Materials for MINISO's IPO in October 2020. Specifically, it challenges statements regarding: (1) the Retail Partner franchise model, ¶¶ 57(a)(i), 264(a)–(h), 109(b)–(c), 270(b)–(c)); (2) expected uses of the IPO proceeds, ¶¶ 57(k), 264(j); (3) related party transactions, ¶¶ 57(*l*), 264(k); (4) the Board's fiduciary duties under Cayman Islands law, ¶¶ 57(j), 264(i); and (5) the disclosure of various historical

financial and operational data in the Offering Materials, ¶ 109–12, 270–72.  Each argument is unavailing.

> a. *The Offering Materials Did Not Materially Misrepresent the Retail Partner Model*

Novia Scotia claims that the disclosures in the Offering Materials about the Retail Partner model were false or misleading because "MINISO's franchise model was not being faithfully executed," "its benefits were not being realized," and "a material percentage of MINISO stores, both in China and globally, . . . were not franchise stores." ¶¶ 107, 121, 122, 268, 272, 273.  However, Novia Scotia fails to plead facts to establish that MINISO was not, in fact, operating through franchisees as of the date of the IPO.

Stores in China.  Novia Scotia claims that the Offering Materials misstated the number of Retail Partner stores in China, and that in fact, a "material percentage" of stores were secretly "owned by MINISO" and "were not franchise stores."  ¶¶ 8, 107, 122, 268, 273.  Novia Scotia's primarily rests its argument on the July 26, 2022 Blue Orca Report, which claims that 2021 records from a "Chinese corporate registry, two pre-IPO articles (a 2017 interview with a MINISO brand director and a 2019 article from Yicai Media[23]), as well as an undated interview with an unnamed Chinese franchisee, show MINISO directly owned and operated hundreds of stores.  ¶¶ 50(a)-(b), 283(a)-(b). These claims fail on two grounds.

---

[23] Novia Scotia also claims that the 2019 Yicai article "conveyed the official Chinese government position" because it was published by a "state-owned" media group."  Doc. 73 at 36 n. 31.  But this position is conclusory, because Novia Scotia pleads no facts, context, or even translations to show that a state-controlled source was in a position to know information related to MINISO, a company that is not state-controlled.  *In re Lehman Bros. Sec. & Erisa Litig.*, No. 10-cv-6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) *4 (declining to credit CWs who were "not managers or corporate officers who could have spoken to the company's practices broadly").  While Novia Scotia relies on *In re Silvercorp Metals, Inc. Securities Litigation*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014), as holding "Chinese registry data" or "'official' documents" should be credited over SEC filings,  Doc. 73 at 36 n. 31, *Silvercorp* concerned discrepancies in defendant's own filings in China and the U.S. and held "plaintiff must allege at least some facts to support that (1) the SEC figures, and not the [Chinese] filings, are false, and (2) any variation is not attributable to variations in reporting rules or accounting standards." 26 F. Supp. 3d at 271.  Novia Scotia does not allege such facts here.

First, a plaintiff must "allege facts demonstrating the challenged disclosure "was false at the time it was made*." In re Lululemon Sec. Litig.*, 14 F. Supp. at 571. Here, the Blue Orca Report and records from a Chinese corporate registry are from after the October 2020 IPO, and thus even if true, do not establish the statements in the Offering Materials were misleading at the time they were made. Novia Scotia claims this "temporal argument would mean the Registration Statement . . . could be challenged only by facts date-stamped on the exact date." Doc. 73 at 36. But at a minimum, a plaintiff must show "that the underlying fraud took place during the time period covered by the purportedly false public statements and the [defendants] knew or had reason to know about it." *PetroChina*, 120 F. Supp. 3d at 358. Novia Scotia's claim that the SAC "establish[es] a consistent state of affairs from 2017 through 2021" is conclusory and falls short of this standard. Doc. 73 at 36–37.

