UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MINISO GROUP HOLDING
LIMITED SECURITIES LITIGATION

**OPINION & ORDER**

22-cv-9864 (ER)

RAMOS, D.J.

This class action concerns MINISO Group Holding Ltd. ("MINISO" or "the Company"), a Chinese retailer of toys and lifestyle products, and was brought by class of individuals or entities who purchased or otherwise acquired MINISO American Depository Shares ("ADS") between October 15, 2020 and July 26, 2022 (the "class period"). Doc. 60. According to the Second Amended Complaint ("SAC"), during the class period, MINISO made false and misleading statements about: (1) its franchise model (the "Retail Partner model"); (2) a joint venture with its chief executive officer, Guofu Ye, to build a new company headquarters; and (3) its business results as reported in publicly filed documents. *Id.*

Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") filed this action individually and on behalf of those who purchased MINISO securities during the class period. *Id.*[1] Nova Scotia asserted claims against MINISO and four of its individual officers: (1) Guofu Ye, the Company's chief executive officer; (2) Saiyin Zhang, the Company's chief financial officer; (3) Minxin Li, the Company's executive vice president; and (4) Donald Puglisi, the managing director of Puglisi & Associates, MINISO's authorized U.S. representative at the time of MINISO's initial public offering ("IPO") on the New York Stock Exchange. *Id.* Nova Scotia also asserted claims against Puglisi & Associates, as well as Goldman Sachs (Asia) LLC and BofA Securities, Inc.,[2]

---

[1] The complaint was filed by Nova Scotia and Adeel Ashraf. Doc. 60. Because this is a class action, the Court will refer only to the lead plaintiff, Nova Scotia, as it did in the prior opinion. *See* Doc. 95.

[2] Formerly known as Bank of America Merrill Lynch.

the investment banks that served as underwriters for the IPO.  *Id.*[3]  On February 23, 2024, the Court granted the motions of MINISO, Ye, Zhang, Li , Puglisi, Puglisi & Associates, Goldman Sachs (Asia) LLC, and BofA Inc.'s (collectively, "Defendants") to dismiss the SAC.  Doc. 95.[4]  Before the Court is Nova Scotia's motion for reconsideration.  Doc. 101.  For the reasons set forth below, the motion is DENIED.

## I.     BACKGROUND[5]

### A.  Factual Background

#### 1.  The Company

MINISO is incorporated in the Cayman Islands.  Doc. 60 ¶ 12.  The majority of its operations are based in China.  *Id.* ¶ 30.  MINISO is an "asset light" retail company built around the Retail Partner model.  *Id.* ¶ 57.  The Retail Partner model is "a franchise-like store model with chain store characteristics."  *Id.* ¶ 33.  Under this model, Retail Partners open and operate MINISO stores at different locations, while shouldering the associated capital expenditure and operating expenses.  *Id.*  MINISO allegedly provides value under this model by allowing its Retail Partners to use the MINISO brand and providing them with "valuable guidance" on store operation, in exchange for a pre-agreed portion of in-store sale proceeds and an annual license fee, based on the quality of the store location and the number of stores owned by the Retail Partner.  *Id.*  MINISO Retail Partners keep

---

[3] Count One of the SAC alleged violations of § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("Exchange Act") against MINISO, Ye, Zhang, Li, Puglisi, and Puglisi & Associates.  Count Two asserted violations of § 20(a) of the Exchange Act against Ye, Zhang, and Li.  Count Three alleged violations of § 11 of the Securities Act of 1933 ("Securities Act") against MINISO, Ye, Zhang, Li, Puglisi, Puglisi & Associates, Goldman Sachs (Asia) LLC, and BofA Securities, Inc.  Count Four asserted violations of § 15 of the Securities Act against Ye, Zhang, and Li.

[4] On June 23, 2023, MINISO, Puglisi, and Puglisi & Associates filed their motion to dismiss.  Doc. 61.  That same day, BofA Securities, Inc., and Goldman Sachs (Asia) joined the existing motion to dismiss, and filed their own motion to dismiss.  Doc. 64.  After being served in China, Ye, Zhang, and Li notified the Court that they join MINISO's motion to dismiss the SAC.  Doc. 93.

[5] The facts are drawn from the SAC, together with "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint."  *Delfonce v. Eltman Law, P.C.*, No. 16-cv-6627 (AMD), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017*), aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC."  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

the remaining sales proceeds, while MINISO retains ownership of inventory until in-store sales to customers are completed. *Id.* According to Nova Scotia, MINISO's success is highly dependent upon its Retail Partner model. *Id.*

MINISO primarily derives revenue from sales of lifestyle products—such as home décor, small electronics, textile, accessories, beauty tools, toys, cosmetics, personal care, perfumes, stationary, and gifts—through sales to MINISO Retail Partners, sales to distributors, and retail sales in directly-operated stores and through online channels. Doc. 63-1 at 91, 99. Other sources of revenue include franchisee license fees, royalties, as well as management and consultation service fees. *Id.* at 252. Ye and Yunyun Yang, Ye's spouse, are the controlling shareholders of MINISO. Doc. 60 ¶ 261. The Company launched an IPO on the New York Stock Exchange on October 15, 2020. *Id.* ¶ 7, 35.

### 2. *The Company's Alleged Misrepresentations*

### a. *Representations During The IPO*

As part of the IPO process, MINISO filed several documents with the Securities Exchange Commission ("SEC"). The Company filed a Form F-1 registration statement on September 23, 2020. *Id.* ¶ 261(a). MINISO filed its first amended registration statement on October 7, 2020, a second amended registration statement on October 13, 2020, and a third amended registration statement on October 14, 2020 (the "Registration Statement"). *Id* .¶ 261(b). Ye, Zhang, Li, and Puglisi all signed the Registration Statement. *Id.* ¶ 261(a), (b). MINISO also filed a prospectus ("Prospectus") with the SEC on October 15, 2020. *Id.* ¶ 261(c).

