UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MINISO GROUP HOLDING LIMITED SECURITIES LITIGATION | Case No. 1:22-cv-09864-ER<br><br>CLASS ACTION<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS


I. INTRODUCTION .................................................................................... 1

II. SECURITIES ACT ALLEGATIONS ........................................................... 1

A. Jurisdiction And Venue .......................................................................... 1

B. The Securities Act Parties ...................................................................... 2

C. Non-Party Confidential Former Employee (“FE”) .................................... 6

D. Securities Act Allegations ...................................................................... 6

1. MINISO’s Business And Operations ............................................ 6

2. MINISO’s IPO ................................................................................ 8

3. Undisclosed Material Negative Facts And Risks ......................... 12

a. BVI Related Party Transaction ........................................ 12

b. Undisclosed Facts And Risks Described By The FE ........ 14

c. Facts And Risks Revealed By Blue Orca Capital And Confirmed By Plaintiffs’ Investigation .................... 15

d. Admitted Company Misconduct ....................................... 26

4. Misstatements And Omissions ...................................................... 27

a. IPO & Business Operations Misstatements And Omissions ......................................................................... 27

5. The Truth Begins To Emerge ........................................................ 34

6. Plaintiffs’ Securities Act Class Action Allegations ....................... 40

7. Securities Act Claims For Relief .................................................. 42

COUNT I ................................................................................................... 42

COUNT II .................................................................................................. 44

III. VIOLATIONS OF THE EXCHANGE ACT ................................................ 45

A. Jurisdiction And Venue .......................................................................... 45

B. Summary Of The Exchange Act Claims ................................................ 46

C. The Exchange Act Parties ........ 49

D. Non-Party Confidential Witnesses (CWs) ........ 50

E. Exchange Act Allegations ........ 53

1. MINISO's Listing And Operations In The United States ........ 53

2. MINISO's Business And Operations ........ 54

3. MINISO's IPO ........ 55

4. Ye Has At All Relevant Times Controlled MINISO ........ 58

5. Undisclosed Material Negative Facts And Risks ........ 60

a. Undisclosed Facts And Risks Described By The CWs ........ 60

b. Facts And Risks Revealed By Blue Orca Capital And Confirmed By Plaintiffs' Investigation ........ 63

6. Admitted Company Misconduct ........ 74

7. Ye's Post-IPO BVI JV Interested Party Transaction ........ 76

8. The Exchange Act Defendants Committed Fraud ........ 77

a. The JV Transaction ........ 77

b. MINISO's Directly-Owned Stores ........ 88

c. Partial Corrective Disclosures Incrementally Revealed The Fraud ........ 94

9. Additional Facts Probative Of Scienter ........ 103

a. The Exchange Act Defendants' Knowledge Or Reckless Disregard Of Red Flags ........ 103

b. Exchange Act Defendant Ye Was In A Position To Know The Misstatements Were Materially False Or Misleading ........ 107

c. When Given An Opportunity To Respond To The Blue Orca Report, The Exchange Act Defendants Provided Vague Explanations ........ 108

d. Exchange Act Defendant Ye Controlled MINISO ........ 109

e. Exchange Act Defendant Ye Was Financially Motivated To Commit Fraud ........ 111

f. The Exchange Act Individual Defendants Reaped Suspicious Compensation ........ 116

g. MINISO Raised Funds During The Class Period ........ 118

h. The Fraud Implicated Core Operations ........ 118

i. The Exchange Act Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements ........ 120

j. The Fraud Violated MINISO's Corporate Code Of Conduct ........ 120

10. No Safe Harbor ........ 122

11. The Exchange Act Claims Are Timely ........ 123

12. Loss Causation/Economic Loss ........ 124

13. Presumption Of Reliance ........ 126

14. Plaintiffs' Exchange Act Class Action Allegations ........ 128

15. Exchange Act Claims For Relief ........ 130

COUNT III ........ 130

COUNT IV ........ 134

IV. PRAYER FOR RELIEF ........ 135

V. JURY DEMAND ........ 136

## I. INTRODUCTION

1. Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("NSHEPP") and additional non-lead Plaintiff Adeel Ashraf ("Ashraf" and together with NSHEPP "Plaintiffs") bring this class action lawsuit, individually and on behalf of investor classes as defined below, for violations of the federal securities laws.

## II. SECURITIES ACT ALLEGATIONS

2. The claims addressed in this section (Counts I and II) are brought pursuant to Securities Act of 1933 ("Securities Act") §§11 and 15. Count I is brought against all Securities Act Defendants (defined in §II.B. below) and Count II is brought against Securities Act Defendants Guofu Ye ("Ye"), Saiyin Zhang ("Zhang"), and Minxin Li ("Li").

3. Herein, Plaintiffs assert strict liability claims pursuant to the Securities Act on behalf of themselves and the Securities Act Class (defined in §II.D.6. below). Plaintiffs' claims are not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any of the Securities Act Defendants. Plaintiffs' claims do not, and are not intended to, allege fraud or sound in fraud, and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A. Jurisdiction And Venue

4. The Securities Act claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, and rules promulgated thereunder by the SEC.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act (15 U.S.C. §77v(a)).

6. This Court has jurisdiction over each of the Securities Act Defendants named herein because each of them has sufficient minimum contacts with this District so as to render the exercise

of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Securities Act Defendants' actions and the subsequent damages took place within this District. Indeed, the parties transferred the Action to this District based on a forum selection clause in the Depository Agreement governing the securities at issue. *See* No. 2:22-cv-05815-PA-MRW (C.D. Cal.), ECF No. 32.

8. In connection with the acts, conduct and other wrongs alleged in this complaint, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. The Securities Act Defendants disseminated the statements alleged to be false and misleading herein into this District, and they solicited purchasers of MINISO Group Holding Ltd. ("MINISO") securities in this District.

**B. The Securities Act Parties**

9. Lead Plaintiff Nova Scotia Health Employees' Pension Plan purchased American Depository Shares ("ADS") pursuant and/or traceable to the Registration Statement (as defined in §II.D.2) in connection with MINISO's initial public offering on or around October 15, 2020 ("IPO"), which Defendants sometimes called the "offering." NSHEPP suffered economic losses as a result of the Securities Act Defendants' violations of the federal securities laws, alleged herein.

10. Plaintiff Adeel Ashraf purchased ADSs pursuant and/or traceable to the Registration Statement in connection with MINISO's IPO. Plaintiff Ashraf suffered economic losses as a result of the Securities Act Defendants' violations of the federal securities laws, alleged herein.

11. Securities Act Defendant MINISO Group Holding Ltd. is incorporated in the Cayman Islands, and its head office is located at 25F, Heye Plaza, No.486, Kangwang Middle Road, Liwan District, Guangzhou 510140, Guangdong Province, People's Republic of China ("China" or "PRC"). MINISO's ADS securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNSO."

12. Securities Act Defendant Guofu Ye is the founder of MINISO and served as MINISO's CEO and Chairman of the Board of Directors at the time of the IPO and oversaw the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the IPO Materials (hereinafter used as defined in §II.D.2. below), as pled herein. Ye reviewed, contributed to, and signed or caused to be signed, the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

13. Securities Act Defendant Saiyin Zhang served as MINISO's CFO at the time of the IPO, sat on MINISO's Board of Directors from December 2018 to January 31, 2023, and oversaw the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the IPO Materials, as pled herein. Zhang reviewed, contributed to, and signed or caused to be signed, the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

14. Securities Act Defendant Minxin Li served on MINISO's Board of Directors from February 2020 to May 2023 and is MINISO's Executive VP. Li was a Director at the time of the IPO and participated in the drafting, preparation, and/or approval of various untrue and misleading

statements contained or incorporated in the IPO Materials, as pled herein. Li reviewed, contributed to, and signed or caused to be signed, the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

15. Securities Act Defendant Donald J. Puglisi ("Puglisi") was MINISO's duly authorized representative in the U.S. at the time of the IPO. Puglisi signed the false and misleading Registration Statement on his own behalf and on behalf of Securities Act Defendant Puglisi & Associates, which he founded and oversaw as Managing Director.

16. Securities Act Defendant Puglisi & Associates ("P&A") was MINISO's authorized U.S. representative for purposes of the IPO. Securities Act Defendant Puglisi, who signed the Registration Statement, was at all relevant times the Managing Director of P&A. As a result, P&A is liable for the securities law violations committed by Puglisi in his capacity as Managing Director and as a control person of P&A under the Securities Act.

17. Securities Act Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm which acted as a representative underwriter of MINISO's IPO, helping to draft and disseminate the IPO Materials. Goldman Sach's address is 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong, Special Administrative Region of the PRC. Pursuant to an underwriting agreement, Goldman Sachs agreed to purchase 15,200,000 ADSs in the IPO.

18. Securities Act Defendant BofA Securities, Inc. ("BOAS") is an investment banking firm which acted as a representative underwriter of MINISO's IPO, helping to draft and disseminate the IPO Materials. BOAS's address is One Bryant Park, New York, NY 10036. Pursuant to an underwriting agreement, BOAS agreed to purchase 15,200,000 ADSs in the IPO.

19. Ye, Zhang, Li, Puglisi, P&A, Goldman Sachs, and BOAS are collectively the "Securities Act Defendants."

20. Goldman Sachs and BOAS are referred to herein as the "Securities Act Underwriter Defendants." Both are investment banking firms whose regular business includes, *inter alia*, underwriting public offerings of securities. As the underwriters of MINISO's IPO, they assisted Securities Act Defendants MINISO, Ye, Zhang, and Li in its planning and execution and, for their efforts, MINISO paid them lucrative underwriting fees and granted them indemnification commitments. As underwriters, they met and spoke with analysts and potential IPO investors and presented favorable, but materially incorrect and/or materially misleading, information about MINISO and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder. They further purported to conduct an adequate and reasonable "due diligence" investigation into MINISO, during which they and their agents and counsel had access both to confidential, non-public corporate documents and information concerning MINISO's business and operations and to Ye, Zhang, and Li, and MINISO's other management, directors, and lawyers. They used such access to determine the strategy to accomplish the IPO, IPO terms and pricing, language to be used in the IPO Materials, and the responses to inquiries arising from the SEC's review thereof. As a result of the foregoing, Goldman Sachs and BOAS should have known of MINISO's undisclosed then-existing business practices and related party transactions and the materially inaccurate, misleading, and incomplete statements and omissions in the Registration Statement and IPO Materials detailed herein.

21. The Securities Act Underwriter Defendants participated in the drafting and dissemination of the IPO Materials and collectively received discounts and commissions of approximately $1.10 per ADS in connection with the IPO. They caused the Registration Statement

to be filed with the SEC and declared effective in connection with the IPO, so that they, and the other Securities Act Defendants, could offer to sell, and sell, MINISO ADS securities to Plaintiffs and other members of the Class pursuant (or traceable) to the IPO Materials. Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Registration Statement and IPO Materials.

22. Although not an element of Plaintiffs' Securities Act claims and an issue on which each Securities Act Underwriter Defendant bears the burden of proof to the extent asserted as an affirmative defense, the Securities Act Underwriter Defendants failed to perform adequate due diligence in connection with the matters alleged herein and their role as underwriters and they were negligent in failing to ensure that the Registration Statement and the IPO Materials were prepared properly, accurately, and free from misstatements or omissions of material fact. Their failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein, and they will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.

### C. Non-Party Confidential Former Employee ("FE")

23. FE1 worked at MINISO as a District Manager from 2017 to 2020 overseeing U.S. stores and reviewing reports on MINISO's operations generated by Chinese consultants assigned by MINISO's Chinese headquarters ("HQ"). After a short hiatus, FE1 returned to MINISO as its U.S. National Operations Inspector from April 2021 to July 2022, when FE1 also visited stores.

### D. Securities Act Allegations

#### 1. MINISO's Business And Operations

24. MINISO is a global value retailer offering a range of design-led lifestyle products. Its business is conducted through three store operation models. The first is a direct operation model in which MINISO owns and operates its stores. The second, the MINISO Retail Partner

model, is a franchise-like store model with chain store characteristics. Under this model, MINISO's Retail Partners pay MINISO a fixed annual per-store license fee, based on the location of the store and how many stores the Retail Partner owns, management and consultancy fees, and a pre-agreed portion of the sales proceeds, while purportedly shouldering the capital expenditures associated with opening a new store and the ongoing operating expenses. In exchange, MINISO allows its Retail Partners to use its brand, provides them with operational guidance, and retains inventory ownership until it is sold to the final consumer. The third, the distributor model, is similar to the Retail Partner model, but is distinguishable based on MINISO's lesser operational involvement and the speed under which distributor partners obtain ownership of inventory. Unlike in the Retail Partner model, under the distributor model, MINISO's distributors generally take ownership of inventory when it is either shipped from or delivered to the distributor locations.

25. MINISO represents that its growth is significantly dependent upon opening new stores and global expansion. For example, MINISO entered the growing pop toy market when on December 18, 2020, MINISO launched its sub-brand Top Toy, which operates toy stores selling collectible art toys for children and young adults, such as small vinyl figurines created by designers and brands around MINISO's intellectual property and external brands like Marvel and Disney. To achieve this expansion, MINISO purportedly relies predominantly on its Retail Partner model and, to a lesser extent, its distributor model. MINISO contends that these models allow it to rapidly expand globally in an asset-light manner while maintaining consistent branding and consumer experience both domestically and overseas. MINISO repeatedly said its growth domestically in China, which comprises a great majority of MINISO's revenue, is reliant upon MINISO's Retail Partner model. MINISO has also repeatedly emphasized its representation that it purportedly only

directly owns a handful of its over global stores (5,000 total as of June 30, 2022) and its strong preference not to directly own and operate stores.

**2. MINISO's IPO**

26. Securities Act Defendant Ye and Yunyun Yang (his wife) own a majority of and are the controlling shareholders of MINISO. MINISO sought to tap into the U.S. market, to generate substantial funding, by seeking to be publicly listed in the U.S. through the issuance of ADS and the correlating deposit of Class A shares. Each ADS represents four Class A ordinary shares. MINISO effectuated the IPO by filing the following documents with the SEC (together the "IPO Materials"), some detailed further below, pursuant to the requirements for foreign issuers:

(a) MINISO filed with the SEC a Form F-1 Registration Statement ("Registration Statement") with the SEC, including a Preliminary Prospectus, on September 23, 2020. The Registration Statement was signed by Securities Act Defendants Ye, Li, Zhang and Puglisi.

(b) MINISO filed with the SEC a Form F-1/A for the first amendment of the Registration Statement on October 7, 2020 ("10/7/2020 Form F-1/A"), a second Form F-1/A further amending the Registration Statement on October 13, 2020 ("10/13/2020 Form F-1/A"), and a third Form-1/A further amending the Registration Statement on October 14, 2020 ("10/14/2020 Form F-1/A") (together the "Registration Statement Amendments"). Each contained a Preliminary Prospectus and were signed by Securities Act Defendants Ye, Li, Zhang and Puglisi.

(c) MINISO filed a 424B4 Prospectus with the SEC on October 15, 2020 ("10/15/2020 Prospectus"), the date of the IPO. The Prospectus represents the final version of the prospectuses filed in conjunction with the Registration Statement.

(d) MINISO filed with the SEC a Form F-6 registration statement on October 6, 2020 ("Form F-6") to register 500 million ADS. MINISO filed a Form F-6/A ("Form-6/A"), which

served as an amendment to the Form F-6, on October 13, 2020. The Form F-6 and Form F-6/A were signed by Securities Act Defendants Ye, Zhang, Li and Puglisi.

27. Pursuant to the Registration Statement and other IPO Materials, MINISO completed the IPO on October 15, 2020, issuing 30,400,000 ADS to the Securities Act Class in the aggregate principal amount of $608,000,000. The Securities Act Underwriter Defendants agreed to purchase 30.4 million total ADS and were granted the right to purchase up to an additional 4.56 million ADS to cover over-allotments.

28. Analysts covering MINISO closely followed its IPO. For instance, on September 27, 2020, in its Pre-IPO Equity Research analyst report, Aequitas Research noted that MINISO sought to raise "about US$1bn in its upcoming U.S. IPO" and emphasized that despite a COVID-19 revenue hit, it liked "MINISO's business due to its asset-light strategy." The report noted "the lack of historical financials" reported by MINISO leading up to the IPO and investors' reliance on the Securities Act Defendants for accurate company information: "There could also be better disclosure of operating data with regards to Retail Partners and the split of revenue from distributors vs Retail Partners to help investors understand its revenue driver in detail."

29. On October 15, 2020, MINISO's ADS securities began to be publicly traded on the NYSE. In connection with the IPO, the Securities Act Defendants described MINISO's business model in its Registration Statement, as noted in subparagraphs (a)-(g) below, which were also repeated in each of the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus. Specifically, the Registration Statement:

(a) Emphasized the benefits of MINISO's "flexible business model" and "flexible store operation models." It called MINISO's Retail Partner model "asset-light" and described it as "a

franchise-like store model with chain store characteristics, where the franchisee bears the store opening capital expenditure and store operating expenses to join our 'MINISO' branded retail store franchise" and a "hybrid store operation model that takes advantageous elements from the franchise store model and the self-operated chain store model." It said MINISO "usually choose[s] MINISO Retail Partners with financial strength and strong local ties who can secure optimal locations for new stores" while considering "their management ability and industry experience."

(c) Used the terms "franchisee" and "Retail Partner" interchangeably and said the Retail Partner model allowed MINISO to allocate costs and risks to its Retail Partners, emphasizing "the franchisee bears the store opening capital expenditure and store operating expenses to join our 'MINISO' branded retail store franchise" and "[t]he retail partners employ and manage their own staff to operate the stores and serve their customers (*i.e.*, end consumers who visit the stores), and bear the costs associated with the operation." It added that Retail Partners are "responsible for the placement, physical custody and condition of the merchandise that they have selected after the deliveries are accepted in stores" and "[f] or the products placed at franchisees' stores, [MINISO] bears inventory loss up to a pre-determined loss rate as agreed with franchisees. [MINISO] requires compensations from franchisees for the inventory losses in excess of the pre-determined loss rate." It also emphasized that Retail Partners "shoulder the associated capital expenditure and operating expenses" to open and operate MINISO stores, and explained how the Retail Partner model was a critical reason for MINISO's purported success:

> Our path to success in, our home market, China, depends on the effectiveness and scalability of our MINISO Retail Partner model. Under this innovative model, MINISO Retail Partners mobilize their resources to open and operate MINISO stores at optimal locations and shoulder the associated capital expenditure and operating expenses, while we let them use our brand and provide them with valuable guidance on key aspects of store operation in exchange for a pre-agreed portion of in-store sales proceeds. The MINISO Retail Partners keep the remaining sales proceeds and we retain inventory ownership until in-store sale to consumers.

> The MINISO Retail Partner model aligns the interests and creates mutual benefits between us and the MINISO Retail Partners, where we achieve rapid store network expansion with consistent brand image and consumer experience in an asset-light manner, and our MINISO Retail Partners attain attractive investment returns.

(c) Said MINISO's "highly effective and scalable MINISO retail partner model" was listed as a strength and a reason why MINISO was "positioned favorably against [] competitors." It emphasized the advantages as follows:

> In order to establish or strengthen brand recognition and further acquire market shares, branded variety retailers in China would continue to adopt the asset-light franchising business model, under which franchisees (or channel partners) take charge of store operations and bear operational costs so that branded variety retailers (or brand owners) could focus on updating product portfolio to cater to evolving consumer demand, improving supply chain efficiency, and optimizing network efficiency. Compared with the direct sales model, under which brand owners generally take charge of all aspects of business operations including product design, warehousing, logistics and product sales, the asset-light franchising model could help branded variety retailers expand in scale rapidly and respond to changes in market demand flexibly. The franchising model in China is widely adopted by branded variety retailers and is expected to help branded variety retailers achieve a higher penetration rate in low-tier cities.

(d) Explained that MINISO primarily derived its revenue as follows:

> We primarily derive our revenue from sales of lifestyle products through sales to MINISO Retail Partners, sales to distributors, retail sales in directly operated stores and through online channels. Other sources of revenue mainly include license fees from MINISO Retail Partners and distributors, and sales-based royalties and sales-based management and consultation service fees income from MINISO Retail Partners.

(e) It described MINISO's Retail Partners as its "customers," and described how MINISO generates revenue from its Retail Partner model and explained when Retail Partner model revenue is recognized:

> Our contractual agreements with MINISO Retail Partners typically last for 3 years or less, and include the following material standard terms: (i) a store management and consultation services fee and a sales-based royalty, each equal to a low single-digit percentage of in-store sales proceeds, payable by MINISO Retail Partners at the close of every business day, (ii) MINISO Retail Partners keeping the remaining in-store sales proceeds after remitting a certain portion to us, (iii) a one-time

> refundable deposit to be paid by MINISO Retail Partners, (iv) a fixed annual license fee typically between RMB20,000 and RMB100,000 to be paid by MINISO Retail Partners, (v) us facilitating store renovation and decoration for the MINISO Retail Partners, with the associated costs being borne and prepaid in deposits by the latter, and (vi) MINISO Retail Partners paying for store operating expenses, including logistics costs from product delivery to their stores.
>
> * * * * *
>
> We have entered into a series of agreements with certain retail partners, primarily in the PRC, which mainly include a license agreement and a sales agreement (collectively "Franchise Agreements"), whereby the retail partners are licensed to operate the retail partner stores and are authorized to sell, in their own retail stores, the products that they have purchased from us. Revenue from sales to these retail partners is recognized at the point when they obtain the legal title of the products and become obliged to pay for the products, which is when the retail partners sell the products to their customers in their own retail stores.

(f) Explained the fiduciary duties of MINISO's Board, as Directors of a company incorporated under the laws of the Cayman Islands, as compared to Delaware Corporate Law:

> As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he owes the following duties to the company—***a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his personal interest or his duty to a third party***, and a duty to exercise powers for the purpose for which such powers were intended.

(g) Included a comprehensive list of related party transactions, which included several transactions with Securities Act Defendant Ye and companies Ye both controlled and had influence over. It represented that Securities Act Defendants Ye and Li, as well as entities under Ye's control, were related parties for the purpose of the related party transaction section.

### 3. Undisclosed Material Negative Facts And Risks

#### a. BVI Related Party Transaction

30. On November 26, 2019, Ye incorporated YGF MC Limited ("YGF MC"), a company jointly controlled by Ye and MINISO's other controlling shareholder, his wife Yunyun

Yang, in the British Virgin Islands ("BVI") as a BVI Business Company. The incorporation was complete before MINISO filed the Registration Statement for its IPO on September 23, 2020. YGF MC's sole purpose was participation in a joint venture with MINISO, purportedly related to MINISO's HQ development and an associated acquisition of land for the project, as reflected in its certificate of incorporation, attached as part of Securities Act Exhibit ("SA Exhibit") 1.

31. On August 26, 2020, Ye incorporated YGF Investment V Limited ("YGF Investment") in the BVI, as reflected in its certificate of incorporation, attached as part of SA Exhibit 1, with YGF MC as the sole shareholder. It was formed for the same purpose as YGF MC.

32. On September 15, 2020, Ye incorporated YGF Investment's Hong Kong subsidiary, YGF Investment V Hong Kong Ltd. ("YGF HK"), in Hong Kong, as reflected in its certificate of incorporation, attached as part of SA Exhibit 1. It was formed for the same purpose as YGF MC.

33. On October 13, 2020, Ye set up Mingyou Industrial Investment (Guangzhou) Limited ("Mingyou"), in the People's Republic of China ("PRC") as a subsidiary of YGF Investment to acquire the land use rights for MINISO's HQ.

34. MINISO's IPO closed on October 15, 2020. Each of the Registration Statement and Registration Statement Amendments disclosed a series of "Related Party Transactions" and "Material related party transactions." The Registration Statement and its amendments negligently did not mention YGF MC's, YGF Investment's, or YGF HK's incorporation, Mingyou's creation, or the significance thereof. Nor did the Registration Statement or its amendments mention any related party transaction with YGF MC or with YGF Investment or its subsidiaries. In fact, despite YGF Investment's and YGF HK's incorporation, and Mingyou's creation, none was listed as a

related party for the purposes of the "Material related party transactions" section, which likewise omitted any disclosure of a related party transaction involving Ye with any of these entities.

35. Instead, the first mention to investors occurred on December 11, 2020, less than two months after the IPO closed, when MINISO said that it formed YGF Investment, a joint venture ("JV") in the British Virgin Islands, with YGF MC (the "12/11/2020 Press Release"). According to the 12/11/2020 Press Release, the JV's purpose was to acquire land use right of a parcel of land in Guangzhou, China to construct a new HQ building for MINISO through the JV's subsidiary in Guangzhou. The 12/11/2020 Press Release said MINISO held 20% of the JV and YGF MC held the remaining 80%.

36. The JV was purportedly made—per a Capital Increase Agreement dated December 11, 2020 (the "Capital Increase Agreement") between YGF MC and MINISO, attached as Exhibit 4.6 to MINISO's Form 20-F Annual Report for the fiscal year ended June 30, 2021, filed with the SEC on September 17, 2021 (the "2021 20-F")—by MINISO acquiring 12,500 new shares of YGF Investment in exchange for RMB 356 million. Before the Capital Increase Agreement, YGF MC was the sole shareholder in YGF Investment.

**b. Undisclosed Facts And Risks Described By The FE**

37. MINISO's data requirements and restrictions. FE1 said MINISO's China HQ assigned internal Chinese "consultants" to each countries' operations to advise and assist with meeting HQ's goals, adding that those assigned to MINISO USA had meetings with U.S. operations management to discuss and compare performance of U.S. stores with global stores, including those in China. FE1 said the Chinese consultants' reports compared national overall sales and profits for the different countries, with year-to-date and year-over-year figures, and showed data specific to countries or individual stores regarding, *inter alia*, shipping costs, P&Ls, rent amounts, and profit.

38. MINISO's global store ownership. FE1 said the majority of MINISO's stores, both in China and internationally, were company-owned and operated, which FE1 understood from internal spreadsheets and sales reports that FE1 saw as a District Manager up until 2019. FE1 said the Excel spreadsheets did not include separate tabs or separate tallies tracking numbers for franchise stores. They did not reflect any separate revenue stream or data for franchise stores, and FE1 said, "The reported numbers nationally – they were all corporate stores." FE1 also said the company's focus was on increasing profitability of company-owned stores, a focus that would not have been so intense if 97% of the stores had been franchise stores. Given the foregoing, FE1 does not agree with the company's pre-IPO statements that 97% of its stores, internationally and in China, were franchisee-owned.

#### c. Facts And Risks Revealed By Blue Orca Capital And Confirmed By Plaintiffs' Investigation

39. As alleged in greater detail in §II.D.5., *infra*, Blue Orca Capital ("Blue Orca") issued a report on July 26, 2022, attached as SA Exhibit 2 ("Blue Orca Report"), revealing certain facts and risks about MINISO, many of which predated its IPO. Broadly speaking, Blue Orca revealed materially false or misleading statements and omissions concerning several areas of MINISO's business, concluding: "In our view, not only does our evidence undermine the authenticity of MINISO's reported financials, but also suggests that MINISO should trade at a fraction of its current share price." Plaintiffs' investigation independently confirmed certain core factual bases of the Blue Orca Report, likewise drawing from evidentiary sources in China. Thus, Plaintiffs separately reached relevant building block conclusions advanced in the Blue Orca Report and also concluded that the Securities Act Defendants' public statements indeed were materially false and misleading, negligently rendering its ADS price inflated at relevant times. Specifically:

40. MINISO store ownership. Blue Orca uncovered evidence, confirmed by Plaintiffs' investigation, that a materially larger percentage of MINISO's stores were directly owned by the company (or insiders including Ye), rather than franchisees under MINISO's Retail Partner model. Blue Orca concluded that this evidence undermined MINISO's "foundational narrative," stated in its IPO Materials, that its "value proposition to investors is that it allegedly operates in an asset-light, high-margin independent franchise model" that "enables [it] to expand quickly while minimizing upfront capital costs," and "allows MINISO to generate high margins without the operating expenses and complexity which can drag down profitability at traditional retailers."

