UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE MINISO GROUP HOLDING LIMITED SECURITIES LITIGATION | Case No.  1:22-cv-09864-ER<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
JOINT MOTION TO DISMISS THE THIRD AMENDED COMPLAINT (ECF 115)**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   THE TAC'S ALLEGATIONS ............................................................................. 2

    A.    Securities Act Pleading (¶¶2-77) ............................................................ 2

        1.    MINISO's Operations & IPO ........................................................ 2

        2.    Negligent Misstatements & Omissions.......................................... 3

        3.    Loss Causation Is Not A Securities Act Claim Element............................ 5

    B.    Exchange Act Pleading (¶¶78-241) ........................................................ 5

        1.    Exchange Act Defendants' Fraud .................................................. 5

        2.    Exchange Act Defendants' Scienter .............................................. 8

        3.    The EA Pleading's Alleged Corrective Disclosures ............................... 11

    C.    The TAC Addresses The Court's Concerns............................................. 11

III.  ARGUMENT...................................................................................................... 14

    A.    Rule 12(b)(6) Legal Standards............................................................... 14

    B.    Securities Act Pleading Standards ......................................................... 15

        1.    Securities Act §11 Imposes Strict Liability ................................. 15

        2.    The SA Pleading Is Not Subject To Heightened Pleading ...................... 15

    C.    The TAC Pleads Material Misstatements And Omissions ................................. 17

        1.    The Related Party JV Transaction & Buyout Transaction........................ 17

            a.    SA Pleading (Memo at 15-17)....................................... 17

            b.    EA Pleading (Memo at 17-22)....................................... 19

        2.    MINISO's Store Ownership ....................................................... 23

        3.    Negative Pre-IPO Sales Trends ................................................. 26

    D.    The EA Pleading Sufficiently Alleges EA Defendants' Scienter......................... 27

        1.    Applicable Pleading Standards .................................................. 27

2. Motive & Opportunity ................................................................................. 27

     a. JV & Buyout Transactions........................................................... 27

     b. Other Motive Allegations ........................................................... 29

3. Knowledge / Recklessness & Supporting Allegations............................. 30

4. No Competing Inference......................................................................... 32

E. The TAC Sufficiently Pleads Loss Causation ...................................................... 32

1. The EA Pleading ..................................................................................... 32

2. The SA Pleading ..................................................................................... 34

F. The Control Person Claims Should Not Be Dismissed ........................................ 35

IV.   CONCLUSION............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)....................................................................................................5

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ...................................................................................................2

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...................................................................................................1

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) .............................................................................................29

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002)...................................................................................20, 21, 22

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)...............................................................................................34

*Chen v. Missfresh Ltd.*,
   701 F. Supp. 3d 236 (S.D.N.Y. 2023)................................................................................35

*Crivellaro v. Singularity Future Tech. Ltd.*,
   2024 WL 5146051 (E.D.N.Y. Dec. 17, 2024) ...................................................................33

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
   2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) (Ramos, J.)...................................................14

*Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*,
   162 F.3d 63 (2d Cir. 1998)...............................................................................15, 26, 32

*ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................................27

*Emps.' Ret. Sys. of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...........................................................................20, 22, 23, 25

*Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................................27

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019)................................................................................30

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).............................................................................................29

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)...........................................................................................................14

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008).............................................................................................31

*Harris v. AmTrust Fin. Servs.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)...............................................................................................5

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)......................................................................................................................15

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012).............................................................................................24

*In re China Valves Tech. Sec. Litig.*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013).......................................................................................16, 32

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................................................................31

*In re Farfetch Ltd. Sec. Litig.*,
    2021 WL 4461264 (S.D.N.Y. Sep. 29, 2021)..................................................................................16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).......................................................................................................35, 36

*In re Grab Holdings Ltd. Sec. Litig.*,
    2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024) .................................................................................24

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    2011 WL 1330847 (S.D.N.Y. March 30, 2011) ...............................................................................18

*In re MINISO Grp. Holding Ltd. Sec. Litig.*
    No. 22-CV-8964, 2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)........................................................1

*In re MINISO Grp. Holding Ltd. Sec. Litig.*
    No. 22-CV-8964, 2025 WL 965688 (S.D.N.Y. Mar. 30, 2025) .......................................................1

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)...........................................................................................................15

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013).............................................................................................16

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................36

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) .....................................................................................30

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)....................................................................20, 21, 22

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011).................................................................16

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sep. 10, 2012)......................................................17

*Litwin v. Blackstone Grp.*,
  634 F.3d 706 (2d Cir. 2011)..................................................................................15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)............................................................................33, 35

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020)......................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)................................................................................................27

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  65 F.3d 1044 (2d Cir. 1995)..................................................................................35

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..................................................................................14

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
  890 F.3d 60 (2d Cir. 2018)......................................................................................2

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)............................................................................16, 35

*New Orleans Emps.' Ret. Sys. v. Celestia, Inc.*,
  455 F. App'x 10 (2d Cir. 2011)..............................................................................31

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................22, 25, 30

*Panther Partners Inc. v. Ikanos Commc'ns*,
  681 F.3d 114 (2d Cir. 2012)..................................................................................16

*Pappas v. Qutoutiao, Inc.*,
  2024 WL 4588491 (2d Cir. Oct. 28, 2024)........................................................15, 17, 35

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ......................................................................................23

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..........................................................31

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................................16

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)......................................................................................31

*Schafer v. Direct Energy Servs., LLC*,
  845 F. App'x 81 (2d Cir. 2021) ..............................................................................14

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)....................................................................................29

*Sills v. United Nat. Foods, Inc.*,
  2024 WL 4188324 (S.D.N.Y. Sep. 13, 2024)..........................................................19

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
  2025 WL 416872 (E.D.N.Y. Feb. 6, 2025)..............................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...........................................................................................27, 32

*Villella v. Chem. & Mining Co. of Chile*,
  2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) (Ramos, J.)......................................14

*Walker v. Schult*,
  717 F.3d 119 (2d Cir. 2013)....................................................................................14

*Wallace v. IntraLinks*,
  2013 WL 1907685 (S.D.N.Y. May 8, 2013) ...........................................................16

*Winter v. Stronghold Digit. Mining, Inc.*,
  686 F. Supp. 3d 295 (S.D.N.Y. 2023).....................................................................35

## Statutes

15 U.S.C. §77k.................................................................................................................15

15 U.S.C. §78j(b)............................................................................................................15

15 U.S.C. §78u-4(b)(1) .............................................................................................22, 25

Private Securities Litigation Reform Act of 1995 ...........................................................5, 22, 32

Securities Act of 1933 §11................................................................................... *passim*

Securities Act of 1933 §15......................................................................................2, 16, 33, 35

Securities Exchange Act of 1934 §10(b) .............................................................. *passim*

Securities Exchange Act of 1934 § 20(a) .........................................................................5, 8, 16

## **Rules**

Fed. R. Civ. P. 8...............................................................................................15, 16, 17, 32

Fed. R. Civ. 9(b) ...................................................................................................16, 17, 32

Fed. R. Civ. 12(b)(6)...........................................................................................1, 14, 35

SEC Rule 10b-5 ...................................................................................................19, 20, 21

SEC Rule 10b5-1 ..............................................................................................................30

Lead Plaintiff Nova Scotia Health Employees' Pension Plan and non-lead Plaintiff Adeel Ashraf ("Plaintiffs") respectfully oppose Defendants' joint motion to dismiss (ECF 115) ("Motion") the Third Amended Complaint (ECF 112) ("TAC").[1]  Plaintiffs respectfully ask the Court to deny the Motion and to order the parties into discovery.

## I.    INTRODUCTION

This is Plaintiffs' *second* pleading to face Rule 12(b)(6) litigation in this complex securities fraud class action and the *first* since the Court's Dismissal Order and Recon Order, which dismissed Plaintiffs' superseded Second Amended Complaint (ECF 60) ("SAC").   Contrary to Defendants' claim that Plaintiffs had a "fourth bite at the apple" (Memo at 1), the Dismissal Order was "the Court's first opportunity to highlight the precise defects of [the] pleadings."  *Id.* at 37. Defendants claim that because the SAC was dismissed, the TAC must be dismissed, but the Court granted leave to amend because it was *not* apparent that further amendment would be futile.  *Id.*

The 135-page TAC is streamlined and strengthened, compared to its 254-page predecessor. It clearly separates its 45-page Securities Act pleading ("SA Pleading") and 90-page Exchange Act pleading ("EA Pleading") – temporally, substantively, and physically within.   It expands viable allegations and adds 20 exhibits, appendices, and demonstratives to address the Court's concerns.  Defendants' "once dismissed, always dismissed" refrain wrongly minimizes the TAC's material changes and the Court's important role in holistically evaluating its allegations, assumed as true, construed in Plaintiffs' favor, and viewed on their own two feet.  Defendants' nine-page "Background" section (Memo at 3-11), which they concede was "principally taken from the Court's prior orders and matter of which the Court may take judicial notice" (Memo at 3 n.1)[2] –

---

[1]    Unless otherwise noted, herein, "¶" refers to TAC paragraphs, terms are defined as therein, "SA Exhibits" and "EA Exhibits" are as defined in the TAC, all emphasis is added, all citations omitted, "Memo" is Defendants' memorandum of law (ECF 116). All lettered "Exs." are Defendants' exhibits. "Dismissal Order" cites are to ECF 95 (also found at *In re MINISO Grp. Holding Ltd. Sec. Litig.* No. 22-CV-8964, 2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)) and "Recon Order" cites are to ECF 109 (also found at *In re MINISO Grp. Holding Ltd. Sec. Litig.* No. 22-CV-8964, 2025 WL 965688 (S.D.N.Y. Mar. 30, 2025)).  All internal citations and quotation marks are omitted and all emphasis is added unless otherwise indicated.

[2]    Defendants' authority, *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) does not support the point for which Defendants cite it.

and *not* from the TAC itself – thus has only limited utility.[3]  For example, Defendants fail to cite, even once, the TAC's demonstratives (SA Appendix 1, EA Appendix 1) reconstructing and diagramming the complex JV transaction at the heart of its allegations.  Their "same theories based on essentially the same factual allegations" (Memo at 3) depiction is baseless.

Thus, and for the reasons below, Defendants' Motion should be rejected.

## II.    THE TAC'S ALLEGATIONS

### A.    Securities Act Pleading (¶¶2-77)

Plaintiffs allege Securities Act §§11 and 15 claims (¶¶57-77) on behalf of a Securities Act Class of all purchasers or acquirers of MINISO's ADSs pursuant or traceable to its IPO Materials (Registration Statement, Amendments thereto, and 10/15/2020 Prospectus) (¶¶9, 51-52).