Second, it is a plaintiff's obligation to plead factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Novia Scotia's factual allegations do not meet this test. The records from the corporate registry purport to list only the "legal representative" of a store, which Novia Scotia *equates* to ownership. *See* ¶ 149. It does not dispute that these records do not make claims about the actual owner or operator of a store. Novia Scotia also admits the corporate registry is created by a private company, which relies on data "not limited to" official government sources. Doc. 73 at 37 n.36. Moreover, plausibility depends on "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). Here, Novia Scotia fails to consider MINISO's response to the Blue Orca report, which explained that "[h]istorically, certain MINISO Retail Partners requested the Company's assistance with certain administrative tasks, such as corporate registration . . . . some Company employees may have found it necessary or expedient to provide their names and contact information to the local authorities and did so on their own initiative*." July 28, 2022

Form 6-K at 4.  The information in this public filing undermines the plausibility of Novia Scotia's allegation of widespread fraud.

Novia Scotia's reliance on the pre-IPO articles and interview with the Chinese franchisee similarly fails. Plaintiffs must plead their sources with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Furthermore, it is "inappropriate to give any weight to . . . [CW] statements" when "[t]here is no suggestion that counsel in this action has spoken with these [CWs] or even knows who they are."  *In re Lehman Bros. Sec. & Erisa Litig*., No. 10-cv-6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).  Here, Novia Scotia does not plead facts indicating they have attempted to even contact the unnamed Chinese franchisee, and does not plead any facts about the identity of the brand director identified in the 2017 Yicai Media article.

In response, Novia Scotia points to its CW allegations, which they allege confirm that MINISO misrepresented its Retail Partner model.  ¶¶ 21–28, 41–48, 248–255, 274– 281.  However, the Court finds that all the CWs appear to have worked in North America.[24]  To the extent the CWs comment on MINISO's operations outside of North America, Novia Scotia has not alleged facts with sufficient particularity "to support the probability that" a North American CW would "possess the information alleged" about MINISO's operations outside of North America.  *See Novak* 216 F.3d at 314.  To the extent the CWs claim that stores in North America were Company-operated, the Court

---

[24] Specifically, the SAC claims that CW1 was "based in the Pasadena, California offices," ¶ 21; CW2 "reported to . . . [the] Manager of Merchandise in North America" and "dealt with all U.S. stores and was familiar with MINISO operations in Canada," ¶ 22; CW3 "overs[aw] U.S. stores" and was a "U.S. National Operations Inspector," ¶ 23; CW4 worked at the "Pasadena headquarters," ¶ 24; CW5 "worked at MINISO USA," ¶ 25; CW6 worked at "MINISO USA," ¶ 26; CW7 "worked for MINISO in California," ¶ 27; and CW8 worked at "MINISO USA." ¶ 28. While the SAC does not give the workplace location for CW2 and CW3, it does not plead that they worked outside of North America; indeed, their job titles and responsibilities suggest the opposite.

finds that their representations are consistent with MINISO's disclosures, as explained in more detail below.

Stores Outside of China.  Novia Scotia does not identify anything false or misleading about the statement that "in international markets, there were over 120 stores directly operated" as of June 30, 2020. ¶¶ 57(i), 264(g).  Moreover, this is consistent with MINISO's disclosure that "in North America . . . we typically enter markets by opening and operating stores on our own."  A securities law violation "cannot be premised upon a company's disclosure of accurate historical data."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).  Here, MINISO's disclosure of the number of stores outside of China and its typical practices arguably reflect accurate historical data.

Descriptive Statements.  Novia Scotia argues descriptive statements about MINISO's Retail Model, including descriptions of the "asset-light," "flexible" "franchise-like store model . . . where the franchisee bears the store opening costs" are misleading.  Doc. 73 at 15.  Novia Scotia fails to allege any facts contradicting these descriptive statements.  Relying on the Blue Orca Report's representation that only 60% of MINISO'S Chinese stores were franchise stores, Novia Scotia nonetheless argues that it is "misleading [to] say that 99% of Chinese stores are operated in that [franchise] model [when] the actual number is closer to 60%."  Doc. 73 at 25 n.31.  However, none of the descriptive statements make quantitative assertions.

Accordingly, the Court finds that MINISO's offering materials did not materially misrepresent its Retail Partner model.

*b.   No Material Misrepresentation Regarding the Joint Venture*

Next, Novia Scotia claims that the disclosures in the Offering Materials about MINISO's expected uses of the IPO proceeds, ¶¶ 57(k), 264(j); related-party transactions, ¶¶ 57(*l*), 264(k); and fiduciary duties under Cayman Islands law, *id.* ¶¶ 57(j), 264(i); were false or misleading because "the proceeds from MINISO's IPO would not be used as

advertised" and "a huge portion of MINISO's IPO proceeds were paid to Ye in a related party transaction."  ¶¶ 107, 121, 122, 268, 272, 273.  These allegations fail.