MINISO's Prospectus and Registration Statement (collectively, the "Offering Materials") made a number of disclosures. First, it made the following disclosures about the Retail Partner model:

- That as of June 30, 2020, there were 122 directly-operated stores in overseas markets and 7 directly operated stores in China. *See* Doc. 63-2 (Registration Statement) at 135.

- "In strategic markets with large population and huge market potential such as North America and India, we typically enter the markets by opening and operating stores on our own." *Id*. at 138.

- MINISO uses a "[f]lexible business model" that is an "asset-light franchising business model," *id.* at 122, where the "franchisee bears the store opening capital expenditure[s] and store operating expenses," *id.* at 15.

Second, it made the following disclosures about the use of the anticipated IPO proceeds and related party transactions:

- "We plan to use the net proceeds of this offering to expand our business operations as follows:  approximately 30% to expand our store network; approximately 30% to invest in our warehouse and logistics network; approximately 20% to invest in technologies and information systems; and the balance for general corporate purposes, which may include . . . expanding and upgrading our office space and facilities by acquiring land to build an office building . . . ." *Id*. at 85.

- Disclosed that eleven related party transactions occurred in 2019–2022, all of which involved loans borrowed from Ye, interest free cash advances given to (and associated repayments made by) Ye or companies controlled by Ye, the "dispos[al] of certain loss-making subsidiaries" to companies controlled by Ye, and goods purchased from companies controlled by Ye or where Ye had "significant influence." *Id.* at 169–70.

Third, it made the following disclosures about the fiduciary duties of the MINISO Board[6] pursuant to Cayman Islands law, which is where MINISO is incorporated:

- "As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he owes the following duties to the company—a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his personal interest or his duty to a third party, and a duty to exercise powers for the purpose for which such powers were intended." *Id.* at 178.

Fourth, it made the following disclosures about MINISO's business operations:

- The "[n]egative impact of COVID-19 on our business operations in China has resulted in a decrease in our revenue." *Id*. at 34.

---

[6] Ye, Zhang, and Li are members of the Board of Directors.  Doc. 60 ¶¶ 238–40.

- "[U]nplanned store closures [due to COVID–19] . . . resulted in peak closures of over 60% of MINISO stores in China in early February . . . . As of June 30, 2020, over 20% of MINISO stores in overseas markets were closed." *Id.*

- "Our revenue per MINISO store has fluctuated significantly historically with a decrease of 19.8% from the fiscal year ended June 30, 2019 to the fiscal year ended June 30, 2020. The decrease was primarily due to the outbreak of COVID-19, and an increasing number of new stores being opened in lower-tier cities . . . as well as increased competition issues we faced in 2019 and 2020." *Id.* at 35.

- "We plan to further expand and upgrade our store network both in China and globally and enhance our product development and supply chain capabilities. We face certain risks in executing these strategies and we cannot assure you that we will be able to execute our growth strategies successfully and realize our expected growth." Doc. 63-1 (Prospectus) at 36.

- "If we fail to maintain the relationship with our MINISO Retail Partners or our local distributors or fail to attract new MINISO Retail Partners or local distributors to join our store network, our business, results of operations and financial condition could be materially and adversely affected." Doc. 63-2 (Registration Statement) at 32.

- "The impacts of COVID-19 and intensifying market competition resulted in a negative growth of same-store sales, while our store expansion led to a change in store mix. Same-store sales of MINISO stores in China decreased by 3.8% in the second half of 2019, compared to that in the second half of 2018, primarily due to increased competition in China. Same-store sales of MINISO stores in China decreased by 32.6% in the first half of 2020, compared to that in the first half of 2019, primarily due to the impact of COVID-19." Doc. 63-1 (Prospectus) at 33.

Pursuant to the requirements of Section 406(c) of the Sarbanes Oxley Act, MINISO also filed its Code of Business Conduct and Ethics ("Code of Conduct") with the SEC as an attachment to the Registration Statement. Doc. 60 ¶ 176. It was signed by Ye, Zhang, Li, and Puglisi. *Id.* The Code of Conduct required employees to "strictly comply with all applicable standards, laws, regulations and policies for accounting and financial reporting of transactions, estimates and forecasts," and required employees to report any suspected compliance violations. *Id.* ¶¶ 176–85.

MINISO filed a Form F-6 registration statement to register 500 million ADS on October 6, 2020. *Id.* ¶ 261. On October 15, 2020, MINISO launched its IPO on the New York Stock Exchange, issuing 30.4 million ADS to the general public in the aggregate

principal amount of $608 million.  *Id.* ¶¶ 7, 262.  Goldman Sachs (Asia) LLC and BofA Securities, Inc. agreed to purchase 30.4 million total ADS—which were separate from the shares available to the general public—and were granted the right to purchase up to an additional 4.56 million ADS.  *Id.*

       *b.  Representations After The IPO*

       On December 11, 2020, MINISO announced the formation and terms of a joint venture with Ye (in the form of an entity, YGF MC, which was controlled by Ye) to purchase a parcel of land to build a new headquarters in Guangzhou, China.  *Id.* ¶ 258; Dec. 11, 2020 Form 6-K.  When YGF Investment ("the joint venture") was formed, MINISO disclosed that it held a 20% share of the joint venture while Ye held 80%.  Doc. 60 ¶ 258.  That same day, MINISO issued a press release reporting the joint venture as well.  *Id.* ¶ 68.[7]

       The joint venture had a Hong Kong subsidiary, YGF Investment Hong Kong Limited, which in turn owned a Chinese subsidiary, Mingyou Industrial Investment (Guangzhou) Co. Ltd. ("Mingyou Industrial").  *Id.* ¶ 150.  In January 2021, the joint venture used Mingyou Industrial to acquire a parcel of land in Guangzhou, China, for the new headquarters.  *Id.* ¶¶ 37, 150.  Specifically, Mingyou Industrial entered into a land contract with the Chinese government, which limited the use of the land to the construction of MINISO's regional headquarters and prohibited the purchaser's change of ownership structure for 10 years after the contract was executed.  *Id.*