(a) The Blue Orca Report found:

> [T]his misrepresentation obscures MINISO's true business model, [causing] an unjustified and unsustainable multiple on a mundane retail business model**.** ***MINISO is currently trading at 1.4x sales as an asset light and high margin business, a desirable proposition especially during Covid-19. Yet our due diligence shows that in reality, MINISO is more like a declining brick-and-mortar operator, and we think it should be valued as such***.

Blue Orca claimed its on-the-ground work in China disproved MINISO's "claims that 99% of its stores in China, its key market, are operated by franchisees independent from the Company." Over seven months, Blue Orca manually cross-checked MINISO and Top Toy stores in China against the Chinese corporate registry, as well as online map and consumer data, and "found over 620 supposedly independent franchises, which according to Chinese corporate records, are registered under the names of MINISO executives or individuals closely connected to [Ye]." These included, *inter alia*, Huang Zheng, MINISO's VP and Overseas COO (10 stores); Zhou Hongxia, MINISO's Shanghai subsidiary's legal representative (12 stores); Ye Tao, Supervisor of MINISO (Wuhan) Enterprise Management Consulting (15 stores); Lin Zongyou, legal representative to entities owned by Ye, his wife, or a MINISO Executive Director (34 stores); Minxin Li, MINISO's Director and Executive VP (9 stores), (some registered without any reference to MINISO). Blue

Orca found the Chinese corporate registry database contained 291 other then-existing stores sharing the same phone number as the one that both Minxin Li and Huang Zheng used to register MINISO stores. Blue Orca concluded this information evidenced store ownership by MINISO and MINISO's executives or insiders closely connected to Ye, which would "conceal[] the costs of such stores from investors," because "MINISO's real margins are likely significantly less than reported to investors." Blue Orca found corroborating pre-IPO evidence from China, including: (i) interview statements by MINISO's brand director at a 2017 conference in China, who said that most MINISO stores in tier one cities in China are owned and operated by MINISO with franchising limited to lower tier cities, (ii) a November 2019 article published by the financial news arm of the Chinese state-owned Shanghai Media Group stating 40% of MINISO's stores were owned and operated by the company itself, and (iii) a Chinese franchisee who had owned several MINISO stores since 2016 and who confirmed to Blue Orca that MINISO had over 1,000 company-owned stores in 2019.

(b) Plaintiffs' own on-the-ground investigation in China retraced Blue Orca's steps and confirmed its findings, principally by examining the Chinese corporate registry using Qichacha (a Chinese corporate data provider accessible by mobile application in China). Doing so, Plaintiffs' investigation revealed registration of MINISO stores by MINISO / Ye insiders Huang Zheng (10 stores), Zhou Hongxia (12 stores), Ye Tao (15 stores), Lin Zongyou (34 stores), and Minxin Li (5 stores). The Qichacha registration data showed the above MINISO insiders connected to dozens of MINISO stores by name or phone number, which strongly implied ownership. Plaintiffs' investigation also uncovered suspicious changes in the Chinese corporate registry to some of these stores in the weeks after the Blue Orca Report's publication, including ownership of several of Zhou Hongxia's stores being changed to other owners and deregistration of three of Huang

Zheng's stores, one of Zhou Hongxia's stores, two of Ye Tao's stores, and four of Lin Zongyou's stores. Plaintiffs' investigation also confirmed that the Chinese corporate registry lists 630 MINISO store entities (210 of which were then-still operating) under the same phone number as one registered in Minxin Li's name, as shown in *Figure 1* below.

*Figure 1*
*Evidence of a shared phone number tied to MINISO stores*




Plaintiffs' investigation also corroborated Blue Orca's findings of pre-IPO admissions that MINISO owns a large number of stores. Plaintiffs obtained a Chinese language article that Yicai Media, the financial news arm of Shanghai Media Group, one of China's largest state-owned media conglomerates, published on November 3, 2019 ("11/3/2019 *Yicai* Article"), attached with

a certified translation together as SA Exhibit 3. It stated that MINISO derived 40% of its sales from company-owned stores, a figure that supports MINISO's 40% store ownership (Blue Orca's conclusion), rather than the 3% store ownership MINISO claimed. According to Qichacha, Yicai Media is owned by two Chinese state-owned entities ultimately controlled by the Chinese government: Shanghai State-owned Assets Supervision and Administration Commission (95.76% owner) and State-owned Assets Supervision and Administration Commission of the State Counsel (4.24% owner). Plaintiffs' investigation findings concerning Yicai Media ownership is attached with a certified translation together as SA Exhibit 8. The U.S. government recognizes Yicai Media as Chinese state-media. On October 21, 2020, then-Secretary of State Mike Pompeo announced the State Department was designating the U.S. operations of six China-based media companies as foreign missions, including Yicai Global, which is Yicai Media's English-language news service - a designation consistent with State Department Reports on Human Rights Practices for China. The State Department's 2019 Country Report for China stated "The [Chinese Communist Party] and government continued to maintain ultimate authority over all published, online, and broadcast material."

41. JV Transaction. Blue Orca also challenged the reported facts of the JV transaction, which Blue Orca claimed transferred "shareholder money" to Ye shortly after MINISO's IPO. Plaintiffs' investigation corroborated the concept and uncovered key evidence.

(a) Blue Orca noted it was "highly unusual for a Chinese company to purchase land in China through a BVI intermediary," with a principal advantage of facilitating "opaque" transfers of cash. Blue Orca concluded that Ye did not contribute any capital to the JV by finding Chinese government records from the National Enterprise Credit Information Publicity System stating that Mingyou's (the JV subsidiary being funded) paid-in-capital remained at the level of MINISO's

December 11, 2020 contribution, which matched the initial deposit amount on the HQ land purchase, until ***after*** MINISO bought out Ye's JV stake on October 27, 2021. Blue Orca found Chinese records showing that a day ***later***, on October 28, 2021, Mingyou's paid-in-capital rose to RMB 1.8 billion – when MINISO was its sole remaining shareholder. Blue Orca reported that the HQ land purchase agreement, which it found in an online post by the local Chinese government, expressly prohibits a change of ownership structure in the land purchaser – *i.e.*, the JV – for 10 years. Thus, Blue Orca observed that MINISO's buyout of Ye risked breaching that agreement.

(b) Plaintiffs' investigation identified MINISO's piecemeal explanation of the JV's participants, structure, logistical steps, and directional flow of funds, depicted in Plaintiffs' Securities Act Appendix A ("SA Appendix A") hereto. Plaintiffs' investigation confirmed that, according to the December 11, 2020 Capital Increase Agreement, the BVI JV was established by Ye on August 26, 2020, as reflected in its certificate of incorporation (*see* SA Exhibit 1), with YGF MC (and by extension, Ye) as its sole shareholder. By the Capital Increase Agreement, MINISO accepted a 20% share of the BVI JV. Thus, as of December 11, 2020, Ye, through YGF MC, owned 80% of the shares in the BVI JV. The stated purpose of the BVI JV was to acquire the land for MINISO's planned Guangzhou HQ building. Plaintiffs' investigation confirmed that, as reflected on its certificate of incorporation (*see* SA Exhibit 1) and shown as *Figure 2* below, Ye incorporated YGF MC, whose sole purpose was its participation in the JV transaction, as a BVI Business Company on November 26, 2019 – well ***before*** the IPO. Also, as reflected in its certificate of incorporation (*see* SA Exhibit 1), Ye incorporated the BVI JV's Hong Kong subsidiary, YGF HK, on September 15, 2020. As reflected in MINISO's 2021 20-F, Mingyou was set up in PRC on October 13, 2020. Thus, both YGF HK and Mingyou were also incorporated or created before the IPO closed. As seen in screenshots from the National Enterprise Credit

Information Publicity System (available in China at gsxt.gdgs.gov.cn), appearing as *Figure 3* and *4* below, Plaintiffs' investigation also confirmed Blue Orca's findings that MINISO contributed RMB 345.7 million to the JV on December 11, 2020, and that Mingyou's paid-in-capital remained at this level until October 28, 2021, one day ***after*** MINISO paid $108 million to Ye to buy out YGF MC's 80% share. SA Appendix A depicts the directional flow of funds in these steps, including as described by MINISO. Once MINISO was the sole remaining shareholder in the JV, its paid-in-capital rose to RMB 1.8 billion. Plaintiffs' investigation also analyzed Chinese government documents pertaining to MINISO's HQ land purchase, not accessible outside of China, and confirmed Blue Orca's conclusion that the contract prohibits changes in the ownership structure of the land use purchaser (here, the BVI JV) for 10 years. Those documents and their certified translations, attached as SA Exhibit 4, lay out the relevant terms of the deal as offered and announce the results of the sale.

*Figure 2*



TERRITORY OF THE BRITISH VIRGIN ISLANDS
BVI BUSINESS COMPANIES ACT, 2004

CERTIFICATE OF INCORPORATION
(SECTION 7)

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

YGF MC LIMITED

BVI COMPANY NUMBER: 2026741

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 26th day of November, 2019.

SGD
*for* REGISTRAR OF CORPORATE AFFAIRS
26th day of November, 2019

CERTIFIED A TRUE COPY BY THE REGISTRAR OF CORPORATE AFFAIRS

*for* REGISTRAR OF CORPORATE AFFAIRS
22nd day of November, 2024

*Figure 3*



国家企业信用信息公示系统
National Enterprise Credit Information Publicity System

企业信用信息 | 经营异常名录 | 严重违法失信名单

请输入企业名称、统一社会信用代码或注册号

## 2020年度报告

填报时间:2021年04月21日

企业年报信息由该企业提供，企业对其年报信息的真实性、合法性负责

**基本信息**

- **统一社会信用代码/注册号：** 91440101MA9UWAJ54U
- **企业名称：** 名优产业投资（广州）有限公司
- **企业通信地址：** 广州市海珠区新港东路2429号首层自编003房
- **邮政编码：** 510000
- **企业联系电话：** 89318666
- **企业电子邮箱：** hr@fenlibao.com
- **从业人数：** 企业选择不公示
- **其中女性从业人数：** 企业选择不公示
- **企业经营状态：** 开业
- **企业控股情况：** 企业选择不公示
- **是否有投资信息或购买其他公司股权：** 否
- **是否有网站或网店：** 否
- **是否有对外提供担保信息：** 否
- **有限责任公司本年度是否发生股东股权转让：** 否
- **企业主营业务活动：** 商务服务业

**网站或网店信息**

暂无网站或网店信息

**股东及出资信息**



| 序号 | 股东 | 认缴出资额（万元） | 认缴出资时间 | 认缴出资方式 | 实缴出资额（万元） | 实缴出资时间 | 实缴出资方式 |
|---|---|---|---|---|---|---|---|
| 1 | YGF Investment V Hong Kong Limited | 100000 | 2030年12月31日 | 货币 | 34571 | 2020年12月11日 | 货币 |

*Figure 4*



**修改信息**



| 序号 | 修改事项 | 修改前 | 修改后 | 修改日期 |
|---|---|---|---|---|
| 6 | 实缴出资时间 | 2021-10-28 | 2021-12-10 | 2022年4月14日 |
| 7 | 利润总额（万元） | 不公示 | 不公示 | 2022年4月14日 |
| 8 | 所有者权益合计（万元） | 不公示 | 不公示 | 2022年4月14日 |
| 9 | 从业人数是否公示 | 不公示 | 不公示 | 2022年6月9日 |
| 10 | 资产总额（万元） | 不公示 | 不公示 | 2022年6月9日 |

共 查询到 13 条记录 共 3 页 首页 ‹上一页 1 2 3 下一页› 末页

**修改信息**



| 序号 | 修改事项 | 修改前 | 修改后 | 修改日期 |
|---|---|---|---|---|
| 11 | 实缴出资额（万元） | 179901.33 | 208401.33 | 2022年4月14日 |
| 12 | 负债总额（万元） | 不公示 | 不公示 | 2022年4月14日 |
| 13 | 从业人数是否公示 | 不公示 | 不公示 | 2022年4月14日 |

共 查询到 13 条记录 共 3 页 首页 ‹上一页 1 2 3 下一页› 末页

42. MINISO's negative pre-IPO sales trend. Blue Orca uncovered "independent evidence" that MINISO had negative trends in pre-IPO sales and revenues beyond any scale disclosed in its IPO materials. Plaintiffs' investigation confirmed the approach and conclusion.

(a) Blue Orca conducted extensive China-based research, including review of deleted but archived disclosures on MINISO's Chinese website, reports in Chinese media, and interviews with former MINISO employees regarding MINISO's operations. Blue Orca found a deleted statement on MINISO's Chinese website evidencing that its revenues peaked at RMB 17 billion in 2018 and that revenues declined 40% thereafter in the leadup to the IPO – despite a 50% increase in store count (from 3,459 to 5,205 stores during the same time period) – which implied a 60% same-store revenue decline. Blue Orca interviewed a former MINISO Regional Manager in China, who said MINISO's profitability peaked between 2017 and the first half of 2019 and who cited specific high-performing stores in China that suffered 75% - 80% declines in monthly revenues since then. Blue Orca also interviewed a former MINISO Manager who said that "[m]ost franchisees were not able to make much money" due to factors like market saturation, competition, and high rents and that only 30% - 40% of the 100 new stores in China were profitable, and barely so. To confirm these accounts, Blue Orca, *inter alia*, spent months confirming a Chinese media report that, even pre-COVID, MINISO had closed 850 stores in China (1/3 of its footprint there).

(b) Plaintiffs' investigation, using the Wayback Machine (which permits searches of archived former webpages), was able to replicate and confirm Blue Orca's research as to MINISO's reported revenue trends, including that its 2018 revenue was 17 billion yuan, as seen in the screenshot of MINISO's deleted webpage shown as *Figure 5* below. Plaintiffs' investigation also confirmed Blue Orca's citation to an August 8, 2019 report in China by Tencent Media, which is owned by China's biggest Internet company, that MINISO had closed 850 stores by March 2019.

That report, attached with a certified translation as SA Exhibit 5, included a corroborating screenshot provided by a MINISO employee, seen in *Figure 6* below. Likewise, Plaintiffs' investigation of the Chinese corporate registry showed that of the 630 stores that were opened and registered using a shared phone number, only 210 remained open by December 2022, meaning that 420 of them (67%) were subsequently closed, as seen in the Qichacha screenshot displayed as *Figure 7* below. Plaintiffs' investigation also revealed that the store closures were then-ongoing, with another 80+ locations closed in the five months after the publication of Blue Orca's report.

*Figure 5*




https://web.archive.org/web/20191022091748/http:/www.miniso.cn/Brand/History

*Figure 6*



(Screenshot of MINISO partial store closure information)

*Figure 7*



### d. Admitted Company Misconduct

43. MINISO ultimately responded to the Blue Orca Report in a press release published to its corporate website on July 28, 2022 ("7/28/2022 Press Release") and filed with the SEC the same day as Exhibit 99.1 to a Form 6-K ( "7/28/2022 6-K"), attached as SA Exhibit 6. It purports to refute the Blue Orca Report's validity with preliminary findings from an investigation into Blue Orca's claims. However, instead of "refuting" Blue Orca's claims, the 7/28/2022 Press Release actually ***admits*** misconduct by its employees, which supports the allegation that MINISO's number of company-owned stores had been negligently misstated in the IPO Materials.

44. The 7/28/2022 Press Release claims:

> Historically, certain MINISO Retail Partners requested [MINISO's] assistance with certain administrative tasks, such as corporate registration with the local administration of industry and commerce. From time to time, in providing the requested assistance, ***some [MINISO] employees may have found it necessary or expedient to provide their names and contact information to the local authorities and did so on their own initiative***. This information, in turn, became part of the registration records of a number of stores owned and operated by MINISO Retail Partners.
>
> * * *
>
> These ***unapproved practices by individual employees*** have been substantially curtailed.

45. Even according to the 7/28/2022 Press Release, assistance was purportedly requested by only "***certain*** MINISO Retail Partners," and this practice only occurred "from time to time," meaning the majority of MINISO's *bona fide* Retail Partners were fully capable of properly navigating the registration process, and MINISO and its employees could easily have declined to create inaccurate corporate registration records.

46. The 7/28/2022 Press Release offered no explanation for why this practice was necessary, or even helpful. It merely claimed some MINISO employees "***may*** have found it necessary or expedient" to create inaccurate corporate registration documentation. Indeed, this

language responded to the Blue Orca report's allegation that 620+ MINISO stores were owned by the company, Ye, or insiders. The IPO Materials said MINISO had 4,222 total stores as of June 30, 2020, facially demonstrating that corporate registration could be properly done, given that the larger majority of Retail Partners did so. Given these circumstances, and the information revealed by Blue Orca and corroborated by Plaintiffs' investigation, on information and belief, if MINISO employees used their own names and contact information for corporate registration records before local authorities, they did so at corporate direction for stores owned by MINISO directly, by Ye, or by other insiders. Either way, the IPO Materials negligently failed to disclose, at minimum, that the corporate registrations of 620+ MINISO China stores were false, and, as a reasonable inference, the stores were not owned by regular Retail Partner franchisees – thousands of whom had registered their stores without difficulty – but by MINISO itself, Ye, or insiders.

### 4. Misstatements And Omissions

#### a. IPO & Business Operations Misstatements And Omissions

47. MINISO's Registration Statement, filed with the SEC on September 23, 2020 and signed by Ye, Zhang, Li and Puglisi, negligently misrepresented all of the following, in language repeated in the Registration Statement Amendments and 10/15/2020 Prospectus: (i) the extent of MINISO's direct store ownership in China; (ii) the pre-IPO profitability trend of its Chinese stores; (iii) how MINISO would use the IPO funds, given that just $125.1 million was to be used for a list of general corporate purposes, only one of which was a land acquisition for office expansion; and (iv) the full extent of Related Party Transactions, given that the section listing them omitted the upcoming JV transaction that would be used to pay Ye over $108 million, from IPO funds, purportedly in connection with a land deal for MINISO's HQ project. Specifically:

(a) The Registration Statement represented that MINISO's Retail Partner model, which it described as advantageous, as discussed above, comprised almost all of its business in China. It

said, "***Outside of seven MINISO stores directly operated by [MINISO], substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2020***." It said, "***As of June 30, 2020, apart from seven directly operated stores, substantially all of our other stores in China were operated under our innovative MINISO Retail Partner model.***" It added that MINISO's "ability to expand [its] store network, especially in China, is a key driver of [its] revenue growth" and, regarding Retail Partners, MINISO's "store network expansion in China is ***primarily sustained by [its] continued success in enticing them to open more MINISO stores*** at optimal locations. It added, "As of June 30, 2020, in international markets, ***there were over 120 stores directly operated by us and over 1,500 MINISO Retail Partner stores and stores under the distributor model***." These statements were also made in each of the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus.

(b) When explaining how MINISO would use its IPO proceeds, the Registration Statement said that "***The primary purposes of this offering are to create a public market for our shares for the benefit of all shareholders, retain talented employees by providing them with equity incentives and obtain additional capital***." It identified three uses of funds—percentages of which were clarified in the Registration Statement Amendments—which accounted for roughly ***80%*** of the IPO's net proceeds, stating that: (i) approximately ***30%*** of net proceeds would be used to ***expand MINISO's store network***, (ii) approximately ***30%*** of net proceeds would be ***invested in MINISO's warehouse and logistics network***, and (iii) approximately ***20%*** of net proceeds would be ***invested in technologies and information systems***. It said that the balance remaining, roughly ***20%*** of the IPO's net proceeds, "***may***" be used for a list of "general corporate purposes," including investing in sales and marketing activities, funding working capital needs, potential strategic

investments and acquisitions, and ***"expanding and upgrading [MINISO's] office space and facilities by acquiring land to build an office building."*** It added, while negligently omitting the incorporation of YGF MC and YGF Investment as a BVI entities, YGF HK's incorporation in Hong Kong, and Mingyou's creation in China, all to be used in the forthcoming JV transaction involving Ye: "***In using the proceeds of this offering, we are permitted under PRC laws and regulations as an offshore holding company to provide funding to our PRC subsidiaries only through loans or capital contributions, subject to satisfaction of applicable government registration and approval requirements***." The foregoing statements were also made in each of the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus. As later confirmed in the 2021 20-F, MINISO raised ~ $625.3 million in net IPO proceeds, resulting in ~$187.6 million (30%) to expand the store network, ~$187.6 million (30%) to invest in MINISO's warehouse and logistics network, and ~$125.1 million (20%) for IT systems, leaving only ~$125.1 million for the listed general corporate purposes in the Registration Statement, only ***one*** of which was land acquisition.

(c) The Registration Statement also listed "Related Party Transactions" and "Material related party transactions," including several involving Securities Act Defendant Ye related to cash advances, repayment of loans, and advanced payments, but, as reflected in the excerpted pages that are SA Exhibit 7 hereto, ***negligently omitted any reference to the JV transaction*** described herein, which: (i) was purportedly related to the purchase of land for MINISO's HQ, (ii) unquestionably involved a large payment to Ye, and (iii) involved YGF MC, YGF Investment, YGF HK, and Mingyou, the companies Ye had already incorporated in the BVI, Hong Kong, and China as initial steps in the months and weeks leading up to the IPO. The Registration Statement also negligently failed to disclose the existence of Ye's controlled entities YGF Investment, YGF

HK, and Mingyou. These statements and omissions were repeated in each of the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus.

(d) The Registration Statement also reported as "Key Operating Data" that MINISO had a total of 4,222 MINISO stores as of June 30, 2020 and that just ***129 of them were "directly operated stores"*** operated by MINISO itself. Specifically, as shown in *Figure 8* below, it said that ***only 7 out of 2,533 MINISO stores in China, and 122 out of 1,689 stores outside of China were "directly operated,"*** while ***the rest were "third-party stores***," defined as "includ[ing] those operated under the MINISO Retail Partner model and those under the distributor model," adding that under the "MINISO Retail Partner model," "the retail partners are the customers of us [MINISO]," and "the franchisee bears the store opening capital expenditure and store operating expenses" while MINISO retains ownership of unsold inventory, receives fees for store management and consultation services, and receives a portion of in-store sale proceeds. These statements were repeated in each of the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus.

*Figure 8*

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2018 | December 31, 2018 | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 |
| **Number of MINISO stores** | | | | | | | | |
| **China** | **2,159** | **2,254** | **2,273** | **2,311** | **2,384** | **2,543** | **2,535** | **2,533** |
| —Directly operated stores | 2 | 2 | 5 | 9 | 11 | 8 | 8 | 7 |
| —Third-party stores(2) | 2,157 | 2,252 | 2,268 | 2,302 | 2,373 | 2,535 | 2,527 | 2,526 |
| **Overseas(1)** | **1,019** | **1,205** | **1,280** | **1,414** | **1,529** | **1,668** | **1,688** | **1,689** |
| —Directly operated stores | 58 | 68 | 71 | 74 | 79 | 126 | 122 | 122 |
| —Third-party stores(2) | 961 | 1,137 | 1,209 | 1,340 | 1,450 | 1,542 | 1,566 | 1,567 |
| **Total** | **3,178** | **3,459** | **3,553** | **3,725** | **3,913** | **4,211** | **4,223** | **4,222** |

Notes:
(1) Overseas stores exclude a small number of stores under certain overseas businesses that we had disposed of as of June 30, 2020. We completed such business disposal during the period from December 2019 to April 2020. See "Management's Discuss and Analysis of Financial Condition and Results of Operations—Discontinued Operations." After the disposal, these excluded stores may continue to have business transactions with us.
(2) Third-party stores include those operated under the MINISO Retail Partner model and those under the distributor model.

(e) The Registration Statement reported a 2020 fiscal-year-end net loss of $36.825 million or 260.176 million RMB ($0.04 or 0.26 RMB per basic share) on total revenue of $1.2709 billion

or 8.979 billion RMB, a purported improvement as compared to net loss of 294.409 million RMB (0.32 RMB per basic share) on total revenue of 9.3949 billion RMB for the prior year ended June 30, 2019. Of these amounts, it reported that China-based operations accounted for $855.487 million or 6.0441 billion RMB (equal to 67.3%) of 2020 revenue. It also disclosed MINISO's: (i) "Cost of Sales," defined as cost of inventories (carrying amount of inventories sold and inventory write-down), which declined from 6.8839 billion RMB in 2019 to 6.2465 billion RMB in 2020, plus logistics expenses, and (ii) "Gross Profit" of $386.76 million or 2.7325 billion RMB in 2020, as compared to 2.511 billion RMB in 2019. The Registration Statement also reported that, as of June 30, 2020, MINISO had $403.955 million or 2.854 billion RMB in cash and cash equivalents. These statements were repeated in the Registration Statement Amendments – the 10/7/2020 Form F-1/A, 10/13/2020 Form F-1/A, and 10/14/2020 Form F-1/A – and in the 10/15/2020 Prospectus.

48. The foregoing misstatements and omissions were materially false and misleading when made given the undisclosed material facts and risks as detailed by the FE account pled in §II.D.3.b. *infra* and as detailed in the Blue Orca Report as pled in and as confirmed by Plaintiffs' investigation as pled in §II.D.4.c. Specifically:

(a) Despite the IPO Materials' statements to the contrary, a material percentage of MINISO's stores, both in China and globally, were owned by MINISO itself, by Ye, Zhang, or Li, or other insiders closely tied to Ye and were not *bona fide* Retail Partner franchise stores, thereby increasing MINISO's risks beyond the risk profile described in the IPO Materials. Because MINISO's Retail Partner franchise model was applicable to only ~60% of MINISO's stores (not 97%) as of the IPO, (i) the benefits of MINISO's asset-light strategy were materially diminished; (ii) MINISO could not use the franchise store model to quickly and effectively expand the store network without shouldering capital expenditure and operating expenses; (iii) MINISO recovered

less fixed annual license fees, management and consultant service fees, and percentages of in-store sales proceeds from Retail Partners; (iv) MINISO bore a significantly larger portion of store opening capital expenditures and store operating expenses across its global footprint; (v) MINISO had higher direct exposure to increased costs or decreased sales; and (vi) MINISO's focus was split on maximizing company-owned store profit and operating so many stores. The IPO materials negligently omitted these details while negligently making materially misleading statements about MINSO's stores owned directly versus owned under the Retail Partner model.