#### 1.    MINISO's Operations & IPO

Securities Act Defendant ("SA Defendant") Ye is MINISO's majority owner and controlling shareholder.  ¶26.  MINISO is a global retailer whose branded stores are predominantly self-owned or owned in an "asset light" franchise model by third-party Retail Partners bearing capital expenditures and operating costs and paying MINISO a sales percentage plus management and license fees.  ¶¶24, 28, 29(a)-(b).  MINISO's growth depended on store openings, which it claimed was driven by the Retail Partner model in China.  ¶¶25, 29(c).  MINISO said it disfavored direct ownership and claimed to own few stores.  *Id.*

MINISO netted ~$625 million from its October 15, 2020 IPO, completed pursuant to IPO Materials filed in September and October 2020.  ¶¶26(a)-(d), 27, 47(b).  Those materials described the Retail Partner model.  ¶¶29(a)-(e).  They included a related party transactions list, including several involving Ye and his companies, and a related parties list, including Ye, those companies, and SA Defendant Li.  ¶29(g).  They described Directors' fiduciary duties under Cayman Islands

---

[3]    Defendants' footnoted argument (Memo at 3 n.2) purportedly reserving rights to introduce new argument on appeal runs counter to the Second Circuit's well-established precedent and should be rejected.  *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 n.1 (2d Cir. 2023) ("[W]e generally regard an argument as waived when it appears only in a footnote."); *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 n.5 (2d Cir. 2018) (argument not raised in motion to dismiss is waived).  Their pretense lacks credibility, not only did the Court not order Plaintiffs to provide a redline or summary of TAC changes, Defendants never asked for one.

law, *e.g.*, duties to act in MINISO's *bona fide* best interests and avoid conflicts.  ¶29(f).

### 2.    Negligent Misstatements & Omissions

**Related Party Transaction.**  Just two months later, on December 11, 2020, MINISO first disclosed it was forming a BVI JV, YGF Investment, by spending RMB 356 million for a 20% stake from YGF MC, a BVI company owned and controlled by SA Defendant Ye, that owned 100%.  ¶35.  The JV was to acquire land China, through a subsidiary, for MINISO's new HQ.  ¶35.

The TAC details how Ye initiated and steadily advanced that material, related party transaction beginning nearly *one year before* the IPO, by incorporating four companies, which he fully controlled, solely to engage in that transaction:  (i) YGF MC on November 26, 2019; (ii) YGF Investment, on August 26, 2020; (iii) YGF Investment's wholly owned Hong Kong subsidiary, YGF HK, on September 15, 2020; and (iv) YGF HK's Chinese subsidiary, Mingyou, which would acquire Chinese land use rights, on October 13, 2020, per MINISO's 2021 20-F.  ¶¶30-33, 36, 41(b).  Plaintiffs confirmed these incorporations (SA Exhibit 1) and reconstructed the complex JV transaction.  SA Appendix A.

Ye completed three of these steps *before* MINISO first filed its Registration Statement and *all* of them *before* its IPO closed on October 15, 2020.  ¶¶26(a)-(d).  The Registration Statement and its amendments listed related parties and related party transactions.  ¶¶29(g), 34.  They also listed express uses for MINISO's IPO proceeds, allocating 20% (~$125.1 million) that "may" be used to cover a full list of "general corporate purposes," including "expanding and upgrading [MINISO's HQ] office space and facilities by acquiring land to build an office building."  ¶47(b).

As SA Exhibit 7 shows, the IPO Materials negligently omitted the JV transaction, which unquestionably involved Chairman / CEO Ye, four Ye-controlled companies, and a listed use of IPO funds (acquiring HQ land).  ¶¶34, 47(c).  Ye's four companies should have been listed as related parties, and the JV transaction should have been listed as a related party transaction.  ¶48(b), (d)-(e).  Their negligent exclusion renders those lists incomplete and materially misleading.  *Id.*

**Store ownership.**  The IPO Materials stated that, as of June 30, 2020, Retail Partners operated all but seven stores in China and ~120 stores elsewhere.  ¶¶47(a), (d).

3

Blue Orca's later-published report (SA Exhibit 2) found: (i) 620+ purported franchise stores were registered to MINISO executives or insiders, (ii) a MINISO brand manager in 2017 said most stores in "tier one" Chinese cities were company-owned and operated, (iii) the 11/3/2019 *Yicai* Article said 40% of MINISO's stores were company-owned and operated, and (iv) a Chinese franchisee confirmed that MINISO had 1,000+ company-owned stores in 2019. ¶40(a).  Plaintiffs: (i) confirmed Qichacha data showing insider store registrations, including 630 to one phone number, (ii) confirmed Yicai Media is state owned (SA Exhibit 8), as the U.S. government recognizes, (iii) translated the 11/3/2019 *Yicai* Article (SA Exhibit 3), which said 40% of sales were from company-owned stores, and (iv) obtained the statement of FE1, a District Manager who reported MINISO's intense focus on increasing company-owned store profitability and lack of separate revenue data for franchise stores on internal spreadsheets and sales reports.  ¶¶38, 40(b).

MINISO's 7/28/2022 Press Release responding to Blue Orca admitted employees engaged in widespread "unapproved practices," which had to be "curtailed," by providing false registration information to Chinese authorities.  ¶¶44-45. That the misconduct purportedly only impacted "certain" Retail Partners "from time to time" underscores that it was unneeded for *bona fide* Retail Partners, who registered stores legitimately.  ¶¶45-46.  Plaintiffs allege these false registrations were done at company direction.  ¶46.  The IPO Materials negligently failed to disclose this misconduct, including the 620+ false corporate registrations, as a reasonable inference, of stores owned by Ye and insiders, not by Retail Partners.  *Id.*

**Negative Pre-IPO Sales Trend**.  The IPO Materials disclosed 2019-2020 metrics, purportedly showing improving gross profit, declining cost of sales, and improved fiscal-year-end net loss, with over two-thirds of revenues from China-based operations.  ¶47(e).

However, Blue Orca identified deleted-but-archived disclosures on MINISO's Chinese website evidencing that its revenues peaked in 2018 and declined 40% in the IPO's leadup despite stores increasing by 50%, implying a 60% same-store revenue drop, which Plaintiffs confirmed. ¶¶42(a)-(b). Blue Orca interviewed a former MINISO Regional Manager who said profits peaked between 2017 and early 2019 before high-performing Chinese store revenues dropped 75%-80%,

and a former MINISO Manager who said 30%-40% of new Chinese stores were profitable, excluding most franchisees. ¶42(a).  Blue Orca found 1/3 of Chinese stores (850 total) had closed pre-IPO, citing an August 2019 report, which Plaintiffs translated.  ¶¶42(a)-(b); SA Exhibit 5.

### 3.    Loss Causation Is Not A Securities Act Claim Element

Plaintiffs allege these misstatements and omissions caused inflation in MINISO's ADS prices in and after the IPO ¶48(e)), in amounts subject to expert analysis after discovery, making clear loss causation is not a Securities Act claim element and disclaims attempts to shift SA Defendants' burden to plead and prove absence of loss causation and/or price impact as an affirmative defense.  ¶49.  It nonetheless alleges Securities Act damages are evidenced by, *but not limited to*, market reactions to: (i) a MINISO earnings release and eight analyst reports (¶¶50(a)-(i)); (ii)   Blue Orca's report (¶50(j)); and (iii) MINISO's 7/27/2022 6-K announcing an investigation into Blue Orca's allegations (¶50(k)).

### B.    Exchange Act Pleading (¶¶78-241)

Commencing two months *after* the IPO, the EA Pleading brings Exchange Act §§10(b) and 20(a) claims on behalf of purchasers or acquirers MINISO's ADSs between December 11, 2020 and July 26, 2022 ("Class Period"), against Exchange Act Defendants ("EA Defendants") Ye, Zhang, and MINISO.[4]  ¶¶83, 90-94, 217-218.

### 1.    Exchange Act Defendants' Fraud

**JV Transaction.**   Post-IPO, Ye remained MINISO's controlling shareholder, MINISO was a "controlled company" under NYSE guidance, and MINISO had governance provisions applicable to Ye and any "connected transactions."  ¶¶112-115.   In that context, Ye-controlled MINISO entered into a letter of intent to acquire HQ land on November 26, 2020. ¶122(c).  EA Defendants said MINISO and YGF MC formed a BVI JV and, pursuant to a Capital Increase

---

[4]      MINISO's stock prices post-October 24, 2022 (Class Period plus the PSLRA 90-day lookback period) are irrelevant and, contrary to Memo at 3 n.1, improper for judicial notice. *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39-41 (2d Cir. 2012) (noting PSLRA lookback provision and holding post-corrective stock price rebound does not, at pleading stage, negate showing of economic loss or loss causation).  Plaintiffs object to that portion of Ex. T and all argument (Memo at 25 n.16) based thereon.  Contrary to Memo at 25 n.16, MINISO's stock price recovery during "three years" after Blue Orca's report does not reflect a "temporary price drop" as in *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015).

Agreement (EA Exhibit 5), MINISO would fund 20% for 20% ownership, while YGF MC would fund 80% for a commensurate stake, thereby greatly reducing MINISO's obligation. ¶¶83, 122(c), 128. Plaintiffs illustrated the JV transaction's complex steps in EA Appendix A and certificates of incorporation for three Ye-controlled companies involved are EA Exhibit 4. ¶122(b).

Plaintiffs allege that the JV transaction, as disclosed, was impossible. ¶84. Despite having contributed nothing, Ye (through YGF MC) started with *100%* ownership of the JV entity YGF Investment, which he incorporated. ¶¶84, 122(c). On December 11, 2020, MINISO contributed RMB 356 million to YGF Investment for a 20% stake, setting an RMB 1.78 billion valuation. ¶¶84, 122(b), 130(a). MINISO's contribution flowed through to Mingyou, the entity that ultimately secured the HQ land contact. EA Appendix A.

But neither Ye nor YGF MC had sufficient liquidity to *contribute* the other *RMB 1.424 billion*. ¶84. Indeed, YGF MC only ever contributed, *temporarily*, ~RMB 223 million on February 2, 2021 and RMB 200 million on May 25, 2021. ¶122(d); EA Exhibit 8. Ye obscured his and YGF MC's inability to contribute more by causing another Chinese company he controlled, Minggao, to make an RMB 319.9 million *loan*, not a contribution or an investment, into the JV via Mingyou on February 4, 2021, to *partly* cover the shortfall, as MINISO later stated. ¶¶84, 122(d), 131(c)-(d); EA Exhibit 8. MINISO later claimed that Minggao *itself* "contributed" loan proceeds which lacks consistency. ¶84. Regardless, the infusion was a *loan* (direct or indirect) and *well short* of the total amount YGF MC was contractually obligated to contribute. ¶122(d).

Ultimately, Ye-controlled MINISO contributed *100%* of funding to the JV, by *fully repaying* Ye and his companies their contributions and loaned funds by or about October 29, 2021. ¶122(f). Specifically, MINISO transferred ~RMB 375 million directly to YGF MC, *repaying* its earlier contributions, and RMB 320 million to Mingyou, which was transferred to Minggou, *repaying* its loan. ¶122(d). So, overall, MINISO contributed RMB 356 million on December 11, 2020 and RMB 1.453.3 billion thereafter. ¶¶84; 122(a). Plaintiffs confirmed Blue Orca's finding that MINISO contributed 345.7 RMB to the JV on December 11, 2020, and that paid-in capital stayed flat until one day after Ye's $108 million buyout was settled October 29, 2021, when it rose

6

to RMB 1.8 billion.    ¶¶122(c)-(d); EA Exhibits 6-7 (Chinese National Enterprise Credit Information Publicity System ("NECIPS") screenshots).  These transactions left MINISO solely bearing the RMB 2.885 billion HQ cost.  ¶132.