First, a portion of the IPO proceeds were in fact used for "expanding and upgrading [MINISO's] office space and facilities by acquiring land to build an office building," just as the Offering Materials disclosed.  ¶¶ 57(k), 264(j).  In other words, Novia Scotia does not dispute that MINISO did acquire a new headquarters.  Novia Scotia retorts that "nearly all the IPO funds available to buy headquarters land" (approximately $120 million) were used to pay $108 million to Ye to buy out his joint venture interest.  Doc. 73 at 40.  However, the SAC does not allege that IPO funds were used for the buyout transaction.  Rather, the SAC acknowledges that MINISO disclosed that "the consideration for [the] acquisition" of Ye's joint venture shares would be paid using MINISO's "cash surplus, future cash flows from operating activities and potential bank financing."  ¶ 83.  Second, even if MINISO was contemplating organizing the joint venture at the time of the IPO, where an outcome is merely speculative, the duty to disclose does not attach.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize).  MINISO and Ye did not launch the joint venture until December 2020—two months after the IPO, ¶¶ 54, 250, and MINISO did not buy out Ye's stake until September 2021—nearly a year after the IPO.  ¶¶ 37, 252.  Accordingly, Novia Scotia fails to establish that the Offering Materials could or should have disclosed these future transactions.

Novia Scotia next claims that Defendants were actually "implying" the joint venture was a new idea, and that Ye had planned the transactions all along, and that there is no evidence Ye recused himself from the Board vote to approve the transaction.  Doc. 81 at 40–41.  But these assertions do not appear in the SAC.  Equally unavailing is its argument that Defendants had a duty to update, *id.*, since MINISO did promptly disclose the joint venture transaction.  *See* Dec. 11 2020 Form 6-K; Sept. 27, 2021 Form 6-K.

Third, Novia Scotia fails to allege anything false or misleading about the disclosure in the Offering Materials of the Board's fiduciary duties pursuant to Cayman Islands law.  ¶¶ 57(j), 264(i).  To the extent Novia Scotia contends that this disclosure was false or misleading because the Board subsequently breached its fiduciary duties, the SAC alleges no facts establishing any breach.  Finally, while Novia Scotia alleges a Chinese government land contract barred ownership changes to the equity structure, it provides evidence through a self-translated a local government post that is "inaccessible out of China."  ¶ 281.  Such sparse factual allegations simply do not meet Rule 9(b)'s heightened pleading requirement.

In sum, the Court finds there was no material misrepresentation about the joint venture in the Offering Materials' disclosures.

### c.   *No Material Misrepresentation of Reported Results*

Finally, Novia Scotia claims that the Offering Materials misrepresented or concealed that "MINISO franchises were struggling to reach or maintain profitability and closing in large numbers," that "MINISO was having significant difficulties attracting franchisees to open new stores, despite its considerable efforts and concessions, which included lowering franchise fees and taking on store opening costs," and "MINISO's revenues and profitability, on a per-store and overall basis were declining from peaks reached before its IPO."  ¶¶ 107, 121, 122, 268, 272, 273.  These claims fail because either the Offering Materials disclosed the relevant information or Novia Scotia fails to plead facts establishing the issue existed as of the IPO.

First, Novia Scotia fails to allege any misrepresentation in the Offering Materials about profitability or store closures as of the IPO.  The Offering Materials expressly disclosed that same-store sales had declined each year since 2018.  Doc. 63-1 (Prospectus) at 131.  The Offering Materials similarly disclosed a spike in MINISO store closures due to COVID-19.  Doc. 63-2 at 34.  Novia Scotia claims this disclosure falsely implied "that those issues were recent and temporary," as it attributed such trends to

COVID-19.  Doc. 73 at 41.  But the plain language of the disclosure states that
"intensifying market competition" caused negative growth "in the second half of 2019"
*before* the onset of the pandemic.  Doc. 63-1 at 131.  Thus, MINISO did warn of the
precise risks Novia Scotia claims were omitted.