       On January 25, 2021, MINSO reduced the license fee rates it charged to its Retail Partners.  *Id.* ¶ 55.  On September 17, 2021, MINISO filed its annual report with the SEC by filing Form 20-F ("2021 Form 20-F").  *Id.* ¶ 81; Doc. 63-4.  The 2021 Form 20-F set forth MINISO's financial operating results for fiscal year 2021, which ended in June 30, 2021, and reported a net loss.  Doc. 60 ¶ 115(a).  It also reported decreases in its revenues

---

[7] The SAC cites the December 11, 2020 Form 6-K.

from operations and same-store sales, as well as increases in store closures.  Doc. 63-4 at 105–06, 113–14.  The report also contained a certification required by the Sarbanes–Oxley Act of 2002 ("SOX"), signed by Ye and Zhang.  Doc. 60 ¶¶ 123–24.  As part of the SOX certification, Ye and Zhang swore that the annual report did not contain any "untrue statement of a material fact" or "omit to state a material fact necessary to make the statements made . . . not misleading[.]"  *Id.* ¶ 124.  They also certified that, based on the "most recent evaluation of internal control over financial reporting," they had disclosed to the Company's auditors (1) "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting"; and (2) "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  *Id.*

On September 26, 2021, MINISO announced that it bought out Ye's 80% stake in the joint venture for "roughly" $108.3 million,[8] with the approval of the board of directors and the audit committee.  *Id.* ¶ 260; Sept. 27, 2021 Form 6-K.  MINISO further explained that Ye was paid using non-IPO funds, and that the payment was determined with the assistance of a third-party valuation firm.  Doc. 60 ¶¶ 83–84, 260.  That same day, MINISO issued a press release reporting that it bought out Ye's 80% stake in the joint venture.  *Id.* ¶ 83.[9]

MINISO filed quarterly and annual earnings releases with the SEC from 2020–2021.  *Id.* ¶¶ 70, 72, 74, 79, 81, 85, 91, 94, 96, 124.  Financial analysts commented more generally on MINISO's business strategy and practices following the IPO.  *Id.* ¶¶ 65, 76, 87, 90, 93, 106.[10]  Various financial analysts also provided commentary on MINISO's

---

[8] Based on the Chinese Yuan to United Stated Dollar currency conversation on that date.  The exact price is not alleged.

[9] The SAC cites the September 27, 2021 Form 6-K.

[10] The SAC cites a November 9, 2020 Bank of America analyst report; a May 20, 2021 Bank of America analyst report; a Bank of America analyst report "following the 11/18/2021 earnings call;" a January 11,

2021–2022 earning releases.  *Id.* ¶¶ 137, 140, 142, 144.  Certain other press releases during that time period mentioned MINISO's "massive store network worldwide."  *Id.* ¶¶ 88, 98, 100, 104.[11]

On December 23, 2021, MINISO announced it authorized a share repurchase program of up to $200 million of ADS.  *Id.* ¶ 88.  On January 27, 2022 MINISO again reduced the license fee rates charged to its Retail Partners.  *Id.* ¶ 55.  MINISO also issued an earnings press release on May 26, 2022, which described, among other items, the impacts of inflation, administrative expenses, and land use rights regarding its new headquarters.  *Id.* ¶ 96.  On June 27, 2022, MINISO filed a Form 6–K with the SEC which included public filings for MINISO's application to the Hong Kong Stock Exchange.  *Id.* ¶¶ 118–20, 125–26.

From 2020–2022, MINISO issued numerous press releases and statements affirming its confidence and optimism in the Company, which were also included in various Forms 6-K filed with SEC.  *Id.* ¶¶ 70, 72–74, 77, 79, 85(b), 88, 94, 96, 98–99, 102, 104.[12]  Finally, it made forward-looking statements in various Forms 6-K and news articles from 2020–2022.[13]  *Id.* ¶¶ 61, 66, 74(a), 94(b), 96(b), 102(e).

---

2022 Credit Suisse analyst report; a March 3, 2022 Bank of America analyst report; and a July 20, 2022 Jefferies Group analyst report.

[11] The SAC cites the December 23, 2021 Form 6-K; June 7, 2022 Form 6-K; June 21, 2022 Form 6-K; and the July 7, 2022 Form 6-K.

[12] The SAC cites the December 18, 2020 Form 6-K; the February 25, 2021 Form 6-K; the May 20, 2021 Form 6-K; the August 14, 2021 news article published by China Daily, "Miniso 4th quarter revenue reaches 2.47b yuan [*sic*];" the August 9, 2021 Form 6-K; the November 18, 2021 earnings call; the December 23, 2021 Form 6-K; the March 31, 2022 Form 6-K; the May 26, 2022 Form 6-K; the June 7, 2022 Form 6-K; the June 21, 2022 Form 6-K; the June 27, 2022 Form 6-K; and the July 11, 2022 Form 6-K.

[13] The SAC cites the October 15, 202 Bloomberg News article, "Former Pipe Factory Worker Becomes a Budget Store Billionaire;" The December 3, 2020 Bloomberg News article, "China's Budget Store King Takes on Toys 'R' Us;" the May 20, 2021 Form 6-K; the March 31, 2022 Form 6-K; May 26, 2022 Form 6-K; and the June 27, 2022 Form 6-K.