(b) The IPO materials negligently made material misrepresentations and omissions about the use of IPO proceeds. The IPO proceeds would not used as advertised, as a significant portion was earmarked for a negligently undisclosed, related party transaction to pay Ye through YGF MC as part of an unusually convoluted set of JV transactions (depicted in SA Appendix A), preparations for which began in 2019, to effectuate MINISO's purchase of HQ land rights. The IPO materials stated that 20% of IPO proceeds (~$125.1 million) could be used for a ***list*** of corporate purposes, including investing in sales and marketing activities, funding working capital needs, potential strategic investments and acquisitions, and acquiring HQ land. However, instead of MINISO's using the bulk of that portion of IPO funds directly to purchase land rights and build its HQ (the purpose stated in the IPO Materials), MINISO entered into a BVI JV with YGF MC, which Ye incorporated before the IPO for this purpose, whereby MINISO paid over $108 million to Ye – nearly the entire $125.1 million allocated for the list of corporate purposes. MINISO never explained why a BVI JV was needed or even advantageous as a way to acquire land in China. Nonetheless, MINISO established a total JV valuation of RMB 1,770 million (roughly ~$265.5 million), pursuant to which MINISO was to contribute, and did contribute, RMB 346 million (needed as a first payment on the land use contract) to the JV in exchange for a 20% stake. YGF

MC was obligated to contribute RMB 1,424 million for its 80% stake. However, as MINISO later admitted in its 7/28/2022 Press Release, despite being keeping the full 80% stake as of December 11, 2020, YGF MC never contributed its full amount to the JV (and Ye himself contributed nothing). According to MINISO, YGF MC only contributed ~RMB 222.95 (~$34.5 million) in February 2021 and RMB 200 million (~31.4 million) in May 2021. These amounts fall well short of both YGF MC's promised payments to the JV and the amount (~RMB 700 million or ~$108 million) Ye was paid to buy out YGF MC's stake in the JV. Neither MINISO nor Ye have ever adequately explained the disparity. Instead, MINISO later claimed that a different company owned by Ye, Minggao, made a loan in the amount of RMB 319.9 million to the JV on its behalf. (MINISO elsewhere claimed that Minggao took out a loan and contributed the proceeds to the JV.) Yet, MINISO (and Ye) failed to explain why YGF MC did not obtain the loan and contribute the proceeds itself, did not identify the lender (if there was one, other than Minggao, or even deny that it was MINISO itself), and did not disclose the loan repayment terms. Given the foregoing, on information and belief, Ye was paid more for YGF MC's stake in the BVI JV than YGF MC ever contributed to it.

(c) MINISO's revenues and profitability on a per-store and overall basis were declining from peaks reached before its IPO. According to sources including a deleted page on MINISO's own Chinese website, its revenues declined 40% from a 2018 peak of RMB 17 billion to the figures reported in the IPO materials – despite a 50% increase in store count. The IPO Materials negligently failed to disclose the decline and the negative trends that caused it.

(d) As detailed more fully by the FE accounts pled in §II.D.3.b., the findings of the Blue Orca Report, as confirmed by Plaintiffs' investigation, as pled in §II.D.3.c., the "material" factors that made MINISO's IPO more speculative or risky than advertised to investors included,

at the time of the IPO, that: (a) a material percentage of MINISO stores, both in China and globally, were owned by MINISO or individuals closely tied to Ye and were not *bona fide* Retail Partner stores; (b) MINISO Retail Partners struggled to reach or maintain profitability and were closing in large numbers; (c) MINISO was having significant difficulties attracting Retail Partners to open new stores, despite considerable efforts and concessions; (d) MINISO's revenues and profitability, on a per-store and overall basis were declining from pre-IPO peaks; (e) the benefits of MINISO's Retail Partner were not being fully realized; (f) MINISO's IPO net proceeds would not be fully used as advertised; (g) a large part of MINISO's IPO net proceeds would be paid to Ye in an undisclosed related party transaction. By failing in the IPO Materials to disclose to investors that, as of the date of the IPO, these material trends and risks existed and/or were occurring, resulting in increased risks to investors, the Securities Act Defendants violated their duty of disclosure under Regulation S-K, Item 105, 17 C.F.R. §229.105(a), which requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."

(e) The foregoing negligent misstatements and omissions caused MINISO's ADS prices to be inflated in the IPO and thereafter.

**5. The Truth Begins To Emerge**

49. Loss causation is not an element of Plaintiffs' Securities Act claims, and they need not plead loss causation herein. No allegation herein is meant to serve or shall serve as a basis for eliminating, modifying, limiting, or shifting the burden away from the Securities Act Defendants to plead and prove the absence of loss causation and/or price impact as an affirmative defense at the appropriate stage of the litigation. The proper measure of Plaintiffs' and the Securities Act Class members' damages is a subject for expert analysis after discovery.

50. With that said, Plaintiffs' Securities Act claim damages are evidenced by, but not limited to, the market's reaction to certain revelations related to the misstatements and omissions

alleged herein. Among them were negative revelations about MINISO's post-IPO reported results, which were corrective of both the alleged misstatements and omissions about MINISO's pre-IPO revenue trend and the alleged misstatements and omissions about the number of stores that MINISO directly owned, inasmuch as negative operating metrics and results, like declining sales or rising costs, had greater impacts on MINISO when they arose in directly owned stores, rather than stores operated under the risk-minimizing Retail Partner model. For instance:

(a) On December 28, 2020, Bloomberg reported ("12/28/2020 Bloomberg Report") that Chinese state media, Xinhua, issued a report warning that "blind boxes," boxes containing concealed toys, "breed addiction and gambling" and that "regulators should step up oversight of the 'blind box' business model and prevent a negative impact on society and young people," signaling a crackdown on the sale of a MINISO product that had accounted for total sales of 25 million yuan by November 2020. On this news, MINISO's ADS price fell $5.41 per ADS, or 17.43%, on high volume, from a close of $31.04 per ADS on December 24, 2020, to close at $25.63 per ADS on December 28, 2020.

(b) On November 18, 2021, MINISO issued an earnings press release ("11/18/2021 Earnings Release"), in which Defendants Ye and Zhang were quoted. The 11/18/2021 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed on November 19, 2021 (the "11/19/2021 6-K"), signed by Zhang, announcing its unaudited financial results Q1 of fiscal year 2022, reported selling and distribution expenses increased to US $52.9 million from US $43.8 million the prior quarter; general and administrative expenses increased to US $32.8 million from US $31.0 million the prior quarter; and combined cash, cash equivalents, restricted cash and other investments fell to RMB 6,138.5 million (US $952.7 million) as of September 30, 2021, down from RMB 6,878.3 million (US $1,065.3 million) the prior quarter. On this news, MINISO's ADS

price fell $1.77 per ADS, or 11.17%, on high volume, from a close of $15.85 per ADS on November 18, 2021, to close at $14.08 per ADS on November 19, 2021.

(c) On November 25, 2021, Mexican analysts at Punto Casa de Bolsa, Inc. Corp. issued a Spanish-language report ("11/25/2021 Punto Casa Report"), noting (as translated) a "tight price adjustment in its stock since the IPO," assessing that MINISO's valuation was higher than the industry average, setting a price target of $9.46 in 2022, and recommending selling its securities. On this news, MINISO's ADS price fell $0.80 per ADS, or 5.8%, on high volume, from a close of $13.82 per ADS on November 24, 2021, to close at $13.02 per ADS on November 26, 2021.

(d) On January 26, 2022, a Goldman Sachs Equity Research in Asia report ("1/26/2022 GS Report") said "expect[ed] margins to decrease vs. last quarter on tapering one-off concessions and increasing year-end cost." It also raised concerns about MINISO's declining profits, estimating "adjusted [operating profits] . . . of Rmb154mn at 5.7% OPM, down 2ppt both [year-over-year] and [quarter-over-quarter]." On this news, MINISO's ADS price fell $0.71 per ADS, or 7.26%, on high volume, from a close of $9.78 per ADS on January 25, 2022, to close at $9.07 per ADS on January 26, 2022.

(e) On February 14, 2022, a B of A Global Research report ("2/14/2022 BofA Report") expressed concern about MINISO's "bumpy recovery in China and overseas stores near term," and said, "We lower our FY22/23E non-IFRS EPS by 18%/10%" and "cut PO by 12% to USD 16.6" due to "higher investments in branding in the coming 12 months," among other reasons. It also expressed concern that MINISO's announced expansion plans would be heavily loaded to the second half of the year. On this news, MINISO's ADS price fell $0.30 per ADS, or 3.1%, on high volume, from a close of $9.71 per ADS on February 11, 2022, to close at $9.41 per ADS on February 14, 2022.

(f) On February 23, 2022, a Goldman Sachs Equity Research in Asia report ("2/23/2022 GS Report") analyzed a bear case for its China distribution/retail coverage, including MINISO, raising concerns that a prolonged COVID-19 disruption would cause weaker consumer spending in China. It was specifically concerned that a China bear case could result in reduced margin on MINISO's sales. On this news, MINISO's ADS price fell $1.52 per ADS, or 15.83%, on high trading volume, from a close of $9.60 per ADS on February 22, 2022, to close at $8.08 per ADS on February 23, 2022.

(g) On March 4, 2022, Soochow Securities issued a Chinese-language analyst report ("3/4/2022 Soochow Report") noting, "The MINISO brand's domestic [Chinese] single-store revenue was -7.4% year-on-year, mainly because the company has opened a large number of stores in the sinking market in the past year. These single stores have lower income." It noted risks including "store expansion less than expected." A Credit Suisse report that day noted multiple "downside risks" to its ADS price target and rating, including "failure to maintain good relationship with major distributors and retail partners." It raised concern that MINISO's per store revenue was "-7% YoY in domestic market due to Covid resurgence in Nov/Dec" and only 50 targeted new stores for Top Toy, a miss versus expectations. On this news, MINISO's ADS price fell $0.76 per ADS, or 7.6%, on high volume, from a close of $9.96 per ADS on March 3, 2022, to close at $9.20 per ADS on March 4, 2022.

(h) On March 7, 2022, a Goldman Sachs Equity Research in Asia report ("3/7/2022 GS Report") detailed a non-deal roadshow it held for MINISO that day (March 7 in China). It raised concerns about MINISO's "seasonal weakness in overseas shipping," the "material impact from the latest COVID resurgence in Shenzhen, where 100+ stores were located," and a "4% yoy online sales decline" in the December 2021-ended quarter. It adjusted the MINISO price target down

from $17.30 to $16.20 per ADS. On this news, MINISO's ADS price fell $0.45 per ADS, or 4.89%, on high volume, from a close of $9.20 per ADS on March 4, 2022, to close at $8.75 per ADS on March 7, 2022.

(i) On March 9, 2022, after hours, Bloomberg reported ("3/9/2022 Bloomberg Report") that a Citic Securities Co., Ltd. analyst cut the rating on MINISO's ADSs. On this news, MINISO's ADS price fell $0.41 per ADS, or 4.2%, on high volume, from a close of $9.71 per ADS on March 9, 2022, to close at $9.30 per ADS on March 10, 2022.

(j) The July 26, 2022 Blue Orca Report (SA Exhibit 2) raised concerns with MINISO that inflated its ADS value versus peers, as detailed *supra*. On its news, MINISO's ADS price sharply fell $1.08 per ADS, or 14.98%, on extremely high volume, from a close of $7.21 per ADS on July 25, 2022, to close at $6.13 per ADS on July 26, 2022. In summary:

- *MINISO Store Ownership.* Blue Orca said 600+ MINISO stores in China were registered with the names and phone numbers of company insiders—including Securities Act Defendant Li—when thousands were not (thus demonstrating such a registration approach was not necessary for *bona fide* Retail Partners), strongly implying a much higher percentage of stores were directly owned and/or controlled, either by MINISO, Ye, Li, or other company insiders, than understood by the market, undermining the Retail Model's benefits as stated in the IPO Materials. Blue Orca provided scores of corporate registry records and Chinese language news articles garnered through its investigations and graphics that outlined MINISO's misrepresentation regarding its business model (pages 3-5); with specific examples showing stores owned by MINISO insiders Huang Zheng (10 stores), Zou Hongxia (12 stores), Ye Tao (15 stores), and Lin Zongyou (34 stores) (pages 5-10). Blue Orca also cited a MNISO brand director's 2017 statement that most MINISO stores in tier one China cities are directly owned, a November 2019 Chinese

state-owned media article reporting that 40% of companies were directly owned, and a MINISO franchisee's statement to Blue Orca that MINISO had 1,000 directly owned China stores in 2019.

- *JV Transaction.* Blue Orca revealed information about the related party JV transaction the IPO Materials negligently omitted. It used credit information only available in China to show Mingyou's paid-in capital remained at the level of MINISO's JV contribution until Ye completed the JV buyout, suggesting Ye did not comply with the agreement for YGF MC to fund YGF Investment. Blue Orca explained that it is "highly unusual for a Chinese company to purchase land in China through a BVI intermediary." Blue Orca provided evidence that MINISO's buyout of Ye from the JV violated conditions set Mingyou's the China land use agreement, which it described as prohibiting a change of the purchaser's ownership structure for 10 years.

- *MINISO's Negative Pre-IPO Sales Trend.* Blue Orca also revealed MINISO metrics, negligently missing from the IPO Materials, that showed MINISO was experiencing negative pre-COVID revenue trends, specifically that MINISO was experiencing shrinking revenues, franchise fee declines, and pre-COVID store closures. It cited a since-deleted statement on MINISO's official website, which showed revenues had peaked at RMB 17 million in 2018. It spoke with a former MINISO regional manager who cited 2017 and the first half of 2019 as MINISO's best years, with shrinking revenues and profitability and increasing store closures since.

(k) On July 27, 2022, MINISO filed with the SEC a Form 6-K ("7/27/2022 6-K) that attached as Exhibit 99.1 a press release ("7/27/2022 Press Release) described the Blue Orca Report as "without merit" and "misleading," but stating that MINISO's Board had decided to form an a purportedly "independent committee" consisting of Xu Lili, Zhu Yonghua, and Wang Yongping "to oversee an independent investigation regarding the allegations made in the report." On this

news, MINISO's ADS price fell $0.47 per ADS, or 7.67%, on extremely high volume, from a close of $6.13 per ADS on July 26, 2022, to close at $5.66 per ADS on July 27, 2022.

**6. Plaintiffs' Securities Act Class Action Allegations**

51. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of §§11 and 15 of the Securities Act, and rules promulgated thereunder by the SEC, on behalf of all persons and entities that purchased or acquired MINISO American Depository Shares (ADSs) pursuant or traceable to the Registration Statement, the Registration Statement Amendments, and the 10/15/2020 Prospectus ("Securities Act Class"). Excluded from the Securities Act Class are: (i) the Securities Act Defendants; (ii) members of the immediate family of any Securities Act Individual Defendant; (iii) any person who was an officer or director of MINISO between October 15, 2020 and July 26, 2022; (iv) any firm, trust, corporation, or other entity in which any Securities Act Defendant has or had a controlling interest; (v) MINISO's affiliates, including its employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or otherwise acquired MINISO ADSs pursuant or traceable to the Registration Statement, the Registration Statement Amendments, and the 10/15/2020 Prospectus; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

52. Members of the Securities Act Class are so numerous that joinder of all members is impracticable. MINISO issued 30,400,000 ADSs in the IPO. While the exact number of Securities Act Class members can only be determined by appropriate discovery, Plaintiffs believe that the Securities Act Class members number at least in the thousands and that they are geographically dispersed. Record owners and other members of the Securities Act Class may be identified from records maintained by MINISO or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53. Plaintiffs' claims are typical of the claims of the members of the Securities Act Class, as all members of the Securities Act Class are similarly affected by the Securities Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

54. Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Securities Act Class that Plaintiffs seek to represent.

55. Questions of law and fact common to Securities Act Class members predominate over any questions that may affect only individual members in that the Securities Act Defendants have acted on grounds generally applicable to the entire Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

(a) whether the Securities Act Defendants violated the federal securities laws as alleged herein;

(b) whether the IPO Materials contained or incorporated material misrepresentations;

(c) whether the Securities Act Defendants failed to convey material facts in the IPO Materials or to correct material facts previously disseminated;

(d) whether the price of MINISO's ADS securities was artificially inflated due to the material nondisclosures and/or misrepresentations contained or incorporated in the IPO Materials; and

(e) whether the members of the Securities Act Class have sustained damages as a result of the decline in value of MINISO ADS securities when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

56. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for Securities Act Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### 7. Securities Act Claims For Relief

### COUNT I

### For Violations Of §11 Of The Securities Act Against All Of The Securities Act Defendants

57. Plaintiffs repeat and reallege the allegations set forth in ¶¶1-56 contained above as if fully set forth herein.

58. This Count is brought pursuant to §11 of the Securities Act on behalf of the Securities Act Class against all of the Securities Act Defendants.

59. The Registration Statement and other IPO Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

60. This cause of action does not sound in fraud. For purposes of their Securities Act claims, Plaintiffs do not allege that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent

intent, which are not elements of a §11 claim. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

61. The Securities Act Defendants are strictly liable to Plaintiffs and the other members of the Securities Act Class for the misstatements and omissions.

62. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements in the Registration Statement were true and without omissions of any material facts and were not misleading.

63. By reason of the conduct herein alleged, the Securities Act Defendants each violated, and/or controlled a person who violated, §11 of the Securities Act.

64. Plaintiffs purchased ADS securities traceable to the IPO.

65. Plaintiffs and the other members of the Securities Act Class have sustained damages. The value of MINISO ADS securities declined substantially subsequent to and due to the violations of the Securities Act Defendants.

66. At the time of their purchases of MINISO ADS securities, Plaintiffs and the other Securities Act Class members lacked knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Plaintiffs commenced this action. Fewer than three years elapsed between the time the ADS securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

## COUNT II

### For Violations Of §15 Of The Securities Act Against Securities Act Defendants Ye, Zhang, And Li

67. Plaintiffs repeat and reallege the allegations set forth in ¶¶1-56 contained above as if fully set forth herein.

68. This Count is brought pursuant to §15 of the Securities Act on behalf of the Securities Act Class against Securities Act Defendants Ye, Zhang, and Li.

69. Securities Act Defendants Ye, Zhang, and Li each were control persons of MINISO by virtue of their positions as directors and/or senior officers of MINISO. Securities Act Defendants Ye, Zhang, and Li each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of MINISO.

70. Securities Act Defendants Ye, Zhang, and Li each were culpable participants in the violations of Securities Act §11 alleged in Count I above, based on their having signed or authorized the signing of the Registration Statement and Registration Statement Amendments and having otherwise participated in the process which allowed the IPO to be successfully completed.

71. The IPO Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

72. Securities Act Defendants Ye, Zhang, and the Li are strictly liable to Plaintiffs and the other members of the Securities Act Class for the misstatements and omissions.

73. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements in the Registration Statement were true and without omissions of any material facts and were not misleading.

74. By reason of the conduct herein alleged, Securities Act Defendants Ye, Zhang, and Li each violated, and/or controlled a person who violated, §15 of the Securities Act.

75. Plaintiffs purchased ADS securities traceable to the IPO.

76. Plaintiffs and the other members of the Securities Act Class have sustained damages. The value of MINISO ADS securities declined substantially subsequent to and due to the violations of Securities Act Defendants Ye, Zhang, and Li.

77. At the time of their purchases of MINISO ADS securities, Plaintiffs and the other Securities Act Class members lacked knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Plaintiffs commenced this action. Fewer than three years elapsed between the time the ADS securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

## III. VIOLATIONS OF THE EXCHANGE ACT

### A. Jurisdiction And Venue

78. The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

79. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

80. This Court has jurisdiction over each Exchange Act Defendant named herein because each has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

81. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, as a significant portion of the Exchange Act Defendants' actions, and the subsequent damages took place within this District. Indeed, the parties transferred the Action to this District based on a forum selection clause in the Depository Agreement governing the securities at issue. *See* No. 2:22-cv-05815-PA-MRW (C.D. Cal.), ECF No. 32.

82. In connection with the acts, conduct and other wrongs alleged in this complaint, the Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of a national securities exchange. The Exchange Act Defendants disseminated the statements alleged to be false and misleading herein into this District, and they solicited purchasers of MINISO securities in this District.

**B. Summary Of The Exchange Act Claims**

83. The Exchange Act Class Period starts on December 11, 2020 and ends on July 26, 2022, both dates inclusive. During it, Exchange Act Defendants MINISO, Ye (MINISO's CEO, Chairman, Founder, and controlling shareholder), and Zhang, made materially false or misleading misstatements and omissions concerning a British Virgin Islands ("BVI") JV transaction, whose stated purpose was to acquire land in China for development into MINISO's new corporate headquarters ("HQ"). Specifically the Exchange Act Defendants said that MINISO and Ye (through a BVI company) had formed a BVI JV and that MINISO would contribute 20% of the funds for the HQ in exchange for 20% of the JV, while Ye's company would contribute 80% of the funds for a commensurate stake.

84. Unbeknownst to investors, the JV transaction as described was an impossibility. At the outset, Ye owned 100% of the JV entity, which he had previously incorporated without MINISO's involvement, before MINISO or Ye had contributed anything. While MINISO did

contribute RMB 356 million in exchange for its 20% stake, neither Ye nor his BVI incorporated company YGF MC Limited ("YGF MC") had sufficient liquid funds to fulfill the JV's contractual funding obligations. In other words, both lacked the funds necessary to invest into the JV to justify Ye's 80% stake at the valuation set by MINISO's investment. Ye obscured this simple fact by quietly causing another company, incorporated in China, to make a loan, not an investment, to the JV to cover the considerable shortfall, as later stated by MINISO. (MINISO elsewhere claimed this company took out a loan and contributed the proceeds to the JV, so even MINISO's *ex post facto* explanations lack consistency.) Still later, well after Blue Orca Capital ("Blue Orca") published a report ("Blue Orca Report") revealing that the JV had never been properly funded, MINISO, which Ye controls, relied on this purported loan as a basis for both excusing Ye and YFG MC from fulfilling their contractual obligation to adequately fund the JV and a basis for paying Ye a ~RMB 700 million (~$108 million) payout to buy him out of the JV just 10 months after it was partially funded by MINISO for the HQ land acquisition. MINISO also pointed to an unidentified third party "appraiser" who purportedly "confirmed" the valuation of Ye's JV stake, without identifying the entity, its process, or the actual value it evaluated. The buyout agreement, which was separately made public, referred to that entity as "professional organization," without stating its name, whether it was based in China, or any information to permit an assessment of its qualifications and independence. MINISO also claimed that its Board approved the buyout transaction, but neither MINSIO nor Ye said that Ye himself, as controlling shareholder and Chairman, recused himself from that vote. The Chinese land use contract precluded changes in the governing structure of the land acquiror, the JV, for 10 years, and removing Ye and YGF MC from its ownership violated that provision.

85. The Exchange Act Defendants also misrepresented the percentage of stores that post-IPO MINISO directly owned, as versus the percentage owned under the asset-light Retail Partner model, which is designed to offload considerable risk to third party Retail Partners, theoretically allowing MINISO to bypass the worst impacts if sales lag, costs rise, or both. To the contrary, MINISO (and its insiders) directly owned up to 40% of its total stores, not the approximately 3% of stores Exchange Act Defendants told investors.

86. The Exchange Act Defendants were financially motivated to commit fraud and artificially inflate the price of MINISO's American Depository Shares ("ADS") securities. Both Exchange Act Defendants Ye and Zhang reaped suspicious compensation during while the fraud was ongoing. Additionally, Ye used the fraud to obscure a complicated JV transaction, pursuant to which he was paid $108 million. In addition, their knowledge or recklessness of negative facts rendering their public statements materially false or misleading is clear. Ye not only controlled MINISO as its controlling shareholder, founder, Chairman, and CEO, he also owned YGF MC, and incorporated the BVI JV, YGF Investment V Limited ("YGF Investment"), and its international subsidiaries before the JV transaction was announced. Additionally, Ye knew his own liquidity, and whether he and YGF MC would be able to fund 80% of the JV at the valuation set by MINISO's 20% stake.

87. A series of partial corrective disclosures incrementally revealed the Exchange Defendants' fraud. On July 26, 2022, Blue Orca issued the Blue Orca Report, attached as Exchange Act Exhibit ("EA Exhibit") 1, which raised concerns about the JV transaction. It showed that Ye received $108 million for his portion of joint venture even though it appeared that he had not made any contribution. It also showed that Ye and MINISO utilized a highly unusual and needlessly complex structure of subsidiaries to fund the HQ development, with entities

incorporated in the British Virgin Islands, Hong Kong, and China. Exchange Act Defendants' store ownership fraud was incrementally revealed, first by a series of disclosures concerning negative financial metrics that showed MINISO was more affected by negative trends than they would have been if its Retail Partner model was being faithfully executed. Also, the Blue Orca Report revealed that dozens of stores were registered to MINISO insiders and hundreds were registered with the same phone numbers as those registered to insiders, indicating direct MINISO (or insider) ownership for over 600 hundred Chinese stores. Plaintiffs and MINISO's other investors have suffered losses due to the declines in its ADS price following corrective revelations.

**C. The Exchange Act Parties**

88. Lead Plaintiff Nova Scotia Health Employees' Pension Plan was appointed to serve as Lead Plaintiff in this action by Order of this Court dated November 8, 2022. ECF No. 23. As set forth in its prior-filed Certifications, including the one accompanying its Corrected Consolidated Amended Class Action Complaint (ECF 47) ("AC") which is incorporated by reference herein, NSHEPP purchased MINISO's U.S.-traded ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the Exchange Act Defendants' fraud, as alleged herein.

89. Plaintiff Adeel Ashraf filed the initial complaint in this action. ECF 1. As set forth in his prior-filed Certifications (ECFs 1-1, 13-2), incorporated herein by reference, Ashraf purchased MINISO's U.S.-traded ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the Exchange Act Defendants' fraud, as alleged herein.

90. Exchange Act Defendant MINISO Group Holding ("MINISO") is incorporated in the Cayman Islands and its head office is located at 25F, Heye Plaza, No.486, Kangwang Middle Road, Liwan District, Guangzhou 510140, Guangdong Province, People's Republic of China

("China" or "PRC"). MINISO's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNSO."

91. Exchange Act Defendant Guofu Ye ("Ye") is MINISO's Chief Executive Officer ("CEO") and Chairman of the Board of Directors. Ye resides in China.

92. Exchange Act Defendant Saiyin Zhang ("Zhang"), during the entire Class Period, was MINISO's Chief Financial Officer ("CFO") and a Director. Zhang resides in China.

93. Exchange Act Defendants MINISO, Ye, and Zhang are sometimes referred to herein as the "Exchange Act Defendants."

94. Exchange Act Defendants Ye, and Zhang are sometimes referred to herein as the "Exchange Act Individual Defendants."

**D. Non-Party Confidential Witnesses (CWs)**

95. CW1 was Director of Operations at MINISO USA from September 2019 to August 2021, based in the Pasadena, California offices until COVID remote working. CW1 reported directly to Nancy Yang, President of MINISO USA, until she was replaced by the Andrew Xie, General Manager of MINISO North America, and Xie's "right hand man" in the U.S., Hunter Tian. CW1's job was to oversee MINISO USA's retail operations. CW1 was heavily involved in opening new stores, worked on developing standard operating procedures for MINISO's U.S. operations, and worked on improving store efficiency and profitability.

96. CW2 worked at MINISO from November 2018 to September 2021 in the following positions: Inventory Control Analyst Assistant (Nov 2018 – July 2019), Inventory Control Analyst (July 2019 – Jan 2020), Supply Chain Supervisor (Jan 2020 – March 2021), and Business Operations Specialist (March 2021 – Sept. 2021). While working in the supply chain positions, CW2 reported to Elvis Yang, Manager of Merchandise in North America. As a Business Operations Specialist, CW2 reported to CW1, Direction of Operations. CW2's jobs in supply

chain and retail operations meant that CW2 dealt with all U.S. stores and was familiar with MINISO operations in Canada.

97. CW3 worked at MINISO as a District Manager from 2017 to 2020 overseeing U.S. stores and reviewing reports on MINISO's operations generated by Chinese consultants assigned by MINISO's Chinese HQ. After a short hiatus, CW3 returned to MINISO as its U.S. National Operations Inspector from April 2021 to July 2022, in which capacity CW3 also visited stores.

98. CW4 worked as a Human Resources Business Partner at MINISO USA's Pasadena headquarters from March 2020 to May 2021. CW4 reported to superiors including Human Resources Manager Scarlett Wang and Jason Xie. CW4 oversaw human resources ("HR") functions for 15 U.S. stores, including 14 in California and the franchise store in Las Vegas. CW4's job responsibilities included processing payroll for those stores and working with them to manage day-to-day personnel issues and disciplinary procedures. Each month, CW4 prepared an Excel spreadsheet tracking total payroll for each store, submitted to CW4's upper management.