EA Defendants misled investors about the JV transaction's investment structure, creating the misimpression that Ye would contribute 80% of HQ costs despite his inability do so.  ¶¶128, 131(c).  Their materially false or misleading statements included: "YGF MC will invest RMB 1,424 million," made December 11 and 18, 2020.  ¶¶130(a)-(b), 131(c)-(d)).  Ye controlled both sides of this related party transaction – MINISO and YGF MC – and used an unnecessary, complex structure (EA Appendix A) to fund the land purchase, then concealed the transaction's true structure, MINISO's shouldering the full costs, and Ye's noncompliance with MINISO's Code of Conduct, the Capital Increase Agreement, and Chinese land use agreement.  ¶¶128-129, 133(a).

EA Defendants' later statements failed to adequately explain that Ye controlled both sides of the deal (¶133(a)) and how YGF MC acquired its 80% stake in YGF Investment before any contribution thereto (¶133(b)).  Their statements about MINISO's purported Board approval failed to state – then or ever – if Ye, MINISO's controlling shareholder / Chairman, recused himself from the vote, required by MINISO's Code of Conduct because Ye was an "interested director."  ¶¶84, 122(d), 133(c)-(d), 170(a).  EA Defendants claimed the RMB 700.4 buyout figure was objective, the *lower* of "the actual investment amount by YGF MC" or some "appraisal value of the equity interests confirmed by a third-party valuation firm," when YGF MC's actual investment totaled only RMB ~443 million, meaning the buyout was an *overpayment*, and no "valuation firm" *ever* worked on the undisclosed "appraisal value."    ¶¶133(e)-(f).    Late in the Class Period, EA Defendants discussed expenses, depreciation, and land use rights amortization, without disclosing that the HQ project was tainted by Ye's underinvestment.  ¶¶134-137.  In June 2022, they said MINISO acquired the remaining 80% of YGF Investment "for the purpose of obtaining full ownership of the parcel of land" for MINISO's HQ, a misleading half-truth omitting that its true purpose was to pay Ye over $108 million and end contractual funding obligations he could not meet, burdening MINISO instead.  ¶¶138-139.

7

**Store Ownership.**  The TAC alleges that post-IPO MINISO directly owned up to 40% of stores, but claimed it directly owned 3%: 4-11 stores in China and 105-136 elsewhere.  ¶¶ 85, 140(a)-(j).  It includes eight CW statements, all former MINISO employees.  ¶¶95-102.  They said substantially all MINISO North American stores were company-owned and that MINISO could not attract franchisees.  ¶¶116-117, 141(a)-(b).  Blue Orca found hundreds of registrations with the same phone number belonging to MINISO insiders; Qichacha corporate registry data confirming common ownership amongst insiders; and news articles suggesting MINISO or its insiders owned a significant portion of stores (¶141(c)), and Plaintiffs retraced and confirmed these steps (¶141(e)).  Blue Orca found deleted statements from MINISO's website indicating it lowered franchising fees 63% the prior two years and observed 20% of Chinese stores, out of 620+ examined, closed between November 2021 and July 2022.  ¶123(a).  Plaintiffs replicated these findings.  ¶123(b).  MINISO's response to Blue Orca admitted its employees falsified hundreds of Chinese store registrations.  ¶¶124-126.  EA Defendants thus misrepresented store ownership numbers and MINISO's asset-light status.  ¶¶127, 140.

### 2.    Exchange Act Defendants' Scienter

The alleged fraud elevated MINISO's ADS prices, benefitting Ye, who sold at least 5.64 million shares during part of the Class Period, and MINISO, which closed a Class Period offering raising HK $567.2 million.  ¶¶86, 177-181.  Ye was further motivated to receive his $108 million buyout and to obscure its details to escape his funding obligations and fallout from dodging them.  ¶86.  Ye and Zhang also reaped suspicious compensation during the fraud.  ¶¶86, 185.

Ye controlled MINISO at all relevant times: owning a supermajority of shares, serving as CEO and Chairman, and being listed as "Controlling shareholder" in public filings.  ¶¶172, 174-176.  Ye incorporated and controlled all companies involved in the JV transaction.  ¶122(b); EA Exhibit 4; EA Appendix A.  Ye also served on the Audit Committee, responsible for "reviewing and approving all proposed related party transactions."  ¶173.

Ye's knowledge of facts concealed from Class Period investors is indisputable.  Ye knew and controlled every detail and both sides of the JV transaction.  ¶¶86, 166; EA Appendix A.  Ye

8

knew his own and YGF MC's liquidity and that they could not fund the promised RMB 1.424 billion.  ¶¶86, 167.  Ye knew that months after MINISO funded the JV, Ye, through YGF MC, had contributed only RMB ~443 million; even adding Minggao's RMB 319.9 million *loan* was still *half* what YGF MC was contractually obligated to invest.  ¶¶167, 170(b), 182.  Ye knew all relevant details about the buyout, because he controlled both parties negotiating the deal.  ¶168.  The JV transaction also violated the Code of Conduct, as YGF Investment is an "Interested Business," and interested Director / Chairman Ye "shall not be involved in any proposed transaction between the Company and an Interested Business."  ¶¶131(f), 196.  Ye knew the differences between the agreement's true terms and what was disclosed to investors.  ¶¶168-169.

These transactions were suspicious in process, timing, and amount.  ¶¶182-184.  It was highly unusual to do a simple Chinese land purchase via a BVI JV, with the company's CEO being the majority JV partner despite no up-front contribution, with no explanation why or how this approach purportedly benefitted MINISO.  ¶183.  Ye, fully controlling MINISO, had simpler options, but suspiciously waited until MINISO was flush with IPO cash to announce the JV.  ¶183.  Ye and YGF MC contributed under 1/3 the contractually required amount, only half when including Minggao's funds, which EA Defendants inconsistently described as a loan or as proceeds of a loan.  ¶183.  At arm's length, MINISO would have pursued breach remedies against Ye and YGF MC, not reward them with a free-pass, $108 million buyout while shifting Ye's funding burden fully onto MINISO and risking a land use agreement breach.  ¶¶182-183.  Ye's payout was pre-set by the Equity Transfer Agreement and did not, contrary to later explanations, result from an "appraisal" of his stake.  ¶184.  Regardless, the buyout was supposed to be the *lower* of that appraisal value or YGF MC's total contributions, RMB ~423 million, making the buyout an *overpayment* despite the "appraisal value."  ¶184.[5]

Blue Orca also disclosed that Ye had four other property developments, valued at RMB 23

---

[5]    Defendants misleadingly cite the Court's "appraisal" ruling.  Recon Order at 19-20 (cited in Memo at 9, 21). The Court then considered *only* whether the SAC adequately alleged scienter concerning its claim that the JV buyout was a "money for nothing" transaction, concluding otherwise because *some* valuation was approved.  *Id.*

billion, also using complex BVI structures that could shield further payments to Ye. ¶¶122(a), 165(b). By shifting Ye's HQ funding obligation to MINISO, increasing MINISO's funding responsibility from 20% to 100%, Ye directly benefitted himself at MINISO's expense. ¶122(f).

EA Defendants' opaque responses to Blue Orca further support scienter. ¶171. The July 2022 statements offered no explanation for Ye's serious underfunding; failed to provide the Equity Transfer Agreement's terms; and failed to justify the complex JV structure. ¶¶170(c), (e)-(f). MINISO never identified the entity that purportedly "confirmed" Ye's JV stake valuation, its process, or the actual "appraisal" valuation. ¶¶84, 132, 170(d). The buyout agreement later called that entity a "professional organization" without providing its name, whether it was China-based, or any information to assess its qualifications and independence and without disclosing its evaluation report. ¶¶84, 122(d). MINISO claimed its Board approved the buyout, but, like Ye, never said that Ye recused himself, as controlling shareholder and Chairman, from the vote (¶¶84, 170(a)), as MINISO's Code of Conduct required (¶¶115, 122(d)). Neither MINISO nor Ye ever explained MINISO's need to repay Minggao, instead of simply returning its loaned funds. ¶122(d). Nor did they explain why *Minggao's* RMB 319.9 million *loan* counted for the "actual *investment* amount by YGF MC" to justify reimbursing Ye or why YGF MC was reimbursed above its "actual investment amount." ¶133(e).

MINISO's response to Blue Orca's finding that hundreds of Chinese stores were company-owned admitted widespread employee misconduct, falsifying store registrations. ¶126. It never explained why that was necessary, when thousands of registrations proceeded correctly. ¶126.

Ye's knowledge as to the rest of MINISO's operations is likewise indisputable. The CWs establish that MINISO corporate exercised tight control over all stores including those outside China, corporate leadership including Ye visited global operations, and employees were barred from downloading or printing documents showing comparisons of country-by-country or store-by-store performance. ¶¶118-19, 164(c)-(d). The EA Pleading also asserts scienter supported by core operations allegations and EA Defendants' SOX certifications. ¶¶188-193; *infra* §III.D.3.

10

### 3.     The EA Pleading's Alleged Corrective Disclosures

A series of partial corrective disclosures incrementally revealed the true facts and removed artificial inflation from MINISO's stock.  ¶¶87, 142-161.

Blue Orca's report raised concerns about the JV transaction, challenged Ye's $108 million payout given his questionable contribution level, and questioned the highly unusual, needlessly complex transaction to fund the HQ project, including BVI, Hong Kong, and China corporations.  ¶¶87, 122(a), 157(c)-(d).  It cited Chinese government records stating that the JV's paid-in capital remained consistent with MINISO's contribution until *after* Ye's buyout, when it rose to RMB 1.8 billion.  ¶¶122(a), 157(c).  It also reported that MINISO risked breaching its Chinese land agreement with the ownership change.  *Id.*  Plaintiffs analyzed and translated Chinese government documents to confirm the contract prohibited the change for 10 years.  ¶122(e); EA Exhibit 9.  A further corrective disclosure occurred when MINISO announced an investigation.  ¶¶159-160.

The store ownership fraud was ultimately revealed by Blue Orca's findings that 600+ China stores were registered to insiders, which indicated MINISO or insider ownership; MINISO's declining franchise fees, signaling difficulty attracting Retail Partners; and statements by a former manager, a former franchisee, and Chinese state-owned media suggesting that 40% of stores (over 1,000) were company-owned.  ¶¶87, 121(a), 157(a)-(b).  Plaintiffs confirmed these sources, translated the 11/3/2019 *Yicai* Article, and pled findings about Yicai Media being state-owned.  ¶121(b); EA Exhibits 2-3.  It was also revealed by a series of disclosures, many of them analyst reports, concerning negative financial metrics, which showed greater impacts on MINISO than would have occurred if the Retail Partner model was faithfully executed.  ¶¶87 142-156.