     Novia Scotia claims that MINISO misrepresented or concealed that 850 stores
allegedly closed by March 2019.  ¶¶ 55, 289.  But Novia Scotia fails to tie these alleged
closures to any misstatement.  The Offering Materials reported the total number of stores
at the end of each quarter.  Doc. 63-1 (Prospectus) at 16; *see also id.* at 28 (noting that
"store expansion led to a change in store mix").  Because Novia Scotia does not allege
that any quarterly reported data regarding revenue or the total number of stores was false,
they cannot state a claim on the basis of this "accurate historical data."  *Boca Raton*, 506
F. App'x at 39.  It is Novia Scotia's contention that there was a duty to speak the whole
truth" without "concealing the underlying negative trends.  Doc. 73 at 42.  As the Second
Circuit has made clear, "[w]hatever the scope of the responsibility not to make statements
that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated
corporate earnings."  *Boca Raton*, 506 F. App'x at 38 (rejecting theory that reported
earnings were "actionable, even though literally true, because they did not acknowledge
the long-term unsustainability of its business model").

     Novia Scotia then argues that absent a more detailed breakdown of store closures
and openings, total store counts may "imply[] a straightforward doubling" Doc. 73 at 42
n.47.  This argument is unpersuasive.  Novia Scotia cannot base a securities claim "on
implicit promises read into [d]efendants' historical factual statements."  *In re Coty Inc.*
*Sec. Litig.*, No. 14-cv-919 (RJS), 2016 WL 1271065, at *9 (S.D.N.Y. Mar. 29, 2016); *see*
*Boca Raton*, 506 F. App'x at 38 ("To the extent that investors might impute a positive
corporate outlook from omissions in earnings reports, we have explained that general
expressions of corporate optimism are too indefinite to be actionable under the securities

laws.") (internal quotation marks omitted).  The SAC alleges no facts that there were other material store closure trends or data that MINISO was required to disclose.

Second, Novia Scotia fails to allege any misrepresentation in the Offering Materials about license fee rates as of the date of the IPO.  Indeed, the Offering Materials did not discuss—and thus could not have misrepresented—the amount of the license fee rates charged to MINISO's Retail Partners; they merely reported the total revenue earned from license fees.  Doc. 63-1 (Prospectus) at 99.  The Offering Materials explicitly warned that it "may also be unable to continuously offer attractive terms or economic benefits to our MINISO Retail Partners."  *Id.* at 31.  In any event, Novia Scotia notes that the license fee rate reductions were in January 2021 and January 2022—after the October 2020 IPO.  ¶¶ 55, 289.  Nor did MINISO have a duty to disclose under Item 303 or Item 105 of Regulation S-K.[25]  Item 303 generally requires disclosure of "known trends or uncertainties" that the issuer considers "reasonably likely" to have a material impact on its business.10 17 C.F.R. § 229.303(b)(2)(ii).  Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  By Novia Scotia's own allegations in the SAC, there was no downward trend in the license fee rates as of the date of the IPO.

Third, Novia Scotia does not allege any omission or misstatement in the Offering Materials about revenues as of the date of the IPO.  An omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Novia Scotia claims that MINISO's reported revenues for fiscal years 2019 and 2020 were lower than unreported revenue for 2018.  ¶¶ 52, 55, 285, 289.  But MINISO had no duty to disclose revenues from 2018, two years before the IPO.  Even assuming the 2018 revenue alleged in the SAC is accurate, there is no misrepresentation.  The Offering

---

[25] Novia Scotia cites Items 105 and 103 of Regulation S-K to underpin its Exchange Act claims.  *See* Doc. 73 at 32 & n.18.

Materials disclosed MINISO's trend of declining revenues.  Doc. 63-1 (Prospectus) at 3, 12, 28 (attributing declines to COVID-19, "an increasing number of new stores being opened in lower-tier cities and under penetrated locations" and "increased competition issues we faced in 2019 and 2020").

Accordingly, the Court finds that Novia Scotia has failed to allege that MINISO materially misrepresented its business challenges in its reported results.