### c. Blue Orca Report

On July 26, 2022, a short seller, Blue Orca Capital, issued a report regarding MINISO's business. *Id.* ¶¶ 147, 282–85, 310–14. The Blue Orca Report claimed that, contrary to MINISO's representation that the vast majority of stores in China employ the Retail Partner model, a "Chinese corporate registry" and two pre-IPO articles revealed that MINISO directly owned and operated hundreds of stores in China. *Id.* ¶¶ 50(a)–(b), 283(a)–(b). In the corporate registry, Blue Orca claimed to have identified 620 MINISO stores in China that "are registered under the names of MINISO executives or individuals closely connected to the Company's chairman." *Id.* ¶ 50(a). Blue Orca also cited (1) a 2017 article that claimed a MINISO brand director "said in an interview that most MINISO stores in Tier 1 cities in China are operated by the Company and that franchising is only limited to lower tier cities" and (2) a 2019 article from Yicai Media, the financial news arm of Shanghai Media Group (a Chinese state-owned media conglomerate), that claimed "40% of MINISO stores are owned by the Company." *Id.* ¶¶ 149(f), 312(f). Blue Orca also interviewed a Chinese franchisee who said MINISO had 1,000 company-owned stores in 2019. *Id.* ¶ 159(a). Finally, the Blue Orca Report claimed to have reviewed Chinese "credit reports" for Mingyou Industrial that showed that Ye did not contribute any capital to the joint venture project. *Id.* ¶¶ 51, 54, 150.

On July 27, 2022, MINISO announced that an independent committee of its board of directors would investigate the allegations in the Blue Orca Report. *Id.* ¶ 153. On July 28, 2022, MINISO issued a press release refuting the allegations. Doc. 63-7. On September 15, 2022, MINISO announced that the audit committee's independent investigation was substantially complete and determined that key allegations made in the Blue Orca Report were not substantiated. Doc. 63-8.

d. *Nova Scotia's Investigative Efforts*

Before bringing this action,[14] Nova Scotia also conducted an independent investigation that "confirmed the core factual bases" of the Blue Orca Report. Doc. 60 ¶¶ 53, 286–89. Specifically, Nova Scotia accessed Chinese corporate registry data[15] and "confirmed extensive insider store ownership"; found "suspicious activity" listing store changes and de-registrations; and concluded that 291 stores were registered to a single phone number allegedly used by Li, MINISO's executive vice president. *Id.*; *see* Doc. 73 at 19. According to Nova Scotia, the investigation also confirmed:

- That "Chinese state-owned Shanghai Media Group[16] published a November 3, 2019 article stating that 40% of MINISO's China stores were directly owned and only 60% were franchises"

- That "Ye . . . owned 80% of the [joint venture] formed post-IPO, his stake was bought out ten months later, and the [joint venture's] paid in capital remained [roughly] 346 million [Chinese Yuan] contributed by MINISO until after his payoff"

- That through a subsidiary, the joint venture entered into a land contract with the Chinese government barring ownership changes for 10 years

- "Blue Orca's citation to a Chinese report that MINISO closed 850 stores by March 2019 and lowered franchise fees 63% over two years"

Doc. 73 at 19–20. Nova Scotia also alleges that certain confidential witnesses, who worked in MINISO's North American stores, confirmed that MINISO misrepresented its Retail Partner model because their stores were owned and/or operated directly by MINISO. Doc. 60 ¶¶ 21–28, 41–48, 248–55, 274–81.

**B. Procedural Background**

The initial complaint in this action was filed by Ashraf in the Central District of California on August 17, 2022. Doc. 1. After reviewing two plaintiff motions as required

---

[14] Nova Scotia does not specify the date of its investigation.

[15] Nova Scotia used the Quichacha website, which Nova Scotia states "uses non-manual retrieval to pull legally disclosed information and data, including from, but not limited to, Chinese government registries." Doc. 73 at 37 n.36.

[16] According to Nova Scotia, the article was published by Yicai Media, "the financial news arm of Chinese state-owned Shanghai Media Group." Doc. 73 at 36 n.31.

by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Central District of California appointed Nova Scotia as lead plaintiff.  Doc. 23.  On November 8, 2022, the Central District of California certified the class.  *Id.*  The parties stipulated to transfer the case to the Southern District of New York, pursuant to a forum selection clause in the depository agreement governing the MINISO ADS.  Doc. 32.  The transfer was ordered on November 15, 2022.  Doc. 33.  On February 2, 2023 and April 24, 2023, Nova Scotia filed its first amended complaint and the SAC, respectively.  Docs. 47, 60.  On June 23, 2023, MINISO, Puglisi, and Puglisi & Associates filed their motion to dismiss.  Doc. 61.  That same day, BoFA Securities, Inc., and Goldman Sachs (Asia) joined the existing motion to dismiss, and filed their own motion.  Doc. 64.[17]  On August 28, 2023, Nova Scotia filed its opposition to the motions to dismiss.  Doc. 73.  On September 28, 2023, Defendants filed their joint reply.  Doc. 81.  On February 23, 2024, the Court granted Defendants' motions to dismiss the SAC based on three grounds:  (1) Nova Scotia failed to allege any material misstatement or omission, (2) Nova Scotia did not allege a strong inference of scienter, and (3) the absence of loss causation.  Doc. 95.  Additionally, the Court directed Nova Scotia to file a third amended complaint—if it wished to—by March 15, 2024 and if it failed to do so, the case would be closed.  *Id.*

On March 1, 2024, Nova Scotia requested a 14-day extension to file a motion for reconsideration and a 26-day extension to file an amended complaint, which the Court granted.  Docs. 98, 100.  On March 22, 2024, Nova Scotia filed this instant motion.  Doc. 101.  On April 2, 2024, Nova Scotia requested that the deadline to further amend the complaint be within 14 days after the Court issues its opinion on the motion for reconsideration, which the Court granted.  Docs. 104, 105.

---

[17] In their joint memorandum of law, BoFA Securities, Inc., and Goldman Sachs (Asia) note they "write separately to address the SAC's sole claim against [them]."  Doc. 65 at 2.