99. CW5 worked at MINISO USA from June 2017 to September 2021 in several capacities. As a Multi-store Manager from June 2017 to June 2018, CW5 was responsible for overseeing day-to-day operations at several MINISO stores in the U.S., including assisting with recruiting, training, and staff management. As a Senior Operations Assistant from June 2018 to April 2019, CW5 helped with the administrative aspects of business operations, with tasks including preparing sales reports, entering data in the company's database, preparing payroll and overtime reports, preparing daily sales reports, assisting with training, and creating policy and procedure forms and checklists. As a Field Operations Manager from April 2019 to September 2021, CW5's tasks included training employees at stores, overseeing HR issues, and overseeing the opening and closing of stores. As part of CW5's operations jobs, CW5 interacted with MINISO

franchisees or their representatives. CW5 worked at MINISO USA's headquarters in Pasadena, California. CW5 reported to MINISO USA District Manager Anushka Gunathunga; a woman named Vivian, who was a high-level operations manager at MINISO China; MINISO USA President Nancy Yang; and Director of Operations at MINISO USA CW1.

100. CW6 worked as Regional Operations Director at MINISO USA from February 2019 to September 2019, located at its Pasadena, California headquarters. CW6 initially reported to MINISO USA's Chief Operating Officer Ben Yu, who departed to work for MINISO Canada when his U.S. work visa expired. Thereafter, CW6 reported to MINISO USA President Nancy Yang, who in turn reported to James Dong. CW6's responsibilities included overseeing the retail stores in California, including oversight of procurement and expenditures for stores.

101. CW7 worked for MINISO in California from June 2019 to June 2022, in several capacities. CW7 worked as an Assistant Store Manager from June 2019 – April 2021 in the Alhambra, California retail location, where CW7 helped to manage the store's day-to-day operations, inventory, and staff and to address issues that arise during a work shift. CW7 was a Store Manager in the Pasadena and Arcadia, California retail locations from April 2021 – October 2021, managing day-to-day store operations but also reporting on the store's sales, inventory, and staffing needs to the District Managers to whom CW7 reported, including Sean Lindsay and Kyana Ly. As an Assistant Area Manager from October 2021 – June 2022, CW7 worked at MINISO's U.S. headquarters in Pasadena, California, directly reported to Senior Operations Area Manager Joshua Larida, and oversaw seven retail stores in the Los Angeles, California metro area, with duties including reporting sales figures and ensuring that Store Managers performed their jobs correctly and met daily, weekly, and monthly goals.

102. CW8 worked as Director of Real Estate at MINISO USA from May 2019 to January 2022, overseeing the real estate aspect for store sites, in which capacity CW8 worked with franchises and potential franchisees.

**E. Exchange Act Allegations**

**1. MINISO's Listing And Operations In The United States**

103. MINISO, a Chinese global value retailer offering a variety of design-led lifestyle products, became listed in the U.S. through an IPO of 30,400,000 American Depositary Shares at a public offering price of $20 per ADS in October 2020. Each ADS represents four Class A ordinary shares. The U.S. listing came approximately eleven years after MINISO was founded by Ye, its CEO and Chairman, and approximately seven years after MINISO commenced its operations in China, to raise over $600 million in gross proceeds. Following the IPO, MINISO has been trading in the U.S. on the New York Stock Exchange, under the ticker symbol "MNSO."

104. While MINISO has a North American footprint, the bulk of its operations have always been in China. For instance, according to MINISO, as of June 30, 2022, 62% of its stores were located in China and its operations in China accounted for 73.8% of its total revenue.

105. Significantly, investors and analysts who invest in and cover MINISO must rely on the accuracy of MINISO's disclosures when evaluating the investment value of what MINISO, including as regards to, *inter alia*: (i) the number of store franchisees and their level of independence; (ii) the actual cost borne by franchisees and fees derived therefrom; (iii) the amount of MINISO stores owned by MINISO itself; (iv) the amount of MINISO stores owned by the Exchange Act Defendants Ye and Zhang, and other MINISO insiders; (v) the details of MINISO's HQ construction project efforts and its contract with the Chinese government; and (vi) the use of MINISO's IPO proceed and joint venture funding.

### 2. MINISO's Business And Operations

106. MINISO is a global value retailer offering a wide-range of design-led lifestyle products. Its business is conducted through three store operation models. The first is a direct operation model in which MINISO owns and operates its stores. The second, the MINISO Retail Partner model, is a franchise-like store model with chain store characteristics. Under this model, MINISO's Retail Partners pay MINISO a fixed annual per-store license fee, based on the location of the store and how many stores the Retail Partner owns, management and consultancy fees, and a pre-agreed portion of the sales proceeds while purportedly shouldering the capital expenditure associated with opening a new store and the ongoing operating expenses. In exchange, MINISO allows its Retail Partners to use its brand, provides them with operational guidance, and retains inventory ownership until it is sold to the final consumer. The third, the distributor model, is similar to the Retail Partner model, but is distinguishable based on MINISO's lesser operational involvement and the speed under which distributor partners obtain ownership of inventory. Unlike in the Retail Partner model, under the distributor model, MINISO's distributors generally take ownership of inventory when it is either shipped from or delivered to the distributor locations.

107. MINISO represents that its growth is significantly dependent upon the opening of new stores and global expansion. For example, MINISO entered the growing pop toy market when on December 18, 2020, MINISO launched its sub-brand Top Toy, which operates toy stores that sell collectible art toys for children and young adults such as small vinyl figurines created by designers and brands often around MINISO's intellectual property products and external brands such as Marvel and Disney. In order to achieve this expansion, MINISO purportedly relies predominantly on its Retail Partner model and, to a lesser extent, its distributor model. MINISO contends that its independent Retail Partner and distributor models allow it to rapidly expand globally in an asset-light manner while maintaining consistent branding and consumer experience

both domestically and overseas. In fact, MINISO has repeatedly stated that its growth domestically in China, which comprises a great majority of MINISO's revenue, is reliant upon MINISO's Retail Partner model. Additionally, MINISO has repeatedly emphasized its representations that it only directly owns a handful of its, as of June 30, 2022, over 5,000 total stores globally and has made clear its strong preference not to directly own and operate stores.

### 3. MINISO's IPO

108. Securities Act Defendant Ye and Yunyun Yang (Ye's wife) own a majority, and are the controlling shareholders of MINISO. MINISO sought to tap into the U.S. market, in an effort to generate substantial funding, and went public in the U.S. through the issuance of ADSs and the correlating deposit of Class A shares. Each ADS represents four Class A ordinary shares. As part of its IPO, MINISO filed the following documents with the SEC (together the "IPO Materials"), pursuant to the requirements for foreign issuers: a Form F-1 Registration Statement (the "Registration Statement"), including a Preliminary Prospectus, on September 23, 2020, signed by Exchange Act Defendants Ye and Zhang; amendments of the Registration Statement on October 7, 2020, October 13, 2020, and October 14, 2020, each of which contained a Preliminary Prospectus and were signed by Exchange Act Defendants Ye and Zhang; a 424B4 Prospectus on October 15, 2020 (the "10/15/2020 Prospectus"); a Form F-6 registration statement on October 6, 2020 to register 500 million ADS; and a Form F-6/A, which served as an amendment to the Form F-6, on October 13, 2020, each of which were signed by Exchange Act Defendants Ye and Zhang.

109. Pursuant to the Registration Statement and other IPO Materials, MINISO completed the IPO on October 15, 2020, issuing 30,400,000 ADSs to investors in the aggregate principal amount of $608,000,000. Underwriters agreed to purchase 30.4 million total ADSs and were granted the right to purchase up to an additional 4.56 million ADSs to cover over-allotments. According to later filings, MINISO raised ~$625.3 million in net proceeds from the IPO.

110. On October 15, 2020, MINISO's ADS securities began to be publicly traded on the NYSE. In connection with the IPO, MINISO's business model was more fully described in its Registration Statement, its amendments, and in its 10/15/2020 Prospectus. These IPO Materials explained MINISO's operations to investors as follows:

(a) In its IPO Materials, MINISO described the benefit of its models for not directly owning stores, most often via its Retail Partner model, where a "franchisee bears the store opening capital expenditure and store operating expenses to join our 'MINISO' branded retail store franchise." MINISO described its Retail Partner model as an "asset-light" "hybrid store operation model that takes advantageous elements from the franchise store model and the self-operated chain store model." MINISO claimed to "usually choose MINISO Retail Partners with financial strength and strong local ties who can secure optimal locations for new stores" while also considering "their management ability and industry experience." MINISO said it generates revenue from its Retail Partner model because Retail Partners pay MINISO, *inter alia,* (i) store management and consultation services fees, (ii) sales-based royalties on Retail Partner sales of products they purchase from MINISO, (iii) a one-time refundable deposit, and (iv) a fixed annual license fee.

(b) The IPO Materials explained that MINISO recognizes revenue only when its Retail Partners sell products to end customers, a model that allows MINISO to allocate costs and risks away from itself and onto its Retail Partners. MINISO also benefits because Retail Partners bear the store opening capital expenditure and store operating expenses and logistics, manage their own staff, and operate their own stores. Retail Partners also bear inventory loss risk up to a pre-determined loss rate. The IPO Materials compared MINISO's asset-light, flexible Retail Partner model to the direct sales model, saying it allowed MINISO to let Retail Partners manage store operations and bear operational costs so MINISO could focus on its product portfolio, supply chain

efficiency, and network efficiency. Unlike the direct sales model, the Retail Partner model allowed MINISO to scale rapidly and respond nimbly to changing market demand. The Retail Partner model was a critical reason for MINISO's stated success, and the "highly effective and scalable" model was depicted as a reason why MINISO was "positioned favorably against [] competitors."

(c) The IPO Materials explained MINISO primarily derived its revenue as follows:

> We primarily derive our revenue from sales of lifestyle products through sales to MINISO Retail Partners, sales to distributors, retail sales in directly operated stores and through online channels. Other sources of revenue mainly include license fees from MINISO Retail Partners and distributors, and sales-based royalties and sales-based management and consultation service fees income from MINISO Retail Partners.

(d) MINISO remained consistent in describing its business model during the Class Period, *e.g.*, reporting on March 31, 2022, in MINISO's Supplemental and Updated Disclosures ("2021 20-F Supplement"), attached as Exhibit 99.1 to MINISO's March 31, 2022 Form 6-K ("3/31/2022 6-K"), signed by Zhang, that MINISO has "adopted a range of flexible store operation models, including MINISO Retail Partner model, distribution model and direct operation model, as we expand our footprints in China and globally." It described MINISO's Retail Partner model as a "Seller-buyer relationship in which MINISO Retail Partners enter into sales agreements, license agreements, and store renovation agreements with the Company." It added that "MINISO Retail Partners bear (i) initial capital expenditure, (ii) inventory deposit and (iii) costs associated with store operation, such as rental, salary, logistics expenses from our warehouse to stores, utilities, expenses related to discretionary promotional campaigns and store management and consultation services fee, and risks associated with investment recovery and store operations, among others" as opposed to the Direct operation model where "The Company bears all associated costs and risks." The June 27, 2022 Supplemental and Updated Disclosures ("2nd 2021 20-F Supplement"), attached as Exhibit 99.1 to MINISO's June 27, 2022 Form 6-K ("6/27/2022 6-K"),

signed by Zhang, also said that "Store management responsibility" is "Mainly on MINISO Retail Partners," who are responsible for some major business decisions while, under the direct operation model, store management and major business decisions are solely MINISO's responsibility.

(f) The IPO Materials also explained the fiduciary duties of MINISO's Board, as Directors of a company incorporated under the laws of the Cayman Islands, as compared to Delaware Corporate Law:

> As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he owes the following duties to the company—***a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his personal interest or his duty to a third party***, and a duty to exercise powers for the purpose for which such powers were intended.

111. Shortly after MINISO's IPO, analysts initiated positive coverage of MINISO based, in large part, on its asset-lean operations and Retail Partner Model. For example, BoA's November 9, 2020 analyst report initiated a buy rating and $29.20 price target, highlighting MINISO's Retail Partner model. The report emphasized that MINISO has only "129 directly operated stores (mostly in overseas markets) and the rest under third-party stores," that "MINISO adopts the retail partner model for a [the] majority of stores in China," and that "Over 90% of MINISO stores in its global network were established and operated by MINISO retail partners and local distributors." The report also emphasized that the "highly effective and scalable MINISO retail partner model" required retail partners to "shoulder the associated capital expenditure and operating expenses of stores."

### 4. Ye Has At All Relevant Times Controlled MINISO

112. Even after its IPO, Ye remained MINISO's controlling shareholder, as MINISO admits. For instance, MINISO's 2021 20-F Supplement described MINISO as a "controlled

company" as defined under the NYSE Listed Company Manual because Ye and Yunyun Yang own more than 50% of MINISO's total voting power through their holding entities. It stated,

> For so long as we remain a controlled company under that definition, we are permitted to elect to rely, and may rely, on certain exemptions from corporate governance rules, including an exemption from the rule that a majority of our board of directors must be independent directors or that we have to establish a nominating committee and a compensation committee composed entirely of independent directors. Currently, we rely on the exemption with respect to the requirement that a majority of the board of directors consist of independent directors. If we rely on additional exemptions in the future, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements.

113. Consequently, MINISO had certain provisions applicable to Ye due to his status, which were designed to protect MINISO, though they failed to do so.

114. For instance, the 6/27/2022 6-K attached, as Exhibit 99.1 the 2nd 2021 20-F Supplement, which included a post-hearing information package ("PHIP") filed with the Stock Exchange of Hong Kong Limited ("Hong Kong Stock Exchange") after its initial listing application was filed with the Hong Kong Stock Exchange on March 31, 2022. The PHIP was filed in connection with the proposed dual primary listing of ordinary shares on the Hong Kong Exchange Main Board, together with a Hong Kong IPO and a global offering of the shares. The PHIP described MINISO's purported corporate governance measures to resolve actual or potential conflict of interests between MINISO and controlling shareholders Ye and Yunyun Yang. They stated, *e.g.*: "our Company has established internal control mechanisms to identify connected transactions, and we will comply with the applicable Listing Rules if we enter into connected transactions with our Controlling Shareholders or any of their associates after [REDACTED]"; "the independent non-executive Directors will review, on an annual basis, whether there is any conflict of interests between our Group and our Controlling Shareholders (the "Annual Review") and provide impartial and professional advice to protect the interests of our minority

Shareholders"; "our Controlling Shareholders will undertake to provide all information necessary or requested by the independent non-executive Directors for the Annual Review, including all relevant financial, operational and market information"; "our Company will disclose decisions on matters reviewed by the independent non-executive Directors either in its annual reports or by way of announcements as required by the Listing Rules;" and "we have established our audit committee…with written terms of reference in compliance the Listing Rules and the Code of Corporate Governance and Corporate Governance Report in Appendix 14 to the Listing Rules."

115. Likewise, MINISO established conflict of interest and related party transaction rules for Ye and Yunyun Yang. MINISO's Code of Business Conduct, filed with the SEC as Exhibit 99.1 to the Registration Statement ("Code of Conduct"), included a section on Conflicts of Interest. It allowed a director to continue to hold his/her investment in a business entity that was made or obtained before MINISO invested in or otherwise became interested in such business or entity (an Interested Business), but said: "Notwithstanding the other provisions of this Code . . . (b) an interested director or senior officer shall refrain from participating in any discussion among senior officers of the Company relating to an Interested Business and shall not be involved in any proposed transaction between the Company and an Interested Business."

**5. Undisclosed Material Negative Facts And Risks**

**a. Undisclosed Facts And Risks Described By The CWs**

116. <u>MINISO's North American store ownership</u>. The CWs collectively establish that MINISO owned a greater percentage of its branded stores than publicly stated, putting the figure at 27 of 32 U.S. stores (CW1), 32 of 35 U.S. stores (CW4), 32 of 36 U.S. stores (CW6), all stores in California (CW7), and all but five U.S. stores (CW8). CW3 understood the U.S. stores were company-owned, adding that MINISO opened no U.S. franchise stores for years and that only seven were opened – one in Las Vegas, two in Florida, two in California (which closed), and two

in Texas. In harmony, CW1, CW5, and CW8 collectively said that MINISO had opened just five U.S. franchises by September 2021, one of which closed in 2019. No new franchises were opened during CW4's tenure. CW1 believes MINISO Canada had ~50 stores at the time, and, as CW2 corroborated, most were company-owned. CW1 and CW3 said that in early 2021, MINISO China decided to combine MINISO USA and MINISO Canada into a single MINISO North America operation. CW3 said all franchise owners were "miserable" and wanted to sell out.

117. MINISO's store obligations. CW1 said MINISO corporate in China funded its U.S. operations and that, after the U.S. and Canadian operations were combined, MINISO itself found the location of stores, built them out, stocked them, hired staff, and opened the store – tasks previously left to franchisees to handle – before attempting to bring in a franchisee to take over operations, payroll, and rent from MINISO. CW3 said MINISO's Chinese HQ brought in Lin "Tyrone" Li as a new General Manager to its North American operations to focus on transitioning company-owned stored into franchises, but that, despite a goal for more franchises, MINISO was still only opening company-owned and -operated stores as of November 18, 2022. CW4 said MINISO corporate paid wages and salaries for all U.S. company employees. As a Senior Operations Analyst, CW5 reported labor data, employees' hours and overtime, and sales figures to a high-level operations manager at MINISO China named Vivian, who was assigned to assist with U.S. operations and fix problems. CW5 said the company-owned U.S. stores were all losing money and that MINISO's efforts to open more U.S. franchises failed. CW5 said those efforts included forming a "business development" office (a/k/a "Franchise Department"), which looked for store sites, tried to interest potential franchisees, and prepared reports about the potential store's location, surrounding demographics, expected foot traffic, and potential sales. CW5 said once

potential franchisees learned that monthly rent could be as high as $40,000 per month and that California's minimum wage was $15 per hour, they usually lost interest due to the cost.

118. MINISO China's tight control. CW1 said that MINISO's Chinese HQ exerted control over MINISO USA's personnel and payroll decisions, with its approval needed on hirings and firings; dictated 80% of inventory sent to U.S. stores from China; and had to approve any significant expenditures or decisions regarding U.S. operations, *e.g.*, Chinese HQ had to approve each step when MINISO USA built out a new store, including reviewing any contractor contracts and approving any construction expenditures. CW1 said all MINISO USA requests for HQ approval were submitted via an internal network portal shared with MINISO China. CW4 said that MINISO corporate leadership were Chinese and communicated in Mandarin, facts that CW6 corroborated, and that they wanted to hire only Chinese nationals in the U.S. Accounting Department, given its level of communications with China corporate HQ, thus turning down U.S.-based candidates (with one Asian-American exception) for open accounting positions and preferring to sponsor people from China to work in the U.S. CW6, MINISO USA's Regional Operations Director, described MINISO leadership as secretive and failing to keep CW6 in the loop beyond CW6's immediate job responsibilities. CW6 said Ye visited MINISO USA's Pasadena, California offices in August or September 2019, during which he dined with all the Store Managers and MINISO USA's leadership from the Pasadena office. CW7 said MINISO China sent a number of China HQ executives to the Pasadena offices for a few-month stay in February and March 2022, during which they implemented severe money-saving cutbacks – including on staff hiring, employee salaries, shipments to stores, and basic store necessities – with which CW7 disagreed, causing employee frustration and stress and CW7's departure.

119. MINISO's data requirements and restrictions. CW4, an HR Business Partner at MINISO USA, prepared monthly Excels tracking payroll for 15 U.S. stores. CW4 was given data written mostly in Chinese and told to plug certain payroll numbers into specific Excel cells. CW4 said the monthly reports included a tally of total payroll costs of all company-owned U.S. stores. CW3 said corporate consultants advised MINISO USA on meeting HQ goals; they compared MINISO USA store performance against other stores globally. The comparisons had country-by-country and store-specific data. CW3 said the Chinese consultants only provided a view of the documents to MINISO's U.S. employees – never an actual document that could be downloaded or printed out – and that the MINISO USA Franchise Department was secretive about its work.

**b. Facts And Risks Revealed By Blue Orca Capital And Confirmed By Plaintiffs' Investigation**

120. As alleged in greater detail in §III.E.8.c., *infra*, Blue Orca issued the Blue Orca Report, attached as EA Exhibit 1, revealing certain facts and risks about MINISO, many of which predated its IPO and all of which remained concealed from U.S. investors until the Blue Orca Report. Broadly speaking, Blue Orca revealed that MINISO had made materially false or misleading statements and omissions concerning several areas of its business, discussed below, concluding: "In our view, not only does our evidence undermine the authenticity of MINISO's reported financials, but also suggests that MINISO should trade at a fraction of its current share price." Plaintiffs' investigation independently confirmed certain core factual bases of the Blue Orca Report, likewise drawing from evidentiary sources only available in China. Thus, Plaintiffs separately reached relevant building block conclusions advanced in the Blue Orca Report and likewise concluded that the Exchange Act Defendants' public statements indeed were materially false and misleading, rendering its ADS price inflated at relevant times. Specifically:

121. MINISO store ownership. Blue Orca, as confirmed by Plaintiffs' investigation, uncovered evidence that a materially larger percentage of MINISO's stores were directly owned by the company (or insiders including Ye), rather than franchisees under MINISO's Retail Partner model. Blue Orca concluded that this evidence undermined MINISO's "foundational narrative," stated in its IPO Materials, that its "value proposition to investors is that it allegedly operates in an asset-light, high-margin independent franchise model" that "enables [it] to expand quickly while minimizing upfront capital costs," and "allows MINISO to generate high margins without the operating expenses and complexity which can drag down profitability at traditional retailers."

(a) The Blue Orca Report found:

> [T]his misrepresentation obscures MINISO's true business model, [causing] an unjustified and unsustainable multiple on a mundane retail business model**.** ***MINISO is currently trading at 1.4x sales as an asset light and high margin business, a desirable proposition especially during Covid-19. Yet our due diligence shows that in reality, MINISO is more like a declining brick-and-mortar operator, and we think it should be valued as such***.

Blue Orca claimed its on-the-ground work in China disproved MINISO's "claims that 99% of its stores in China, its key market, are operated by franchisees independent from the Company." Over seven months, Blue Orca manually cross-checked MINISO and Top Toy stores in China against Chinese corporate registry data, as well as online map and consumer data, and "found over 620 supposedly independent franchises, which according to Chinese corporate records, are registered under the names of MINISO executives or individuals closely connected to [Ye]." These included, *inter alia*, Huang Zheng, MINISO's VP and Overseas COO (10 stores); Zhou Hongxia, MINISO's Shanghai subsidiary's legal representative (12 stores); Ye Tao, Supervisor of MINISO (Wuhan) Enterprise Management Consulting (15 stores); Lin Zongyou, legal representative to entities owned by Ye, his wife, or a MINISO Executive Director (34 stores); and Minxin Li, MINISO's Director and Executive Vice President (9 stores), some registered without any reference to

MINISO). Blue Orca also found that the Chinese corporate registry database contained 291 other then-existing stores sharing the same phone number as the one that both Minxin Li and Huang Zheng used to register MINISO stores. Blue Orca concluded that this information evidenced store ownership by MINISO and MINISO's executives or insiders closely connected to Ye, which would "conceal[] the costs of such stores from investors," because "MINISO's real margins are likely significantly less than reported to investors." Blue Orca found corroborating evidence from China predating MINISO's IPO. It identified interview statements made by MINISO's brand director at a 2017 conference in China, who said that most MINISO stores in tier one cities in China are owned and operated by MINISO, with franchising limited to lower tier cities. Blue Orca also found a November 2019 article published by the financial news arm of the Chinese state-owned Shanghai Media Group stating 40% of MINISO's stores were owned and operated by the company itself. Blue Orca also spoke with a Chinese franchisee who had owned several MINISO stores since 2016 and who confirmed MINISO had over 1,000 company-owned stores in 2019.

(b) Plaintiffs' own on-the-ground investigation in China retraced Blue Orca's steps and confirmed, principally through examination of Chinese corporate registry data using Qichacha (a Chinese corporate data provider accessible by mobile application in China), key findings. Doing so, Plaintiffs' investigation revealed ownership of MINISO stores by MINISO / Ye insiders Huang Zheng (10 stores), Zhou Hongxia (12 stores), Ye Tao (15 stores), Lin Zongyou (34 stores), and Minxin Li (5 stores). Plaintiffs' investigation also uncovered suspicious changes in the Chinese corporate registry to some of these stores in the weeks after the Blue Orca Report's publication, including ownership of several of Zhou Hongxia's stores being changed to other owners and deregistration of three of Huang Zheng's stores, one of Zhou Hongxia's stores, two of Ye Tao's stores, and four of Lin Zongyou's stores. Plaintiffs' investigation also confirmed that the Chinese

corporate registry lists 630 MINISO store entities (210 of which were then-still operating) under the same phone number as one registered in Minxin Li's name, as shown in *Figure 1* below. Plaintiffs' investigation also corroborated Blue Orca's findings of pre-IPO statements admitting MINISO itself owns a large number of stores. Plaintiffs obtained the Chinese language article that Yicai Media, the financial news arm of Shanghai Media Group, one of China's largest state-owned media conglomerates, published on November 3, 2019 ("11/3/2019 *Yicai* Article"), attached with a certified translation together as EA Exhibit 2. It stated that MINISO derived 40% of its sales from company-owned stores, a figure that supports MINISO's 40% store ownership (Blue Orca's conclusion), rather than the 3% store ownership MINISO claimed. According to Qichacha, Yicai Media is owned by two Chinese state-owned entities ultimately controlled by the Chinese government: Shanghai State-owned Assets Supervision and Administration Commission (95.76% owner) and State-owned Assets Supervision and Administration Commission of the State Counsel (4.24% owner). Plaintiffs' investigation findings concerning Yicai Media ownership is attached with a certified translation together as EA Exhibit 3. The U.S. government recognizes Yicai Media as Chinese state-media. On October 21, 2020, then-Secretary of State Mike Pompeo announced the State Department was designating the U.S. operations of six China-based media companies as foreign missions, including Yicai Global, which is Yicai Media's English-language news service - a designation consistent with State Department Reports on Human Rights Practices for China. The State Department's 2019 Country Report for China stated "The [Chinese Communist Party] and government continued to maintain ultimate authority over all published, online, and broadcast material." Given Yicai Media's status as Chinese state-media, it is unlikely MINISO personnel would provide inaccurate information, lest they face potentially severe consequences for doing so.

*Figure 1*

*Evidence of a shared phone number tied to MINISO stores*




122. JV Transaction. Blue Orca also challenged the legitimacy of the JV transaction, which transferred "shareholder money" to Ye shortly after MINISO's IPO. Plaintiffs' investigation corroborated the premise and uncovered key evidence.

(a) Blue Orca noted it was "highly unusual for a Chinese company to purchase land in China through a BVI intermediary" and "[t]he principal advantage of the BVI is that it easily facilitates opaque offshore transfer of cash to insiders." Blue Orca concluded Ye did not contribute any capital to the JV by finding Chinese government records from the National Enterprise Credit Information Publicity System stating that the JV's paid-in-capital remained at the level of

MINISO's December 11, 2020 contribution, which matched the initial deposit amount on the HQ land purchase, until ***after*** MINISO bought out Ye's JV stake on October 27, 2021. Blue Orca found Chinese records showing that a day ***later***, on October 28, 2021, the JV's paid-in-capital rose to RMB 1.8 billion – when MINISO was its sole remaining shareholder. Significantly, Blue Orca reported that the HQ land purchase agreement, which it found in an online post by the local Chinese government, expressly prohibits a change of ownership structure in the land purchaser – *i.e.*, the JV – for 10 years. Thus, Blue Orca observed that MINISO's buyout of Ye risked breaching the land purchase agreement. Blue Orca noted MINISO had four other property developments in China valued at RMB 23 billion total, which appear to be owned by Ye through similar layered BVI offshore holding structures that might permit other payments of shareholder funds to Ye.