All pled disclosures caused declines in MINISO's ADS prices, damaging Plaintiffs and Class members.  ¶¶87, 142-161.

### C.     The TAC Addresses The Court's Concerns

The TAC is a streamlined, restructured complaint, half the length of its superseded predecessor, with the SA Pleading and EA Pleading more clearly separated and significant new allegations and supporting exhibits and demonstratives demonstrating Plaintiffs' ability to address

11

any Court concerns.  Contrary to Memo at 3-11, the changes made, in overview, are as follows.

**SA Pleading.**  The SA Pleading's separation from the EA Pleading is clear.  All TAC claims arising directly from MINISO's IPO are solely under the Securities Act (¶¶24-77), which disclaims fraud, scienter, or recklessness to pursue strict liability (¶3) against SA Defendants MINISO, its U.S. representatives Puglisi and P&A, its IPO underwriters Goldman Sachs and BOAS, Zhang (CFO / Board Member), Li (Executive VP / Board Member), and Ye (¶¶11-22). The SA Pleading buttresses its theory that the IPO Materials negligently omitted the JV transaction and its participants from their lists of related parties and related party transactions by appending relevant Registration Statement excerpts (SA Exhibit 7) and related allegations (¶¶20, 29(g), 34, 47(c), 48(b), 48(d), 50(j)).  It further addresses the Court's concerns:

• that the notion that "Ye had planned the transaction all along" "do[es] not appear in the SAC," being too "speculative" to "establish that the Offering materials could or should have disclosed" the JV and buyout transactions, given that "Ye did not launch the joint venture until December 2020 – two months after the IPO" (Dismissal Order at 24; Recon Order at 13) by: (i) including incorporation documents (SA Exhibit 1; ¶¶30-33) for YGF MC, YGF Investment, and YGF HK, which Ye formed pre-IPO and used in the JV transaction; (ii) further pleading the pre-IPO creation date for Mingyou, the JV's Chinese subsidiary used to secure the land use agreement, as stated in MINISO's 2021 20-F (¶¶33, 41(b)); and (iii) reconstructing and diagramming the JV transaction, including its structure, flows of funds, and dates of incorporation (SA Appendix A).

• that the SAC "fails to consider MINISO's response to the Blue Orca report" (Dismissal Order at 21), by attaching Blue Orca's full report (SA Exhibit 2) and MINISO's response (SA Exhibit 6) and pleading why that response supports Plaintiffs' Securities Act claims (¶¶39, 43-46, 50(j)-(k)).

• that the Court wanted, *inter alia*, "facts, context, or even translations" to support the allegation that the 11/3/2019 *Yicai* Article was published by state-owned media and conveyed a government position (Dismissal Order at 20 n.23) and more than "self-translated" evidence of the Chinese land contract's terms (Dismissal Order at 25) by attaching certified translations of

corroborating evidence from Plaintiffs' investigation, including: (i) the 11/3/2019 *Yicai* Article (SA Exhibit 3); (ii) findings concerning Yicai Media ownership (SA Exhibit 8); (iii) Chinese government documents regarding MINISO's land contract (SA Exhibit 4); (iv) the August 8, 2019 Tencent Media report (SA Exhibit 5); and (v) including correlating allegations (¶¶40(b), 41(b), 42(b)), with streamlined focus on a single witness in FE1 (¶¶23, 37-38).

   • that the SAC "has not alleged facts" to "support the probability" that CWs "possess the information alleged" "about MINISO's operations outside of North America" (Dismissal Order at 22) by pleading FE1 allegations concerning internal spreadsheets and sales reports. ¶38.

   **EA Pleading.** Plaintiffs allege a Class Period starting months after MINISO's IPO, with Exchange Act claims against only EA Defendants Ye, Zhang, and MINISO concerning alleged misstatements and omissions between December 11, 2020 and July 26, 2022. ¶83. Its theory that EA Defendants misrepresented the JV and the buyout is supported by: (i) diagramming the complex transaction (EA Appendix A); (ii) appending the December 11, 2020 Capital Increase Agreement (EA Exhibit 5) and press release (EA Exhibit 10), NECIPS screenshots (EA Exhibits 6-7), MINISO's July 28, 2022 press release (EA Exhibit 8), and translated Chinese government documents related to MINISO's HQ land agreement (EA Exhibit 9); and (iii) including allegations regarding the foregoing and the September 23, 2021 Equity Transfer Agreement. *See, e.g.*, ¶¶122(b)-(e), 124-128, 130(a), 131(e), 133(h), 166, 169). These allegations and supporting materials address many Court concerns, *e.g.*, that the SAC "say[s] nothing about what Ye contributed to the actual joint venture" and pled "no facts supporting Ye's self-dealing." Dismissal Order at 29.[6] It also addresses other Court concerns:

   • that, relatedly, Plaintiffs relied on only the credit reports of a JV subsidiary, cited by Blue Orca to challenge Ye's contributions to the JV (Dismissal Order at 28-29), by fully diagramming both the JV and buyout transactions (EA Appendix A) and including allegations

---

[6]    Defendants' overview-style TAC summaries (Memo at 5-6, 7-8, 10) are facially deficient, failing to account for many new allegations, exhibits, and appendices, *e.g.*, they inaccurately claim the TAC has only "two additions" regarding the JV transaction and everything else is "minutia" [sic].

regarding the Minggao loan (¶¶82, 122(d), 131(c)-(d), 133(f), 167, 170(b), 182, 183).

•        that Plaintiffs' position "that there is no evidence Ye recused himself from the Board vote to approve the transaction" is an "assertion [that] do[es] not appear in the SAC" (Dismissal Order at 24; Recon Order at 20) by adding such allegations, including related violations of MINISO's Code of Conduct, and why they support falsity or scienter.  ¶¶84, 122(d), 133(c), 139, 170(a), 196.

•        that the SAC "fails to consider MINISO's response to the Blue Orca report" (Dismissal Order at 21), by attaching Blue Orca's full report (EA Exhibit 1) and MINISO's response (EA Exhibit 8) and pleading why that response supports Plaintiffs' Exchange Act claims (¶¶84, 87, 120-127, 141(c)-(e), 157(a)-(c), 159, 165(a)-(c), 170-171, 182-183).

## III.    ARGUMENT

### A.    Rule 12(b)(6) Legal Standards

A Rule 12(b)(6) motion challenges only a complaint's "legal feasibility" – "the test of a claim's 'substantive merits' is 'reserved for the summary judgment" after discovery.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016).  The Court's "limited" task is to decide "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  It should not "assay the weight of the evidence which might be offered in support" of Plaintiff's claims.  *Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81, 82 (2d Cir. 2021).  It must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff," dismissing only if "[plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).[7]

In applying these standards, the Court must "look only to the allegations in [the] most recent complaint as '[i]t is well established that an amended complaint ordinarily supersedes the

---

[7]        The argument (Memo at 12 n.6), claiming the SA Pleading's alleged misstatements in ¶47 and allegations explaining why they were false or misleading in ¶48 is "puzzle pleading," fails.  It does not rely on *pro forma* statements of falsity or generalize about defendants. *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2022 WL 912965, at *5 (S.D.N.Y. Mar. 29, 2022) (Ramos, J.).  It sufficiently pleads the "who, what, when, where and how" of alleged violations. *Villella v. Chem. & Mining Co. of Chile*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017) (Ramos, J.).

original and renders it of no legal effect.'" *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998). The TAC, not its dismissed predecessor, is at issue.

### B.   Securities Act Pleading Standards

#### 1.   Securities Act §11 Imposes Strict Liability

Securities Act §11 imposes liability on issuers and signatories of registration statements containing "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp.*, 634 F.3d 706, 715-16 (2d Cir. 2011). Section 11 imposes "virtually absolute" liability for material misstatements, "even for innocent misstatements," and "places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *Litwin*, 634 F.3d at 716 (§11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering" that is "absolute"). It "give(s) rise to liability more readily" than Exchange Act §10(b), with materiality assessed by "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359-60 (2d Cir. 2010). On a §11 claim, "[plaintiffs] ***need not allege*** scienter, reliance, or ***loss causation***." *Id.* (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)). Instead, "a plaintiff need allege no more than negligence to proceed under Section 11" "subject only to the 'short and plain statement' requirements" of Fed. R. Civ. P. 8. *Litwin*, 634 F.3d at 715.

#### 2.   The SA Pleading Is Not Subject To Heightened Pleading

"A plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11…claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Pappas v. Qutoutiao, Inc.*, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024). The TAC adopts all these actions. The SA Pleading (¶¶2-77) is physically separate from the EA Pleading (¶¶78-241); expressly disclaims fraud, scienter, or recklessness (¶3); and pleads liability only for "negligent" actions (¶¶22, 34, 39, 43, 46-48, 50). It is temporally and

15

substantively separated, bringing the *only* claims, under the Securities Act, arising from MINISO's

IPO Materials (¶¶47-48, 51). It brings the *only* claims against unique SA Defendants Li, Puglisi,

P&A, Goldman Sachs, and BOAS. ¶¶14-21. The EA Pleading begins *two months after the IPO*,

bringing Exchange Act claims on behalf of a class of *post-IPO* investors (¶¶83, 217) against *only*

EA Defendants Ye, Zhang, and MINISO (¶¶90-92); based on *different* (and later) alleged

misstatements constituting an alleged *fraud* (¶¶130-141); with a separate scienter section (¶¶162-

198) including the *only* allegations concerning EA Defendants' state of mind.

Plaintiffs plead two "separate complaints" and avoids Rule 9(b) application to the SA

Pleading. *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 415 n.134 (S.D.N.Y. 2013)

("separable two-part complaint" avoids Rule 9(b) application to Securities Act claim (quoting *In

re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374-75 (S.D.N.Y. 2011) (attempt to separate

Securities Act from Exchange Act claims, even if not "carefully structured," avoids Rule 9(b)))).[8]

*Some* topical overlap and *one* common CW in a 135-page pleading (Memo at 12 n.5), does not

trigger Rule 9(b). *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) (§11 claims

not subject to Rule 9(b) even if premised on same alleged facts, same misstatements, and

allegations defendants "knew or should have known" of them); *Wachovia*, 753 F. Supp. 2d at 374-

75 (alleging "elsewhere" that defendants engaged in fraud under §10(b) "does not strip plaintiffs

of the right to plead negligence in the alternative under §11" and Rule 8(a)).[9] That is particularly

true for claims against SA Defendants Li, Puglisi, P&A, Goldman Sachs, and BOAS, not even

named in the EA Pleading. *Rombach*, 355 F.3d at 178 (claims against underwriter defendants

"sound" in negligence" and are not subject to Rule 9(b)).