### 2.  Novia Scotia Fails to Allege Any Material Misstatement or Omission in MINISO's Post-IPO Materials

Novia Scotia also asserts additional Exchange Act claims challenging post-IPO disclosures; including several quarterly and annual earnings releases, ¶¶ 70, 72, 74, 79, 81, 85, 91, 94, 96, 124; public filings for MINISO's  application to the Hong Kong Stock Exchange, ¶¶ 118–20, 125–26; press releases about the joint venture, ¶¶ 68, 83; quotes from MINISO'S CEO and CFO reported in various news articles, and certain other press releases mentioning MINISO's "massive store network worldwide,"  ¶¶ 88, 98, 100, 104. Novia Scotia contends these disclosures were false or misleading for largely the same reasons as the Offering Materials.  ¶¶ 107, 121–22.  Accordingly, the Court finds they fail for largely the same reasons.  To the extent the additional Exchange Act claims do not overlap with the Securities Act claims, the Court considers each one below.

### a.  No Material Misstatement or Omission Regarding the Joint Venture Transaction

Novia Scotia contends that Ye never contributed any funds to the joint venture, thus making his eventual buyout "money for nothing" and a "naked transfer of shareholder money to the chairman." ¶¶ 51, 107.  As evidence, they cite to the Blue Orca Report, which claims to have reviewed Chinese "credit reports" that allegedly show Mr. Ye did not contribute any capital to the project. ¶¶ 51, 150.  However, these alleged credit reports were not for the joint venture entity itself, but for a Chinese subsidiary (Mingyou Industrial) of a different subsidiary (YGF Investment V Hong Kong) of the joint venture. ¶¶ 54, 150.  Courts have rejected attempts to use the filings of one entity to establish the

falsity of another's.  *See, e.g.*, *In re China XD Plastics Co. Sec. Litig.*, No. 14-cv-05308 (GBD), 2016 WL 1241522, at *5-6 (S.D.N.Y. Mar. 23, 2016); *Harris v. AmTrust Fin. Servs., Inc.*, 649 F. App'x 7, 9-10 & n.3 (2d Cir. 2016).  Here, these credit reports for Mingyou Industrial say nothing about what Ye contributed to the actual joint venture– an entity two levels above the Mingyou Industrial subsidiary.  Mingyou Industrial's filings do not establish the falsity of the joint venture's filings.  Because the SAC pleads no facts supporting Ye's self-dealing, "the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed."  *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (emphasis in original).  Accordingly, the Court finds no material misstatement or omission in the joint venture transaction.

  b. *No Material Misstatement or Omission in Post-IPO License Fee Rate Reductions*

   Novia Scotia alleges that it was a misrepresentation or omission for MINISO not to disclose reductions in license fees charged to its Retail Partners in January 2021 and January 2022, arguing that these cuts indicated that MINISO "was having significant difficulty attracting franchisees."  ¶ 107.  But again, an omission is actionable "only when the corporation is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267.  Here, Novia Scotia alleges no facts establishing MINISO's obligation to disclose pricing changes, nor any statements rendered misleading without disclosure of the reduction.  Accordingly, its claim of a material misstatement or omission based on changed license fees fails.

  c. *No Misrepresentation or Omission Regarding Internal Controls*

   Novia Scotia also argues that employees with a "a significant role in MINISO's internal controls over financial reporting" made materially false statements in various SEC filings.[26]  ¶¶ 123–127.  This claim fails because, as set forth above, Novia Scotia

---

[26] Specifically, in the 2021 Form 20–F SOX certification; the March 31, 2022 Form 6-K, and the June 27, 2022 20–F supplement. ¶¶ 123-126.

fails to allege that MINISO's SEC filings were false and misleading, or that the Company's employees participated in any fraud.  Novia Scotia's reliance on *Venkataraman v. Kandi Technologies Group, Inc.* is inapposite.  Doc. 73 at 34 n.54. Here, MINISO's post-class period statements did not admit "that earlier statements were false when made," No. 20-cv-8082 (LGS), 2022 WL 4225562, at *6 (S.D.N.Y. Sept. 13, 2022), but rather, rebutted any claim of fraud or falsity.  Thus, Novia Scotia does not successfully establish internal controls fraud.