II.    **LEGAL STANDARDS**

A.  **Motion for Reconsideration**

The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). "A motion for reconsideration should be granted only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (citation and internal quotation marks omitted). It is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys*, 684 F.3d at 52 (citation omitted). The decision to grant or deny the motion for reconsideration is within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

III.  **DISCUSSION**

Nova Scotia argues that the Court in its February 23, 2024 Opinion and Order (the "Opinion") made both factual errors and errors of law that affected each of the Court's three grounds for dismissal: failure to allege falsity, scienter, or loss causation. Doc. 102 at 8–23. Defendants argue that Nova Scotia's challenges have no merit. Doc. 106 at 5–8. The Court will discuss Nova Scotia's arguments in turn as to each ground for dismissal.

A.  **Falsity**

*1. Joint Venture Transaction*

Nova Scotia seeks reconsideration of the Court's holding that it failed to plead facts showing any misstatement or omission about the post-IPO joint venture between MINISO and Ye for a new headquarters. Nova Scotia makes four arguments.

First, Nova Scotia argues that the Court incorrectly found that Nova Scotia did not allege that IPO funds were used for the joint venture buyout. Doc. 102 at 10–11. In the Opinion, the Court determined that Nova Scotia's claim that the disclosures in the Offering Materials about MINISO's expected uses of the IPO proceeds were false and misleading failed because Nova Scotia failed to establish that the Offering Materials could or should have disclosed future transactions. Doc. 95 at 23–24. The Court's determination was based on two separate findings: (1) "'a portion of the IPO proceeds were in fact used for 'expanding and upgrading [MINISO's] office space and facilities by acquiring land to build an office building, just as the Offering Materials disclosed" and (2) "even if MINISO was contemplating organizing the joint venture at the time of the IPO," MINISO had no duty to disclose the joint venture transactions in the Offering Materials because the outcome of the joint venture was "merely speculative." *Id.* at 24 (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize).[18] Although the Court noted that the SAC does not allege that IPO funds were used for the buyout transaction, as the Court explained, "MINISO and Ye did not launch the joint venture until December 2020—two months after the IPO… [] and MINISO did not buy out Ye's stake until September 2021—nearly a year after the IPO." *Id.* Thus, the Court's determination that Nova Scotia failed to establish that the Offering Materials could or should have disclosed the joint venture transactions remains.

---

[18] Nova Scotia argues for the first time in its reply that it also challenges the finding that MINISO had no duty to disclose the joint venture transactions as an improper application of Rule 12(b)(6). The Court will not consider this argument because "[i]t is well settled…that an argument raised for the first time in a reply brief is waived." *Center for Independence of Disabled, New York v. Metropolitan Transportation Authority*, 2023 WL 5744408, at *6 (S.D.N.Y. Sept. 6, 2023); *see also Jackson Hole Burger, Inc. v. Estate of Galekovic*, 701 F. Supp. 3d 228, 232 (S.D.N.Y. 2023) ("[A]rguments raised for the first time on reply are waived.").

Second, Nova Scotia argues that the Court misconstrued MINISO's September 26, 2021 press release announcing the joint venture buyout "in a way that materially changes its meaning." Doc. 102 at 11. Nova Scotia explains that the announcement "does not reveal the source of consideration paid to Ye [and] only explains how future [joint venture] capital expenditures would be financed." *Id.* (emphasis omitted). In the Opinion, the Court described the announcement as "disclos[ing] that 'the consideration for [the] acquisition' of Ye's joint venture shares would be paid using MINISO's 'cash surplus, future cash flows from operating activities and potential bank financing.'" Doc. 95 at 24. As Defendants note, the Court's interpretation of the announcement was based on the "selective quotations in the SAC, which spliced together separate sentences from the announcement in a way that supports the Court's interpretation." Doc. 106 at 10.[19] Even if the Court were to now consider that the announcement only explains how future joint venture capital expenditures would be financed, the Court's holding that Nova Scotia failed to establish that the Offering Materials could or should have disclosed the joint venture transactions would remain. *See* Doc 95 at 24; *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 108 (2d Cir. 2013) (district court properly denied reconsideration where movant raised "matters not relevant to this proceeding"). As already explained, the Court also found that MINISO had no duty to disclose the joint venture transactions in the Offering Materials because the outcome of the joint venture was "merely speculative." Doc. 95 at 24.

In the Opinion, the Court also considered the other allegations that Nova Scotia cites regarding the use of IPO funds for the joint venture buyout. *See* Doc. 95 at 16–17, 23–24, 28–29, 33; Doc. 102 at 10–11. And "just because [the] [C]ourt does not

---

[19] The relevant portion quoted in the SAC stated: "The 9/26/2021 Press Release also stated that the 'total investment for the headquarters building project, including the consideration for acquisition of land use right, is estimated to be approximately RMB 2,885 million' and the Miniso 'currently intends to support the subsequent capital expenditures of the project with its cash surplus, future cash flows from operating activities and potential bank financing.'" Doc. 60 ¶ 83. However, Plaintiffs note that the "full [press release] was added to the record by Defendants' judicial notice motion." *See* Doc. 63-5.

specifically reference every factual detail … to which [Nova Scotia] attaches special significance does not necessarily establish that the Court did not consider that particular matter." *See In re CRM Holdings, Ltd. Securities Litigation*, No. 10-cv-00975 (RPP), 2013 WL 787970, at *5 n.6 (S.D.N.Y. Mar. 4, 2013) (citation omitted).

Third, Nova Scotia also argues that the Court discounted the allegation that the joint venture buyout was a breach of the land contract with the Chinese government, which "barred ownership changes to the equity structure," in finding that Nova Scotia "fails to allege anything false or misleading about the disclosure in the Offering Materials of the Board's fiduciary duties pursuant to Cayman Islands law." Doc. 95 at 25; Doc. 102 at 13.[20]  However, in the Opinion, the Court did consider this allegation and found that it "simply [did] not meet Rule 9(b)'s heightened pleading requirement." Doc. 95 at 25.