(b) Plaintiffs' investigation identified MINISO's scattershot, *ex post facto* explanation of the JV's participants, structure, logistical steps, and directional flow of funds, as recreated in Plaintiffs' Exchange Act Appendix A ("EA Appendix A") hereto. Plaintiffs' investigation first confirmed the building blocks of the complicated JV transaction, including the companies, their incorporation jurisdictions and dates, and their owners / parents and subsidiaries (if any). Specifically, Ye incorporated: (i) YGF MC, a company he jointly controlled with his wife, in the BVI on November 26, 2019; (ii) YGF MC's wholly-owned subsidiary, YGF Investment, in the BVI, on August 26, 2020; (iii) YGF Investment's wholly-owned Hong Kong subsidiary, YGF Investment V Hong Kong Limited ("YGF HK") on September 15, 2020. Certificates of Incorporation for YGF MC, YGF Investment, and YGF HK are attached together as EA Exhibit 4. Ye also caused YGF Investment's wholly-owned subsidiary, Mingyou Industrial Investment (Guangzhou) Limited ("Mingyou"), to be set up in China to acquire the land use rights in China for MINISO's HQ on October 13, 2020. Mingyou's October 13, 2020 creation date was confirmed

by MINISO's Form 20-F Annual Report for the fiscal year ended June 30, 2020, filed with the SEC on September 17, 2021 ("2021 20-F"). MINISO said the JV was made per a Capital Increase Agreement dated December 11, 2020 ("Capital Increase Agreement") between YGF MC and MINISO, attached as Exhibit 4.6 to the 2021 20-F. According to the Capital Increase Agreement, MINISO acquired new shares of YGF Investment, resulting in a 20% ownership of the company, after the share increase, in exchange for RMB 356 million.

(c) Plaintiffs' investigation also confirmed Blue Orca's core finding that the JV transaction, as publicly described by the Exchange Act Defendants during the Class Period, is highly suspicious, appeared to be non-compliant with both Chinese law and the transaction's own contractual terms, and paid an amount to Exchange Defendant Ye that was not commensurate with his actual investment into the JV transaction. According to the Capital Increase Agreement and YGF Investment's certificate of incorporation, attached as part of EA Exhibit 4, the BVI JV was established by Ye on August 26, 2020, with YGF MC as its sole shareholder. By the December 11, 2020 Capital Increase Agreement, attached as EA Exhibit 5, MINISO accepted a 20% share of the JV in exchange for RMB 356 million. Before then, YGF MC owned all of YGF Investment (the JV entity), despite neither YGF MC nor Ye having personally invested any funds to that point. To be clear, even before December 11, 2020, the BVI JV's purpose was to acquire land for MINISO's planned Guangzhou HQ building in China, as MINISO clarified in its 2021 20-F:

> On October 13, 2020, Mingyou Industrial Investment (Guangzhou) Limited ("Mingyou"), a subsidiary of the Group's equity-accounted investee was set up to acquire land use right of a parcel of land and to establish a new headquarters building for MINISO in a district in Guangzhou, the PRC. ***In connection with the acquisition of land use right and the construction of new headquarters building by Mingyou, on November 26, 2020, MINISO Guangzhou entered into a letter of intent (the "Letter") with the local government of that district, whereby MINISO Guangzhou committed to the local government that the aggregate amount of tax levies paid by the subsidiaries of MINISO Guangzhou in that district and Mingyou would be no less than RMB 965,000,000 for a five-year period starting***

> ***from January 1, 2021***. If the above entities fail to meet such commitment, MINISO Guangzhou will be liable to compensate the shortfall. On January 25, 2021, MINISO Guangzhou provided a performance guarantee of RMB 160,000,000 issued by a commercial bank to this local government in respect of the commitment of tax payments for the calendar year of 2021, which was valid from April 1, 2021 to March 31, 2022.

As shown in the screenshots from the National Enterprise Credit Information Publicity System (available in China at gsxt.gdgs.gov.cn) attached as EA Exhibits 6 and 7, Plaintiffs' investigation also confirmed, via a website inaccessible outside of China, the essence of Blue Orca's findings that: (i) MINISO contributed RMB 345.7 million to the JV on December 11, 2020, (ii) Mingyou's paid-in-capital remained at this level until October 28, 2021, one day ***after*** MINISO paid $108 million to Ye to buy out YGF MC's 80% share in the BVI JV, and (iii) Mingyou's paid-in-capital rose to RMB 1.8 billion after the buyout, at a time when MINISO was the sole remaining shareholder in the JV. This flow of funds is shown in Plaintiffs' EA Appendix A.

(d) Plaintiffs' investigation has also unscrambled MINISO's trickle of more recent public statements about the transactions, post-dating both the Blue Orca report and the initiation of this lawsuit, to piece together its description of the transaction, which is noncompliant with the contractual terms of the JV. Per a press release published to MINISO's corporate website on July 28, 2022 ("7/28/2022 Press Release") and filed with the SEC the same day as Exhibit 99.1 to a Form 6-K ("7/28/2022 6-K"), attached hereto as EA Exhibit 8, (and an Equity Transfer Agreement dated September 23, 2021 ("Equity Transfer Agreement"), attached as Exhibit 4.6 to the 2021 20-F for point (ii)): (i) on February 2, 2021, YGF MC contributed $34.5 million (~RMB 222.95 million) to YGF Investment; (ii) two days later, on February 4, 2021, Minggao Trading (Guangzhou) Co., Ltd. ("Minggao"), an entity Ye purportedly owned and controlled, loaned Mingyou RMB 319.9 million; and (iii) YGF MC contributed RMB 200 million to YGF Investment on May 25, 2021. The RMB 742.88 million in funds were not commensurate with YGF MC's 80%

stake, based on the valuation derived from MINISO's RMB 356 million for a 20% stake. Nor did Minggao make a contribution to the JV, it made a loan that Ye presumably expected Mingyou to pay back. MINISO's buyout of Ye's stake, announced on September 26, 2021, via payment of approximately RMB 700 million (~$108 million) to Ye, via YGF MC, purportedly was used, in part, to repay Minggao's loan, though neither MINISO nor Ye explained why ***any*** funds from MINISO were necessary to "repay" the loan when Mingyou could simply have returned Minggao's funds intact. MINISO also claimed on September 26, 2021 that the payment to Ye would be the lower of YGF MC's actual investment and the "appraisal value of the equity interests confirmed by a third-party valuation firm, deducted by the estimated accumulative loss of YGF Investment that YGF MC should bear up to the closing of this transaction." However, the Equity Transfer Agreement, which was signed on YGF MC's behalf by Ye and on MINISO's behalf by Zhang, said that MINISO purportedly relied on an unnamed "professional organization" to evaluate Ye's holdings in YGF Investment and prepare an unreleased "evaluation report," to justify the buyout price. The professional organization was never identified and the evaluation report is not available to investors. Additionally, neither MINISO nor Ye has ever said that Ye – the controlling shareholder of both MINISO and YGF MC recused himself from any MINISO Board of Directors or Audit Committee vote concerning the JV transaction or Ye's buyout. The buyout was fully settled on October 29, 2021, according to the 2021 20-F Supplement. The convoluted flow of funds, based on MINISO's descriptions, is shown in Plaintiffs' EA Appendix A.

(e) Plaintiffs' investigation also analyzed Chinese government documents pertaining to MINISO's HQ land purchase, not accessible outside of China, and confirmed Blue Orca's conclusion that the contract prohibits changes in the ownership structure of the land use purchaser

(here, the BVI JV) for 10 years. Those documents and their certified translations, attached as EA Exhibit 9, lay out the relevant terms of the deal as offered and announce the results of the sale.

(f) Plaintiffs' investigation has uncovered the fact that aside from all the foregoing, and the issue of the funds paid over to Ye having been at least partially a self-enriching transfer of MINISO's corporate resources, the unexplained unwinding of the JV transaction meant that MINISO was fully committed and fully liable to pay 100% of the costs of its new corporate HQ. The JV transaction, as described by MINISO, would have required it to only pay 20% of the costs of its HQ project, or RMB 356 million, while Ye, through his separate company YFG MC, was required to pay 80% of the costs, or RMB 1.424 billion. That cost allocation would have been in keeping with MINISO's self-described "asset light" philosophy. However, once the contract was signed with the Chinese government and MINISO had already committed its RMB 356 million, the JV transaction was without notice or explanation unwound, leaving MINISO responsible to pay the full costs of its corporate HQ project.

123. <u>MINISO's negative trend</u>. Blue Orca uncovered "independent evidence" that MINISO was concealing negative trends about MINISO's Retail Partner model and revenues. Plaintiffs' investigation confirmed the approach and conclusion.

(a) Blue Orca found deleted statements from MINISO's Chinese website indicating MINISO had lowered its franchising fee by 63% the prior two years "in a desperate attempt to attract franchisees," which it termed "a telltale sign that the business is substantially less attractive to retail partners than it used to be" and a concern because "[f]ranchise fees are a cornerstone of MINISO's value proposition and are 100% margin revenue." Blue Orca also examined 620+ MINISO stores in China from November 2021 and observed that 120 of them (20%) closed by July 2022, including 110 that "deregistered their business licenses, suggesting permanent closure."

(b) Plaintiffs' investigation, using the Wayback Machine (which permits searches of archived former webpages), was able to replicate and confirm Blue Orca's research. Likewise, Plaintiffs' investigation of the Chinese corporate registry showed that of the 630 stores that were opened and registered using a shared phone number, only 210 remained open as of December 2022, meaning that 420 of them (67%) were subsequently closed. Plaintiffs' investigation also revealed that the store closures remained ongoing, with another 80+ locations closed in the five months after the Blue Orca's report's publication. Also, Plaintiffs' investigation confirmed Blue Orca's findings regarding MINISO's dramatically lowering franchise fees by 63% over two years. MINISO's Licensed annual Trademark Use Fee declined from RMB 80,000 as of December 2, 2020 to RMB 50,000 on January 25, 2021, and RMB 29,000 on January 27, 2022. Its one-time Product Security Deposit dropped from RMB 750,000 as of December 2, 2020 to RMB 600,000 on January 25, 2021, and either RMB 350,000 or RMB 250,000 as of January 27, 2022 depending on store location, as seen in *Figure 2* below showing Plaintiffs' screenshots taken of MINISO's corporate website using the Wayback Machine.

[*The rest of this page is intentionally left blank to accommodate the Figure*]

*Figure 2*




### 6. Admitted Company Misconduct

124. MINISO ultimately responded to the Blue Orca Report in the 7/28/2022 Press Release, filed with the SEC the same day as Exhibit 99.1 to the 7/28/2022 6-K, attached hereto as EA Exhibit 8. It purports to refute the validity of the Blue Orca Report with preliminary findings from an investigation into Blue Orca's claims. However, instead of "refuting" Blue Orca's claims, the 7/28/2022 Press Release actually ***admits*** misconduct by its employees, which supports the allegation that MINISO's number of company-owned stores had been misstated.

125. The 7/28/2022 Press Release claims that "[h]istorically, certain MINISO Retail Partners requested [MINISO's] assistance with certain administrative tasks, such as corporate

registration with the local administration of industry and commerce. From time to time, in providing the requested assistance, ***some [MINISO] employees may have found it necessary or expedient to provide their names and contact information to the local authorities and did so on their own initiative***. This information, in turn, became part of the registration records of a number of stores owned and operated by MINISO Retail Partners." The 7/28/2022 Press Release went on "These ***unapproved practices by individual employees*** have been substantially curtailed." Even according to the 7/28/2022 Press Release, assistance was purportedly requested by only "***certain*** MINISO Retail Partners," and this practice only occurred "from time to time," meaning the majority of MINISO's *bona fide* Retail Partners were fully capable of properly navigating the registration process and MINISO and its employees could easily have declined to create inaccurate corporate registration records.

126. The 7/28/2022 Press Release offered no explanation for why this practice was necessary, or even helpful. It merely claims that some MINISO employees "***may*** have found it necessary or expedient" to create inaccurate corporate registration documentation. Indeed, this text of the 7/28/2022 Press Release was responding to the Blue Orca report's allegation that 620+ MINISO stores were owned by the company, Ye, or insiders. MINISO's 2021 20-F said that MINISO had 4,749 total stores as of June 30, 2021, facially demonstrating that corporate registration could be properly done, given that the larger majority of Retail Partners did so. Given these circumstances, and the information revealed by Blue Orca and corroborated by Plaintiffs' investigation, on information and belief, if MINISO employees used their own names and contact information for corporate registration records before local authorities, they did so to conceal the true ownership of particular stores by MINISO directly, by Ye, or by other insiders.

127. By reporting post-IPO store ownership numbers they knew or recklessly disregarded were false, the Exchange Act Defendants mislead the market into believing MINISO was closer to a completely "asset light," rapid-growth franchisor than what it actually was, mixed-model brand with a significant portfolio of company-owned stores subject to increased costs associated with store ownership and split focus as MINISO struggled to operate its own stores.

**7. Ye's Post-IPO BVI JV Interested Party Transaction**

128. After MINISO's IPO, the Exchange Act Defendants misled investors as to an interested party transaction between MINISO and Ye (MINISO's CEO, Chairman, and controlling shareholder). They misrepresented the investment structure of the BVI JV, misrepresenting to investors that YGF MC was contributing 80% of the cost of building the HQ, when in reality YGF MC and Ye lacked sufficient liquidity to make their required contractual investment, such that Ye was underinvesting in the project. Ye and MINISO, which he controlled, engaged in an unnecessary and elaborate deal structure to purchase land rights for its China HQ by way of supposedly jointly-owned subsidiaries. The complicated transaction structure used various entities that were already incorporated, as discussed above: YGF MC in the BVI, YGF Investment in the BVI, YGF HK in Hong Kong, and Mingyou in China. The complex structure (*see* EA Appendix A), and the Exchange Act Defendants' public misrepresentations and omissions about the transaction, allowed Ye to conceal the true investment structure of the entity building the HQ, Ye's underinvestment in the JV, noncompliance with both the JV's contractual obligations and Chinese laws, an off-the-books payment to Ye, and deviation from Ye's fiduciary duties as an officer and Chairman of MINISO under Cayman Islands law.

129. As stated in MINISO's 2021 20-F:

> "In connection with the acquisition of land use right and the construction of new headquarters building by Mingyou, on November 26, 2020 MINISO Guangzhou entered into a letter of intent (the "Letter") with the local government of that district,

> whereby MINISO Guangzhou committed to the local government that the aggregate amount of tax levies paid by the subsidiaries of MINISO Guangzhou in that district and Mingyou would be no less than RMB 965,000,000 for a five-year period starting from January 1, 2021. If the above entities fail to meet such commitment, MINISO Guangzhou will be liable to compensate the shortfall."

### 8. The Exchange Act Defendants Committed Fraud

#### a. The JV Transaction

130. MINISO announced the transaction on December 11, 2020. Starting with this announcement, the Exchange Act Defendants committed a securities fraud regarding the BVI JV transaction, as discussed below.

(a) On December 11, 2020, MINISO filed with the SEC a Form 6-K ("12/11/2020 6-K"), signed by Exchange Act Defendant Zhang that attached as Exhibit 99.1 the a press release also published to MINISO's corporate website ("12/11/2020 Press Release"), which is attached hereto as EA Exhibit 10, announcing a joint venture with YGF MC. On information and belief, as MINISO's controlling shareholder, CEO and Chairman, and as the owner of YGF MC, MINISO's JV co-participant, Exchange Act Defendant Ye wrote and/or edited the 12/11/2020 Press Release and authorized its dissemination and wrote and/or edited the 12/11/2020 6-K and authorized its filing. The 12/11/2020 Press Release said:

> "MINISO ***formed a joint venture in the British Virgin Islands with YGF MC Limited***, a company jointly controlled by [MINISO's] controlling shareholders, [Exchange Act Defendant] Ye and Ms. Yunyun Yang, to acquire land use right of a parcel of land in Guangzhou and to establish a new headquarters building for MINISO through such joint venture's subsidiary in Guangzhou. ***The Company holds 20% of the shares of the joint venture company while YGF MC holds the remaining 80% of the shares of the joint venture company. After the formation of the joint venture company, [MINISO] invested RMB 356 million in the joint venture company. YGF MC will invest RMB 1,424 million.***
>
> The total investment for the headquarters building project is estimated to be approximately RMB 2,885 million, including approximately RMB 1,780 million as consideration for acquisition of land use right and the remaining as building costs. The joint venture company will participate in the public bidding process for the

land use right and ***make deposit payments representing 20% of the purchase price for the land use right in December 2020.”***

(b) On December 18, 2020, MINISO issued an earnings press release (“12/18/2020 Earnings Release”), in which Exchange Act Defendants Ye and Zhang were quoted. The 12/18/2020 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed the same day (“12/18/2020 6-K”) signed by Exchange Act Defendant Zhang, which announced MINISO’s financial and operating results for the first quarter of fiscal year 2021 ended September 30, 2020. On information and belief, as MINISO’s controlling shareholder, CEO and Chairman, and as the owner of YGF MC, MINISO’s JV co-participant, Exchange Act Defendant Ye wrote and/or edited the 12/18/2020 Earnings Release and authorized its dissemination and wrote and/or edited the 12/18/2020 6-K and authorized its filing. Under the header “***Recent Development***,” the 12/18/2020 Earnings Release also said:

> On December 11, 2020, the Company announced that it had formed a joint venture in the British Virgin Islands with YGF MC Limited, a company jointly controlled by the Company’s controlling shareholders, Mr. Guofu Ye and Ms. Yunyun Yang, to acquire the land use rights for a parcel of land in Guangzhou and to establish a new headquarters building for MINISO through the joint venture’s subsidiary in Guangzhou. The Company holds 20% of the shares of the joint venture company, while ***YGF MC Limited holds the remaining 80% of the shares*** of the joint venture company. After the formation of the joint venture company, the Company invested RMB 356 million in the joint venture company. ***YGF MC Limited will also invest RMB 1,424 million in the joint venture company.***

131. The 12/11/2020 Press Release and 12/18/2020 Earnings Release contained materially false and misleading statements as follows:

(a) The 12/11/2020 Press Release and 12/18/2020 Earnings Release said that MINISO and YGF MC had “formed a joint venture in the British Virgin Islands.” This statement was materially false or misleading because, in reality, YGF Investment was incorporated on August 26, 2020 and was wholly-owned by YGF MC, which was wholly-owned by Ye. Instead of forming

a new company as a joint venture, MINISO and YGF MC actually engaged in a Capital Increase Agreement whereby MINISO bought into the existing entity that was fully owned by Ye.

(b) The 12/11/2020 Press Release and 12/18/2020 Earnings Release said "The Company holds 20% of the shares of the joint venture company while YGF MC [Limited] ***holds the remaining 80% of the shares of the joint venture company."*** This statement was a materially misleading half-truth, because in reality YGF MC had not contributed any funds to YGF Investment to that point and was never able contribute sufficient funds to justify an 80% ownership stake, given the valuation MINISO was required to invest in exchange for its 20% stake.

(c) The 12/11/2020 Press Release said that "YGF MC will invest RMB 1,424 million" and the 12/18/2020 Earnings Release said that "YGF MC Limited will also invest RMB 1,424 million in the joint venture company." These statements were materially false or misleading because they did not disclose that, at the time, neither YGF MC nor Ye had sufficient liquidity to invest that amount of funds into the JV, nor could they reasonably have been expected to timely generate it. As MINISO later said in the 7/28/2022 Press Release, YGF MC only ever contributed ~RMB 423 million to YGF Investment. According to the 7/28/2022 Press Release, to cover the shortfall, yet another entity owned by Ye gave YGF Investment's subsidiary, Mingyou, a ~RMB 319.9 million ***loan*** (not an investment). That Ye's entities only ever contributed ~RMB 743 million – ***roughly half*** of what the 12/11/2020 Press Release said YGF MC would contribute – shows that YGF MC itself lacked any ability to pay the amount promised and that even Ye had insufficient liquidity to fund the 80% investment into YGF Investment as stated.

(d) The 12/11/2020 Press Release and the 12/18/2020 Earnings Release said that YGF MC would "invest" RMB 1,424 million in the joint venture. These statements were materially false or misleading because YGF MC could not "invest" that level of funds, and neither could Ye,

so that any infusion even approaching that level needed to be repaid. Instead, Ye sought to make a substantial portion of YGF MC's contribution as a loan, by a different entity, which Ye expected to be repaid. As MINISO later said in the 7/28/2022 Press Release, and as reflected in the Equity Transfer Agreement, on February 4, 2021, a different entity owned and controlled by Ye, Minggao, ***loaned*** YGF Investment's subsidiary, Mingyou ~RMB 319.9 million. A "loan," which must be paid back by the JV, is not an investment. Moreover, the Minggao loan did not fully cover the YGF MC investment shortfall. They were also materially misleading because YGF MC's failure to invest in full would mean that MINISO would go from having responsibility to pay just 20% of the land use acquisition costs, or ~RMB 346 million, to having responsibility for 100% of the land use acquisition, or ~RMB 1.8 billion.

(e) The 12/11/2020 Press Release and the 12/18/2020 Earnings Release were also materially misleading half-truths because they did not disclose the complicated ownership structure involving five subsidiaries, incorporated in three jurisdictions, that served to obscure YGF Investment's funding (*see* EA Appendix A). They further did not explain the need for or reasoning behind that ownership structure, as it is highly unusual for a Chinese company to purchase land use rights in China through a BVI intermediary.

(f) The 12/11/2020 Press Release and the 12/18/2020 Earnings Release were also materially misleading half-truths because they did not disclose that YGF Investment is an "Interested Business" under the Code of Conduct, which mandated that Ye, an interested Director (and Chairman) "shall not be involved in any proposed transaction between the Company and an Interested Business."

132. MINISO announced the JV buyout by a press release published to its corporate website on September 26, 2021 ("9/26/2021 Press Release"), which MINISO filed with the SEC

attached as Exhibit 99.1 to a September 27, 2021 Form 6-K ("9/27/2021 6-K"), signed by Exchange Act Defendant Zhang. On information and belief, as MINISO's controlling shareholder, CEO and Chairman, and as the owner of YGF MC, MINISO's JV co-participant, Ye wrote and/or edited the 9/26/2021 Press Release and authorized its dissemination and wrote and/or edited the 9/27/2021 6-K and authorized its filing. The 9/26/2021 Press Release said:

> "[MINISO] has entered into a definitive agreement with YGF MC, a company jointly controlled by [MINISO's] controlling shareholders, [Exchange Act Defendant] Ye and Ms. Yunyun Yang, to acquire the remaining 80% equity stake in ***YGF Investment, a joint venture between YGF MC and [MINISO] to establish MINISO's new headquarters building***." After closing of the proposed purchase, [MINISO] will hold 100% equity interests in YGF Investment and will start to consolidate the financial results of YGF Investment into [MINISO's] financial statements. The transaction has been approved by the audit committed and the board of directors of [MINISO].
>
> The total consideration of this transaction is estimated to be approximately RMB 700.4 million, ***representing the lower of the actual investment amount by YGF MC as of August 31, 2021 and the appraisal value of the equity interests confirmed by a third-party valuation firm***, deducted by the estimated accumulative loss of YGF Investment that YGF MC should bear up to the closing of this transaction. Closing of the transaction is subject to customary closing conditions and is estimated to take place in the second quarter of the Company's 2022 fiscal year."[1]
>
> "In January 2021, ***YGF Investment's PRC subsidiary acquired land use right of a parcel of land in Guangzhou for approximately RMB 1,780 million, which shall be paid by two equal installments.*** As of the date of this press release, the first installment has been paid. This parcel of land is located in the Pazhou Internet Innovation Zone, which is at the center of Guangzhou's future CBD area where many large new-economy companies in China have chosen to place their headquarters or regional headquarters.
>
> ***The total investment for the headquarters building project, including the consideration for acquisition of land use right, is estimated to be approximately RMB 2,885 million***. [MINISO] currently intends to support the subsequent capital expenditures of the project with its cash surplus, future cash flows from operating activities and potential bank financing."

---

[1] The RMB 700.4 million was equivalent to roughly $108.3 million, based on the currency conversion ratio that day.

133. The 9/26/2021 Press Release contained materially false and misleading statements as follows:

(a) The 9/26/2021 Press Release said "[MINISO] has entered into a definitive agreement with YGF MC, a company jointly controlled by [MINISO's] controlling shareholders, [Exchange Act Defendant] Ye and Ms. Yunyun Yang, to acquire the remaining 80% equity stake in YGF Investment, a joint venture between YGF MC and [MINISO] to establish MINISO's new headquarters building." This statement was materially false or misleading because it did not disclose that—as the controlling shareholder and CEO of MINISO—Ye was on both sides of the transaction. It further omitted that such a structure violated MINISO's Code of Conduct.

(b) The 9/26/2021 Press Release said "[MINISO] has entered into a definitive agreement with YGF MC, a company jointly controlled by [MINISO's] controlling shareholders, [Exchange Act Defendant] Ye and Ms. Yunyun Yang, to acquire the remaining 80% equity stake in YGF Investment, a joint venture between YGF MC and [MINISO] to establish MINISO's new headquarters building." This statement was materially false or misleading because in reality YGF MC did not invest the funds it promised as part of the Capital Increase Agreement sufficient to justify an 80% ownership stake, given what MINISO invested for its 20% stake. It was also a materially misleading half-truth for obscuring the net effect of the transaction was that MINISO went from having responsibility to pay just 20% of the land use acquisition costs, or ~RMB 346 million, to having responsibility for 100% of the costs, or ~RMB 1.8 billion.

(c) The 9/26/2021 Press Release said, "The transaction has been approved by the audit committee and the board of directors of [MINISO]." This statement was materially false or misleading because it did not disclose whether Ye recused himself from the Audit Committee and/or Board of Directors votes. Indeed, neither MINISO nor Ye has ever said that Ye recused

himself from the votes, a highly exonerating fact that, if it were true, Exchange Act Defendants would have likely emphasized. Significantly, neither Ye nor MINISO has ***ever*** said that he recused himself – an incredibly simple statement to make, if it had actually occurred. Thus, on information and belief, because it is the only logical inference from the MINISO's failure to say otherwise, Ye did not recuse himself from any MINISO Board vote, rendering this statement materially false or misleading.

(d) The 9/26/2021 Press Release said, "The transaction has been approved by the audit committee and the board of directors of [MINISO]." This statement was materially false or misleading because it did not disclose that the transaction was in contradiction to MINISO's Code of Business Conduct and Ethics, attached as Exhibit 99.1 to the Registration Statement which said, "Notwithstanding the other provisions of this code . . . an interested director or senior officer shall refrain from participating in any discussion among senior officers of the Company relating to an Interested Business [like YGF Investment] and shall not be involved in any proposed transaction between the Company and an Interested Business." Neither MINISO nor Ye ever refuted that the JV transaction violated MINISO's Code of Conduct.

(e) The 9/26/2021 Press Release said, "The total consideration of this transaction is estimated to be approximately RMB 700.4 million, representing the lower of the actual investment amount by YGF MC as of August 31, 2021 and the appraisal value of the equity interests confirmed by a third-party valuation firm, deducted by the estimated accumulative loss of YGF Investment that YGF MC should bear up to the closing of the transaction." This statement was materially false or misleading because it implied the payment to Ye would be determined by an objective reference point, when in reality, the RMB 700.4 million Benchmark Price was already agreed to between MINISO and YGF MC—both controlled by Ye—and was the subject of a friendly

negotiation, independent of either an actual investment or appraisal, as revealed by the Equity Transfer Agreement.