Thus, because the SA Pleading's claims are not "premised on allegations of fraud," they

***need not satisfy*** Rule 9(b)'s or the PSLRA's heightened pleading standards. *NECA-IBEW Health

& Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156-157 (2d Cir. 2012); *Panther Partners*

---

[8]    In Defendants' distinguishable case (Memo at 12), *In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, at *8 n.3 (S.D.N.Y. Sep. 29, 2021), plaintiffs did not argue Rule 9(b) was inapplicable to the Securities Act claim, which was based on all the same misstatements, allegedly misleading for all the same reasons, as the Exchange Act claim.
[9]    *See also, e.g.*, *Wallace v. IntraLinks*, 2013 WL 1907685, at *11-12 (S.D.N.Y. May 8, 2013) (applying Rule 8(a) standard to §11 claims premised on same facts as §10(b) claim).

*Inc. v. Ikanos Commc'ns*, 681 F.3d 114, 120 (2d Cir. 2012); *Pappas*, 2024 WL 4588491 at *2.

### C.    The TAC Pleads Material Misstatements And Omissions

Despite the two pleadings' separateness, Defendants argument (Memo at 12-22) proceeds by thematic categories. For ease of review, Plaintiffs will do the same but oppose applying Rule 9(b) to the SA Pleading.

#### 1.    The Related Party JV Transaction & Buyout Transaction

##### a.    SA Pleading (Memo at 15-17)

Defendants misquote the Dismissal Order at 24, claiming it ruled that Plaintiffs "cannot establish" that the JV transaction "could or should" have been disclosed in the IPO Materials, when it only held that the *SAC* had "fail[ed] to establish" so, given it lacked allegations that "Ye had planned the transaction all along." As explained in §§II.A.2. and II.C., *supra*, the TAC addresses this concern by: (i) pleading Ye created the *four* companies used in the JV transaction starting *one year* pre-IPO; (ii) appending their foreign incorporation documents; (iii) diagramming their corporate structure and the JV and buyout transactions. ¶¶30-33, 36, 41(b); SA Exhibit 1; SA Appendix A. Defendants fail to challenge these allegations, waiving argument (*see* n.3, *supra*). Instead, they ask the Court (Memo at 15) to port over rulings on the superseded SAC, which *lacked* these allegations. The Court should decline. The JV transaction involved a listed use for IPO funds (HQ development) (¶47(b)), and the IPO Materials listed Ye as a "related party" and transactions involving Ye and his companies as "related party transactions" (¶29(g)). As such, allegations that the IPO Materials negligently omitted YGF MC, YGF Investment, YGF HK, and Mingyou from listed "related parties" and the JV transaction from listed "related party transactions" (¶34) adequately plead materially false or misleading misstatements or omissions under §11. *See, e.g.*, *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *9-11 (S.D.N.Y. Sep. 10, 2012) (undisclosed related party transaction was basis for well-pled §11 claim).[10]

Defendants argue (Memo at 16-17) only that because the JV transaction (by two months)

---

[10]    *Cf. also Pappas*, 2024 WL 4588491, at *1, *3 (vacating and remanding dismissal of §11 claim premised partly on undisclosed related-party transactions where court erroneously applied Rule 9(b) instead of Rule 8 standard).

and buyout transaction (by one year) were "future" and closed after the October 15, 2020 IPO, the TAC fails to allege MINISO "could or should" have disclosed them.[11] This uncited, conclusory argument fails. Plaintiffs allege and diagram constant Ye-led actions, pre-IPO and post-IPO, by seven companies (including MINISO) Ye owned and/or controlled, to effectuate these transactions.[12] It defies credulity to say that as of the IPO, four steps deep, the JV transaction was "speculative," simply because the Capital Increase Agreement between two entities Ye owned and controlled (YGF MC and MINISO) was executed shortly after the IPO (not "eventually" as the Memo at 17 n.11 claims). *See Martinek v. AmTrust Fin. Servs., Inc.*, 2020 WL 4735189, at \*12 (S.D.N.Y. Aug. 14, 2020) (statement that preferred stock "will continue to be listed post-Merger" is actionable when defendants decided to delist preferred shares two months post-merger because it "strongly suggests that Defendants knew this statement to be false when made").[13]

Defendants' Memo at 15-16 argues that the IPO Materials made no material misrepresentations or omissions about the JV transaction because they disclosed 20% of IPO proceeds (~$125.1 million) would be used for corporate purposes, including the HQ (¶47(b)). But the total spent on the JV and buyout transactions exceeded that amount. MINISO paid RMB 356 million (~$55.3 million) for a 20% JV stake in December 2020 (¶36), and RMB 685 million (~$108 million) more to Ye (via his companies) just over a year post-IPO (¶47). *See* SA Appendix A at 6. Defendants' "allocation" of the ~$125.1 million argument fails, because the total paid (~$163.3 million) exceeded the entire permitted use amount.

---

[11]    Defendants' Memo at 15-16 overlooks that even if the buyout transaction was not contemplated by the IPO, it undisputedly involved Ye's companies. That these entities engaged in a *second* related party transaction involving MINISO and Ye shortly post-IPO serves, at minimum, to underscore the materiality of their omission from the "related parties" list, which was required due to everything preceding the IPO.

[12]    The SA Pleading lists 13 incorporation, transaction, and payment flow events from November 26, 2019 through October 29, 2021, all detailed in SA Appendix A. ¶¶30-33, 36, 41(b); SA Exhibit 1; SA Appendix A.

[13]    *See also In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 1330847, at \*8 (S.D.N.Y. March 30, 2011) (while defendants need not "speculate about uncertain market conditions," allegations that they knew the auction rate security market would fail absent intervention, auction rate securities lacked demand, and they contemplated ending their intervention created duty to disclose because "the increased risk of auction failure was uniquely within Defendants' ken, and Defendants would not be speculating on an event 'shrouded in uncertainty,' to appraise Plaintiffs of that risk").

### b.    EA Pleading (Memo at 17-22)

Defendants' six challenges to the EA Pleading's post-IPO, JV-related allegations fail.

First, contrary to Defendants' Memo at 17-18, ¶131(a) alleges the December 11, 2020 announcements were materially false or misleading not only because YGF Investment was incorporated in August 2020, but also (and more importantly), because at inception, it was "wholly-owned by YGF MC, which was wholly owned by Ye." So, instead of jointly forming a new JV, Ye-controlled MINISO was forced to buy into an existing entity – at an RMB 1,770 million valuation, setting MINISO's buy-in at RMB 356 million ¶48(b) – that Ye already fully owned, without ever having contributed funds.

Second, Defendants' Memo at 18 challenges statements on December 11 and 18, 2020 (¶131(b)), September 26, 2021 (¶133(b)), and June 27, 2022 (¶139) that MINISO held 20% of shares while YGF MC held 80% of shares. These statements are pled, *inter alia*, as misleading half-truths because YGF MC contributed nothing at the JV's inception (compared to MINISO's infusion), never contributed the RMB 1.424 billion for its 80% stake at the valuation set by MINISO's investment, and was allegedly unable to do so. While Defendants (referencing YGF MC and Ye interchangeably) are correct YGF MC started with 100% ownership and never fell below 80%, it was materially misleading to withhold that it *never* contributed the ***required*** funding for its 80% stake. *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, 2025 WL 416872, at *9 (E.D.N.Y. Feb. 6, 2025) ("Under Rule 10b-5, 'once a company speaks on an issue or topic, there is a duty to tell the whole truth.' 'The law is well settled that so called "half truths"—literally true statements that create a materially misleading impression—will support claims for securities fraud.' '[T]he proper inquiry requires an examination of defendants' representations, taken together and in context.'"); *Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324 (S.D.N.Y. Sep. 13, 2024) (plaintiff plausibly alleged misleading half-truths about topics defendants put into play).

Third, The alleges December 11 and 18, 2020 statements that "YGF MC will invest 1,424 million in the JV company" were materially false or misleading for failing to disclose that, at that time, neither YGF MC nor Ye had sufficient liquidity to invest that amount, nor could they be

19

reasonably expected to timely generate it. ¶131(c). It pleads: (i) MINISO paid its investment on December 11, 2020; (ii) YGF MC contributed no funds then; (iii) by September 23, 2021 (9 months later), YGF MC had only contributed ~RMB 423 million (29.7% of its obligation); (iv) another Ye-owned company, Minggao, provided a *loan* to partly cover YGF MC's shortfall; (v) the ~RMB 743 million total, loan included, was *half* of YGF MC's obligation. ¶131(c); EA Appendix A.

Defendants argue (Memo at 18-20), without citation, that particularized facts, *e.g.*, about Ye's personal finances, are needed at this stage, and proffer a competing explanation: that Ye's "contributions" including Minggao's *loan* tracked land use payments. Defendants' argument is flawed, *inter alia*, because they: (i) count Minngao's *loan* as a "contribution;" (ii) gloss over YGF MC's failure to meet its contractual obligation; (iii) claim the other 50% of YGF MC's obligation was not "owed" until a January 2022 land use milestone, when the Capital Increase Agreement does not provide this timeline for contribution; (iv) treat YGF MC (MINISO's JV counter-party) and Ye interchangeably; (v) argue that Ye did not "expect[ed] to be repaid" when, within 8 months of Minggao's loan, he was literally repaid (*see* EA Appendix A).

Defendants' arguments should be rejected. Plaintiffs' allegations in ¶131(c) and EA Appendix A raise the reasonable inference, which should be credited, that Ye and YGF lacked sufficient liquidity or they would have met their funding obligation. *Emps.' Ret. Sys. of V.I. v. Blanford*, 794 F.3d 297, 306-07 (2d Cir. 2015) (defendant's proffered reason for its revenue gap to rebut plaintiffs' alleged misstatement "entitled to little weight at this stage of litigation, when we must 'accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor'").[14]

Fourth, statements on December 11 and 18, 2020 (discussing the JV transaction) and

---

[14]    Memo at 20 n.13 also challenges ¶¶135, 137, which plead that earnings releases in March and May 2022, shortly after Ye's buyout, were materially misleading "half-truths" for attributing increased general and administrative expenses related to the HQ without disclosing impacts of Ye's underinvestment, *i.e.*, the buyout shifted Ye's HQ funding obligations to MINISO, amplifying impacts of those increased costs. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth," even without an existing independent duty to disclose the information); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not…a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues.").

September 25, 2021 (discussing the buyout transaction) are allegedly false or misleading for failing to disclose the complex transaction structure or reasons therefor.  ¶¶130(e), 131(e), 133(i), 139. Indeed, the structure and flow of funds were not fully apparent until even after the Blue Orca Report, when the Equity Transfer Agreement was finally published.  *See* SA Appendix A.  Until then, investors could not understand, *e.g.*, YGF MC's failure to meet its JV funding agreement obligations, that MINISO took over YGF MC's 80% funding obligation for no apparent benefit (¶122(f)), and how much Ye was overpaid in the buyout (¶133(f)).  Thus, in harmony with Defendants' authority (Memo at 20), disclosure was needed to "make the statements made…not misleading."  *See also Vivendi*, 838 F.3d at 258 ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose information' on the issue or topic."); *Caiola*, 295 F.3d at 331 ("[T]he lack of an independent duty is not…a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues.").