> #### d.  Other Inactionable Statements In The SAC

In addition to all the issues set forth above, many of the statements Novia Scotia challenges are not actionable for other reasons.  It is axiomatic that "a defendant must actually make a false or misleading statement" to be held liable under § 10(b) of the Exchange Act.  However, several statements in the SAC were not made by the Defendants.  *See, e.g.*, ¶¶ 65 76, 87, 90, 93, 106 (analyst reports about MINISO's business after the IPO).[27]  Others do not relate to any alleged facts or misconduct at all. *See, e.g.*, ¶ 88 (share repurchase program); ¶ 96 (impacts of inflation, administrative expenses, and land use rights for the new headquarters).

Novia Scotia also challenged numerous statements where MINISO affirms its confidence and optimism in the Company, relying primarily on various 6-K Forms filed with the SEC.  ¶¶ 70, 72, 73, 74, 77, 79, 88, 94, 96, 98, 99, 102, 104.[28]  But these types of statements are inactionable puffery.  *See Boca Raton*, 506 F. App'x at 37.  Novia Scotia

---

[27] The SAC cites a November 9, 2020 Bank of America analyst report; a May 20, 2021 Bank of America analyst report; a Bank of America analyst report "following the 11/18/2021 earnings call;" a January 11, 2022 Credit Suisse analyst report; a March 3, 2022 Bank of America analyst report; and a July 20, 2922 Jefferies analyst report.

[28] The SAC cites the December 18, 2020 Form 6-K; the February 25, 2021 Form 6-K; the May 20, 2021 Form 6-K; the August 14, 2021 news article published by China Daily, "Miniso 4th quarter revenue reaches 2.47b yuan [*sic*];" the August 9, 2021 Form 6-K; the December 23, 2021  Form 6-K; the March 31, 2022 Form 6-K; the May 26, 2022 Form 6-K; the June 7, 2022 Form 6-K; the June 21, 2022 Form 6-K; the June 27, 2022 Form 6-K; and the July 11, 2022 Form 6-K.

next challenges statements of opinion expressed during earning calls or various 6–K Forms filed with the SEC, which also express faith in the Company.  ¶¶ 70, 85(b), 94(b), 96(a), 102(e).[29]  However, to be actionable, opinion statements must be both objectively false and disbelieved when made.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015).  Novia Scotia never pleads these statements meet these requirements.

Finally, Novia Scotia also challenges forward-looking statements, ¶¶ 61, 66, 74(a), 94(b), 96(b), 102(e), made in various 6–K Forms and reported in news articles.[30] But these are protected under the PSLRA safe harbor and bespeaks caution doctrine.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) ("defendant "shall not be liable with respect to any forward-looking statement,"); *Rombach*, 355 F.3d at 173 ("under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.") (internal quotation marks omitted).  As set forth above, Novia Scotia issued forward looking statements with adequate cautionary language.  *See, e.g.*, Doc. 63–1 at 36 (warning that MINISO "face[s] certain risks in executing [business] strategies" and "cannot assure [investors] that [it] will be able to execute [its] growth strategies successfully").  In sum, Novia Scotia's other allegations in the SAC are inactionable.

---

[29] The SAC cites the December 18, 2020 Form 6-K; the November 18, 2021 earnings call; the March 31, 2022 Form 6-K; May 26, 2022 Form 6-K; and the June 27, 2022 Form 6-K;

[30] The SAC cites the October 15, 2020 Bloomberg News article, "Former Pipe Factory Worker Becomes a Budget Store Billionaire;" The December 3, 2020 Bloomberg News article, "China's Budget Store King Takes on Toys 'R' Us;" the May 20, 2021 Form 6-K; the March 31, 2022 Form 6-K; May 26, 2022 Form 6-K; and the June 27, 2022 Form 6-K.

### B.  Novia Scotia Does Not Allege A Strong Inference of Scienter

Separately, Plaintiffs' Exchange Act claims also fail because the SAC does not sufficiently establish scienter for Ye, Zhang, Li, and Puglisi.  To state a claim pursuant to § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind."  *ECA & Local 134 IBEW*, 553 F.3d at 198.  A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314 (emphasis added).

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Id.*  "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13-cv-2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322–23, 127).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A*., 459 F.3d 273, 290–91 (2d Cir. 2006).