Lastly, Nova Scotia argues that the Court "misapplied the Rule 12(b)(6) standard by making inferences in Defendants' favor concerning the use of a complex [joint venture] subsidiary structure" and overlooked other allegations in holding that the SAC "pleads no facts supporting Ye's self-dealing." Doc. 95 at 29; Doc. 102 at 19–20. However, in the Opinion, the Court cited the allegations that Nova Scotia argues were overlooked. Doc. 95 at 28–29.  Although Nova Scotia cites to additional paragraphs in instant motion, these paragraphs convey the same allegations as cited by the Court. *See* Doc. 60 ¶¶ 51, 54, 150, 284, 288, 313.  Considering the allegations in the SAC, the Court determined that "the SAC pleads no facts supporting Ye's self-dealing." Doc. 95 at 29. Thus, the Court did not misapply the Rule 12(b)(6) standard and simply rejected Nova'

---

[20] Nova Scotia further argues that the Court "misapprehended that the SAC included only a self-translated local government post, when in actuality it included a screenshot of the full Chinese text of the agreement." Doc. 107 at 9.  Even if the Court considers the agreement, the Court's conclusion—that Nova Scotia "fails to allege anything false or misleading about the disclosure in the Offering Materials of the Board's fiduciary duties pursuant to Cayman Islands law"—remains the same.  Additionally, Defendants argue— and the Court agrees—that "even if the joint venture buyout had violated some provision in the land contract …, [Nova Scotia] failed to … establish that such a contractual breach would constitute a breach of fiduciary duty under Cayman Islands law." Doc. 106 at 6.

Scotia argument that "Ye never contributed any funds to the joint venture." *Id.* at 28–29. Nova Scotia is rehashing the arguments in its opposition to Defendants' motions to dismiss. *Beverley v. New York City Health & Hospitals Corp.*, No. 18-cv-8486 (ER), 2020 WL 5750828, at *6 (S.D.N.Y. Sept. 25, 2020) ("[Plaintiff's] attempt to use the instant motion to reargue her opposition must be rejected.").

> *2. Retail Partner Model*

Nova Scotia seeks reconsideration of the Court's holding that the SAC failed "to establish that MINISO was not, in fact, operating through franchisees as of the date of the IPO." Doc. 95 at 20. Nova Scotia makes three arguments.

First, Nova Scotia challenges the Court's conclusion that the Chinese corporate registry records created after the IPO failed to show that MINISO was not primarily operating through its Retail Partner model as of the date of the IPO. Doc. 102 at 12. Nova Scotia argues that the Court overlooked Chinese corporate registry records—tables that are mostly in Chinese—included in the SAC that predate the IPO. *Id.* (citing Doc. 60 ¶¶ 53, 149, 287, 312); *see* Doc. 106 at 13.[21] Nova Scotia argues that the Court erred in finding that the Chinese corporate registry records post-date the October 2020 IPO and then concluding that the records were insufficient to plead that MINISO directly owned and operated most of its stores in China. Doc. 102 at 13. Defendants argue the SAC did not explain what these tables allegedly showed and that Nova Scotia did not address this

---

[21] Nova Scotia also cites to a pre-IPO interview and article, specifically (1) a 2017 article that claimed a MINISO brand director "said in an interview that most MINISO stores in Tier 1 cities in China are operated by the Company and that franchising is only limited to lower tier cities" and (2) a 2019 article from Yicai Media that claimed "40% of MINISO stores are owned by the Company." Doc. 102 at 12 (citing Doc. 60 ¶¶ 149(f), 213(f)). The Opinion noted that (1) "Plaintiffs must plead their sources with 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'" and (2) it is "inappropriate to give any weight to . . . [confidential witnesses] statements" when "[t]here is no suggestion that counsel in this action has spoken with these [confidential witnesses] or even knows who they are." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) and *In re Lehman Bros. Securities & Erisa Litigation*, No. 10-cv-6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)). The Court explained that Nova Scotia did not plead facts indicating they even attempted to contact the unnamed Chinese franchisee, and did not plead any facts about the identity of the brand director in the 2018 Yicai Media article. *Id.*

issue in its opposition to the motion to dismiss. Doc. 106 at 13. Nova Scotia did not acknowledge this issue in its reply in support of the instant motion. *See* Doc. 107. The Court can deny reconsideration because "[a] party seeking reconsideration may [not] . . . 'advance new facts, issues or arguments not previously presented to the Court." *In re Facebook, Inc., IPO Securities & Derivative Litigation*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014), *aff'd sub nom. Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016). In any event, in the Opinion, the Court determined that the records were insufficient to plead that MINISO directly and operated most of its stores in China because "the records from the corporate registry purport to list only the 'legal representative' of a store, which Nova Scotia equates to ownership." Doc. 95 at 20–22.[22]

Second, Nova Scotia argues that the Second Circuit routinely credits allegations outside the class period that may "shed light on whether the class period statements were false or materially misleading," citing to various cases that it also relied on in its opposition to the motion to dismiss. Doc. 102 at 13, 17; *see* Doc. 73 at 36–37.[23] In the Opinion, the Court considered this argument and the cited cases, even if not explicitly mentioned. *See In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 72 (2d Cir. 2001); *Novak v. Kasaks*, 216 F.3d 300, 312–13 (2d Cir. 2000); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). However, these cases are inapplicable because the shareholders in those cases—unlike the instant case—alleged particularized facts

---

[22] In their opposition, Defendants explain that "[t]iming was only one of two independent reasons that the alleged records were insufficient to plead that MINISO directly owned and operated most of its stores in China. The other was that '[t]he records from the corporate registry purport to list only the 'legal representative of a store, which [Plaintiffs] equate[] to ownership. But Plaintiffs did not—and still do not—dispute that these records do not make claims about the actual owner or operator of a store." Doc. 106 at 13–14 (citations and emphasis omitted). In its reply, Nova Scotia now claims that it did challenge the second independent reason in the memorandum of law in support of its motion for reconsideration because it challenged the fact that the Court credited the submission of the July 28, 2022 press release. Doc. 107 at 9. However, as Defendants note, Nova Scotia does not specifically challenge this determination in the memorandum of law in support of its motion for reconsideration. Thus, the Court will not consider this argument because "[i]t is well settled … that an argument raised for the first time in a reply brief is waived." *Center for Independence of Disabled*, 2023 WL 5744408, at *6.