(f) The 9/26/2021 Press Release said, "The total consideration of this transaction is estimated to be approximately RMB 700.4 million, representing the lower of the actual investment amount by YGF MC as of August 31, 2021 and the appraisal value of the equity interests confirmed by a third-party valuation firm, deducted by the estimated accumulative loss of YGF Investment that YGF MC should bear up to the closing of the transaction." This statement was materially false or misleading because it said that Ye's equity interest were confirmed by a third-party valuation firm, but in reality, as confirmed by the Equity Transfer Agreement, MINISO and Ye agreed to use a "professional organization," not an accounting firm. Also, in reality, the "professional organization" never actually confirmed the value of Ye's equity interest as revealed by the 7/28/2022 Press Release which said "Ye's total interest in the JV was estimated to be over RMB 700 million," without specifying the value. Additionally, the Equity Transfer Agreement provides that the "professional organization" will issue an evaluation report within 60 working days of the Benchmark Date (August 31, 2021). Because no report was ever disclosed to investors and no specific figure was ever revealed, upon information and belief no report was ever created. This statement was also materially false or misleading because it did not disclose (i) the appraisal method, (ii) the bases for the evaluation, (iii) the name of the third-party valuation firm, (iv) whether the third-party valuation firm was related to MINISO or Ye, and if so how, or (v) what steps were done to "confirm" the appraisal. It was materially false or misleading because, as was later revealed by the 7/28/2022 Press Release and the Equity Transfer Agreement, YGF MC did not contribute anywhere close to RMB 700.4 million to YGF Investment. Instead, the 7/28/2022 Press Release and Equity Transfer Agreement claim YGF MC only contributed RMB 422.95

million. Any other purported investments into YGF Investment, according to the Equity Transfer Agreement, was in the form of a loan by Minggao to Mingyou. It was also materially false or misleading because it failed to state why ***any*** funds from MINISO were needed to "repay" Minggao, when Mingyou could have simply returned the funds Minggao loaned it.

(g) The 9/26/2021 Press Release was also a materially misleading half-truth because it did not disclose the amounts or dates of YGF MC's purported contributions to YGF Investment or the ultimate source of funds from YGF MC.

(h) The 9/26/2021 Press Release was also a materially misleading half-truth because it did not disclose that the JV buyout risked breaching the JV's land use contract with the Chinese government to build MINISO's HQ, the terms of which were made publicly available by the Guangzhou Municipal Planning and Natural Resources Bureau, and which forbade changes in ownership structure of the purchaser for 10 years. Specifically, the terms state that "From the day when the bidder signs the 'State-owned Construction Land Use Right Transfer Contract,' the transferee's equity cannot be changed within 10 years." Documents showing the terms of the land use contract and a confirmation of transfer (with certified translations) are attached here as EA Exhibit 9.

(i) The 9/26/2021 Press Release was also a materially misleading half-truth because it did not disclose the complicated ownership structure involving five subsidiaries, incorporated in three jurisdictions, that served to obscure YGF Investment's funding. It further did not explain the need for or reasoning behind that ownership structure, as it is highly unusual for a Chinese company to purchase land use rights in China through a BVI intermediary.

(l) The 9/26/2021 Press Release and the 9/27/2021 6-K were also materially misleading half-truths because they did not disclose that YGF Investment is an "Interested

Business" under the Code of Conduct, which mandated that Ye, an interested Director (and Chairman) "shall not be involved in any proposed transaction between the Company and an Interested Business."

134. On March 3, 2022, MINISO issued an earnings press release ("3/3/2022 Earnings Release") in which Exchange Act Defendants Ye and Zhang were quoted. The 3/3/2022 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed on March 4, 2022 ("3/4/2022 6-K"), signed by Exchange Act Defendant Zhang, which announced MINISO's financial and operating results for the second quarter of fiscal year 2022 ended December 31, 2021. The 3/3/2022 Earnings Release said:

> "**General and administrative expenses** were RMB 221.4 million ($34.7 million), representing an increase of 17.1% year over year. Excluding share-based compensation expenses, general and administrative expenses were RMB 214.7 million (US $33.7 million), representing an increase of 34.0% year over year. The year-over-year increase was primarily due to increased depreciation and amortization expenses of land use right related to the Company's headquarter building project, and to a lesser extent, increased personnel-related expenses and professional service fees.

135. The 3/3/2022 Earnings Release was a materially misleading half-truth because it reported an increase in general and administrative expenses attributable to increased depreciation and amortization expenses of land use right without disclosing that the HQ project was tainted by Exchange Act Defendant Ye's underinvestment in the JV.

136. On May 26, 2022, MINISO issued an earnings press release ("5/26/2022 Earnings Release"), in which Exchange Act Defendants Ye and Zhang were quoted. The 5/26/2022 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed the same day ("5/26/2022 6-K"), signed by Exchange Act Defendant Zhang, which announced MINISO's financial and operating results for the third quarter of fiscal year 2022 ended March 31, 2022. The 5/26/2022 Earnings Release said:

> "**General and administrative expenses** were RMB 198.7 million ($31.3 million), representing an increase of 17.2% year over year. Excluding share-based compensation expenses, general and administrative expenses were RMB 191.2 million (US $30.2 million), representing an increase of 21.8% year over year. The year-over-year increase was primarily due to (i) increased depreciation and amortization expenses of land use right related to the Company's headquarter building project, and (ii) increased personnel-related expenses and tax and surcharges.

137. The 5/26/2022 Earnings Release was a materially misleading half-truth because it reported an increase in general and administrative expenses attributable to increased depreciation and amortization expenses of land use right without disclosing that the HQ project was tainted by Exchange Act Defendant Ye's underinvestment in the JV.

138. On June 27, 2022, MINISO filed the 6/27/2022 6-K, which attached as Exhibit 99.1 the 2nd 2021 20-F Supplement, which in turn contained the PHIP, and was signed by Exchange Act Defendant Zhang. The 2nd 2021 20-F Supplement stated that in October 2021, MINISO "acquired the remaining 80% equity interest in YGF Investment ***for the purpose of obtaining full ownership of the parcel of land for establishing our Company's new headquarters building***."

139. The 2nd 2021 20-F Supplement was false and misleading because it implied the purpose of the JV buyout was to obtain full ownership of the HQ project without disclosing that (i) as the controlling shareholder and CEO of MINISO—Ye was on both sides of the transaction which paid him approximately $108 million; (ii) Ye did not recuse himself from the Audit Committee or Board of Directors votes for the JV buyout; (iii) the amount of the JV buyout was determined by a friendly negotiation between MINISO and YGF MC, both of which Ye controlled; (iv) YGF MC did not invest the funds it promised as part of the Capital Increase Agreement sufficient to justify an 80% ownership stake, given what MINISO invested for its 20% stake; (v) MINISO's Code of Conduct forbade Exchange Act Defendant Ye's participation in the JV buyout;

(vi) the JV buyout risked breaching the JV's land use contract with the Chinese government; and (vii) the need for or reasoning behind the structure of the entire JV transaction.

**b. MINISO's Directly-Owned Stores**

140. In addition, the Exchange Act Defendants made a series of materially false or misleading statements regarding the number of stores (MINISO and Top Toy) that were company-owned versus "third party" owned, meaning primarily owned under the Retail Partner model. Given the stated attributes and benefits of the Retail Partner model, *i.e.*, permitting MINISO to operate in an "asset light" manner that offloaded considerable costs and responsibilities to franchisees while minimizing MINISO's risks, understating the true number of company-owned stores misleading downplayed MINISO's exposure to decreased sales or increased expenses and MINISO's true risk profile, while inflating its valuation to investors. The Exchange Act Defendants made such statements as follows:

(a) On February 25, 2021, MINISO issued an earnings press release ("2/25/2021 Earnings Release"), in which Exchange Act Defendants Ye and Zhang were quoted. The 2/25/2021 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed the same day ("2/25/2021 6-K"), signed by Zhang, which announced MINISO's financial and operating results for the second quarter of fiscal year 2021 ended December 31, 2020. It reported that MINISO had a total of 4,514 stores of December 31, 2020, representing a net increase of 303 stores year over year and 184 stores quarter over quarter, and that just 110 of them were "directly operated stores" operated by MINISO itself. Specifically, it said that only 5 out of 2,768 MINISO stores in China and 105 out of 1,746 stores outside of China were "directly operated," while the rest were "third-party stores."

(b) On May 19, 2021, MINISO issued an earnings press release ("5/19/2021 Earnings Release"), in which Ye and Zhang were quoted. The 5/19/2021 Earnings Release was filed with

the SEC as Exhibit 99.1 to a Form 6-K filed on May 20, 2021 ("5/20/2021 6-K"), signed by Zhang, which announced MINISO's financial and operating results for the third quarter of fiscal year 2021 ended March 31, 2021. It reported that MINISO had a total of 4,587 MINISO stores as of March 31, 2021, from 4,223 as of March 31, 2020 and 4,514 as of December 31, 2020, that just 112 of them were "directly operated stores" operated by MINISO itself, and it said that only 5 out of 2,812 MINISO stores in China and 107 out of 1,775 stores outside of China were "directly operated," while the rest were "third-party stores."

(c) On August 19, 2021, MINISO issued an earnings press release ("8/19/2021 Earnings Release"), in which Ye and Zhang were quoted. The 8/19/2021 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed the same day ("8/19/2021 6-K"), signed by Zhang, which announced MINISO's financial and operating results for the fourth quarter and full fiscal year ended June 30, 2021. It reported that MINISO had a total of 4,749 MINISO stores, representing a net addition of 162 stores, and 33 TOP TOY stores as of June 30, 2021 and that just 110 MINISO stores and 2 TOP TOY stores were "directly operated stores" operated by MINISO itself and said that only 5 out of 2,939 MINISO stores in China, 105 out of 1,810 stores outside of China, and 2 out of 33 TOP TOY stores were "directly operated," while the rest were "third-party stores." In the 8/19/2021 Earnings Release, Ye said "In fiscal year 2021, the MINISO brand added 527 stores worldwide [and] we successfully accomplished our IPO."

(d) On August 19, 2021, MINISO held an earnings call with analysts and investors in conjunction with its Q4 2021 and year end June 30, 2021 financial results ("8/19/2021 Earnings Call"), on which Ye and Zhang spoke. During prepared remarks, Ye boasted that in "China, we added 127 MINISO stores during this quarter, compared to a net decrease of two stores and a net addition of 38 stores during the same period of 2020 and 2019, respectively." He said, "[W]e

should give credit to support our retail partners here" and said that "[b]y the end of June, we had 820 retail partners, increased by 80 year-over-year, with each partner adding 3.5 MINISO stores average flat year-over-year."

(e) MINISO's 2021 20-F, filed with the SEC, signed by Ye, and SOX-certified by Ye and Zhang, announced MINISO's full-year 2021 financial results regarding the fiscal year ended June 30, 2021. The 2021 20-F, particularly in its Operating and Financial Review and Prospects section,[2] set forth MINISO's financial and operating results and metrics. It reported that MINISO had a total of 4,749 MINISO stores and 33 TOP TOY stores as of June 30, 2021 and that just 2.3% of them (110 MINISO stores and 2 TOP TOY stores) were "directly operated stores." It said that only 5 out of 2,939 MINISO stores in China, 105 out of 1,810 stores outside of China, and 2 out of 33 TOP TOY stores were "directly operated," while the rest were "third-party stores," defined as "includ[ing] those operated under the MINISO Retail Partner model and those under the distributor model." It added, "Outside of five MINISO stores directly operated by us [the company], substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2021" and "As of June 30, 2021, over 95% of MINISO stores in our global network were established and operated by our MINISO Retail Partners and local distributors."

(f) On November 18, 2021, MINISO issued an earnings press release ("11/18/2021 Earnings Release"), in which Defendants Ye and Zhang were quoted. The 11/18/2021 Earnings Release was filed with the SEC as Exhibit 99.1 to a Form 6-K filed on November 19, 2021 (the "11/19/2021 6-K"), signed by Zhang, which announced MINISO's financial and operating results

---

[2] Per SEC guidance, the Form 20-F "Operating and Financial Review and Prospects" section is subject to similar requirements and is intended to be treated similarly to the Management's Discussion & Analysis of Financial Condition and Results of Operations ("MD&A") section in Forms 10-K and 10-Q.

for the first quarter of fiscal year 2022 ended September 30, 2021. It reported that MINISO had a total of 4,871 MINISO stores and 72 TOP TOY stores as of September 30, 2021 and that just 112 MINISO stores and 6 TOP TOY stores were "directly operated stores." It said that only 4 out of 3,035 MINISO stores in China, 108 out of 1,836 stores outside of China, and 6 out of 72 TOP TOY stores were "directly operated," while the rest were "third-party stores."

(g) MINISO's 3/4/2022 6-K, filed with the SEC and signed by Zhang, attached as Exhibit 99.1 the 3/3/2022 Earnings Release containing statements made by Ye and Zhang. It reported that MINISO had a total of 5,045 MINISO stores and 89 TOP TOY stores as of December 31, 2021 and that just 122 MINISO stores and 5 TOP TOY stores were "directly operated stores." It said that only 5 out of 3,168 MINISO stores in China, 117 out of 1,877 stores outside of China, and 5 out of 89 TOP TOY stores were "directly operated," while the rest were "third-party stores."

(h) On March 31, 2022, MINISO filed the 3/31/2022 6-K which attached, as Exhibit 99.1, MINISO's 2021 20-F Supplement. The 2021 20-F Supplement reported results for the 6 months ended December 31, 2021. It reported that MINISO had a total of 5,045 MINISO stores and 89 TOP TOY stores as of December 31, 2021 and that just 141 MINISO stores and 5 TOP TOY stores were "directly operated stores." The 2021 20-F Supplement said that only 5 out of 3,168 MINISO stores in China, 136 out of 1,877 stores outside of China, and 5 out of 89 TOP TOY stores were "directly operated," while the rest were "third-party stores," which consists of those operated under the MINISO Retail Partner model and those under the distributor model. The 2021 20-F Supplement added, "As of December 31, 2021, apart from five directly operated MINISO stores and five directly operated TOP TOY stores, substantially all of our other MINISO and TOP TOY stores in China were operated under our innovative MINISO Retail Partner model." It added, "As of December 31, 2021, in international markets, there were over 130 stores

directly operated by us and over 1,700 MINISO Retail Partner stores and stores under the distributor model."

(i) MINISO's 5/26/2022 6-K, filed with the SEC and signed by Zhang, attached as Exhibit 99.1 the 5/26/2022 Earnings Release containing statements made by Ye and Zhang. It reported that MINISO had a total of 5,113 MINISO stores and 92 TOP TOY stores as of March 31, 2022 and that just 147 MINISO stores and 4 TOP TOY stores were "directly operated stores." It said that only 11 out of 3,197 MINISO stores in China, 136 out of 1,916 stores outside of China, and 4 out of 92 TOP TOY stores were "directly operated," while the rest were "third-party stores."

(j) On June 27, 2022, MINISO filed the 6/27/2022 6-K which attached, as Exhibit 99.1 the 2nd 2021 20-F Supplement and PHIP with the Hong Kong Stock Exchange subsequent to its initial listing application filed on March 31, 2022, in connection with the proposed dual primary listing of its ordinary shares on the Main Board of the Hong Kong Exchange, together with a Hong Kong initial public offering and a global offering of the shares. The 2nd 2021 20-F Supplement reported that MINISO had a total of 5,113 MINISO stores and 92 TOP TOY stores as of March 31, 2022 and that just 147 MINISO stores and 4 TOP TOY stores were "directly operated stores." It said that only 11 out of 3,197 MINISO stores in China, 136 out of 1,916 stores outside of China, and 4 out of 92 TOP TOY stores were "directly operated," while the rest were "third-party stores," which consists of those operated under the MINISO Retail Partner model or the distributor model. It added, "[A]part from a small number of directly operated stores and a few stores operated by one distributor in Tibet, all of our other MINISO stores are operated and will be operated under the MINISO Retail Partner model." It added "During 2020 and 2021, when the pandemic negatively impacted many offline retailers' expansion in China, we added 625 stores in China, among which 624 were MINISO Retail Partner stores." It also reported that of MINISO's

$1,423.542 million (or RMB 9.072 billion) in revenue, $864.069 million (or RMB 5.5064 billion) of it (68.5%) is attributable to "Product sales to franchisees," while only $50.807 million or RMB 323.775 million of it (4.0%) is attributable to "Retail sales in self-operated stores." Further, "Product sales to franchisees made up 60.6% of MINISO's total revenue in the fiscal year ended June 30, 2021, while "Retail sales in self-operated stores" only accounted for 3.6% of total revenue.

141. The foregoing statements regarding MINISO's directly-owned stores, which concerned their total number and percentage of its total stores, were materially false or misleading because:

(a) As detailed by the CW accounts pled in §III.E.5.a, MINISO owned significantly fewer stores post-IPO than it told the market, both in China and internationally. CW1, CW3, CW4, CW5, CW6, CW7, and CW8 all revealed that MINISO owned the vast majority of its U.S.-based stores. CW1, CW5,and CW8 all said that MINISO had opened just five U.S. franchises by September 2021. CW3 and CW4 both explained that MINISO US struggled to find franchise owners who, according to CW3 were "miserable " and wanted to sell out. CW5 said that potential Retail Partners in the U.S. usually lost interest after learning about the costs. The U.S.-based CWs all indicate MINISO struggled to identify and retain Retail Partners.

(b) As revealed by CW1, CW4, CW6, and CW7, post-IPO, MINISO's HQ in China were controlling, and exerted stiff control over MINISO USA's personnel and payroll decisions. CW1 revealed that hiring and firing decisions needed approval from corporate, MINISO dictated 80% of inventory, and had to approve any significant expenditures. The statements by the U.S.-based CWs all indicate that MINISO exerted more significant control over its stores, both in China and internationally than was being reported to the market.

(c) As revealed by the Blue Orca Report, as plead in §III.E.5.b. uncovered evidence that indicated a materially larger percentage of MINISO's stores were directly owned by the company or insiders related to Ye than was being reported to the market. The Blue Orca Report found examples where dozens of MINISO stores were registered under the name or phone numbers of MINISO insiders. The Blue Orca Report also found that hundreds of MINISO stores shared the same registered phone number as one owned by MINISO insiders Minxin Li and Huang Zhang.

(d) The Blue Orca Report also found, as plead in §III.E.5.b., pre-IPO statements by MINISO personnel that indicated MINISO owned approximately 40% of its stores in China.

(e) Plaintiffs' own investigation, as plead in §III.E.5.b., confirmed key findings of the Blue Orca Report. Plaintiffs reviewed Chinese corporate registry data using Qichacha to confirm common ownership of MINISO stores by insiders. Plaintiffs' investigation also retraced Blue Orca's review of pre-IPO Chinese news articles and confirmed that they suggested MINISO or its insiders owned a significant portion of its stores.

**c. Partial Corrective Disclosures Incrementally Revealed The Fraud**

142. The Exchange Act Defendants' fraud was incrementally revealed by a series of partial corrective disclosures, as follows. Many concerned negative operational data and/or financial results, which had greater impact on MINISO due to the greater percentage of its global stores that were directly-owned, as versus those owned by third parties, particularly Retail Partners, and operated under franchise-like arrangements like the Retail Partner model.

143. On November 19, 2021, MINISO filed with the SEC its 11/19/2021 6-K and 11/18/2021 Earnings Release announcing its unaudited financial results for Q1 of fiscal year 2022. In it, MINISO stated selling and distribution expenses rose to US $52.9 million from US $43.8 million the previous quarter; general and administrative expenses rose to US $32.8 million from

US$31.0 million the previous quarter; and combined cash, cash equivalents, restricted cash and other investments were down to RMB 6,138.5 million (US $952.7 million) as of September 30, 2021, down from RMB 6,878.3 million (US $1,065.3 million) the prior quarter.

144. On this news, MINISO's ADS price fell $1.77 per ADS, or 11.17%, on high volume, from a close of $15.85 per ADS on November 18, 2021, to close at $14.08 per ADS on November 19, 2021.

145. On November 25, 2021, Thanksgiving day in the U.S., a Spanish-language analyst report was issued by Mexican analysts at Punto Casa de Bolsa, Inc. Corp. and noted (as translated) a "tight price adjustment in its stock since the IPO," assessed that MINISO's valuation was higher than the industry average, set a price target of $9.46 in 2022, and recommended selling its securities. The analysis was muted, however, by the analysts' clear, continued reliance upon the alleged misstatements, *e.g.*, the report noted that MINISO had 4,871 global stores, including 3,035 in China, and (as translated) "It is important to clarify that only 118 stores (2%) are directly owned by MNSO, the rest is operated by third parties."

146. On this news, MINISO's ADS price fell $0.80 per ADS, or 5.8%, on high volume, from a close of $13.82 per ADS on November 24, 2021, to close at $13.02 per ADS on November 26, 2021.

147. On January 26, 2022, before the markets opened, Goldman Sachs Equity Research in Asia issued a report that, despite expected total sales in the high range of earlier guidance, "expect[ed] margins to decrease vs. last quarter on tapering one-off concessions and increasing year-end cost." The report also expressed concerns about MINISO's operating profits, estimating "adjusted [operating profits] . . . of Rmb154mn at 5.7% OPM, down 2ppt both [year-over-year] and [quarter-over-quarter]."

148. On this news, MINISO's ADS price fell $0.71 per ADS, or 7.26%, on high volume, from a close of $9.78 per ADS on January 25, 2022, to close at $9.07 per ADS on January 26, 2022.

149. On February 14, 2022, B of A Global Research issued a report expressing concern about MINISO's "bumpy recovery in China and overseas stores near term" stating, "We lower our FY22/23E non-IFRS EPS by 18%/10%" and "cut PO by 12% to USD 16.6" due to, among other things, "higher investments in branding in the coming 12 months." It also expressed concern that MINISO's announced expansion plans would be heavily loaded to the second half of the year.

150. On this news, MINISO's ADS price fell $0.30 per ADS, or 3.1%, on high volume, from a close of $9.71 per ADS on February 11, 2022, to close at $9.41 per ADS on February 14, 2022.

151. On February 23, 2022, Goldman Sachs Equity Research in Asia issued a report analyzing a bear case for its China distribution/retail coverage, including MINISO, raising concerns that a prolonged COVID-19 disruption would cause weaker consumer spending in China and a specific concern that a China bear case could result in reduced margin on MINISO's sales.

152. On this news, MINISO's ADS price fell $1.52 per ADS, or 15.83%, on high trading volume, from a close of $9.60 per ADS on February 22, 2022, to close at $8.08 per ADS on February 23, 2022.

153. On March 4, 2022, Soochow Securities issued a Chinese-language analyst report that noted "The MINISO brand's domestic [Chinese] single-store revenue was -7.4% year-on-year, mainly because the company has opened a large number of stores in the sinking market in the past year. These single stores have lower income." It noted risks including "store expansion less than expected." A Credit Suisse report also issued on March 4, 2022, noted multiple

"downside risks" to its ADS price target and rating, including "failure to maintain good relationship with major distributors and retail partners," and noted only 50 targeted new stores for Top Toy, which was below expectations, and raised concern that MINISO's per store revenue was "-7% YoY in domestic market due to Covid resurgence in Nov/Dec."

154. On this news, MINISO's ADS price fell $0.76 per ADS, or 7.6%, on high volume, from a close of $9.96 per ADS on March 3, 2022, to close at $9.20 per ADS on March 4, 2022.

155. On March 7, 2022, Goldman Sachs Equity Research in Asia issued a report detailing a non-deal roadshow it held for MINISO that day (March 7 in China). Goldman Sachs's report expressed concerns about MINISO's "seasonal weakness in overseas shipping," the "material impact from the latest COVID resurgence in Shenzhen, where 100+ stores were located," a "4% yoy online sales decline" in the December 2021-ended quarter, an "insufficient pool of potential strong retail partners / distributors for consistent / aggressive store expansion in China / overseas," and "higher-than-expected OPEX and additional investments." Goldman Sachs adjusted its price target for MINISO ADS down from $17.30 per ADS to $16.20 per ADS.

156. On this news, MINISO's ADS price fell $0.45 per ADS, or 4.89%, on high volume, from a close of $9.20 per ADS on March 4, 2022, to close at $8.75 per ADS on March 7, 2022.

157. On July 26, 2022, Blue Orca Capital published a report (the "Blue Orca Report"), alleging several issues with MINISO, as discussed in relevant part below.

(a) ***MINISO Store Ownership*.** Blue Orca questioned MINISO's "foundational narrative" and its trading multiple of 1.4x sales, saying a much higher percentage of stores were directly owned, either by MINISO, Ye, or company insiders, than the market understood, allowing post-IPO MINISO to "conceal[] the cost of those stores from investors." It said on page 1:

> Rather than operate an independent network of franchisees, our seven-month investigation of Chinese corporate records and store level data indicates, in our opinion, that hundreds of stores are secretly owned and operated by MINISO executives or individuals closely connected to the chairman.
>
> * * *
>
> a. Hundreds of Stores Registered to MINISO Executives or Persons Connected to Chairman. MINISO claims that 99% of its stores in China, its key market, are operated by franchisees <u>independent</u> from the Company. To vet this claim, over the course of seven months, we manually crosschecked MINISO and Top Toy stores in China with the Chinese corporate registry and online map and consumer data. Through our investigation, first begun in November 2021, we found over 620 supposedly independent franchises, which, according to Chinese corporate records, are registered under the names of MINISO executives or individuals closely connected to the Company's chairman. Rather than independent franchises, we believe that such evidence indicates that these stores are secretly owned and operated by the Company.
>
> b. MINISO Admitted in Chinese Media that 40% of Stores Directly Owned. Our due diligence is consistent with MINISO's disclosures before the Company began preparing for a U.S. listing. At a 2017 conference in China, MINISO's brand director said in an interview that most MINISO stores in tier one cities in China are owned and operated by the Company, and that franchising is only limited to lower tier cities. In November 2019, another article published by Chinese state-owned media reported that 40% of MINISO stores were owned and operated by the Company. This tracks with our investigation, and directly contradicts MINISO's disclosures to investors.

Blue Orca Report pages 3-5 provided records and graphics that explicitly diagrammed and charted the 600+ company- and insider-registered stores, with a column showing the high deregistration rates among them. Blue Orca provided, on pages 5-10, specific examples of 10 stores owned by MINISO Senior VP and COO Huang Zheng, 12 stores owned by MINISO subsidiary legal representative Zou Hongxia, 15 stores owned by an executive of a MINISO subsidiary, Ye Tao, and 34 stores owned by Ye's legal representative, Lin Zongyou. Blue Orca provided backup, including screenshots of the Chinese Corporate Registry, tables of stores owned by the insiders, and diagrams explaining their relationships to Exchange Act Defendants. Blue Orca revealed that hundreds of entities shared overlapping registration information, implying common company- or

insider-ownership. Using Chinese Corporate Registry Data, it found 556 total entities sharing the same phone number associated with Li Minxin's stores, as shown on pages 10-11. Blue Orca found the data showed 37% of Top Toy sores had the same issues. According to the Blue Orca Report, pages 11-13, MINISO admitted in Chinese media that 40% of MINISO stores are directly owned, citing: (i) MINISO's brand director's statements at a 2017 conference in China that most MINISO stores in Tier 1 cities in China are operated by MINISO and franchising is only limited to lower tier cities; (ii) a November 2019 Chinese media article by the Shanghai Media Group, which reported that 40% of MINISO stores are company-owned; and (iii) a MINISO franchisee, who said MINISO had more than 1,000 company-owned China stores in 2019.