Fifth, Plaintiffs allege: (i) YGF Investment was an "Interested Business" under the Code of Conduct, which mandated that Ye "refrain from participating in any discussion...relating to an Interested Business" and from involvement  "in any proposed transaction between the Company and an Interested Business" (¶¶131(f), 133(d)); (ii) JV transaction announcements were "misleading half-truths for not disclosing those facts (¶131(f)); (iii) buyout transactions announcements were materially false or misleading for not disclosing those facts and that Ye was on "both sides of the transaction" and did not recuse himself from related votes, violating the Code of Conduct (¶¶133(a), 133(d)); (iv) EA Defendants' failure to *ever* confirm Ye's Code-requited recusal – a highly exonerating, simple statement – creates the logical inference, on information and belief, that he did not recuse himself (¶¶122(d), 133(c)-(d), 139).

Defendants wrongly argue (Memo at 20) these allegations were "already rejected" – the cited rulings found only that recusal "assertions do not appear in the SAC" and the SAC's (less complete) Code of Conduct allegations, absent other allegations that Defendants "were engaged in fraudulent acts," "do not support scienter."  Dismissal Order at 24, 35; Recon Order at 20.  The

21

TAC's challenged Code of Conduct allegations *did not appear* in the SAC, which focused on other provisions. *Compare* ECF 60 at ¶¶176-185. Indeed, "as highlighted by the Defendants, the word 'recuse' or 'recusal' does not appear in the SAC" (Recon Order at 20), and neither does the phrase "both sides." Contrary to Defendants' argument, the TAC's recusal inference is well-pled, permissibly based on information and belief (15 U.S.C. §78u-4(b)(1)), must be construed in Plaintiffs' favor, and suffices. *Blanford*, 794 F.3d at 306-07; *Novak v. Kasaks*, 216 F.3d 300, 312-313 (2d Cir. 2000) (PSLRA permits information and belief pleading).

Finally, Plaintiffs allege that buyout announcements in September 2021 were materially false or misleading because they claimed the buyout would be the lower of either an appraisal value or YGF MC's actual investment (~RMB 423 million), when actually, the then-non-public Equity Transfer Agreement said it would be the lower of a pre-set "Benchmark Price" RMB 700.4 million (not negotiated at arms' length) or an "evaluation price" set by a "professional organization." ¶¶133(e)-(f), 139, 184; Ex. S at 3 §1.2.3.[15]

Contrary to Memo at 20-21, the two descriptions did not "match." Publicly, Defendants claimed a methodology leading to ~RMB 423 million, while privately, the Benchmark Price was RMB 700.4 million, roughly what Ye was paid. Publicly, they said a "valuation firm" would conduct an "appraisal," while privately, they agreed a "professional organization" would set an "evaluation price" (the value of which was ever disclosed, explained or justified). Their argument underscores the differences' materiality, as they note the Court was swayed by the "approval of the valuation by the independent *appraiser*" (Recon Order at 20), but no *appraiser* was ever engaged and no *appraisal* ever done. On these facts, Defendants' duty to speak the whole truth (¶133(f)) is clear – the omitted details made public statements materially misleading. *Vivendi*, 838 F.3d at 258; *Caiola*, 295 F.3d at 331. Regardless, based on Defendants' public statements, Ye's buyout should have capped at ~RMB 423 million, not the RMB 695 million he received.

Without challenging the TAC's land agreement translation (EA Exhibit 9), Defendants

---

[15]    Defendants' Declaration and Ex. S correct a scrivener's error in ¶122(d), which said the Equity Transfer Agreement was attached 2021 20-F, not the 2022 20-F a year later.

argue (Memo at 21-22) that the buyout was permitted because Mingyou was the land use purchaser, and as of the agreement's execution, it was fully owned by YGF HK – which was fully owned YGF Investment, which was then-owned by YGF MC (80%) and MINISO (20%). *See* EA Appendix A at 3; ¶122(b). But, post-buyout, MINISO owned 100% of YGF Investment, and its subsidiaries including Mingyou. As such, Plaintiffs plead that the buyout "risked" breaching or "appeared to breach" the land use contract. ¶¶122(a), 122(c), 122(h), 133(h), 139, 157(c), 165(b), 183.[16] Defendants proffer an alternative interpretation of the restrictions that must be rejected at this stage, where factual allegations must be accepted and all reasonable inferences drawn in Plaintiffs' favor. *Blanford*, 794 F.3d at 306-07.

### 2. MINISO's Store Ownership

SA Pleading. The SA Pleading alleges the IPO Materials negligently misstated that, as of June 30, 2020, MINISO only operated seven stores in China and ~120 stores elsewhere, when the true figure was much higher. ¶¶47(a), (d). It pleads these statements were contrary to, *inter alia*, Qichacha registration data, reporting by Tencent Media and state-owned Yicai Media, and statements by FE1 and by Blue-Orca-interviewed former China employees. *See* §II.A.2., *supra*. Addressing the Court's concerns, it includes revised allegations about these sources, appends translated copies, and addresses MINISO's response to Blue Orca. *See* II.C., *supra*.

EA Pleading. The EA Pleading alleges that post-IPO MINISO owned up to 40% of stores, not the 3% described to investors, rendering its contrary statements materially false or misleading. ¶¶85, 140(a)-(j). The allegation is based on deleted MINISO corporate website postings, Qichacha data, news articles, statements by eight CWs, and MINISO's admission that employees falsified corporate registrations. *See* §II.B.1., *supra*. It addresses the Court's concerns similarly to the SA Pleading, including, *e.g.*, addressing MINISO's Blue Orca response. *See* §II.C., *supra*.

Defendants' arguments (Memo at 12-15) should be rejected.

---

[16]     ¶128's reference to "Chinese laws" does not reference the land use agreement, making Defendants' cited authority, *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021), concerning enforceability of contracts under foreign law, inapplicable.

First, in the SA Pleading, FE1's express disagreement with MINISO's public statements about its store ownership percentage was based on FE1's firsthand observation of MINISO's intense focus on increasing company-owned store profitability, which would make no sense if MINISO only owned a handful of stores, and on internal spreadsheets and sales reports, generated by MINISO China, lacking separate tabs or tallies tracking revenue, data, or numbers for franchise stores, which FE1 viewed up until 2019 – close enough to the IPO that MINISO's store ownership percentage would not have drastically changed by the IPO.  ¶¶23, 38, 40(b).  The EA Pleading augments these CW3 statements with allegations that nearly all 80+ MINISO North American stores were company-owned, MINISO China's efforts to transition them to Retail Partners failed, and MINISO corporate consultants showed CW3 and others country-by-country store comparisons with store-specific data.  ¶¶97, 116-117, 119, 141(a), 164(a)-(b), 164(d).[17]

Contrary to Memo at 13, these alleged facts, which cross-corroborate the findings of Blue Orca and Plaintiffs' post-dismissal investigation, and reasonable inferences drawn therefrom, do "show[] how [FE1 / CW3] would know the ownership details of MINISO's stores in China and internationally."  Indeed, MINISO North America, FE1 / CW3's employer in 2021, included both U.S. and "international" stores in Canada. ¶¶116.  Defendants challenge (Memo at 13 n.7) to FE1 / CW3's reliance on spreadsheets and sales reports from 2019 (~9 months before the IPO Materials were first filed) fails.  *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 567-68 (S.D.N.Y. 2012) (discrepancies between Chinese and US financials from 2006-2008 supported falsity of 2009 IPO statements); *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *15 (S.D.N.Y. Mar. 12, 2024) (§11 claim sufficiently pled proxy statements misstatements and omissions about driver shortages where company "was already increasing partner incentives…to combat the driver supply constraint" and facts from the full pre-IPO year were relevant to establish falsity).

Second, Plaintiffs' allegations establish Yicai Media was state-owned (as Memo at 13 concedes); MINISO personnel would not provide Yicai inaccurate information given the severe

---

[17]    Defendants do not challenge the statements by CW3 and others regarding MINISO's North American stores (¶¶116-117) or otherwise challenge the statements of CWs 1-2 and 4-8 in the falsity pleadings.

consequences; Yicai reported 40% of MINISO's sales came from company-owned stores (figures only obtainable from MINISO personnel); and that figure supports the inference that MINISO owned ~40% of stores (Blue Orca's conclusion) not 3% as publicly stated.  ¶¶40(a)-(b), 50(j), 121(a)-(b), 157(a); SA Exhibits 3, 8.  These allegations satisfy Court concerns about Yicai's state-owned status and ability to report on MINISO's operations.  Dismissal Order at 20 n.23. Defendants' competing explanation, that 3% of company-owned stores accounted for 40% of MINISO's total overall sales is illogical – MINISO's SEC filing would have extensively discussed such astounding over-performance and MINISO would have had to rethink the "Retail Partner" model's entire rationale – and, regardless, cannot be credited over Plaintiffs' allegations and reasonable inference.  *Blanford*, 794 F.3d at 306-07.

Third, Blue Orca and Plaintiffs' investigation revealed 620+ purported franchises registered to MINISO executives and insiders, including SA Defendant Li.  ¶¶38, 40(b), 50(j).  The TAC pleads MINISO's response to Blue Orca, which it appends, admitted MINISO employees engaged in widespread "unapproved practices," which had to be "curtailed," by providing *hundreds* of falsified corporate registrations to Chinese authorities – without ever explaining why doing so was needed, given that *thousands* of legitimate Retail Partners registered stores properly – supporting the inference that a greater number of stores were company-owned than publicly stated.  ¶¶39, 43-46, 50(j)-(k), 121(a)-(b), 124-127, 140; SA Exhibit 6; §II.C., *supra*.  It adds that on information and belief, these actions were done at company direction.  ¶¶46, 126.  All these allegations are sufficient and must be construed, along with reasonable inferences, in Plaintiffs' favor.  *Blanford*, 794 F.3d at 306-07; *Novak*, 216 F.3d at 312-313; 15 U.S.C. §78u-4(b)(1).

These allegations satisfy Court concerns that the SAC "fails to consider" the response (Dismissal Order at 21), which was outside the pleadings.  Contrary to Memo at 14-15, the Court only held that, as considered on Defendants' judicial notice request, the response undermined the *SAC's* allegations of *fraud* and "did not admit" that the SAC's *Internal Controls fraud* misstatements (not replicated in the TAC) were false when made.  Dismissal Order at 21, 29.

Regardless, the TAC pleads that, at minimum, the IPO Materials negligently omitted

25

disclosure that corporate registrations for 620+ MINISO China stores were false and, as a reasonable inference, owned by MINISO or company insiders and not regular Retail Partner franchisees. ¶46. Defendants do not directly challenge this negligent non-disclosure allegation.