*1. Novia Scotia's Allegations of Motive are Insufficient*

Novia Scotia does not plead motive for Li or Puglisi, and focuses its allegations on Ye and Zhang.  Novia Scotia asserts two theories of motive for Ye.  First, it alleges that Ye sold certain MINISO shares at some point in 2021.[31] ¶ 164.  To establish motive, Novia Scotia must establish that Ye's alleged sales were "unusual" or "suspicious," and the "mere fact that insider stock sales occurred does not suffice." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772 (S.D.N.Y. 2019).

But Novia Scotia does not allege that there was anything unusual or suspicious, beyond conclusory statements, about the timing or amount of Ye's purported sales.  As to timing, Novia Scotia asserts that these sales "obviously compare suspiciously" to Ye's behavior before the class period, "when he sold no shares."  ¶ 164.  However, prior to the IPO, which began the class period, there was simply no market for MINISO shares.  As to amount, Ye allegedly only sold 5.6 million ordinary shares (the equivalent of 1.4 million ADS), which amounts to just 0.6% of the 881 million shares he held.  *Id.*

Second, Novia Scotia also accuses Ye of "self-dealing" in the joint venture transaction.  ¶ 165.  But Novia Scotia does not plead any particularized facts to support that assertion.  It is undisputed that those transactions were approved by MINISO's Board, its audit committee, and an independent appraiser.  ¶ 84.

As to Zhang, Novia Scotia alleges that he received approximately $2.5 million in equity-settled share-based compensation in the fiscal year that ended June 30, 2021.  ¶ 168.  But again, Novia Scotia fails to allege anything suspicious about the timing or amount of Zhang's compensation.  *See Gagnon*, 368 F. Supp. 3d at 772.  Next, Novia Scotia argues that Ye, Zhang, and Li received "outsized" Board of Directors payments.  Doc. 73 at 47.  However, they again plead no particular facts establishing why these benefits were suspicious.  *See Gagnon*, 368 F. Supp. 3d at 772.

---

[31] Novia Scotia does not allege when in 2021 these sales allegedly occurred.

As to Novia Scotia's remaining motive allegations, "universal motives," such as "complet[ing] business transactions" or "increas[ing] officer compensation," are insufficient absent allegations showing "a unique connection between the fraud and the [benefit]." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011).  Here, Novia Scotia pleads no such facts, such as why or when the benefits were awarded.  Novia Scotia argues that even if the requirements for individual scienter are not met, MINISO still has corporate scienter based on the IPO and MINISO's application to the Hong Kong Stock Exchange.  ¶¶ 169–171; Doc. 73 at 47.  However, Novia Scotia does not plead any facts "uniquely connecting" the allegedly suspiciously timed public offerings to the alleged fraud.[32]

### 2.   *Novia Scotia's Allegations of Reckless Disregard are Insufficient*

When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citations omitted); *accord S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Novia Scotia must plead conduct that is "highly unreasonable" or reflects "an extreme departure" from the standards of ordinary care.  *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  This requires pleading particularized facts that show the defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142.  Plaintiffs "must specifically identify the reports or statements containing this information."  *Mechel OAO*, 811 F. Supp. 2d at 869.

---

[32] Novia Scotia's cited cases do plead such a connection and are thus inapposite.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008) ("incentive compensation predicated upon a corporation's share price or financial performance, standing alone, does not provide an adequate basis for motive allegations," and instead finding scienter based on defendants' motive to conceal options backdating scheme); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (CEO's $3 million bonus for boosting earnings statement supported scienter where the earnings statement was the subject of multiple alleged misstatements); *Silvercorp*, 26 F. Supp. 3d at 276 ("stock offering . . . was temporally connected with the allegedly fraudulent SEC reports").

Here, Novia Scotia largely repeats its allegations of falsity based on the Blue Orca Report and CWs, ¶¶ 157–59, and claims that these were red flags that Defendants ignored.  But as demonstrated above, none of the purported "red flags" were inconsistent with any of the Company's disclosures.  Novia Scotia next invokes the "core operations" doctrine to allege Ye, Zhang, Li, and Puglisi violated duties to speak truthfully and familiarize themselves with the subject matter of statements they signed or made, including MINISO's Code of Conduct and SOX certifications.  ¶¶172–185.  However, the core operations doctrine "cannot establish scienter independently" unless "coupled with evidence of corresponding fraudulent intent."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011).  Because "the SAC does not allege [defendants] were engaged in fraudulent acts," *PetroChina*, 120 F. Supp. 3d at 357, Novia Scotia's arguments regarding MINISO's SOX certifications and Code of Conduct do not support scienter.[33]

In sum, Novia Scotia does not establish scienter for any individual "whose intent could be imputed to [MINISO]," the Exchange Act claims against MINISO likewise fail.  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 782 (S.D.N.Y. 2021).