[23] Nova Scotia further argues that the Court crediting Defendants' submission on judicial notice of the July 28, 2022 Form 6-K and the July 28, 2022 press release compounded this error. Doc. 102 at 17.

showing an ongoing fraud and linking non-class period allegations to the class-period statements.  *See In re Scholastic Corp.*, 252 F.3d at 72; *Novak*, 216 F.3d at 312–13 (2d Cir. 2000); *Rothman*, 220 F.3d at 92.

Lastly, Nova Scotia argues that the Court erred in its determination that Nova Scotia "fail[ed] to consider MINISO's response to the Blue Orca report, which explained that '[h]istorically, certain MINISO Retail Partners requested the Company's assistance with certain administrative tasks, such as corporate registration . . . .  [S]ome Company employees may have found it necessary or expedient to provide their names and contact information to the local authorities and did so on their own initiative.'"  Doc. 95 at 21–22 (citing July 28, 2022 Form 6-K at 4).[24]  Nova Scotia argues that in the Opinion, the Court credited MINISO's submission of the July 28, 2022 Form 6-K and the July 28, 2022 press release and essentially adopted the statements in the July 28, 2022 press release as fact, flipping the Rule 12(b)(6) standard on its head by construing the facts, which were not pled in the SAC, in Defendants' favor.  Doc. 102 at 17.  In the Opinion, the Court simply concluded that "the information in th[e] public filing undermines the plausibility of Nova Scotia's allegation of widespread fraud," which supports the Court's

---

[24] In its memorandum of law in support of its motion, Nova Scotia includes a longer excerpt of the July 28, 2022 press release:

> Historically, certain MINISO Retail Partners requested the Company's assistance with certain administrative tasks, such as corporate registration with the local administration of industry and commerce.  From time to time, in providing the requested assistance, some Company employees may have found it necessary or expedient to provide their names and contact information to the local authorities and did so on their own initiative.  This information, in turn, became part of the registration records of a number of stores owned and operated by MINISO Retail Partners. . . . To the best of the Company's knowledge, the number of instances where Company employees provide their names in the manner described was only a very small fraction of the Company's total store counts.  Moreover, most of these instances can be traced back to the same small group of employees whose duties and responsibilities included government relations such as corporate registrations.  These unapproved practices by individual employees have been substantially curtailed.

Doc. 102 at 18 (emphasis omitted).

determination that Nova Scotia failed to plead factual allegations sufficient "to raise a right to relief above the speculative level." Doc. 95 at 21; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (Plausibility depends on "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable.").

Nova Scotia also argues that the July 28, 2022 press release is "an admission of wrongdoing … that a 'group' of unidentified MINISO employees engaged in 'unapproved practices' involving false registration records of a number of stores in undisclosed markets." Doc. 102 at 18.[25] However, the SAC does not allege any facts that this alleged unapproved practice is related to any wrongdoing related to Nova Scotia's claims. Additionally, Nova Scotia does not identify a disclosure that is refuted by this alleged admission.

Accordingly, Nova Scotia does not identify any controlling law or well-pled allegations overlooked by the Court as to falsity.

### B. Scienter

Nova Scotia also seeks reconsideration of the Court's holding that "the SAC does not sufficiently establish scienter for Ye, Zhang, Li, and Puglisi." Doc. 95 at 32. Nova Scotia makes three arguments.

First, Nova Scotia argues that the independent appraiser approved only the valuation of the buyout, not the actual transaction. Doc. 102 at 14–15. In the Opinion, the Court explained that the allegations in the SAC concerning motive were insufficient and noted that "[i]t is undisputed that [the joint venture] transactions were approved by MINISO's Board, its audit committee, and an independent appraiser." Doc. 95 at 33. As Defendants explain, "[e]ven if the appraiser approved only the valuation, that is precisely what undermines Plaintiffs' claim that the buyout was 'money for nothing.'" Doc. 106 at

---

[25] In its reply, Nova Scotia explains that it did not plead this press release because it is post-class period. Doc. 107 at 12.

7. Thus, the specifics of the appraisal do not alter the Court's determination that Nova Scotia failed to plead any particularized facts to support its assertion that Ye engaged in improper "self-dealing," because what undermines Nova Scotia's claim is the approval of the valuation by the independent appraiser. Doc. 95 at 33.

Second, Nova Scotia argues that Court overlooked that there is no evidence Ye recused himself from voting on the joint venture transactions. Doc. 102 at 15–16. However, the allegation that there is no evidence Ye recused himself from the vote to approve the transactions does not appear in the SAC. Doc. 95 at 24. In fact, as highlighted by the Defendants, the word "recuse" or "recusal" does not appear in the SAC. Doc. 106 at 17. Nova Scotia also argues that in the motion to dismiss, Ye did not "confirm that he recused himself from the Board's approval" of the joint venture transactions. Doc. 102 at 16 n.6. Defendants argue that "it would have been improper for MINISO or Ye to offer proof" of Ye recusing himself from voting on the joint venture transactions at the motion to dismiss stage. Doc. 106 at 17. It is Nova Scotia that must allege particularized facts showing Ye did not recuse himself. *See* Doc. 95 at 33.