(b) *Declining Franchise Fees*. The Blue Orca Report discussed MINISO's struggles to attract Retail Partners, indicating its expansion was not driven by the Retail Partner model as claimed. It stated on page 2:

> ***c. Franchise Fees Dropped by 63%, Indicating Lagging Interest.*** Archived disclosures on MINISO's Chinese website indicate that ***MINISO lowered its franchising fee by 63% over the past two years in a desperate effort to attract franchisees. This is a telltale sign that the business is substantially less attractive to retail partners than it used to be.***

Blue Orca further noted in pages 23-25, with supporting screenshots, that franchise fees dropping by 63% suggested lagging interest thereby leading to a decline in revenues. Blue Orca called franchise fees a "cornerstone of MINISO's value proposition" with 100% margin. Using the Wayback Machine, Blue Order found that MINISO had dropped franchise fees by 63% over the prior two years, from an annual franchising fee of RMB 80,000 per year and a product deposit of RMB 750,000 in December 2, 2020 to franchising fee of RMB 50,000 per year and a product deposit of RMB 600,000 in 2021 to franchising fee of RMB 29,800 per year and a product deposit of RMB 350,000 in 2022. Blue Orca called the reductions "drastic" and said it signaled a

"declining brand value of MINISO to both customers and franchisees," eroded MINISO's future financial health, and undermined MINISO's "asset light" narrative. Blue Orca connected this information to MINISO's difficulty attracting Retail Partners, its higher-than-reported directly-owned store count, and its need to access the Hong Kong capital markets.

(c) *The JV Transaction*. The Blue Orca Report also questioned the JV transaction and payments to Ye on pp. 14-17. It stated on pages 1-2:

> Despite only holding a 20% interest in the JV, MINISO contributed all of the initial RMB 346 million deposit to purchase the land. Less than a year later, MINSO bought out the chairman's 80% interest in the JV. In our opinion, this transaction is a naked transfer of shareholder money to the chairman, as Chinese government records indicate that the chairman likely never contributed any capital to the JV. This means that when MINISO bought him out of his JV interest, it was effectively money for nothing. It is also highly unusual for a Chinese company to purchase land in China through a BVI intermediary. Why not purchase the land directly in China without routing the deal either through the chairman or through the BVI? Unless the point was to siphon investor cash to the chairman using an opaque Caribbean jurisdiction.

Blue Orca questioned the transaction because while MINISO had reported that it had already contributed its required portion of the JV capital (RMB 356 million) in exchange for 20% equity in the JV, as seen in *Figure 3* below, Chinese corporate records had indicated that Ye had not made his required contribution, despite holding 80% equity in the JV, as seen in *Figure 4* below. Blue Orca revealed that MINISO's contribution was equal to 20% of the purchase rice of the land rights for MINISO's HQ in Guangzhou, which were acquired through a public bidding process for RMB 1.73 billion by a subsidiary of the JV, Mingyou Industrial Investment (Guangzhou) Co., Ltd, in January 2021. Blue Orca concluded that Ye "likely never contributed any cash to the entity," because according to MINISO's Hong Kong prospectus, it bought out his 80% interest in the JV on October 27, 2021, for RMB 695 million. Blue Orca also found that the JV's paid-in capital stayed at

RMB 345.7 million, until the day after MINISO bought Ye out, as seen in *Figure 5* below. Blue Orca cited Chines public records showing that the next day, October 28, 2021, the JV's paid-in capital rose to RMB 1.8 billion, as seen in *Figure 6* below and noted that "any change to the paid-in capital is registered with the local government and is generally indicative of whether and what extent shareholders have funded the entity." Based on then-available information, Blue Orca said, "We don't believe the chairman ever contributed any cash to the JV, as the paid-in capital increase took place only after MINISO purchased his 80% interest in the JV." Blue Orca also noted that the Chinese land purchase agreement barred any change of ownership structure in the land purchaser, the JV, for 10 years, such that the buyout transaction risked a breach.

*Figure 3*

| 宗地坐落 | 土地用途 | 宗地面积（平方米） | 地上计算容积率建筑面积(平方米) | 挂牌起始价(万元) | 增价幅度（万元） | 竞买保证金(万元) Bidding Deposit (RMB 10K) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 人民币 RMB | 港币 | 美元 |
| 海珠区琶洲西区AH040228地块 | 商务设施用地（B2）兼容商业设施用地（B1） | 6557 | 地上≤103879 | 172855 | 1000 | 34571 RMB 345.7 Million | 41000 | 5300 |

*Source:* [https://finance.sina.com.cn/stock/relnews/us/2021-01-04/doc-iiznezxt0458160.shtml](https://finance.sina.com.cn/stock/relnews/us/2021-01-04/doc-iiznezxt0458160.shtml)

*Figure 4*




*Source: MINISO Public Filings,* *https://www.qcc.com/firm/237c0d23657dc0d32b5dc874d233a8e6.html*

*Figure 5*

**企业名称：** 名优产业投资（广州）有限公司 Mingyou Industrial Investment (Guangzhou) Co., Ltd

股东及出资信息

Subscribed Capital (RMB 10K) Paid-in Capital (RMB 10K) Paid-in Date

| 序号 | 股东 | 认缴出资额(万元) | 认缴出资时间 | 认缴出资方式 | 实缴出资额(万元) | 实缴出资时间 | 实缴出资方式 |
|---|---|---|---|---|---|---|---|
| 1 | YGF Investment V Hong Kong Limited | 100000万人民币元 | 2030年12月31日 | 货币 | 34571万人民币元 | 2020年12月11日 | 货币 |

RMB 1 billion RMB 345.7 million Dec. 11, 2020

*Source: National Enterprise Credit Information Publicity System*

*Figure 6*

**企业名称：** 名优产业投资（广州）有限公司 Mingyou Industrial Investment (Guangzhou) Co., Ltd

修改信息

| 序号 | 修改事项 (Amendment) | 修改前 (Before) | 修改后 (After) | 修改日期 |
|---|---|---|---|---|
| 1 | 从业人数是否公示 | 不公示 | 不公示 | 2022年06月09日 |
| 2 | 从业人数是否公示 | 不公示 | 不公示 | 2022年04月14日 |
| 3 | 实缴出资额（万元） | 179901.33 | 208401.33 | 2022年04月14日 |
| 4 | 从业人数是否公示 | 不公示 | 不公示 | 2022年04月14日 |
| 5 | 实缴出资时间 | 2021-10-28 | 2021-12-10 | 2022年04月14日 |
| 6 | | | 外商控股 | 2022年04月14日 |

Subscribed Capital (RMB 10K) RMB 1.799 billion

Paid-in Date Oct. 28, 2021

*Source: National Enterprise Credit Information Publicity System*

**名优产业投资（广州）有限公司** 在业 Mingyou Industrial Investment (Guangzhou) Co., Ltd

Paid-in Capital (RMB 10K) Paid-in Date

| 序号 | 发起人 | 认缴出资额(万元) | 认缴出资日期 | 认缴出资方式 | 实缴出资额(万元) | 实缴出资日期 | 实缴出资方式 |
|---|---|---|---|---|---|---|---|
| 1 | YGF Investment V Hong Kong Limited | 230000 | 2030-12-31 | 货币 | 179901.33 | 2021-10-28 | 货币 |

RMB 1.799 billion Oct. 28, 2021

*Source: https://www.qcc.com/creport/237c0d23657dc0d32b5dc874d233a8e6.html*

158. On this news, MINISO's ADS price sharply fell $1.08 per ADS, or 14.98%, on extremely high volume, from a close of $7.21 per ADS on July 25, 2022, to close at $6.13 per ADS on July 26, 2022.

159. The next day, July 27, 2022, MINISO filed with the SEC a Form 6-K ("7/27/2022 6-K) that attached a press release as Exhibit 99.1 ("7/27/2022 Press Release) responding to the Blue Orca Report, stating that MINISO's Board of Directors had decided to form a purportedly "independent committee" of Xu Lili, Zhu Yonghua, and Wang Yongping, to oversee a purportedly "independent investigation" of Blue Orca's allegations. The 7/27/2022 6-K and 7/27/2022 Press Release did not provide any substantive response or evidence negating any of Blue Orca's claims.

160. On this news, MINISO's ADS price fell another $0.47 per ADS, or 7.67%, on extremely high volume, from a close of $6.13 per ADS on July 26, 2022, to close at $5.66 per ADS on July 27, 2022.

161. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the drop in the market value of MINISO ADS, Plaintiffs and other Class Members have suffered significant losses and damages.

### 9. Additional Facts Probative Of Scienter

162. A strong inference of the Exchange Act Defendants' scienter is evidenced through a holistic examination of the facts and circumstances.

#### a. The Exchange Act Defendants' Knowledge Or Reckless Disregard Of Red Flags

163. For many of the same reasons why the Exchange Act Defendants' alleged misstatements and omissions were materially false or misleading when made, there is also a strong inference that they were made with the requisite scienter. Those reasons, include, *inter alia*, the following.

164. The CW allegations pled in §III.E.5.a., *supra*, support a strong inference of the Exchange Act Defendants' scienter, through actual knowledge of or reckless disregard of red flags indicating that their public statements were materially false or misleading when made. Specifically:

(a) As detailed in §III.E.5.a. *supra*, statements by the CWs, former employees with relevant first-hand knowledge, illustrate that MINISO owned, operated, and funded the vast majority of its 80+ stores in its North America operations, combining the U.S. and Canada. CW1, CW2, CW3, CW4, CW5, CW6, CW7, and CW8 all said most U.S. stores were company owned, and MINISO went years without adding a single franchise store.

(b) As also detailed in §III.E.5.a. *supra*, statements by the CWs illustrate that MINISO corporate was heavily involved in the operations of the stores as they sought to bring in franchisees. CW3 said MINISO corporate brought on a North American General Manager specifically to focus on transitioning company-owned stores to franchises. CW1 said MINISO corporate found the location of stores, built them out, stocked them, hired staff, and opened the store before seeking out franchisees. CW4 said MINISO corporate paid wages. CW5 reported labor data and sales figures to high level operations staff at MINISO assigned to fix problems in the U.S. stores preventing operation of the Retail Partner model. CW5 said company-owned U.S. stores (the majority) were all losing money and the well-resourced efforts to develop franchisees failed. CW5 said potential franchisees lost interest once they learned about the cost of operating a store.

(c) As also detailed in §III.E.5.a. *supra*, CW1 said MINISO's Chinese HQ exerted control over MINISO USA's personnel and payroll decisions. CW1, CW4, CW6, and CW7 explained that MINISO corporate approved significant expenditures, dictated inventory, and preferred Chinese nationals in the U.S. for key roles. MINISO leadership visited U.S.-based

stores. CW7 said MINISO China sent a number of executives to stay in the Pasadena offices in February and March 2022.

(d) As also detailed in §III.E.5.a. *supra*, MINISO kept tight control over its data. CW4 prepared Excel spreadsheets tracking payroll with most data provided in Chinese. CW3 said corporate consultants sent by China HQ advised MINISO USA on meeting headquarter goals—comparing MINISO USA store performance against other stores globally, but the consultants only provided a view, never actual documents, of internal spreadsheets and sales reports prepared by the consultants that detailed country- and store-specific data points, all of which pertained to corporate owned stores with no separate entries for franchise stores. CW3 said MINISO USA's franchise department was secretive about its work, and CW6 observed that MINISO's leadership was secretive.

165. The Blue Orca Report, as corroborated by Plaintiffs' investigation, as pled in §III.E.5.b. *supra*, also supports a strong inference of the Exchange Act Defendants' scienter, through actual knowledge of or reckless disregard of red flags indicating that their public statements were materially false or misleading when made. Specifically:

(a) Blue Orca found that 620+ stores, which were purportedly independent franchises, were actually owned by MINISO itself or individuals closely tied to its CEO, Ye, as documented in the Chinese corporate registry database. Blue Orca also uncovered statements predating MINISO's IPO, indicating that 40% of all MINISO stores and most of the stores in "tier one" Chinese cities were company-owned. Blue Orca interviewed a Chinese franchisee who said MINISO had 1,000 company-owned stores in 2019. Blue Orca concluded that these facts directly disproved the Exchange Act Defendants' post-IPO public statements regarding the number and

percentage of stores that were franchises and debunked MINISO's "foundational narrative" of its "independent franchise model." Plaintiffs' investigation separately confirmed these facts.

(b) Blue Orca confirmed that MINISO engaged in the highly unusual action of forming a BVI joint venture to purchase land in China for a new HQ, whereby it contributed significantly more than 20% of the funding for its 20% stake, with the other 80% ownership going to Ye despite contributing significantly less, if anything at all to the joint venture. Blue Orca used the Chinese National Enterprise Credit Information Publicity System to confirm that the joint venture's paid-in-capital remained at the level of MINISO's initial monetary contribution – RMB 356 million, which correlated to the deposit needed for the HQ land purchase – until the day after MINISO bought out Ye's stake for a massive sum. Only then did the joint venture's paid-in-capital rise to RMB 1.8 billion – when MINISO was its sole shareholder. Blue Orca confirmed that changing the joint venture's ownership in this way risked breaching the joint venture's land acquisition contract with the government, which expressly prohibited any change of ownership structure in the land purchaser for a period of 10 years. Plaintiffs' investigation likewise confirmed these facts. In addition, Blue Orca Capital identified four other suspicious property development projects worth RMB 23 billion that are similarly structured with a layered BVI offshore holding structure that can be used to enrich Ye again at the company's expense.

(c) Blue Orca examined a sample of 620 MINISO stores in China from November 2021 and observed that 120 of them (20%) had closed by July 2022, with half of those closures involved a deregistered business license. Blue Orca also found deleted statements from MINISO's Chinese website revealing that MINISO had lowered its franchise fees by 63% over two years in an attempt to attract franchisees. Plaintiffs' investigation corroborated all of these facts.

**b. Exchange Act Defendant Ye Was In A Position To Know The Misstatements Were Materially False Or Misleading**

166. Exchange Act Defendant Ye was in the position to know that all of the misstatements about the JV Transaction, as plead in §III.E.7, *supra*, were materially false and misleading because he was the sole owner of each subsidiary entity involved at the time of that entity's incorporation. Ye was the sole owner of YGF MC, YGF Investment, YGF HK, and Mingyou, before MINISO announced the JV transaction on December 11, 2020. He knew that YGF Investment was not being formed as a JV, but was incorporated by Ye on August 26, 2020.

167. Ye also knew that neither he nor any entity he owned had sufficient liquidity to invest RMB 1,424 million to justify an 80% ownership stake in the JV. According to the 7/28/2022 Press Release and the Equity Transfer Agreement, just two months after MINISO announced the formation of YGF Investment, YGF MC contributed less than 20% of its promised funds, and a separate company he owned, Minggao, issued a "loan" to Mingyou.

168. Ye also knew every relevant fact about the JV buyout because he controlled both YGF MC and MINISO in September 2021. He was negotiating both sides of the deal, which is a clear violation of MINISO's Code of Conduct. As the sole owner, any aspect of the agreement with YGF MC, and any differences between the true terms of the agreement and what was said to investors, would have been known to Exchange Act Defendant Ye. Additionally, the Equity Transfer Agreement was signed by Exchange Act Defendants Ye, on behalf of YGF MC, and Zhang on behalf of MINISO.

169. Plaintiffs were able to piece together the complex JV transaction, as later described by MINISO in piecemeal fashion, and Exchange Defendant Ye is heavily involved in every aspect of it, with multiple of his wholly owned companies participating and over $100 million ultimately

being paid, directly or indirectly, to him, as shown in EA Appendix A. His actual knowledge of the facts of that transaction, in real time, cannot credibly be disputed.

#### c. When Given An Opportunity To Respond To The Blue Orca Report, The Exchange Act Defendants Provided Vague Explanations

170. The 7/28/2022 Press Release entitled "MINISO Refutes Blue Orca's Short Seller Report" was Exchange Act Defendants' opportunity to rebut the allegations in the Blue Orca Report and provide investors comfort if, in fact, they were not true. The Exchange Act Defendants' scienter is further evidenced by the fact that they did not do so. Specifically:

(a) The 7/28/2022 Press Release said the JV buyout was approved by MINISO's Board of Directors and Audit Committee, but it does not say whether Ye recused himself from the votes, as MINISO's Code of Conduct would have required;

(b) The 7/28/2022 Press Release said on February 4, 2021, Ye, through another company owned and controlled by him, obtained a loan in the amount of RMB 319.9 million and contributed the loan proceeds to the JV. It misleadingly calls the transfer a contribution of loan proceeds even though the Equity Transfer Agreement suggests Ye's entity (Minggao) actually made a loan itself for which Ye expected repayment. The 7/28/2022 Press Release also does not identify any terms of the purported loan, does not disclose the name of the lender, whether the loan was repaid, and if so by whom and how, all relevant facts;

(c) The 7/28/2022 Press Release said that Ye contributed a combined RMB 742.88 million, approximately ***half*** of the RMB 1,424 million the 9/26/2021 Press Release claimed YGF MC was going to invest. There was no reason given for the discrepancy and no explanation why MINISO permitted YFG MC to fail to satisfy its contractual obligations to fund the JV.

(d) The 7/28/2022 Press Release said the Company engaged an independent third-party appraiser to conduct a valuation of Ye's shares in the JV, but it does not disclose the method used

for the appraisal, the actual estimated value of the appraised shares, the name of the appraiser, nor whether the appraiser had any connection to MINISO or Ye. Indeed, that appraiser was later identified in the Equity Transfer Agreement to have been a "professional organization," without any disclosure as to where it was based, whether it was independent, whether it was qualified, what work it performed, and whether that work met applicable professional standards.

(e) The 7/28/2022 Press Release did not enclose the Equity Transfer Agreement dated September 23, 2021, which would have provided additional, relevant details.

(f) The 7/28/2022 Press Release did not clarify the need for the complicated JV structure described in the Blue Orca Report.

171. Because the Exchange Act Defendants had an opportunity to refute the allegations in the Blue Orca Report, but withheld relevant, potentially exonerating evidence, the missing detail from the 7/28/2022 Press Release indicates the Exchange Act Defendants knew their prior statements about the JV transaction were materially false or misleading, and all the foregoing confirms their scienter.

**d. Exchange Act Defendant Ye Controlled MINISO**

172. During the Class Period, Exchange Act Defendant Ye fully controlled MINISO, as MINISO admitted in its public filings. Even before the Class Period, in the September 23, 2020 Registration Statement, under the "Material related party transactions," MINISO listed "Mr. Ye Guofu" as MINISO's "Controlling shareholder." The post-IPO September 17, 2021, 2021 20-F also included a "Material related party transactions," section which identified Ye as MINISO's "Controlling shareholder. As shown in §III.E.4, *supra*, Ye owned a supermajority of MINISO shares during the Class Period in addition to serving as MINISO's Chairman and CEO.

173. At the time of the JV buyout, Exchange Act Defendant Ye was on both MINISO's Board of Directors and its Audit Committee, as reflected in the 2021 20-F and as Plaintiffs'

investigation confirmed using the Wayback Machine. Ye's participation in the Audit Committee was significant because, according to the 2021 20-F, "[t]he audit committee is responsible for, among other things . . . reviewing and approving all proposed related party transactions."

174. The 2021 20-F Supplement, filed with the SEC on March 31, 2022, confirmed Ye's control of MINISO. It said:

> "We are a 'controlled company' as defined under the NYSE Listed Company Manual because Mr. Guofu Ye, our chairman of the board of directors and our chief executive officer, and Ms. Yunyun Yang, our vice president, own more than 50% of our total voting power through their holding entities."

175. The 2021 20-F Supplement also acknowledged the extent to which Ye controlled MINISO, not only as a controlling shareholder, but in his executive capacity. In its "Corporate Governance Code," section, the 2021 20-F Supplement said:

> "Pursuant to code provision A.2.1 of the Corporate Governance Code, companies listed on the [Hong Kong] Stock Exchange are expected to comply with, but may choose to deviate from the requirement that the responsibilities between the chairperson and the chief executive officer should be segregated and should not be performed by the same individual. We do not have a separate chairman and chief executive officer and Mr. YE Guofu currently performs these two roles. The Board believes that vesting the roles of both chairperson and chief executive officer in the same person has the benefit of ensuring consistent leadership within our Group and enables more effective and efficient overall strategic planning for our Group."

176. The PHIP, filed with the SEC on June 27, 2022, further confirmed Ye's control of MINISO. In the section on "Controlling Shareholders," the PHIP said:

> "Mr. Ye, our Founder, chairman of the Board, executive Director and chief executive officer, and Ms. Yang, spouse of Mr. Ye and our vice president, held approximately 64.4% of the total issued share capital of the Company, representing approximately 76.8% of the aggregate voting power of our total issued and outstanding Shares.
>
> * * *
>
> Based on the above, both prior to and upon [REDACTED], Mr. Ye and Ms. Yang will continue to be the Controlling Shareholders of our Company."

### e. Exchange Act Defendant Ye Was Financially Motivated To Commit Fraud

*Ye's Sale Of MINISO Securities*

177. As a foreign issuer, MINISO was subject to less stringent reporting standards (*e.g.*, filing SEC Form F-1 instead of Form S-1) before and after its IPO. Consequently, the Exchange Act Individual Defendants were not required to detail their insider transactions to the same extent as a publicly traded domestic company. Nevertheless, it is evident that Ye engaged in substantial self-enrichment during the Class Period, exploiting the facts at issue, and selling a large number of MINISO securities.

178. As reported by Ye on SEC Schedules 13G, through a complex web of offshore limited liability companies and trusts, he and his family benefitted, made substantial insider sales during the period of alleged fraud. These relationships are described in a Schedule 13G filing made on February 8, 2021, relating to the event date of December 31, 2020, and signed by Ye, individually and on behalf of certain of these legal entities (the "12/31/2020 13G"), which stated, in relevant part as follows:

> Mini Investment Limited is wholly owned by YGF Development Limited, a limited liability company incorporated under the laws of British Virgin Islands. All shares of YGF Development Limited are held by TMF (Cayman) Ltd. on behalf of YGF Trust, with TMF (Cayman) Ltd. as the trustee, and Mr. Ye and his family members as beneficiaries. Mr. Guofu Ye is deemed to be the controlling person of the trust. YGF MC LIMITED is wholly-owned by Mr. Guofu Ye. YYY MC LIMITED is wholly owned by YYY Development Limited, a limited liability company incorporated under the laws of British Virgin Islands. All shares of YYY Development Limited are held by TMF (Cayman) Ltd. on behalf of YYY Trust, with TMF (Cayman) Ltd. as the trustee, and Ms. Yang and her family members as beneficiaries. Ms. Yunyun Yang is deemed to be the controlling person of the trust. Ms. Yunyun Yang is Mr. Guofu Ye's spouse. Mr. Guofu Ye and Ms. Yunyun Yang make joint decisions on the exercise of the voting power of the shares owned by them through their holding vehicles. As a result, both Mr. Guofu Ye and Ms. Yunyun Yang are deemed to be beneficial owners of the shares directly held by Mini Investment Limited, YGF MC LIMITED and YYY MC LIMITED.

179. The 12/31/2020 13G sets forth the ownership of MINISO securities by Ye as of December 21, 2020, both directly and through these entities, as follows:

| Reporting Person* | Amount beneficially owned | Percent of class[1] | Percent of aggregate voting power[2] | Sole power to vote or direct the vote | Shared power to vote or to direct the vote | Sole power to dispose or to direct the disposition of | Shared power to dispose or to direct the disposition of |
|---|---|---|---|---|---|---|---|
| Guofu Ye | 881,991,109[3] | 72.0% | 81.7% | 92,586,048[4] | 789,405,061[5] | 0 | 789,405,061[5] |
| Yunyun Yang | 789,405,061[5] | 64.4% | 76.8% | 0 | 789,405,061[5] | 0 | 789,405,061[5] |
| Mini Investment Limited | 328,290,482[6] | 26.8% | 52.3% | 0 | 328,290,482[6] | 0 | 328,290,482[6] |
| YGF Development Limited | 328,290,482[6] | 26.8% | 52.3% | 0 | 328,290,482[6] | 0 | 328,290,482[6] |
| YGF MC LIMITED | 203,265,382[7] | 16.6% | 10.8% | 0 | 203,265,382[7] | 0 | 203,265,382[7] |
| YYY MC LIMITED | 257,849,197[8] | 21.0% | 13.7% | 0 | 257,849,197[8] | 0 | 257,849,197[8] |
| YYY Development Limited | 257,849,197[8] | 21.0% | 13.7% | 0 | 257,849,197[8] | 0 | 257,849,197[8] |

Note (1) of this chart explained the "Percent of class" column, which relayed the total MINISO ordinary shares outstanding and made clear that Ye controlled the company:

> (1) The percentage of class of securities beneficially owned by each of the Reporting Persons as of December 31, 2020 is based on a total of 1,225,566,355 outstanding ordinary shares (being the sum of 897,275,873 Class A ordinary shares and 328,290,482 Class B ordinary shares) of the Issuer outstanding as a single class as of December 31, 2020. Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis, whereas Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. In computing the percentage ownership of a Reporting Person, the shares that the Reporting Person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security, after December 31, 2020 have been included

Note (3) of this chart explained the "Amount Beneficially Owned" column, which distilled Ye's ownership stakes through the various legal entities described above:

> (3) Represents (i) 328,290,482 Class B ordinary shares directly held by Mini Investment Limited, a limited liability company incorporated under the laws of British Virgin Islands, (ii) 203,265,382 Class A ordinary shares directly held by YGF MC LIMITED, a limited liability company incorporated under the laws of British Virgin Islands, (iii) 257,849,197 Class A ordinary shares directly held by YYY MC LIMITED, a limited liability company incorporated under the laws of British Virgin Islands, and (iv) 92,586,048 Class A ordinary shares held by 12 share incentive awards holding vehicles, which appointed Mr. Guofu Ye as their proxy and authorized Mr. Guofu Ye to exercise, on behalf of them, the voting power of the 92,586,048 Class A ordinary shares at the discretion of Mr. Guofu Ye.

180. A year later, a Schedule 13G filing made on February 11, 2022, relating to the event date of December 31, 2021, and signed by Ye, individually and on behalf of certain of the legal entities ("12/31/2021 13G"), set forth the same chart, showing a material change of Ye's holdings:

| Reporting Person* | Amount beneficially owned | Percent of class[1] | Percent of aggregate voting power[2] | Sole power to vote or direct the vote | Shared power to vote or to direct the vote | Sole power to dispose or to direct the disposition of | Shared power to dispose or to direct the disposition of |
|---|---|---|---|---|---|---|---|
| Guofu Ye | 876,346,537[3] | 71.6% | 81.5% | 86,941,476[4] | 789,405,061[5] | 0 | 789,405,061[5] |
| Yunyun Yang | 789,405,061[5] | 64.5% | 76.9% | 0 | 789,405,061[5] | 0 | 789,405,061[5] |
| Mini Investment Limited | 328,290,482[6] | 26.8% | 52.4% | 0 | 328,290,482[6] | 0 | 328,290,482[6] |
| YGF Development Limited | 328,290,482[6] | 26.8% | 52.4% | 0 | 328,290,482[6] | 0 | 328,290,482[6] |
| YGF MC Limited | 203,265,382[7] | 16.6% | 10.8% | 0 | 203,265,382[7] | 0 | 203,265,382[7] |
| YYY MC Limited | 257,849,197[8] | 21.1% | 13.7% | 0 | 257,849,197[8] | 0 | 257,849,197[8] |
| YYY Development Limited | 257,849,197[8] | 21.1% | 13.7% | 0 | 257,849,197[8] | 0 | 257,849,197[8] |

Once again, Note (1) of this chart explained the "Percent of class" column, which relayed the total MINISO ordinary shares outstanding and evidenced Ye's control:

> (1) The percentage of class of securities beneficially owned by each of the Reporting Persons as of December 31, 2021 is based on a total of 1,224,757,315 outstanding ordinary shares (being the sum of 896,466,833 Class A ordinary shares and 328,290,482 Class B ordinary shares) of the Issuer outstanding as a single class as of December 31, 2021 (excluding 809,040 Class A ordinary shares in the form of 202,260 ADSs repurchased by the Issuer pursuant to a share repurchase program adopted by the Issuer in December 2021). Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis, whereas Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. In computing the percentage ownership of a Reporting Person, the shares that the Reporting Person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security, after December 31, 2021 have been included.