### 3. Negative Pre-IPO Sales Trends

Contrary to Memo at 22, Plaintiffs adequately allege the IPO Materials were materially misleading for failing disclose MINISO's difficulties attracting Retail Partners and declining revenue trends (¶¶47(e), 48(c)-(d)), which began in 2019, off a 2018 revenues peak (¶¶42(a), 48(c)). Plaintiffs allege Blue Orca's findings, which Plaintiffs' investigation corroborated (¶42(b)), after (i) interviewing former MINISO Managers and (ii) reviewing the Tencent Media report: the revenue declines were in "*high-performing stores* in China," and hit "most franchisees" due to "market saturation, competition, and high rents." ¶42(a). These are not the reasons in the IPO Materials, attributing declines to COVID-19, new stores in lower-tier cities, and increased competition in 2019-20. Dismissal Order at 28. To the extent the IPO Materials disclosed declining revenue, the reasons negligently but misleadingly implied one-off causes or difficulties for new, small-market stores, not the two-year freefall identified by Blue Orca and replicated by Plaintiffs. The TAC, unlike the SAC, is clear about the misleading nature of these disclosures and the gap between them and the truth. The Court should review Plaintiffs' allegations fresh, without reflexively adopting prior rulings on the SAC. *Dluhos*, 162 F.3d at 68.

Plaintiffs retain a revised theory regarding MINISO's profitability and metrics. Declining franchise fees and store closures revealed that, contrary to public statements, MINISO was deviating from its "asset-light" Retail Partner Model to a greater extent than publicized. ¶¶50(a)-(i), 140, 157(b). Revelations of problem financial metrics (in Blue Orca's report and other correctives, *see infra* §III.E.1) partially revealed that MINISO was unable to faithfully execute its model and consequently suffered greater financial impacts. Defendants' misleading presentation of MINISO's financial condition, performance, and metrics, including those arising from its Retail Partner model, support a well-pled claim, including under Regulation S-K. ¶¶48(d), 85, 140(a)-(j), 210; §III.C.2, *supra*.

26

### D.    The EA Pleading Sufficiently Alleges EA Defendants' Scienter

#### 1.    Applicable Pleading Standards

The TAC sufficiently pleads scienter for EA Defendants Ye, Zhang, and MINISO.[18] Contrary to Memo at 23-24, the Court's rulings on the superseded SAC are not outcome-determinative – the TAC's scienter allegations (¶¶162-198) must be holistically considered, within the context of its revised, expanded EA Pleading. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). "[A]ccepting all factual allegations in the complaint as true," "[t]he inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Scienter is adequately pled if, on review of "all the allegations holistically," "a reasonable person would deem the inference … cogent and at least *as compelling* as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 48 (2011) (quoting *Tellabs*, 551 U.S. at 324, 326). "[S]cienter can be established by alleging facts to show either (1) defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

#### 2.    Motive & Opportunity

##### a.    JV & Buyout Transactions

The EA Pleading reconstructs and diagrams the complex JV and buyout transactions, including the Ye-controlled entities on all sides and flow of funds, based on the transaction agreements, MINISO's filings, and foreign incorporation certificates. ¶¶122(b)-(d), 128; EA Appendix A; EA Exhibit 5. It alleges Ye fully controlled MINISO in these transactions, as its

---

[18]    The TAC does not name Minxin Li (named in the SAC) as an EA Defendant.

27

company-listed "Controlling Shareholder," CEO, Chairman, executive Director, and Audit Committee member that approved all related party transactions. ¶¶172-176.[19] It alleges that while Ye-controlled MINISO contributed RMB 356 million for a 20% stake in the JV entity, YGF Investment, in accordance with the Capital Increase Agreement (EA Exhibit 5), Ye-owned YGF MC, MINISO's contractual counter-party, never made its required RMB 1.424 billion investment for its 80% stake. ¶¶130(a)-(b), 131(c)-(d), 170(c), 182-183.

Ye-controlled MINISO never pursued breach remedies. Instead, Ye caused Minggao to issue a *loan* to Mingyou (¶¶84, 182) to justify a full ~RMB 700 million (~$108 million) buyout of YGF MC's JV stake. *See* EA Appendix A at 6; ¶¶84, 122(d), 132. MINISO claimed in September 2021 that, per the buyout agreement, the RMB 700.4 million buyout was the "lower" of "the actual investment amount by YGF MC" or "the appraisal value of the equity interests confirmed by a third-party valuation firm." ¶¶122(d), 132, 133(e)-(f). YGF MC only invested ~RMB 423 million (¶¶131(c), 182), yet Ye received RMB 695 million by October 29, 2021. ¶157(c).

The transactions were highly suspicious and strongly support scienter. (1) They shifted 80% of the HQ funding obligation from Ye-owned YGF MC to Ye-controlled MINISO, while *overpaying* YGF MC by at least RMB 272 million (RMB 695 million buyout minus the RMB ~423 million YGF MC investment) and *overvaluing* YGF MC's contribution, given that MINISO's investment (RMB 356 million for a 20% stake) valued an 80% stake at RMB 1.424 billion. ¶¶122(d), 122(f), 130(a)-(b), 131(b), 133(b), 139, 167, 182-183, 188.[20] (2) Neither Ye nor MINISO ever explained why the complex transaction structure was needed or beneficial to MINISO, why MINISO failed to enforce YGF MC's funding obligation, or why MINISO needed to repay Minggao's loan instead of returning Minggao's loaned funds (inconsistently described as loan proceeds). ¶¶122(d), 128, 133(f), 139, 183. (3) The Ye-controlled transactions violated

---

[19] Defendants do not present any argument disputing Ye's opportunity to commit fraud, only his motive.

[20] Indeed, Ye had a choice of which controlled company he used as YGF Investment's parent. If he had chosen MINISO, it would have had a 100% stake in the JV to start, with Ye (via YGF MC) having to invest his way up to the 80% stake; his actual contributions only justified a 45.7% stake (based on YGF MC's investment) or a 67.6% stake (if Minggao's loan is factored in). By instead choosing YGF MC as the parent, Ye gave *himself* the default 100% stake, against MINISO's interests.

MINISO's Code of Conduct, and neither Ye nor MINISO confirmed Ye's recusal from the Board vote as required thereby. ¶¶84, 115, 122(d), 131(f), 133(a), 133(c)-(d), 133(l), 139, 168, 170(a), 196. (4) The buyout price was pre-set. The Equity Transfer Agreement, finally made public in October 2022 attached to MINISO's 2022 20-F (¶122(d)), said the buyout was the lower of the pre-set "Benchmark Price" of RMB 700.4 million, not negotiated at arm's length, or an "evaluation price" (not an appraisal) issued by a "professional organization" (not a valuation firm). ¶¶133(e), 139, 184; Ex. S at 3 §1.2.3. (5)  Neither Ye nor MINISO ever disclosed the valuation firm / professional organization's identity, its process, the appraisal / evaluation price amount, or its "evaluation report." ¶¶84, 122(d), 133(f), 170(d), 184. (6) With no stated benefit for MINISO, the buyout benefitted Ye but risked breaching MINISO's Chinese land agreement. ¶¶122(a), 133(h), 139, 157(c), 165(b), 183.

Defendants' only counter-argument is one conclusory, uncited sentence claiming that Plaintiffs "do not plead particularized facts showing Ye engaged in self-dealing." Memo at 23. They waive any further argument at this stage. *See* n.3 (citing waiver cases), *supra*. Moreover, the Court's prior-cited authority (Dismissal Order at 34), *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011), supports scienter, as the TAC's allegations evidence a "unique connection between the fraud and the [benefit]" to Ye.

### b.    Other Motive Allegations

Plaintiffs allege Ye, who never sold stock pre-IPO, sold **5,644,572** MINISO shares during *part* of the Class Period, timed to benefit from alleged fraud inflation in MINISO's stock price. ¶¶177-181. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (selling tens of thousands of shares during alleged fraud supports scienter (citing *Goldman v. Belden*, 754 F.2d 1059, 1063 (2d Cir. 1985) (defendants' sales of 29,000 and 40,000 shares during fraud supported scienter))). Plaintiffs allege that, during the fraud, Ye and Zhang reaped suspicious compensation, far exceeding other Board members; Zhang received a suspicious $2.47 million payment and total compensation nine times above a year prior; and MINISO closed a suspiciously-timed $72 million offering benefitting from the fraud inflation. ¶¶185-187. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d

29

249, 260-61 (5th Cir. 2005) (executive compensation package supported scienter where defendant got a bonus that was 175% of base salary); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive to commit fraud survives motion to dismiss where misstatements allegedly increased stock price, permitting capital raise at higher offering price, with less shares issued and less dilution).  Defendants argue only that the Court should replicate prior rulings.  Memo at 23 (citing Dismissal Order at 33-34).[21]

### 3.    Knowledge / Recklessness & Supporting Allegations

Contrary to Memo at 24, Ye's and Zhang's states of mind are not alleged based only their CEO and CFO roles.  Circumstantial evidence of Ye's conscious misbehavior or recklessness regarding the JV and buyout transactions is overwhelming.  Undisputed allegations include: (i) MINISO's SEC filings state "We are a 'controlled company'" and report Ye as "Controlling Shareholder" (¶¶174, 176); (ii) Ye was Chairman and a member of the Audit Committee charged with "approving all proposed related party transactions" (¶173); (iii) Ye incorporated and owned MINISO's JV counter-party, YGF MC, and its three involved subsidiaries, including the JV entity, YGF Investment; (iv) Ye controlled both sides of the JV and buyout transactions; and (v) Ye ultimately received the buyout.  ¶¶122(b), 166-169; EA Appendix A.  Both the JV funding agreement and the buyout agreement were signed by Ye (on behalf of YGF MC) and Zhang (on behalf of MINISO).  ¶168; EA Exhibit 5; Ex. S.  These allegations establish actual knowledge of alleged facts rendering EA Defendants' alleged misstatements false or misleading, satisfying the Court's concerns with the SAC.  *See* Dismissal Order at 34 (citing, *inter alia*, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  Ye's Code of Conduct violation (controlling both sides of the JV and buyout transactions) strengthens that inference.  *Novak*, 216 F.3d at 311-12 (scienter inference strengthened by knowing violation of company policy).

The EA Pleading's related allegations must be viewed, holistically, within the context of

---

[21]    The Court's prior-cited authority, *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772-73 (S.D.N.Y. 2019), lists the amount of net profits and whether sales occurred in a Rule 10b5-1 trading plan as relevant considerations. Ye's sales were outside a Rule 10b5-1 plan and his 5,644,572 million sold shares correlate to profits between $28.6 million and $198.7 million (based on the Class Period intra-day low and high per-share prices of $5.07 and $35.21).

its entire scienter pleading, regardless of whether any of them, piecemeal, supported the superseded SAC. The core operations doctrine bolsters the strong inference of CEO Ye's and CFO Zhang's scienter, as the JV transaction concerned MINISO's RMB 2.885 billion HQ project. ¶¶84, 167, 183, 188. *Cf. Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (amount of write-off of royalty advances – $73.8 million or 84% - following poor sales supports strong recklessness inference). The Retail Partner model was also undisputedly "core" to MINISO. ¶¶189-190. These facts combine with CW allegations about MINISO China's corporate leadership's closely managing global operations, including internal spreadsheets and sales reports tracking store-by-store progress toward goals, and Ye's visiting MINISO USA's offices to support scienter. ¶¶118, 163-165, 191. Ye and Zhang also signed, were quoted in, and SOX certified the SEC filings and other statements at issue, supporting scienter. ¶¶192-193; *New Orleans Emps.' Ret. Sys. v. Celestia, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("[A]llegations of a company's core operations…can provide supplemental support for allegations of scienter…."); *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020) (SOX certifications support scienter).

Plaintiffs allege the 7/28/2022 Press Release responding to Blue Orca was intentionally vague (*e.g.*, failing to say if Ye recused himself from Board votes, failing to explain why YGF MC failed to meet funding obligations); withheld the buyout agreement signed 10 months prior; and contradicted its undisclosed terms (*e.g.*, portraying Minggao's funds as loan proceeds and retention of a "valuation firm" to do an "appraisal"); and admitted MINISO employees engaged in "unapproved practices," by creating false store registrations, that had to be "substantially curtailed." ¶¶125, 170-171. Contrary to Memo at 24, these allegations support scienter. *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (admission of backdating scheme supported scienter); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 316-17 (E.D.N.Y. 2002) (admission that financial statements needed revision due to improprieties, combined with related party transactions, supported CFO scienter).

31

### 4.    No Competing Inference

Under *Tellabs*, dismissal must be rejected unless Defendants proffer a *more compelling* inference than the TAC's strong inference supporting their scienter.   Defendants articulate ***no competing inference***.   Memo at 23-24.   Reference only to this Court's determinations on the superseded SAC falls well short of *Tellabs*.

### E.    The TAC Sufficiently Pleads Loss Causation

The TAC's loss causation allegations (§§II.A.3. and §II.B.3., *supra*) must be considered afresh – prior Court Orders finding loss causation insufficiently pled in the superseded, nullified SAC (Memo at 24) are inconclusive.   *Dluhos*, 162 F.3d at 68 (court correctly considers only allegations from "amended complaint [which] supersedes the original, and renders it of no legal effect" (quoting *Shields*, 25 F.3d at 1128)).   The Court applied heightened pleading standards of Rule 9(b) and the PSLRA to the *entire* dismissed SAC (Dismissal Order at 18-19), but must now apply Rule 8 to the SA Pleading (*see* §III.B.2., *supra*).  *See, e.g.*, *China Valves*, 979 F. Supp. 2d at 415 (amended complaint separated Securities Act claims, cured pleading deficiency, and avoided Rule 9(b) and the need to plead loss causation).   The question now is whether the alleged disclosures, "old" and "new," correct the misstatements ***as pled in the TAC***.   Its allegations suffice.

### 1.    The EA Pleading

Plaintiffs allege misstatements concerning, *inter alia*: (i) the JV and buyout transactions, (ii) the buyout's purpose and valuation, (iii)  the number of directly-owned versus Retail Partner stores and metrics impacts on MINISO from the former, and (iv) expenses concerning the HQ. *See supra* §III.B.1.  Blue Orca's report added its independent, China-based research to publicly available information to explain and highlight for investors the JV's underfunding, its complex and questionable structure, Ye's conflicts of interest, Ye's noncompliance with the JV funding agreement, the apparent overpayment to Ye, and apparent noncompliance with the Chinese land agreement's terms.  ¶¶157(c)-158.  MINISO's announcement of an investigation underscores the gravity of Blue Orca's findings.  ¶¶159-160.

EA Defendants also allegedly misrepresented the number of stores MINISO directly owned

versus Retail Partner stores, which misleadingly downplayed MINISO's exposure to decreased sales or increased expenses (¶¶140(a)-(j)), and they misleadingly reported increased expenses associated with the HQ land agreement without disclosing the impacts of Ye's JV underfunding (¶¶134-137).  Blue Orca partially corrected these statements, revealing MINISO's higher store ownership (up to 40%) and declining franchise fees, which illustrated difficulties attracting Retail Partners.  ¶¶157(a)-(b).  Plaintiffs allege earnings releases and analyst reports partially corrected the fraud by revealing negative metrics, which had greater impact on MINISO given the higher percentage of directly-owned stores.  ¶¶142-156.  They included: increased selling, distribution, and branding expenses (¶¶143-144, 149-150, 155-156); decreased revenues, profits, and margins (¶¶147-148, 151-154); decreased cash position (¶¶143-144); and analyst downgrades (¶¶145-146).

The January 26, February 23, and March 7, 2022 corrective disclosures (¶¶147, 151, 155) are exemplars: reduced operating profits (¶147), potential reduced margin (¶151), and higher than expected operating expenses (¶155) for MINISO stores all (i) would be less likely if Retail Partners—with more local knowledge and attention to their stores—operated the stores and (ii) hurt MINISO more where it owned and operated problem stores.

These allegations suffice.  Contrary to Memo at 24, claiming it "did not disclose any new facts," the Blue Orca report suffices as a corrective disclosure.  *Crivellaro v. Singularity Future Tech. Ltd.*, 2024 WL 5146051, at *8 n.6 (E.D.N.Y. Dec. 17, 2024) (short seller reports sufficient corrective disclosures despite repacking public information because they publicized red flags and exceeded "negative journalistic characterizations" of prior-disclosed facts).  Defendants argue (Memo at 24-25) the other alleged corrective disclosures "have nothing to do with the alleged fraud" and should be disregarded.[22]  However, to plead §10(b) loss causation, "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms. v. Broudo*, 544

---

[22]      Defendants cite only EA Pleading paragraphs (¶¶ 147, 151, 155, 211) for this argument.

U.S. 336, 347, (2005)).  Plaintiffs need only "plausibly allege…'the available public information regarding the company's financial condition was corrected,' and that the market reacted negatively to the corrective disclosure." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (quoting *In re Omnicron Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010)) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

### 2.    The SA Pleading

Loss causation is not a §11 claim element and ***need not be pled***.  *See* §II.A.3., III.B.1., *supra*.  The SA Pleading's loss causation allegations (§II.A.3., *supra*) only illustrate damages from market reactions to revelations.  ¶50(a)-(k).

Blue Orca's July 26, 2022 report first spotlighted the JV's underfunding, its complex and questionable structure, Ye's conflicts of interest, apparent noncompliance with the JV funding agreement, overpayment to Ye, and noncompliance with the Chinese land agreement's terms. ¶50(j).  While the JV's creation and Ye's buyout were earlier disclosed, the entire deal was extremely complex, with details trickling out over time.  Blue Orca synthesized the available information, added its own independent, China-based research, and explained the various agreements' materiality and ramifications.  Its report illustrated why the SA Defendants had materially misled investors by negligently omitting the JV transaction and companies used from the IPO Materials' lists of related party transactions and related parties respectively.  *Id.*

Blue Orca also revealed MINISO's pre-IPO fee declines, store closures, and shrinking revenues, that 600+ stores were registered to insiders including SA Defendant Li, and MINISO owned 10x as many stores as publicly disclosed in 2017-2019. ¶50(j).  Negative revelations about MINISO's post-IPO results, via an earnings release and analyst reports also illustrate damages (¶50(a)-(k)), because negative operating metrics and results had greater impacts on MINISO when arising in directly-owned stores rather than Retail Partner stores.  ¶50.  MINISO's investigation announcement further underscored the gravity of Blue Orca's findings.  ¶50(k).

Under §11, "any decline in value is presumed to be caused by the misrepresentation" and "defendant…bears the burden of proving that the price decline was not related to the

34

misrepresentations" as a "negative causation" affirmative defense. *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995). Defendants' burden is "heavy." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35-36 (2d Cir. 2009). It is typically adjudicated on a motion for summary judgment or at trial. *Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295, 310 (S.D.N.Y. 2023); *Chen v. Missfresh Ltd.*, 701 F. Supp. 3d 236, 250 (S.D.N.Y. 2023) (negative causation generally not properly raised on Rule 12(b)(6) motion and "typically requires expert testimony disaggregating the various causes of stock price movements"). Rule 12(b)(6) dismissal is permissible only in the "'unusual' case where 'negative causation is apparent on the face of the complaint." *Winter*, 686 F. Supp. 3d at 310. If "plaintiffs…raise a plausible inference that 'the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security,'" dismissal must be denied. *Id.* at 311 (quoting *Lentell*, 396 F.3d 173).

The SA Pleading passes muster. *Id.* at 311 (even where shipping delays already disclosed and competing explanation for post-corrective stock drop existed, Securities Act claim not dismissed); *Chen*, 701 F. Supp. 3d at 249-50 (same, even where stock already fell 95% below IPO price before any corrective disclosure and it recovered after the disclosure). It would be reversible error to dismiss the SA Pleading on loss causation grounds. *NECA-IBEW*, 693 F.3d at 156-57 (vacating ruling requiring out-of-pocket loss allegations for §11 claim); *Pappas*, 2024 WL 4588491 at *2 (vacating dismissal of Securities Act claims for applying wrong pleading standard).

### F.      The Control Person Claims Should Not Be Dismissed

As the Memo at 25 n.17 concedes, if the Securities Act §11 or Exchange Act §10(b) claims are upheld, even in part, the Securities Act §15 or Exchange Act §20(a) claims also survive.

## IV.    CONCLUSION

Plaintiffs respectfully ask that Defendants' Motion be denied or, alternatively, leave to further amend to address any remaining Court concerns. *Loreley*, 797 F.3d at 191 (Second Circuit encourages amendments, especially when case "combines a complex commercial reality with a long, multi-prong complaint," and district court's denying amendment "violated the liberal spirit

35

of Rule 15").[23]

Dated: September 16, 2025

Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*

Jeremy A. Lieberman
Matthew L. Tuccillo
Zachary Denver
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
zdenver@pomlaw.com

*Counsel for Lead Plaintiff the Nova Scotia Health Employees' Pension Plan and Lead Counsel for Plaintiffs and the Class*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
275 Madison Avenue
40th Floor
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Additional Counsel for Plaintiff Adeel Ashraf*

---

[23]    *See also, e.g.*, *Flag Telecom*, 574 F.3d at 33 (noting lower court permitted a fourth amended complaint where loss causation extensively litigated); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312-13 (S.D.N.Y. 2008) (granting leave to amend twice-amended complaint and noting "general policy that leave to amend should be granted liberally in cases alleging securities fraud").

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 16, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), and pursuant to the Order granting Plaintiffs' Letter Motion for Leave to File Excess Pages (ECF 121), I certify that Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss the Third Amended Complaint (ECF 115) contains 13,114 words, and is less than 37.5 pages, excluding items exempted by Local Civil Rule 7.1(c). In making this certification I have relied upon the word count of Microsoft Word, the word-processing system used to prepare the memorandum.

Dated: Fairfield, Connecticut
       September 16, 2025

>                                    */s/ Matthew L. Tuccillo*
>                                    Matthew L. Tuccillo