### C.  The Absence of Loss Causation Requires Dismissal

Novia Scotia's claims independently fail because its alleged losses are not caused by the alleged fraud.  Novia Scotia's assertion that loss causation cannot be considered for the Securities Act claims until summary judgment is incorrect.  *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011) (dismissing Securities Act claims where it was "apparent on the face of the complaint that

---

[33] Additionally, failure to plead a primary violation of § 11 or §10(b) of the Exchange Act precludes a claim for control persona liability under § 15 or § 20(a).  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010). Here, no such primary violation exists, and thus Novia Scotia's § 15 and § 20(a) claims must be dismissed.

the alleged loss is not causally connected to the misrepresentations at issue").  Pursuant to the Exchange Act, Novia Scotia must allege that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  Similarly, Securities Act claims are dismissed where "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue."  *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).

Nova Scotia primarily relies on the Blue Orca Report for its loss causation argument.  But a negative "characterization of previously disclosed facts does not constitute a corrective disclosure."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).  As set forth above, the Blue Orca Report did not disclose any new facts about MINISO's business practices, store closures, declining revenues, or other financial information.  Second, Novia Scotia sold its shares before the short seller report, meaning the report could not have caused the alleged losses.  *See Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11-cv-2484 (KMW) 2013 WL 944777, at *10 (S.D.N.Y. Mar. 12, 2013) (dismissing Securities Act claims on negative loss causation grounds where plaintiff "sold all his stock well prior to the corrective disclosures").

Novia Scotia claims that several other "partial corrective disclosures incrementally revealed the frauds" before the Blue Orca Report, specifically:  (1) a Bloomberg article about "blind box sales"[34] ¶ 130; (2) MINISO's November 19, 2021 Form 6–K, ¶ 134; and (3) analyst commentary about the Company's 2021–2022 fiscal quarter earnings, ¶¶ 137, 140, 142, 144.  Disclosures that "do not reveal to the market the falsity" or alleged fraud "do not amount to corrective disclosure[s]."  *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 175 n.4 (2d Cir. 2005).  Since these disclosures have nothing

---

[34] MINISO sells blind boxes of its toys, which do not show what figure is inside.  ¶ 130.

to do with the alleged fraud, they are not "corrective" and thus fail to support Novia Scotia's argument.  Accordingly, the Court finds that Novia Scotia does not plead loss causation. [35]

### D.  Leave to Amend

Novia Scotia has requested leave to amend in the case of dismissal.  Doc. 73 at 51 n.73.  Courts are instructed to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are ultimately within the discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted); *see also Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-cv-10104 (ER), 2023 WL 2674743 at *3 (S.D.N.Y. Mar. 29, 2023) ("The party opposing the motion to amend bears the burden of proving the claim's futility.").  This is a permissive standard since the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits" of the case.  *Conley v. Gibson*, 355 U.S. 41, 48 (1957).  Moreover, the Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015)).

Because this is the Court's first opportunity to highlight the precise defects of Novia Scotia's pleading, and it is not yet apparent that another opportunity to amend would be futile, the Court will permit Novia Scotia to replead the dismissed claims.

---

[35] The parties also dispute whether the SAC is "puzzle pled."  *See* Doc. 73 at 31; Doc. 81 at 10.  Puzzle pleading, or allegations without any effort to "'demonstrate with specificity why and how' each statement is materially false or misleading," is improper and alone warrants dismissal.  *Boca Raton*, 506 F. App'x at 37-38.  Because the Court grant Defendants' motions to dismiss on other grounds, it does not reach this argument.

## IV.    CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 61, 64. Should Novia Scotia wish to file a third amended complaint, it must do so by March 15, 2024.  If it fails to do so, the case will be closed.

It is SO ORDERED.

Dated:    February 23, 2024
          New York, New York

_____

EDGARDO RAMOS, U.S.D.J.