Lastly, Nova Scotia argues that the July 28, 2022 press release and the alleged credit reports support "falsity and (for the Exchange Act claims) scienter," and are not exonerating. Doc. 102 at 18–20. In the Opinion, the Court held that Nova Scotia's allegations failed to support falsity. Doc. 95 at 21–22, 28–29. As to the alleged credit reports, the Court specifically noted that they "were not for the joint venture entity itself, but for a Chinese subsidiary (Mingyou Industrial) of a different subsidiary (YGF Investment V Hong Kong) of the joint venture" and that "[c]ourts have rejected attempts to use the filings of one entity to establish the falsity of another's." *Id.* at 28–29 (citations omitted). The Court further explained that the "credit reports … say nothing about what Ye contributed to the actual joint venture … [and] do not establish the falsity of the joint venture's filings." *Id.* at 29.

Moreover, the Court also needs to consider competing inferences in determining the scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007). Nova Scotia also did not argue in its opposition to the motion to dismiss that the July 28, 2022 press release supports scienter. *In re Facebook, Inc.*, 43 F. Supp. 3d at 373 (S.D.N.Y. 2014) ("A party seeking reconsideration may [not] . . . 'advance new facts, issues or arguments not previously presented to the Court.'" (citation omitted)).

Accordingly, Nova Scotia does not identify any controlling law or well-pled allegations overlooked by the Court as to scienter.

### C. Loss Causation

Nova Scotia also seeks reconsideration of the Court's holding dismissing all claims because "its alleged losses [we]re not caused by the alleged fraud." *See* Doc. 95 at 35. Nova Scotia makes five arguments.

First, Nova Scotia argues that the Court "completely overlooked the presence of … Plaintiff Ashraf, who held shares past the Blue Orca Report corrective." Doc. 102 at 9. Defendants argue that the "dispositive holding that there were no corrective disclosures applies to the entire putative class, including Ashraf, [and] [i]t did not depend on when any particular plaintiff purchased or sold shares." Doc. 106 at 18. Nova Scotia failed to plead any corrective disclosure, so the Court did not need to specifically address Ashraf in connection with loss causation. *See* Doc 95 at 36–37.

Second, Nova Scotia argues that the Court "dismissed [its] Securities Act claims, [] without reference to [] Ashraf, on the ground that the SAC 'does not plead causation' … [but] loss causation is not an element of a Securities Act claim." Doc. 102 at 21. In the Opinion, the Court explained that Securities Act claims may be "dismissed where 'it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue.'" Doc. 95 at 36 (quoting *In re State St. Bank & Trust Co. Fixed Income Funds Investment Litigation*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011)). Although Nova Scotia acknowledges that "Securities Act claims may be dismissed if

negative causation is apparent from the face of the [c]omplaint," it argues that "is not the case here, *e.g.*, because of [] Ashraf's presence and the other alleged correctives." Doc. 102 at 21. Nova Scotia is using the instant motion as "a vehicle … to voice its disagreement with the decision." *Levitant v. Workers Compensation Board of New York*, No. 16-cv-6990 (ER), 2019 WL 5853438, at *3 (S.D.N.Y. Nov. 8, 2019). However, reconsideration is not "a vehicle for a party dissatisfied with the Court's ruling to voice its disagreement with the decision." *Id*. Additionally, the Court also held in the Opinion that Nova Scotia's "assertion that loss causation cannot be considered for the Securities Act claims until summary judgment is incorrect." Doc. 95 at 35 (citing *In re State St. Bank*, 774 F. Supp. 2d at 588 (dismissing Securities Act claims where it was "apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue")).

Third, Nova Scotia also argues that the Court "did not address whether Defendants met their burden" to "prove a price decline connected to an alleged corrective disclosure was not related to the misrepresentations." Doc. 102 at 21. However, just as when "a 'price decline' [that occurs] before disclosure may not be charged to defendants," similarly here, because there was no disclosure, "Plaintiffs' loss causation fail for the same reason that negative causation is apparent on the fact of the complaint." Doc. 106 at 19 (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995)).

Fourth, Nova Scotia argues that the Court wrongly ignored alleged partial corrective disclosures made prior to the Blue Orca Report, specifically (1) a Bloomberg article about "blind box sales"; (2) MINISO's November 19, 2021 Form 6–K; and (3) analyst commentary about the Company's 2021–2022 fiscal quarter earnings. Doc. 102 at 21–22. The Court did not ignore them in the Opinion, rather the Court held that these disclosures cannot be corrective because "these disclosures have nothing to do with the alleged fraud." Doc. 95 at 36–37.

Additionally, Nova Scotia argues that "corrective disclosure … analysis for Exchange Act claims … is inappropriate even at the class certification stage where Defendants have the burden[] of production and persuasion," and cite to *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) and *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) in support of its argument.  Doc. 102 at 21–22.  However, both of those cases concern class certification and do not discuss whether a complaint stated a claim.  *See Goldman Sachs Group, Inc.*, 594 U.S. 113; *Erica P. John Fund, Inc.*, 563 U.S. 804.  Nova Scotia also did not cite to these cases in its opposition to the motion to dismiss.

Lastly, Nova Scotia argues that, as they already argued in its opposition to the motion to dismiss, the SAC sufficiently plead loss causation, citing to the same cases, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) and *In re Mylan N.V. Securities Litigation*, No. 16-cv-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018).  Doc. 102 at 22; *see* Doc. 73 at 49–51.  However, in the Opinion, the Court considered this argument and the cited cases, even if not explicitly mentioned.

Accordingly, Nova Scotia does not identify any controlling law or well-pled allegations overlooked by the Court as to loss causation.

## IV.    CONCLUSION

For the reasons set forth above, Nova Scotia' motion for reconsideration is DENIED.  Should Nova Scotia wish to file a third amended complaint, it must do so by April 14, 2025.  If Nova Scotia fails to file a third amended complaint by April 14, 2025, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 101.

It is SO ORDERED.

Dated:    March 30, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.