Likewise, Note (3) of this chart once again explained the "Amount Beneficially Owned" column, which distilled Ye's ownership stakes through the various legal entities described above:

> (3) Represents (i) 328,290,482 Class B ordinary shares directly held by Mini Investment Limited, a limited liability company incorporated under the laws of British Virgin Islands, (ii) 203,265,382 Class A ordinary shares (including

8,800,000 Class A ordinary shares in the form of 2,200,000 ADSs) directly held by YGF MC Limited, a limited liability company incorporated under the laws of British Virgin Islands, (iii) 257,849,197 Class A ordinary shares directly held by YYY MC Limited, a limited liability company incorporated under the laws of British Virgin Islands, and (iv) 86,941,476 Class A ordinary shares (including 52,418,660 Class A ordinary shares in the form of 13,104,665 ADSs) held by 12 share incentive awards holding vehicles, which appointed Mr. Guofu Ye as their proxy and authorized Mr. Guofu Ye to exercise, on behalf of them, the voting power of the 86,941,476 Class A ordinary shares at the discretion of Mr. Guofu Ye.

181. As evidenced by these two filings, Ye sold ***5,644,572*** MINISO shares during just a portion of the Class Period, when the alleged fraud was still causing artificial inflation in the prices of MINISO's securities.[3] These sales were timed so as to benefit, and did benefit, from the artificial inflation in MINISO's securities prices due to the alleged fraud, thereby enabling Ye to reap considerable sale proceeds from his MINISO holdings before revelation of the truth about MINISO and the Exchange Act Defendants' fraud. For these reasons, Ye's Class Period transactions were unusual and suspicious and support a strong inference of his scienter.

*Ye's Self-Dealing Transaction*

182. As discussed *supra*, the Blue Orca Report revealed, and Plaintiffs' investigation later corroborated, that Ye engaged in a complex, potentially self-enriching, related party transaction that utilized a BVI JV, which MINISO joined shortly after MINISO closed its IPO, ostensibly for the purpose of furthering MINISO's work to build a large Chinese HQ. Ye held an 80% stake in the JV, through YGF MC, but contributed significantly less of its funding, while MINISO, which he still controlled, owned just a 20% interest in the JV but contributed 100% of the RMB 356 million in funding that was purportedly to be used to buy the land use rights for the HQ building and aligns with a deposit made on a land use purchase. Instead of contributing the

3 Plaintiffs not comparing Ye's sales during the Class Period to Ye's pre-Class Period actions because there is no comparable time period or available information.

promised RMB 1,424 million for its 80% stake, YGF MC, Ye's wholly owned company, only contributed approximately RMB 423 million and used his other controlled entity, Minggao, to issue the JV's PRC subsidiary, Mingyou, an RMB 319.9 million loan. After a year, MINISO bought out Ye's JV interest, paying him RMB 695 million – or roughly $108.5 million at an exchange rate of 1 RMB = $6.4 USD – for an interest in an offshore JV of questionable necessity to which he had contributed significantly less he promised.

183. This transaction is highly suspicious in both process, timing, and amount. As to the process, it is highly unusual for a simple land purchase in China to funnel through a British Virgin Islands JV, with the company's CEO as the majority JV partner despite not contributing any funds up front, and appearing to lack sufficient liquidity to ever fund the venture. As to the timing, it was highly suspicious, given that Ye, as its controlling shareholder, could have caused MINISO to engage in a direct acquisition transaction for land for the HQ project at any point, but instead, waited until just two months post-IPO – when the company was flush with cash – to use an offshore JV with MINISO to act as the conduit of the land purchase funds. It was highly suspicious in amount, because Ye never contributed to the JV what he promised YGF MC would, if he indeed contributed anything at all, and it is undisputed both that YGF MC did not contribute the RMB 1,424 million as promised, and Exchange Act Defendants claim a part of the contribution was in the form of a loan from another Ye-controlled entity. (MINISO elsewhere claimed a part of the contribution was in the form of loan proceeds.) Moreover, by buying out Ye, MINISO went from having responsibility for 20% of the land use acquisition costs to bearing 100% of those costs, while MINISO risked breaching its Chinese government contract for the JV's land use purchase, which prohibited a change in the purchaser's ownership structure for 10 years. In reporting the JV transaction and in responding to Blue Orca's allegations, MINISO and Ye never

provided an explanation for the structure, which involved five subsidiaries incorporated in three different jurisdictions, or for its unwinding.

184. Additionally, Ye and MINISO implied any payment to Ye was pursuant to an appraisal of his shares' value, when in reality, per the Equity Transfer Agreement, the Benchmark Price was negotiated ahead of time. Over time, MINISO made conflicting, belated statements implying that some third-party organization (whether a valuation firm, an appraiser, or a professional organization) "confirm[ed]" the value of Ye's stake, but MINISO and Ye never disclosed the entity's identify, methodology, work product, final letter or report, or even the valuation figure it evaluated. The JV transaction was designed to be opaque and may have siphoned a huge amount of MINISO's IPO proceeds to Ye, without any commensurate benefit to the company.

#### f. The Exchange Act Individual Defendants Reaped Suspicious Compensation

185. Despite MINISO's lessened stringency of reporting obligations as a foreign issuer, the company's filings were required to list certain compensation information under the Hong Kong exchange rules, which appeared in its 2022 Hong Kong Annual Report for the fiscal year ended June 30, 2022, which was filed with the SEC as Exhibit 99.5 to a Form 6-K filed with the SEC on October 19, 2022 and signed by Zhang. Its page 157 lists the payments the Exchange Act Individual Defendants reaped for serving as Directors. The figures, expressed in RMB, are as follows:

| | Note | Directors' fees RMB'000 | Salaries, allowances and other benefits RMB'000 | Discretionary bonuses RMB'000 | Retirement scheme contributions RMB'000 | Equity-settled share-based payments RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| | | For the year ended June 30, 2021 | | | | | |
| **Directors** | | | | | | | |
| Mr. Ye Guofu | | - | 1,228 | 386 | 34 | - | 1,648 |
| Mr. Li Minxin | | - | 1,322 | 312 | 34 | - | 1,668 |
| Mr. Zhang Saiyin | | - | 1,527 | 474 | 18 | 15,786 | 17,805 |
| Ms. Yang Yunyun | (i) | - | 52 | - | 8 | - | 60 |
| Ms. Dou Na | (i) | - | 478 | 395 | - | 20,585 | 21,458 |
| Mr. Cao Wei | (ii) | - | - | - | - | - | - |
| Mr. Hao Rui | (ii) | - | - | - | - | - | - |
| **Independent directors** | | | | | | | |
| Ms. Xu Lili | (iii) | - | - | - | - | 601 | 601 |
| Mr. Zhu Yonghua | (iii) | - | - | - | - | 601 | 601 |
| | | - | 4,607 | 1,567 | 94 | 37,573 | 43,841 |

| | Note | Directors' fees RMB'000 | Salaries, allowances and other benefits RMB'000 | Discretionary bonuses RMB'000 | Retirement scheme contributions RMB'000 | Equity-settled share-based payments RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|
| | | For the year ended June 30, 2022 | | | | | |
| **Directors** | | | | | | | |
| Mr. Ye Guofu | | - | 2,645 | 772 | 35 | - | 3,452 |
| Mr. Li Minxin | | - | 2,270 | 623 | 35 | - | 2,928 |
| Mr. Zhang Saiyin | | - | 1,527 | 448 | 37 | - | 2,012 |
| **Independent directors** | | | | | | | |
| Ms. Xu Lili | (iii) | 728 | - | - | - | 102 | 830 |
| Mr. Zhu Yonghua | (iii) | - | - | - | - | 515 | 515 |
| Mr. Wang Yongping | (iv) | 706 | - | - | - | - | 706 |
| | | 1,434 | 6,442 | 1,843 | 107 | 617 | 10,443 |

These charts make clear that the Exchange Act Individual Defendants were paid more than other Board members, particularly the independent Directors. Moreover, Zhang's 2020 equity-settled share-based payment and the uptick in all Exchange Act Individual Defendants' 2021 salaries, allowances and benefits, stand out as suspicious. Translated into U.S. dollars, using the

average exchange rates applicable to each of those years, the Exchange Act Individual Defendants' payments look as follows:

**Year End 6/30/21: (avg 2021 exchange rate: 1 RMB = $6.4 USD)**

| Directors | Salaries, allowances, other benefits | Discretionary Bonuses | Retirement scheme contributions | Equity-settled-share-based payments* | Total |
|---|---|---|---|---|---|
| Mr. Ye Guofu | $191,875 | $60,313 | $5,313 | $0 | $257,500 |
| Mr. Zhang Saiyin | $238,594 | $74,063 | $2,813 | $2,466,563 | $2,782,031 |

**Year End 6/30/22: (avg 2022 exchange rate: 1 RMB = $6.74 USD)**

| Directors | Salaries, allowances, other benefits | Discretionary Bonuses | Retirement scheme contributions | Equity-settled-share-based payments* | Total |
|---|---|---|---|---|---|
| Mr. Ye Guofu | $391,852 | $114,370 | $5,185 | $0 | $511,407 |
| Mr. Zhang Saiyin | $226,222 | $66,370 | $5,481 | $0 | $298,074 |

### g. MINISO Raised Funds During The Class Period

186. MINISO's corporate scienter is further evidenced by the fact that it raised funds through suspiciously timed public offerings during the period of alleged fraud.

187. While the fraud was still inflating the price of its securities, MINISO announced on March 31, 2022 that it was applying for a dual primary listing on the Hong Kong Exchange. MINISO priced the offering of 41.1 million shares at HK $13.60 per share on July 6, 2022. The offering closed on July 13, 2022 and raised roughly HK $567.2 million, equal to roughly USD $72 million.

### h. The Fraud Implicated Core Operations

188. The fraud alleged herein implicated MINISO's core operations. MINISO's HQ project was a significant undertaking, and despite years of construction is still not complete. When MINISO announced the JV transaction in December 2020, it estimated the total investment for the

project would be approximately RMB 2,885 million. This expenditure represents a significant outlay of funds when compared to both the net proceeds raised in the IPO ($625.3 million or ~RMB 4,190 million using a 6.7:1 exchange rate as of October 15, 2020) and MINISO's total revenue for fiscal year ended June 30, 2021 (RMB 9,072 million per the 2021 20-F). The JV transaction was by design a way to apportion only 20% of that liability to MINISO, while Ye, through YGF MC would shoulder 80% of the costs. Additionally, the JV transaction was important to Ye, MINISO's controlling shareholder, Chairman of the Board, and CEO. Ye committed to provide RMB 1,424 million or ~$217.7 million in funding to the JV, a substantial amount for Ye who was not able to fund more than half that amount before the JV buyout.

189. Also, as discussed *supra*, MINISO's Retail Partner was part of its "core business" according to MINISO's SEC filings and investor presentations during the Class Period, and they accounted for a material portion of its revenue and projected growth. According to MINISO itself, its Retail Partner model accounts for more than half of MINISO's revenue and, together with its distributor model, accounts for a substantial majority of MINISO's revenue. Further, MINISO attributes the focus of its growth plan, its ability to expand its store network both domestically and abroad, to its Retail Partner model and distributor models.

190. Because the Retail Partner model is such an integral part of MINISO's business, it follows that correct and lawful registration of MINISO stores is essential for MINISO. Additionally, MINISO reports store ownership numbers quarterly and touts both gains in net new stores and the percentage of stores operated under the Retail Partner model to investors. Without proper and correct record-keeping about store ownership, MINISO could not provide this information.

191. In light of these facts, it is inconceivable that Ye, Zhang, and other MINISO executive management did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to them, given the implication of core operations, their roles and status within MINISO, and the facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including without limitation by information revealed by the CW statements.

#### i. The Exchange Act Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements

192. As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Exchange Act Individual Defendants Ye and Zhang were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

193. As the individuals who SOX certified SEC filings as described *supra*, Ye and Zhang were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

#### j. The Fraud Violated MINISO's Corporate Code Of Conduct

194. Pursuant to the requirements of Section 406(c) of the Sarbanes Oxley Act, MINISO filed its Code of Conduct on its website throughout the Class Period. MINISO's Code of Conduct barred all of the misconduct detailed herein, including the concealment of the undisclosed negative facts discussed in the "Undisclosed Material Negative Facts And Risks" section *supra*, as revealed by the CW statements, the Blue Orca Report, and Plaintiffs' investigation, and the insider selling and unjust self-enrichment by the Exchange Act Individual Defendants and MINISO, as set forth in the "Additional Facts Probative of Scienter" section *supra*.

195. MINISO's Code of Conduct makes clear that it is binding upon all employees:

> ***This Code applies to all directors, officers and employees of the Company***, whether they work for the Company on a full-time, part-time, consultative or temporary basis (each, an "employee" and collectively, the "employees"). Certain provisions of the Code apply specifically to our chief executive officer, chief financial officer, senior finance officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for the Company (each, a "senior officer," and collectively, the "senior officers").

196. The Code of Conduct also forbids directors from participating in related party transactions:

> An interested director or senior officer shall refrain from participating in any discussion among senior officers of the Company relating to an Interested Business and shall not be involved in any proposed transaction between the Company and an Interested Business.

197. ***The Code of Conduct, generally, also expressly states the obvious – that all employees have an obligation to comply with "the laws of the cities, provinces, regions and countries in which the Company operates" and specifies this includes insider trading***. This encompasses the U.S. federal securities laws, rules and regulations that the Exchange Act Defendants violated, as alleged herein.

198. The forgoing provisions of MINISO's Code of Conduct barred the Exchange Act Defendants' misconduct alleged herein, including the JV transaction and buyout, their disguising of store ownership to misrepresent the proficiency of its Retail Partner model, their materially false and misleading public statements, and their self-enrichment through insider trading and executive compensation increases. The Exchange Act Defendants' violation of this express corporate policy, which was in force and binding throughout the Class Period, further buttresses the inference of their scienter.

**10. No Safe Harbor**

199. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

200. Many of the alleged statements were not accompanied by any cautionary language. Any purported cautionary language that was used was legally deficient, including because it warned only of theoretical future risks at times when those risks had already ripened due to the Exchange Act Defendants' then-ongoing misconduct as alleged herein. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

201. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MINISO who knew that those statements were false when made.

202. For all these same reasons, the bespeaks caution likewise does not apply to shield the Exchange Act Defendants from liability.

203. In addition, to the extent the Exchange Act Defendants' statements are determined to be ones of opinion, they were materially false and misleading because (i) they were either not

believed by the Exchange Act Defendants and were objectively false and (ii) because MINISO's shareholders expected not just that the Exchange Act Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time. However, the Exchange Act Defendants' statements did not fairly align with the information in their possession at the time such statements were made, and they omitted material facts about the Exchange Act Defendants' knowledge of the true state of the facts, including, *inter alia*, the true facts concerning the ownership of MINISO stores, the amount MINISO charged in franchise fees and the nature and the purpose of MINISO's joint venture. Specifically, it was known or knowable at the time of the Exchange Act Defendants' statements outlined herein that many of MINISO's stores were directly owned and operated by MINISO, that MINISO drastically lowered its franchisee fees, and that funds from its joint venture were siphoned to Exchange Act Defendant Ye for his personal benefit. Those true facts were known to the Exchange Act Defendants or recklessly disregarded by them and conflicted with what a reasonable investor would take from the Exchange Act Defendants' statements.

**11. The Exchange Act Claims Are Timely**

204. The claims set forth herein were timely filed.

205. The market was not arguably aware until December 28, 2020 at the earliest, that credible allegations existed to the effect that MINISO misrepresented and failed to disclose material facts about its business and operations, particularly in regards to its Retail Partner model and its joint venture to purportedly build new HQ.

206. It was also not until November 19, 2021 that Plaintiffs were first presented with any credible evidence that the Exchange Act Defendants had made materially false and misleading statements to investors during the Class Period. In the absence of publicly available information prior to then suggesting that MINISO's pronouncements in its SEC filings and other public

statements during the Class Period were materially false and/or misleading, Plaintiffs were not under any duty to inquire as to the truthfulness of MINISO's public statements. Therefore, Plaintiffs' duty in that regard arose no earlier than November 19, 2021.

207. Prior to November 19, 2021, Plaintiffs and Exchange Act Class members could not have been on any inquiry notice of possible claims under the Exchange Act. Even assuming this early date for inquiry notice, Plaintiffs' Exchange Act claims against the Exchange Act Defendants were brought within two years. Therefore, Plaintiff have complied with the requirements of 28 U.S.C. §1658(b).

**12. Loss Causation/Economic Loss**

208. The market for MINISO ADS securities was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated MINISO ADS securities and operated as a fraud or deceit on Class Period purchasers of MINISO ADS securities by misrepresenting the material facts set forth herein. As detailed above, when the Exchange Act Defendants' prior misrepresentations became known to the public through a series of partial corrective disclosures, the price of MINISO ADS securities fell precipitously, as the prior artificial inflation came out. As a result of their purchases of MINISO ADS securities during the Class Period, Plaintiffs and the other Exchange Act Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

209. The Exchange Act Defendants' allegedly unlawful conduct caused the losses incurred by Plaintiffs and the Exchange Act Class. The market for MINISO's ADS securities was open, well developed, and efficient at all relevant times. Throughout the Class Period, MINISO's ADS securities traded at artificially inflated prices as a direct result of the Exchange Act Defendants' materially misleading statements and omissions of material fact, which were widely

disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other Exchange Act Class members purchased or otherwise acquired MINISO ADS securities relying upon the integrity of the market price for MINISO's ADS securities and market information relating to MINISO and have been damaged thereby.

210. During the Class Period, the Exchange Act Defendants presented a misleading picture of MINISO's financial condition, growth, performance, and business prospects, including without limitation the contributions and impacts arising from its Retail Partner model and its joint venture to purportedly build new HQ. The Exchange Act Defendants' false and misleading statements had the intended effect and caused MINISO ADS securities to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

211. As detailed herein, the price of MINISO ADS securities sharply dropped, on high volume, in response to each of the following partially corrective disclosures, alleged herein: (a) MINISO's press release and SEC filing on November 19, 2021, (b) an analyst report pertaining to MINISO's ADS stock price target on November 25, 2021, (c) an analyst report pertaining to expected decreases to MINISO's margins and operating profits on January 26, 2022, (d) an analyst report pertaining to MINISO's Chinese operations February 14, 2022, (e) an analyst report considering the potential downside case for MINISO's Chinese operations on February 23, 2022, (f) an analyst report discussing decreases in per-store revenue on March 4, 2022, (g) an analyst report discussing MINISO's non-deal roadshow on March 7, 2022, and (h) disclosures pertaining to the Blue Orca Report on July 26, 2022 and July 27, 2022. Each of the related price drops partially removed inflation from the price of MINISO's ADS securities, causing real economic loss to investors who had purchased MINISO ADS securities during the Class Period.

212. These declines were a direct and proximate result of the nature and extent of the Exchange Act Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in MINISO's ADS securities negate any inference that the loss suffered by Plaintiffs and the other Exchange Act Class members was caused by changed market conditions, macroeconomic factors, or MINISO-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

213. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Exchange Act Class members was a direct and proximate result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of MINISO's ADS securities and the subsequent significant declines in the value of those securities when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**13. Presumption Of Reliance**

214. At all times, the market for MINISO ADS securities was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a) MINISO met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market, under the ticker symbol "MNSO";

(b) According to the Prospectus, MINISO's IPO resulted in the sale of 30,400,000 ADSs, when total issued and outstanding MINISO securities also included 887,611,125 Class A ordinary shares and 328,290,482 Class B ordinary shares, all figures subject to the underwriters' over-allotment in the offering, and by August 5, 2022, the total number of shares outstanding following MINISO's Hong Kong listing had risen to 1,267,152,555 shares, such that the market for MINISO securities, including its ADS securities, was at all relevant times liquid. During the Class Period, numerous MINISO ADSs were traded on a daily basis, with moderate to heavy

volume, demonstrating an active and broad market for MINISO ADS securities and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, MINISO filed periodic public reports with the SEC;

(d) MINISO regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) MINISO was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f) Unexpected material news about MINISO was rapidly reflected and incorporated into MINISO's ADS price during the Class Period.

215. As a result of the foregoing, the market for MINISO's ADS securities promptly digested current information regarding MINISO from all publicly available sources and reflected such information in the ADS prices. Under these circumstances, all purchasers of MINISO's ADS securities during the Class Period suffered similar injury through their purchase of MINISO's ADS securities at artificially inflated prices and a presumption of reliance applies.

216. Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Exchange Act Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### 14. Plaintiffs' Exchange Act Class Action Allegations

217. Plaintiffs bring this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class ("Exchange Act Class") of all persons and entities who purchased or otherwise acquired the American Depository Shares (ADSs) of MINISO (NYSE:MNSO) during the Class Period extending between December 11, 2020 and July 26, 2022, both dates inclusive, seeking to pursue remedies against Exchange Act Defendants MINISO, Ye, and Zhang for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5.

218. Excluded from the Exchange Act Class are the Exchange Act Defendants herein, their family members and their affiliates, and any entities in which they owned a controlling interest, the officers and directors of MINISO at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

219. The Exchange Act Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, MINISO ADS securities were actively traded on NYSE. While the exact number of Exchange Act Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by MINISO or its transfer agent and may be notified of the pendency of this action by mail, with Exchange Act Class members not so identified being notified through publication notice, using forms of notice similar to that customarily used in securities class actions.

220. Plaintiffs' claims are typical of the claims of the Exchange Act Class members, as all Exchange Act Class members are similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

221. Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Act Class.

222. Common questions of law and fact exist as to all Exchange Act Class members and predominate over any questions solely affecting individual Exchange Act Class members. Among the questions of law and fact common to the Exchange Act Class are:

- whether the federal securities laws were violated by the Exchange Act Defendants' acts as alleged herein;
- whether statements made by the Exchange Act Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MINISO, including without limitation as regarded its Retail Partner model and its joint venture to purportedly build new HQ;
- whether Ye, and Zhang caused MINISO to issue false and misleading financial statements during the Class Period;
- whether the Exchange Act Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of MINISO ADS securities during the Class Period were artificially inflated because of the Exchange Act Defendants' conduct complained of herein; and
- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

223. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for Exchange Act Class members to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

224. As alleged herein, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine inasmuch as the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of MINISO's ADS securities; and Plaintiffs and the Exchange Act Class members purchased or otherwise acquired MINISO ADS securities between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

### 15. Exchange Act Claims For Relief

### COUNT III

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against The Exchange Act Defendants

225. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

226. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

227. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other Exchange Act Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such schemes were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MINISO securities; and (iii) cause Plaintiffs and the other Exchange Act Class members to purchase or otherwise acquire MINISO's ADS securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

228. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MINISO securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MINISO's finances and business prospects, including without limitation as regarded its Retail Partner model and its joint venture to purportedly build new HQ;

229. The Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at MINISO, and intended thereby to deceive Plaintiffs and the other Exchange Act Class members, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the

Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

230. The Exchange Act Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of MINISO securities.

231. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. The Exchange Act Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of MINISO, who among other things oversaw its Retail Partner model and directly entered into and made decisions regarding the joint venture with the purported purpose of building new HQ, the Exchange Act Defendants Ye and Zhang had knowledge of the details of MINISO's operations, business, and internal affairs, including without limitation those regarding its Retail Partner model and its joint venture to purportedly build new HQ.

232. Ye and Zhang are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of MINISO. As officers and/or directors of a publicly held company, they had a duty to disseminate timely, accurate, and truthful information with respect to MINISO's businesses, operations, financial condition, and prospects, including without limitation as regarded its Retail Partner model and its joint venture to purportedly build new HQ. As a result of the dissemination of the false and misleading reports, releases and public statements alleged herein, the market price of MINISO ADS securities was artificially inflated

throughout the Class Period. In ignorance of the adverse facts concerning MINISO's business, operations, and financial condition concealed by the Exchange Act Defendants, including without limitation those regarding its Retail Partner model and its joint venture to purportedly build new HQ, Plaintiffs and the other Exchange Act Class members purchased or otherwise acquired MINISO's ADS securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

233. During the Class Period, MINISO securities were traded on an active and efficient market. Plaintiffs and the other members of the Exchange Act Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired MINISO's ADS securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other Exchange Act Class members known the truth, they would not have purchased or otherwise acquired said ADSs or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of MINISO ADS securities was substantially lower than the prices paid by Plaintiffs and the other Exchange Act Class members. The market price of MINISO securities declined sharply upon public disclosures of the fraud alleged herein, to the injury of Plaintiffs and Exchange Act Class members.

234. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

235. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other Exchange Act Class members suffered damages in connection with their respective purchases, acquisitions, and sales of MINISO's ADS securities during the Class Period, upon the disclosures that MINISO had been disseminating materially false or misleading misstatements and omissions to the investing public.

**COUNT IV**

**For Violations Of Section 20(a) Of The Exchange Act**
**Against Exchange Act Defendants Ye and Zhang**

236. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

237. During the Class Period, Ye and Zhang participated in the operation and management of MINISO, and conducted and participated, directly and indirectly, in the conduct of MINISO's business affairs. Because of their senior positions, they knew the adverse non-public information about MINISO's business, operations, finances, and prospects, including without limitation the adverse non-public information about its Retail Partner model and its joint venture to purportedly build new HQ.

238. As officers and/or directors of a publicly owned company, Ye and Zhang had a duty to disseminate accurate and truthful information with respect to MINISO's business, operations, financial condition, results of operations, and prospects, including without limitation as regarded its Retail Partner model and its joint venture to purportedly build new HQ, and to correct promptly any public statements issued by MINISO which had become materially false or misleading.

239. Because of their positions of control and authority as senior officers, Ye and Zhang were able to, and did, control the contents of the various reports, press releases, SEC filings, and other public statements that MINISO disseminated in the marketplace during the Class Period

concerning its business, operations, financial condition, results of operations, and prospects, including without limitation as regarded its Retail Partner model and its joint venture to purportedly build new HQ. Throughout the Class Period, Ye and Zhang exercised their power and authority to cause MINISO to engage in the wrongful acts complained of herein. They, therefore, were "controlling persons" of MINISO within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein that artificially inflated the market price of MINISO's ADS securities.

240. Both of Ye and Zhang, therefore, acted as a controlling person of MINISO. By reason of their senior management positions and/or being directors of MINISO, each of them had the power to direct the actions of, and exercised the same to cause, MINISO to engage in the unlawful acts and conduct complained of herein. Each of them exercised control over the general operations and business of MINISO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Exchange Act Class members allege.

241. By reason of the above conduct, Exchange Act Defendants Ye and Zhang are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MINISO.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Plaintiffs as class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the class members by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## V. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 30, 2025

Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*
Jeremy A. Lieberman
Matthew L. Tuccillo
J. Alexander Hood II
Jennifer Banner Sobers
Zachary Denver
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
ahood@pomlaw.com
jsobers@pomlaw.com
zdenver@pomlaw.com

*Counsel for Lead Plaintiff Nova Scotia Health Employees' Pension Plan and Lead Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
275 Madison Avenue
40th Floor
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Additional Counsel for Plaintiff Adeel Ashraf*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 30, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo