UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MINISO GROUP HOLDING LIMITED SECURITIES LITIGATION | **OPINION & ORDER** 22-cv-9864 (ER) |

RAMOS, D.J.

This securities fraud class action concerns MINISO Group Holding Ltd. ("MINISO" or "the Company"), a Chinese retailer of toys and lifestyle products. The Securities Act claims were brought by a class of individuals or entities who purchased or otherwise acquired MINISO American Depository Shares ("ADS") pursuant to or traceable to the Registration Statement, the Registration Statement Amendments, and the October 15, 2020 Prospectus ("Securities Act class"). Doc. 112. The Exchange Act claims were brought by a class of individuals or entities who purchased or otherwise acquired the ADS between December 11, 2020 and July 26, 2022 ("Exchange Act class"). According to the Third Amended Complaint ("TAC"),[1] MINISO made materially false and misleading statements about: (1) its franchise model (the "Retail Partner model"); (2) a joint venture with its chief executive officer, Guofu Ye, to build a new company headquarters; and (3) its business results as reported in publicly filed documents. Doc. 112.

Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") filed this action individually and on behalf of the Securities and Exchange Act classes. ¶ 1. There are eight defendants. Nova Scotia alleges claims against MINISO and four individuals: (1) Guofu Ye, the chief executive officer; (2) Saiyin Zhang, the chief financial officer; (3) Minxin Li, the executive vice president; and (4) Donald Puglisi, MINISO's duly authorized U.S. representative at the time of MINISO's initial public offering ("IPO") on the New York Stock Exchange, who is also the managing director of Puglisi &

---

[1] Unless otherwise noted, citations to "¶ _" refer to the TAC, Doc. 112.

Associates.  ¶¶ 11–15.  Puglisi & Associates is MINISO's authorized U.S. representative for purposes of the IPO and also listed as a Defendant (collectively with MINISO and four individual defendants "MINISO Defendants").  ¶ 16.  Moreover, Nova Scotia alleges claims against the investment banks who served as underwriters for the IPO—Goldman Sachs (Asia) LLC and BofA Securities, Inc. ("Underwriter Defendants).[2]

Before the Court is the motion to dismiss the TAC jointly filed by all Defendants pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6); as well as § 101(b) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4.  For the reasons set forth below, the motion is GRANTED.

## I.  BACKGROUND

### A.  Factual Background[3]

#### 1.  The Company

MINISO is incorporated in the Cayman Islands.  ¶ 11.  The majority of its operations are based in China.  ¶ 25.  MINISO is an "asset light" retail company built around the Retail Partner model.  *Id*.  The Retail Partner model is "a franchise-like store model with chain store characteristics."  ¶ 24.  Under this model, Retail Partners open MINISO stores at different locations, while shouldering the associated capital expenditure and operating expenses.  *Id*.  MINISO allegedly provides value under this model by allowing its Retail Partners to use its brand and providing them with "valuable guidance" on store operation, in exchange for a pre-agreed portion of in-store sale proceeds, management and consultancy fees, and an annual license fee, based on the quality of the store location and the number of stores owned by the Retail Partner.  *Id*.

---

[2] Count one of the TAC alleges violations of Section 11 of the Securities Act of 1933 ("Securities Act") against MINISO, Ye, Zhang, Li, Puglisi, Puglisi & Associates, Goldman Sachs (Asia) LLC, and BofA Securities, Inc.  Count two asserts violations of Section 15 of the Securities Act against Ye, Zhang, and Li. Count three alleges violations of Section 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934 ("Exchange Act") against MINISO, Ye, Zhang. Count four asserts violations of § 20(a) of the Exchange Act against Ye and Zhang.  Doc. 112.

[3] Familiarity with the facts underlying this action, which are set forth in the Court's Opinion and Order dismissing the SAC, Doc. 95, is assumed.

MINISO Retail Partners keep the balance of the sales proceeds, while MINISO retains ownership of inventory until in-store sales to customers are completed. *Id.* According to Nova Scotia, MINISO's success is highly dependent upon its Retail Partner model. ¶ 25.

MINISO primarily derives revenue from sales of lifestyle products (such as home décor, small electronics, textile, accessories, beauty tools, toys, cosmetics, personal care, perfumes, and stationary) to MINISO Retail Partners, sales to distributors, and retail sales in directly-operated stores and through online channels. ¶29(d); Doc. 117-2 at 91. Other sources of revenue include franchisee license fees, royalties, as well as management and consultation service fees. ¶ 29(d). Ye and his wife Yunyun Yang are the controlling shareholders of MINISO. ¶ 26. The Company launched an IPO on the New York Stock Exchange on October 15, 2020. ¶ 29.

2. *The Company's Alleged Misrepresentations*

a. *Representations During The IPO*

As part of the IPO process, MINISO filed several documents with the Securities Exchange Commission ("SEC"). The Company filed a Form F-1 registration statement (The Registration Statement) on September 23, 2020. ¶ 26(a). It filed a first amended Registration Statement on October 7, 2020, a second amended Registration Statement on October 13, 2020, and a third amended Registration Statement on October 14, 2020. ¶ 26(b). Ye, Zhang, Li, and Puglisi all signed the Registration Statement. ¶ 26(a). MINISO also filed a prospectus ("Prospectus") with the SEC on October 15, 2020. ¶ 26(c).

MINISO's Prospectus and Registration Statements (collectively, the "Offering Materials") made a number of disclosures. First, they made the following disclosures about the Retail Partner store model:[4]

---

[4] The TAC uses the terms "franchise store" and "Retail Partner store" interchangeably as MINISO itself did in the Offering Materials. *See, e.g.*, ¶¶ 29, 38, 48(a). This opinion uses the term "Retail Partner store" exclusively.

- "Outside of seven MINISO stores directly operated by us, substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2020." Doc. 117-1 (Registration Statement) at 92.

- "As of June 30, 2020, in international markets, there were over 120 stores directly operated by us and over 1,500 MINISO Retail Partner stores and stores under the distributor model." *Id*. at 131.

- "In strategic markets with large population [*sic*] and huge market potential such as North America and India, we typically enter the markets by opening and operating stores on our own." *Id*. at 131.

Second, they made the following disclosures about the use of the anticipated IPO proceeds and related party transactions:

- "We plan to use the net proceeds of this offering to expand our business operations as follows:  approximately 30% to expand our store network; approximately 30% to invest in our warehouse and logistics network; approximately 20% to invest in technologies and information systems; and the balance for general corporate purposes, which may include . . . expanding and upgrading our office space and facilities by acquiring land to build an office building . . . ." *Id*. at 78.

- Eleven related party transactions occurring in 2019–2020, all of which involved loans borrowed from Ye, interest free cash advances given to (and associated repayments made by) Ye or companies controlled by Ye, the "dispos[al] of certain loss-making subsidiaries" to companies controlled by Ye, and goods purchased from companies controlled by Ye or where Ye had "significant influence." *Id.* at 162–63.

Third, they made the following disclosures about MINISO's business operations:

- The "[n]egative impact of COVID-19 on our business operations in China has resulted in a decrease in our revenue." *Id*. at 27.

- "[U]nplanned store closures [due to COVID-19] . . . resulted in peak closures of over 60% of MINISO stores in China in early February . . . . As of June 30, 2020, over 20% of MINISO stores in overseas markets were closed." *Id.*

- "Our revenue per MINISO store has fluctuated significantly historically with a decrease of 19.8% from the fiscal year ended June 30, 2019 to the fiscal year ended June 30, 2020.  The decrease was primarily due to the outbreak of COVID-19, and an increasing number of new stores being opened in lower-tier cities . . . as well as increased competition issues we faced in 2019 and 2020." *Id.* at 28.

- "We plan to further expand and upgrade our store network both in China and globally and enhance our product development and supply chain capabilities. We face certain risks in executing these strategies and we cannot assure you

4

that we will be able to execute our growth strategies successfully and realize our expected growth." Doc. 117-2 (Prospectus) at 31.

- "If we fail to maintain the relationship with our MINISO Retail Partners or our local distributors or fail to attract new MINISO Retail Partners or local distributors to join our store network, our business, results of operations and financial condition could be materially and adversely affected." Doc. 117-1 at 25.

- "The impacts of COVID-19 and intensifying market competition resulted in a negative growth of same-store sales, while our store expansion led to a change in store mix. Same-store sales of MINISO stores in China decreased by 3.8% in the second half of 2019, compared to that in the second half of 2018, primarily due to increased competition in China. Same-store sales of MINISO stores in China decreased by 32.6% in the first half of 2020, compared to that in the first half of 2019, primarily due to the impact of COVID-19." Doc. 117-1 at 28.

Pursuant to the requirements of Section 406(c) of the Sarbanes Oxley Act, MINISO also filed its Code of Business Conduct and Ethics ("Code of Conduct") with the SEC as an attachment to the Registration Statement. ¶¶ 115, 194. The Code of Conduct provides that "an interested director or senior officer shall refrain from participating in any discussion among senior officers of the Company relating to an Interested Business and shall not be involved in any proposed transaction between the Company and an Interested Business." ¶ 115. The Code of Conduct also states that all employees have an obligation to comply with "the laws of the cities, provinces, regions and countries in which the Company operates" and specifies this includes insider regulations. ¶ 197.

MINISO filed a Form F-6 registration statement to register 500 million ADS on October 6, 2020. ¶ 108. On October 15, 2020, MINISO launched its IPO on the New York Stock Exchange, issuing 30.4 million ADS to the general public in the aggregate principal amount of $608 million. ¶ 109. Goldman Sachs (Asia) LLC and BofA Securities, Inc. agreed to purchase 30.4 million total ADS—which were separate from the shares available to the general public— and were granted the right to purchase up to an additional 4.56 million ADS to cover over-allotments. *Id.*

*b. Representations After The IPO*

On December 11, 2020, MINISO announced the formation and terms of a joint venture with YGF MC, a British Virgin Islands company controlled by Ye, to purchase a parcel of land to build a new headquarters in Guangzhou, China. ¶ 130; Doc. 112-1 at 4. MINISO stated the following in a press release:

- "MINISO formed a joint venture in the British Virgin Islands with YGF MC Limited, a company jointly controlled by [MINISO's] controlling shareholders, Ye and Ms. Yunyun Yang, to acquire land use right of a parcel of land in Guangzhou and to establish a new headquarters building for MINISO through such joint venture's subsidiary in Guangzhou." ¶ 130 (a) (alteration in original).

- "The Company holds 20% of the shares of the joint venture company while YGF MC holds the remaining 80% of the shares of the joint venture company. After the formation of the joint venture company, [MINISO] invested RMB.[5] 356 million in the joint venture company. YGF MC will invest RMB 1,424 million." *Id.* (alteration in original).

- "The total investment for the headquarters building project is estimated to be approximately RMB 2,885 million, including approximately RMB 1,780 million as consideration for acquisition of land use right and the remaining as building costs. The joint venture company will participate in the public bidding process for the land use right and make deposit payments representing 20% of the purchase price for the land use right in December 2020." *Id.*

On September 26, 2021, MINISO announced that it bought out Ye's 80% stake in the joint venture for "roughly" $108.3 million, ¶ 132, with the approval of the board of directors and the audit committee. ¶ 133(c). MINISO stated the following in the press release:

- "The total consideration of this transaction is estimated to be approximately RMB 700.4 million, representing the lower of the actual investment amount by YGF MC as of August 31, 2021 and the appraisal value of the equity interests confirmed by a third-party valuation firm, deducted by the estimated accumulative loss of YGF Investment that YGF MC should bear up to the closing of this transaction." ¶ 132.

---

[5] RMB is the abbreviation for renminbi, the official currency of China.

6

- "In January 2021, YGF Investment's [People's Republic of China] subsidiary acquired land use right of a parcel of land in Guangzhou for approximately RMB 1,780 million, which shall be paid by two equal installments. As of the date of this press release, the first installment has been paid . . . The total investment for the headquarters building project, including the consideration for acquisition of land use right, is estimated to be approximately RMB 2,885 million. [MINISO] currently intends to support the subsequent capital expenditures of the project with its cash surplus, future cash flows from operating activities and potential bank financing." *Id.* (alteration in original)

The joint venture had a Hong Kong subsidiary, YGF Investment V Hong Kong Limited, which in turn owned a Chinese subsidiary, Mingyou Industrial Investment (Guangzhou) Co. Ltd. ("Mingyou Industrial"). Doc. 112-1 at 4. The joint venture used Mingyou Industrial to acquire a parcel of land in Guangzhou, China, for the new headquarters. ¶ 129. Specifically, Mingyou Industrial entered into a land contract with the Chinese government, which limited the use of the land to the construction of MINISO's regional headquarters and prohibited the purchaser's change of ownership structure for 10 years after the contract was executed. *Id.*; ¶ 49(j).

Following the buyout, MINISO issued an earning press release on March 3, 2022. The release stated:

- "General and administrative expenses were RMB 221.4 million ($34.7 million), representing an increase of 17.1% year over year. Excluding share-based compensation expenses, general and administrative expenses were RMB 214.7 million (US $33.7 million), representing an increase of 34.0% year over year. The year-over-year increase was primarily due to increased depreciation and amortization expenses [for] land use right related to the Company's headquarter[s] building project, and to a lesser extent, increased personnel-related expenses and professional service fees." ¶ 134.

Meanwhile, post-IPO, MINISO continued to make the representation that only a very small number and percentage of MINISO stores are Company-owned. ¶ 140. For example, in the 2021 Form 20-F, MINISO stated:

- "Outside of five MINISO stores directly operated by us [], substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2021." ¶ 140(e).

- ▪ "As of June 30, 2021, over 95% of MINISO stores in our global network were established and operated by our MINISO Retail Partners and local distributors." *Id.*

c.  *Blue Orca Report*

On July 26, 2022, a short seller, Blue Orca Capital, issued a report regarding MINISO's business. ¶¶ 157, 170.  The Blue Orca Report claimed that contrary to MINISO's representation that the vast majority of stores in China employ the Retail Partner model, a "Chinese corporate registry" and two pre-IPO articles revealed that MINISO or MINISO insiders directly owned and operated hundreds of stores in China. ¶ 157(a).  In the corporate registry, Blue Orca claimed to have found 620 MINISO stores in China that "are registered under the names of MINISO executives or individuals closely connected to the Company's chairman." *Id.*  Blue Orca also cited (1) a 2017 article that claimed a MINISO brand director "said in an interview that most MINISO stores in tier one cities in China are operated by the Company and that franchising is only limited to lower tier cities," and (2) a 2019 article from Yicai Media, the financial news arm of Shanghai Media Group (a state-owned media conglomerate), that reported "40% of MINISO stores are owned by the Company." *Id.*  According to Blue Orca, a MINISO franchisee also said MINISO had 1,000 company-owned stores in 2019. *Id.*  Finally, the Blue Orca Report claimed to have reviewed Chinese government reports for Mingyou Industrial that showed that the joint venture's paid-in-capital remained at the level of MINISO's initial monetary contribution until the day after it bought out Ye's stake. ¶ 157(c).

On July 27, 2022, MINISO announced that an independent committee of its board of directors would investigate the allegations in the Blue Orca Report. ¶ 159.  On July 28, 2022, MINISO issued a press release refuting the allegations. ¶ 43.  Among other things, MINISO explained why MINISO employees' information appeared in the corporate registration of some MINISO stores. ¶ 44.  It acknowledged that some MINISO employees provided their names and contact information to local authorities

without the Company's approval while assisting Retail Partner stores with administrative tasks. *Id.* According to MINISO, these unapproved practices have been substantially curtailed. *Id.*

### d. *Nova Scotia's Investigative Efforts*

Before bringing this action, Nova Scotia also conducted an independent investigation that "confirmed the core factual bases" of the Blue Orca Report. [6] ¶¶ 39–42, 120–23. Specifically, Nova Scotia accessed Chinese corporate registry data through Qichacha, a private Chinese corporate data provider, and allegedly confirmed extensive insider store ownership, ¶¶ 40(b), 121(b); found "suspicious changes" in store ownership registration after the Blue Orca report's publication, *Id.*; and concluded that 210 stores were registered to a single phone number allegedly used by Li, MINISO's executive vice president. *Id.* According to Nova Scotia, the investigation also confirmed:

- That Yicai Media, the financial news arm of Shanghai Media Group, published a November 3, 2019 article stating that MINISO derived 40% of its sales from Company-owned stores.[7] ¶ 40(b);

- Yicai Media is owned by two Chinese state-owned entities. The U.S. government recognized Yicai Media as Chinese state-media and designated the U.S. operations of Yicai Global—Yicai's English language news service—as a foreign mission. *Id.*;

- That the underlying entity of the joint venture was initially incorporated by Ye on August 26, 2020. After MINISO and YGF MC entered into a Capital Increase Agreement on December 11, 2020, MINISO owned 20% of the joint venture and Ye owned 80% through YGF MC. ¶ 41(b);

- That YGF MC was incorporated by Ye on November 26, 2019. Mingyou, the entity who entered into the land use right contract with the Chinese government, was incorporated on October 13, 2020. *Id.*;

- That MINISO contributed RMB 345.7 million to the joint venture on December 11, 2020, and Mingyou's paid-in-capital remained at this

---

[6] Nova Scotia does not specify the date of their investigation.

[7] According to the TAC, the Yicai article "stated that MINISO derived 40% of its sales from company-owned stores, a figure that supports MINISO's 40% store ownership (Blue Orca's conclusion), rather than the 3% store ownership MINISO claimed." ¶ 40(b).

9

level until October 28, 2021, the day after MINISO bought out YGF MC's shares in the joint venture. *Id*.;

- That through Mingyou, the joint venture entered into a land contract with the Chinese government barring ownership changes for 10 years. *Id*.; and

- That according to a report by Tencent Media, MINISO closed 850 stores by March 2019 and lowered franchise fees 63% over two years. ¶ 123(b);

Nova Scotia also alleges that certain confidential witnesses ("CWs") who worked in MINISO's North American stores stated that the Company owned most of the MINISO U.S. stores. ¶¶ 95–102, 116. In addition, a confidential former employee ("FE1"), who was a MINISO district manager in the U.S. until 2019, alleges that the internal MINISO spread sheets and sales reports that FE1 saw did not include separate tabs for Retail Partner stores or reflect separate data on Retail Partner stores in any other way. ¶ 38. FE1 also claims that the Company's focus was on increasing the profitability of Company-owned stores. *Id*. Based on the manner of data reporting and the business strategy, FE1 concluded that the majority of MINISO's stores, both in China and internationally, were Company-owned. *Id.*

## B. Procedural Background

The initial complaint in this action was filed by plaintiff Adeel Ashraf in the Central District of California on August 17, 2022. Doc. 1. After reviewing two plaintiffs' motions as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Central District of California appointed Nova Scotia as lead plaintiff. Doc. 22. The Central District of California certified the class action on November 8, 2022. Nov. 8, 2022 Minute Entry. The parties stipulated to transfer the case to the Southern District of New York, pursuant to a forum selection clause in the depository agreement governing the MINISO ADS. Doc. 32. The transfer was ordered on November 15, 2022. Doc. 33. Nova Scotia filed its first amended complaint on February 2, 2023, and filed the Second Amended Complaint ("SAC") on April 24, 2023. Docs. 47,

60.  MINISO, Puglisi, and Puglisi & Associates filed a joint motion to dismiss the SAC on June 23, 2023.  Doc. 61.  That same day, BofA, and Goldman Sachs joined the existing motion to dismiss the SAC, and filed their own motion to dismiss.  Doc. 64.  The motion to dismiss the SAC was granted by the Court on February 23, 2024.  Doc. 95.  Plaintiffs filed a motion for reconsideration on March 22, 2024, Doc. 101, which was denied with leave to amend on March 30, 2025.  Doc. 109.  Plaintiffs filed the TAC on April 30, 2025. Doc. 112.  All of Defendants jointly filed the instant motion to dismiss the TAC on June 30, 2025.  Doc. 115.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

11

### B. Heightened Pleading Standard under Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'"); *see also In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d 283, 300 n.17 (S.D.N.Y. 2021) (applying particularity standards to Securities Act claims notwithstanding plaintiffs' separation of claims and disclaimers of fraud).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).

Like Rule 9(b), the PSLRA requires that securities fraud complaints "specify each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); s*ee also, e.g.*, *Slayton v. American Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (same).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Securities Litigation,* 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

### C.  External Documents

In resolving a motion to dismiss, the Court may consider documents that are "referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. App'x. 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  The Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)); *see also In re Bank of America AIG Disclosure Securities Litig*ation, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. App'x. 93 (2d Cir. 2014) (summary order).  Defendants attach the following documents to their motions to dismiss:

- Registration Statement dated October 14, 2020
- Prospectus dated October 14, 2020
- Form 6-K dated December 11, 2020 (press release, "MINISO Announces Joint Venture for Headquarters Building Project in Guangzhou")

- Form 6-K dated December 18, 2020 (press release, "MINISO Announces Unaudited Results for the 2021 First Fiscal Quarter Ended September 30, 2020")

- Form 6-K dated February 25, 2021 (press release, "MINISO Announces Unaudited Results for the Second Quarter of Fiscal Year 2021")

- Form 6-K dated May 20, 2021 (press release, "MINISO Announces Unaudited Results for the Third Quarter of Fiscal Year 2021")

- Form 6-K dated August 19, 2021 (press release, "MINISO Group Announces June Quarter and Full Fiscal Year 2021 Results")

- Transcript of fourth fiscal quarter 2021 earnings call, dated August 19, 2021

- Form 20-F dated September 17, 2021(2021 annual report)

- Form 6-K dated September 27, 2021 (press release, "MINISO Group Announces Acquisition of Remaining Stake in a Joint Venture for its Headquarters Building Project")

- Form 6-K dated November 19, 2021 (press release, "MINISO Group Announces September Quarter 2021 Results")

- Form 6-K dated March 4, 2022 (press release, "MINISO Group Announces December Quarter 2021 Results")

- Form 6-K dated March 31, 2022 (first supplemental disclosures to 2021 Form 20–F)

- Form 6-K dated May 26, 2022 (press release, "MINISO Group Announces March Quarter 2022 Results")

- Form 6-K dated June 27, 2022 (second supplemental disclosures to 2021 Form 20–F dated 2021)

- Form 6-K dated July 27, 2022 (press release, "Voluntary Announcement")

- Form 6-K dated July 28, 2022 (press release, "MINISO Refutes Blue Orca's Short Seller Report")

- Form 6-K dated September 15, 2022 (press release, "MINISO Announces Substantial Completion of Independent Investigation")

- Equity Transfer Agreement dated September 23, 2021

- Chart showing MINISO stock prices from October 15, 2020 – June 27, 2025

See Doc. 117. The TAC cites the vast majority of the documents attached to Defendants'

motion.[8] A district court is entitled to consider "the full text of those documents"

---

[8] The TAC cites all the documents listed, except for the Form 6-K dated September 15, 2022 (press release, "MINISO Announces Substantial Completion of Independent Investigation"), and the chart showing MINISO stock prices from October 15, 2020 to June 27, 2025.

partially quoted in a complaint but considered integral to ruling on a motion to dismiss. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996). Here, partially quoted securities filings are integral to a complaint based on securities fraud. Accordingly, the TAC incorporates these documents by reference and the Court will consider them in deciding the present motion.

Regarding the documents not cited in the TAC—the Form 6-K dated September 15, 2022 and a chart showing MINISO stock prices from October 15, 2020 to June 27, 2025—the Court may "take judicial notice of public disclosure documents that must be filed with the SEC" as well as documents that both "bear on the adequacy of SEC disclosures and are public disclosure documents required by law," *Silsby*, 17 F. Supp. 3d at 354, and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008)). Nova Scotia also does not raise any objection to the Court's consideration of the majority of the attached documents. Accordingly, this Court may take judicial notice of the majority of the documents attached to the Defendants' motions to dismiss.[9]

## III.   DISCUSSION

### A.  Pleading Standard for the Securities Act Claims

The parties dispute whether the Securities Act claims are subject to the heightened pleading standard under Rule 9(b). Nova Scotia argues that its Securities Act claims are not subject to the heightened standard because they are physically separated from its Exchange Act claims, expressly disclaim fraud, scienter, or recklessness, and only plead negligence. Doc. 122 at 15–16. In addition, it argues that the Securities Act claims

---

[9] Nova Scotia does raise objection to the consideration of MINISO's stock prices post-October 24, 2022 and Defendants' arguments based on that portion of the chart. Doc. 122 at 5 n. 4. The Court will not consider that portion of the chart.

against Li, Puglisi, Puglisi & Associates, Goldman Sachs, and BofA, in particular, should not be subject to Rule 9 because there are no Exchange Act claims against them in the TAC. *Id.* at 16. Defendants, however, argue that the Securities Act and Exchange Act claims rely on the same theories and both allege fraud. Doc. 123 at 2.

Securities Act claims are subject to the heightened pleading requirements of Rule 9(b) if they sound in fraud. *See Rombach*, 355 F.3d at 170. A claim sounds in fraud when fraud is an "integral part of the conduct giving rise to the claim." *In re Beacon Associates Litigation*, 745 F. Supp. 2d 386, 434 (S.D.N.Y. 2010). Courts should examine if the claims contain wording and imputations classically associated with fraud. *Rombach*, 355 F.3d at 172. Formalisms, such as simply separating the Securities Act claims from the Exchange Act claims or inserting disclaimer of fraud, are insufficient. *City of Omaha Police & Fire Retirement System v. Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379, 402 (S.D.N.Y. 2020).

But the Rule 8 notice pleading standard can be retained "by expressly pleading negligence, disclaiming fraud, eschewing language . . . implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (summary order). Moreover, the mere fact that the Securities Act and Exchange Act allegations overlap is insufficient to subject the Securities Act claims to Rule 9(b). *Van v. Bright Health Group, Inc.*, No. 24-3132-CV, 2025 WL 3171688, at *2 (2d Cir. Nov. 13, 2025) (summary order) (holding that the Securities Act claims are not subject to Rule 9(b) when the Securities Act and Exchange Act claims are physically separated and the Exchange Act claims allege additional misrepresentations, in spite of overlapping allegations).

Here, the TAC physically and temporally separates the Securities Act claims and the Exchange Act claims. The Securities Act claims are set forth in the first half of the TAC, ¶¶ 2–77, alleging misrepresentations in MINISO's Offering Materials filed during

16

the period between September and October 2020, against all Defendants.  The Exchange Act claims are in the second half of the TAC, ¶¶ 78–241, alleging misrepresentation in post-IPO materials published for the period between December 2020 and June 2022, only against Defendants MINISO, Ye, and Zhang (collectively "Exchange Act Defendants"), ¶ 83.

Specifically, the Securities Act claims allege that Defendants:  (1) negligently misrepresented what percentage of MINISO stores[10] are Retail Partner stores, ¶ 47 ("Retail Partner store claim");[11] (2) negligently failed to disclose the upcoming joint venture transaction and misrepresented how MINISO would use the IPO funds, *Id*. ("joint venture claim"); and (3) negligently failed to disclose the negative pre-IPO profitability trend and the reasons behind it, *Id*. ("pre-IPO profitability claim").  Meanwhile, the Exchange Act claims allege that Exchange Act Defendants misrepresented or omitted: (1) what percentage of MINISO stores are Retail Partner stores post-IPO, ¶ 85; (2) that MINISO and Ye had formed a British Virgin Islands joint venture, which Ye held 80% of and MINISO held 20% of, ¶ 83; (3) that Ye would contribute 80% of the fund for the headquarters project for a commensurate stake, *Id*.; and (4) a series of details related to the joint venture transaction, ¶ 84.

---

[10] The Securities Act allegations are inconsistent with regard to whether it alleges misrepresentations regarding MINISO stores in China or both in China and internationally.  A summary paragraph alleges the Offering Materials misrepresented "the extent of MINISO's direct store ownership in China."  ¶ 47.  But the following paragraphs cite MINISO statements on stores both in China and internationally and allege that "[d]espite the IPO Materials' statements to the contrary, a material percentage of MINISO's stores, both in China and globally . . . were not bona fide Retail Partner franchise stores."  ¶¶ 47(a), 48.  The Securities Act allegations also state that "the majority of MINISO's stores, both in China and internationally, were [C]ompany-owned."  ¶ 38.  Accordingly, the Court presumes the Securities Act allegations involve misrepresentations regarding store ownership both in China and internationally, as the substantive paragraphs above indicate.  But as discussed below, even if the TAC only alleges misrepresentations regarding stores in China, the Court still concludes that there were no relevant material misrepresentations or omissions.

[11] In addition, the TAC alleges that at a minimum, the IPO Materials negligently failed to disclose that the corporate registrations of over 600 MINISO China stores were false and as a reasonable inference, the stores were not owned by regular Retail Partner franchise but by MINISO or insiders.  ¶ 46.

Previously, the Court applied the Rule 9(b) standard to all Securities Act claims in the SAC.  The TAC made substantive changes to its claims that compel using the lower standard to some of the Securities Act claims.  The Court concludes that for the TAC, the Securities Act claims against the Underwriter Defendants are reviewed under Rule 8(a).  For the rest of the Defendants, the pre-IPO profitability claim pursuant to the Securities Act is subject to Rule 8(a), and the Retail Partner store claim and joint venture claim are subject to the heightened pleading standard pursuant to Rule 9(b).

### 1.  Underwriter Defendants

The underwriters' liability rests on their failure to perform adequate due diligence and negligence in preparing the Offering Materials.  ¶ 22.  The Securities Act Section 11 claim against underwriters Goldman Sachs and BofA is therefore not subject to Rule 9(b) because it sounds in negligence.  *See Rombach*, 355 F.3d at 178 (holding that Securities Act claims against underwriters are not subject to Rule 9(b) because their liability rests on their duty to make reasonable investigation of the statements in prospectus); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (holding that the Securities Act claims against the underwriter defendant are not subject to Rule 9(b) because plaintiffs only allege that the underwriter defendant acted negligently in preparing the registration statement and prospectus).

### 2.  MINISO Defendants

For rest of Defendants, the Court concludes that the Retail Partner store claim and the joint venture claim pursuant to the Securities Act are subject to Rule 9(b) while the pre-IPO profitability claim is not.

#### a.  The Securities Act Retail Partner Store Claim

The Securities Act Retail Partner store claim sounds in fraud.  First, the claim contains wording and imputations classically associated with fraud.  *See Rombach*, 355 F.3d at 172.  The Securities Act allegations repeatedly assert that MINISO described the Retail Partner model as a major competitive advantage and a primary driving force for its

18

revenue and expansion, ¶¶ 24–25, 29(c)(d), 47(a).  When the TAC asserts that Retail Partner stores only made up 60% of MINISO stores, not 97% as MINISO claimed, it is in effect accusing MINISO of misrepresenting its core business.  Second, the Securities Act and Exchange Act Retail Partner store claims rest on the same theory:  that MINISO misrepresented what percentage of MINISO stores are Retail Partner stores.[12]  ¶¶ 47(a), 85.  In cases involving nearly identical Securities Act and Exchange Act claims, such as the claims here, courts in this district apply the heightened pleading standard. [13]  *See In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d at 300 n.17 (applying heightened pleading standard when Securities Act and Exchange Act claims were "almost a mirror image" of one another); *In re Farfetch Ltd. Securities Litigation*, 2021 WL 4461264, at *8 n.3 (S.D.N.Y. Sept. 29, 2021) (applying heightened standard to the Securities Act claims because "[e]very statement that [p]laintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act"), *aff'd sub nom. IAM National Pension Fund v. Farfetch Ltd.*, No. 21-cv-2752, 2023 WL 2879304 (2d Cir. Apr. 11, 2023); *In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015) (similar).

### b.  *The Securities Act Joint Venture Claim*

The Securities Act joint venture claim is also premised on allegations of fraud.  Although this claim does not explicitly allege that MINISO Defendants intentionally

---

[12] The Securities Act claims allege MINISO misrepresented the percentage of Retail Partner store at the time of the IPO, while the Exchange Act claims allege MINISO misrepresented the percentage of franchise store after IPO.  ¶¶ 47(a), 85.  The Court concludes the two claims rest on the same theory despite the different time frames, because the statements are alleged to be misleading for the same reasons.  *In re Farfetch Ltd. Securities Litigation*, No. 19-cv-08657 (AJN), 2021 WL 4461264, at *8 n.3 (S.D.N.Y. Sept. 29, 2021) (applying heightened standard to the Securities Act claims because "[e]very statement that [p]laintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act.").  The differentiation is merely formalistic and insufficient.  *City of Omaha Police & Fire Retirement System*, 450 F. Supp. 3d at 402.

[13] Nova Scotia's cases are inapposite.  *See In re China Valves Technology Security Litigation*, 979 F. Supp. 2d 395, 415 (S.D.N.Y. 2013) (Securities Act claims avoid any allegation of fraud); *In re Wachovia Equity Security Litigation*, 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011) ("mere use of [] statutory language . . . insufficient" to trigger Rule 9(b)); *In re OSG Securities Litigation*, 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) (similar).

19

concealed information related to the joint venture, it characterizes the joint venture transaction as suspicious, implying that the omission was a purposeful part of the fraud. *Cf. Pappas*, 2024 WL 4588491, at *2 (summary order) (plaintiffs can retain application of Rule 8 by among other things, "eschewing language . . . implying fraud or the elements thereof").[14]  For example, the Securities Act joint venture claim alleges that:  the joint venture transaction is "unusually convoluted"; "instead of MINISO's using the bulk of that portion of IPO funds directly to purchase land rights and build its [headquarters] … MINISO entered into a [British Virgin Islands joint venture] with YGF MC"; and "MINISO never explained why a [British Virgin Islands joint venture] was needed or even advantageous as a way to acquire land in China."  ¶ 48(b).  In addition, the Securities Act pleading also takes pain to describe how Ye was paid more than he deserved in the joint venture transaction.  *Id.*; ¶ 49(j).

  *c.  The Securities Act Pre-IPO Profitability claim*

  The Securities Act pre-IPO profitability claim does not sound in fraud.  No fraudulent conduct was alleged in the TAC.  Defendants argue that the Securities Act profitability claim rests on the same theory as the Exchange Act claim.  Doc. 123 at 2.  The Exchange Act pleading, however, does not include a profitability claim.  ¶¶ 83–87.

  Nova Scotia argues that the Securities Act claims against Li, Puglisi, and Puglisi & Associates should not be subject to Rule 9 because there are no Exchange Act claims

---

[14] Nova Scotia cites *Pappas v. Qutoutiao Inc*, 2024 WL 4588491, to support applying Rule 8 to the Securities Act claims.  In *Pappas*, the Second Circuit held that Rule 8 pleading standard should be applied to the Securities Act claim that Qutoutiao negligently failed to disclose its profit-seeking business strategies to disseminate illegal advertisements.  The Second Circuit held that it is possible for the signer and underwriter defendants to negligently fail to disclose conduct that other employees engaged in intentionally.  *Id.* at *2.  The present case is distinguishable because assuming the joint venture transaction is fraudulent, as the TAC implies here, it is less likely that Defendants failed to disclose it merely due to negligence.  The $108 million joint venture transaction was a major event, considering MINISO raised $625.3 million in the IPO.  Comparatively, the illegal advertisements were not central to Qutoutiao's business because only some of the advertisements placed by Qutoutiao were illegal.  *In re Qutoutiao, Inc. Securities Litigation*, No. 20-cv-6707 (SHS), 2023 WL 4977499, at *14 (S.D.N.Y. Aug. 3, 2023).  In addition, some Defendants in the present case, such as Ye and MINISO are directly involved in the joint venture transaction, unlike in *Pappas* where the defendants likely did not participate in the intentional placement of the illegal advertisements.

against them in the TAC.  Doc. 122 at 16.  But a Securities Act claim can independently be premised on fraud without an Exchange Act counterpart as long as the Securities Act claim is based on a theory of fraud.  *See Rombach*, 355 F.3d at 172 (concluding that the Securities Act claims sound in fraud and subject to Rule 9(b) without analyzing the similarity between the Securities Act and Exchange Act claims).

### B.  Nova Scotia Fails to Allege Any Material Misstatements or Omissions

1. *Nova Scotia Does Not Allege Any Material Misstatement or Omission in MINISO's IPO Materials*

Nova Scotia's Securities Act claims are based on the Offering Materials for MINISO's IPO in October 2020.  Specifically, Nova Scotia challenges statements regarding:  (1) what percentage of MINISO stores are Retail Partner stores, ¶¶ 47(a)(d), 48(a); (2) expected uses of the IPO proceeds, ¶¶ 47(b), 48(b); (3) joint venture transactions, ¶¶ 47(c), 48(b); and the disclosure of pre-IPO financial data, ¶¶ 47(e), 48(c). Each argument is unavailing.

a. *The Offering Materials Did Not Materially Misrepresent the Percentage of MINISO Retail Partner stores*

i. *MINISO Defendants*

The Offering Materials represented that "substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2020" and "in international markets, there were over 120 stores directly operated by us and over 1,500 MINISO Retail Partner stores and stores under the distributor model."  ¶ 47(a). Nova Scotia claims that these disclosures were false or misleading because a material percentage of MINISO stores were owned by MINISO or individuals closely tied to Ye, and thus these stores were not *bona fide* Retail Partner stores.  ¶¶ 48(a)(d).  However, Nova Scotia fails to sufficiently allege falsity.

The Securities Act Retail Partner store claim primarily relies on:  the statement of Former Employee 1("FE1"); the Blue Orca report; Plaintiffs' verification of the Blue Orca report based on the Chinese corporate registry information provided by Qichacha

and an article by Yicai Media; and MINISO's July 28, 2022 response to the Blue Orca report. ¶¶ 37–38, 40, 43–46. In the Opinion granting the motion to dismiss the SAC, the Court held that the SAC failed to allege any material misrepresentations regarding the percentage of Retail Partner stores. Doc. 95 at 20. The TAC includes additional information, namely, the statement of FE1, the state-controlled status of Yicai Media, and MINISO's July 28, 2022 response. However, these additional allegations do not bolster Nova Scotia's claim.

The Court finds FE1's statement speculative. *Twombly*, 550 U.S. at 555 (holding that it is a plaintiff's obligation to plead factual allegations sufficient "to raise a right to relief above the speculative level"). FE1 concludes that the majority of MINISO stores are Company-owned, exclusively on the ground that: (1) the internal spreadsheets and reports he saw "did not include separate tabs or separate tallies tracking numbers for [Retail Partner stores]" and "did not reflect any separate revenue stream or data for [Retail Partner stores];" and (2) the Company focused on increasing profitability of Company-owned stores. ¶ 38. But plausibility depends on "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). Here, since FE1 worked in the U.S., where MINISO typically operated its own stores, Doc. 117-1 at 131, it was reasonable for MINISO to show FE1 only data without separate labels for Retail Partner stores. For the same reason, it was natural for MINISO to emphasize Company-owned store sales to FE1. ¶ 38. Such emphasis does not plausibly bear on the overall percentage of Company-owned store in China and internationally.

The additional information concerning the relationship between Yicai Media and the Chinese government also does not add to Nova Scotia's claim. According to the TAC, the Blue Orca Report relied on "a November 2019 article published by the financial news arm of the Chinese state-owned Shanghai Media Group[,] stating *40% of MINISO's stores were owned and operated* by the company itself." ¶ 40(a). To independently

22

verify the Blue Orca Report, Nova Scotia obtained that Yicai Media article.  ¶ 40(b). According to Nova Scotia's translation of the article, it stated that "MINISO derived *40% of its sales* from [C]ompany-owned stores."  *Id*.  While that figure "supports MINISO's 40% store ownership (Blue Orca's conclusion), rather than the 3% store ownership MINISO claimed," it does not state what the Blue Orca report's translation claims.  *Id*. The differences in the translation are substantive.  At the very least, the TAC's translation gives the store ownership claim less support.

In any event, even assuming the Yicai article states what Nova Scotia's translation claims, the additional information alleged by the TAC does not add to Nova Scotia's claim.  Given the "severe consequences" of providing inaccurate information to a state-owned media that was designated as "foreign mission" by the U.S. State Department, Nova Scotia argues, MINISO would not provide inaccurate information to Yicai.  ¶ 40; Doc. 122 at 24–25.  However, without specifying what severe consequences are and why there would be such consequences, Nova Scotia fails to plead above speculative level why MINISO would provide more accurate information to Yicai.  *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (holding that plaintiffs must plead their sources with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").  Moreover, regardless of its accuracy, the Yicai report on revenue does not substantiate Nova Scotia's allegation about store ownership because revenue does not necessarily correlate to the number of stores. Nova Scotia argues that no matter what, 3% of the stores could not have reasonably produced 40% of revenue.  Doc. 122 at 25.  But the Court finds the alternative inference sufficiently reasonable to rebut the inference made by Nova Scotia, especially if the Company-owned stores were located in major cities and Retail Partner stores were limited to lower tier cities.  *See* ¶ 40(a).

Nova Scotia's reliance on MINISO's July 28, 2022 response also fails.  In 2022, Blue Orca published a report claiming that names and contact information of some

23

MINISO employees showed up on the corporate registration record of over 620 MINISO stores. *Id.* In response to the report, MINISO acknowledged that some MINISO employees provided their names and contact information to local authorities without the Company's approval while assisting Retail Partner stores with administrative tasks. ¶ 44. This response does not bear on the ownership of MINISO stores. Nova Scotia also alleges that at minimum, MINISO's response reveals that the corporate registration of over 620 MINISO stores was false. But the corporate registrations provided by Qichacha only listed the MINISO employees as "connected to," instead of owning, the stores. ¶ 40(b). Nova Scotia fails to plead sufficient facts to show how these registrations are false.

### ii. Underwriter Defendants

Nova Scotia's claims against Underwriter Defendants are subject to Rule 8(a) notice pleading standard. But the TAC fails to plead sufficient facts to allege the Retail Partner claim even under the Rule 8(a) standard.

As the Court has previously held, the Blue Orca Report and materials it relies on failed to demonstrate that the challenged statements were false at the time of IPO, which was the time the statements were made. Doc. 95 at 6. In addition, as discussed above, the rest of the allegations regarding the percentage of Retail Partner stores in TAC are merely speculative and fail even under the Rule 8(a) standard.

### b. *The Offering Materials Did Not Misrepresent the Joint Venture Transaction*
### i. *Use of IPO Proceeds Claim*

The TAC alleges that the Offering Materials misrepresented the joint venture transaction because the IPO proceeds were not used as disclosed in the materials. ¶¶ 47(b), 48(b). Specifically, the TAC alleges that MINISO spent the entire 20% of the IPO proceeds on the headquarters project, while the Offering Materials represented that 20% of the proceeds may be used for a list of "general corporate purposes," including building new headquarters. *Id.* The TAC also alleges the representation was misleading

24

because MINISO acquired the land through a joint venture with Ye, instead of purchasing the land directly. ¶ 48(b). These allegations fail even under the Rule 8(a) standard.

First, the Offering Materials did not make any representations regarding the allocation of the 20% proceeds among all the "general corporate purposes" listed. Thus, there could not be any misrepresentation regarding how the 20% proceeds were allocated between the headquarters project and other general corporate purposes. *See In re Coty Inc. Securities Litigation*, No. 14-cv-919, 2016 WL 1271065, at *9 (S.D.N.Y. Mar. 29, 2016) (holding that Securities Act claims cannot be based on an alleged "implicit promise"). Similarly, the TAC does not allege that MINISO made any representation on the manner in which the land would be acquired. Thus, MINISO couldn't have made relevant misrepresentation.[15]

### ii. Related-party Transaction

The TAC also alleges that the Offering Materials omitted any reference to the joint venture transaction and the entities which had been incorporated as "initial steps" for the transaction, including YGF Investment, YGF HK, and Mingyou, in the "Related-party Transaction" section of the Offering Materials. ¶ 47(c). The Court previously held that even if MINISO were contemplating the joint venture at the time of the IPO, there is no duty for MINISO to disclose the plan. Doc. 95 at 24. MINISO and Ye did not launch the joint venture until December 2020—two months after the IPO. ¶ 188. Nova Scotia argues that the TAC establishes the duty to disclose by: (1) pleading Ye created the four companies used in the joint venture transaction one year prior to the IPO; (2) attaching the four companies' incorporation documents to the complaint; and (3) diagramming the structure of these companies and the joint venture transaction. Doc. 122 at 17. But these

---

[15] In its memorandum of law in opposition to the motion to dismiss, Nova Scotia argues that the total amount spent on the joint venture transaction exceeded 20% of IPO proceeds, which makes the IPO proceeds statement a material misrepresentation. Doc. 122 at 18. As Defendants argue, however, this allegation, was not raised in the TAC. The Court will not consider this allegation as a part of the complaint. *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp. 2d 429, 436 (S.D.N.Y. 2003) (holding that complaints should not be amended by way of briefs).

additional allegations, at a maximum, can only possibly show that MINISO was contemplating the joint venture transaction at the time of the IPO, which does not create a duty to disclose. *See In re Centerline Holding Co. Securities Litigation*, 380 F. App'x 91, 94 (2d Cir. 2010) (summary order) (finding no affirmative duty to disclose future plans when the omission did not render other affirmative statements misleading); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize). Accordingly, the TAC fails to establish that the Offering Materials should have disclosed the transaction and these entities. Thus this claim fails under the Rule 8(a) standard.

### iii. Pre-IPO Profitability Trend

The TAC claims that the Offering Materials failed to disclose the 2018 to 2019 decline in MINISO's revenue and profitability on a per-store and overall basis. ¶ 48(c). It also alleges that the Offering Materials failed to disclose the negative trend that caused the decline. *Id*. But the TAC fails to plead any actionable omissions even under the Rule 8(a) standard.

An omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. *See In re Time Warner Inc. Securities Litigations*, 9 F.3d 259, 267 (2d Cir. 1993). The Court previously held that MINISO had no duty to disclose its financial results in 2018, over two years prior to the IPO. Doc. 95 at 27. In addition, the Offering Materials did disclose the declining trend by reporting a decline in revenue and profits from 2019 to 2020. Doc. 117-2 at 12.

Nova Scotia also argues that the Offering Materials did not disclose the real reasons behind the decline and misleadingly implied the decline was attributed to "one-off causes or difficulties for new, small-market stores." Doc. 122 at 26. The Court disagrees. First, the "real reasons" for decline claimed by Nova Scotia largely overlapped with the reasons the Offering Material disclosed. Nova Scotia alleges the decline was

26

caused by "market saturation, competition . . . high rents," and deviation from [MINISO's] asset-light Retail Partner store model. *Id*. The Offering Materials identified "intensifying market competition" and COVID-19 as the reasons for revenue decline. Doc. 117-2 at 28. Second, the Offering Materials did not "imply" these causes were one-off or limited to new, small-market stores. Contrary to Nova Scotia's argument, the Offering Materials listed competition as a possible reason for revenue fluctuation without further qualification and warned that the revenue per MINISO store "may further decrease and is not expected to grow significantly in the near future" because of a series of factors, including competition. *Id*. 28–29. Third, some reasons for the decline alleged by Nova Scotia, including deviation from the Retail Partner store model, are merely conjecture. Nova Scotia concluded that MINISO deviated from the Retail Partner store model based on the decline in franchise fees, which occurred *after the IPO*, ¶ 157(b), and an unsubstantiated report that MINISO closed many stores *before March 2019* and *around 2022*, ¶¶ 42(a) (b). Doc. 122 at 26. The Court, however, finds it is not reasonable to infer from the information above that MINISO deviated from the Retail Partner store model at the time of the IPO in 2020, much less the deviation became a risk for MINISO's revenue and profitability at that time.

2. *Nova Scotia Does Not Allege Any Material Misstatement or Omission in MINISO's Post-IPO Materials*

a. *Joint Venture Transaction*

According to Nova Scotia, MINISO's statement that it "formed a joint venture in the British Virgin Islands with YGF MC" was materially false or misleading because MINISO and YGF MC did not establish a new company as the joint venture—the joint venture entity, YGF Investment, was initially incorporated as a wholly owned subsidiary of YGF MC on August 26, 2020. ¶¶ 130, 131(a). This allegation fails because the statement matches facts alleged in the TAC. As the TAC alleges, YGF Investment had been a wholly owned subsidiary since incorporation and only became a joint venture after

27

MINISO and YGF MC entered into the Capital Increase Agreement on December 11, 2020. ¶ 122(c).

Nova Scotia also alleges a series of post-IPO statements to be actionable "half-truths." The Court disagrees. There are two actionable theories under Section 10(b) and Rule 10b-5 of the Exchange Act: (1) an actual statement that is "untrue outright," and (2) a half-truth, which is "a representation that states the truth only so far as it goes, while omitting critical qualifying information." *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 138 (2d Cir. 2025) (cleaned up). A classic example of half-truth is "the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 188–89 (2016). Another example is when a child ate a whole cake but only told his parents that he "had dessert." *Gimpel*, 156 F.4th at 138 n.11.

Pure omissions of material information are not actionable under Section 10(b) and Rule 10b-5. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 266 (2024). But once a company speaks on a subject matter, it assumes a duty to be both accurate and complete to make its statements not misleading in light of the circumstances under which they were made. *Gimpel*, 156 F.4th at 138–39.

According to Nova Scotia, statements that YGF MC held 80% of the shares of the joint venture and MINISO planned to acquire these shares were materially misleading half-truths because YGF MC was never able to and in fact did not contribute sufficient funds to justify an 80% ownership of the joint venture. ¶¶ 130, 131(b), 132, 133(b), 138, 139. But these statements did not touch on the capital contribution to the joint venture. It only addressed the equity distribution, which Nova Scotia acknowledges was accurate, Doc. 122 at 19. Thus, this MINISO statement is not a misleading statement about capital contribution as it does not address this subject matter. *See Universal Health*, 579 U.S. at 188–89.

Nova Scotia also alleges that MINISO's statements about the joint venture transaction were materially misleading half-truths because they did not disclose the "complicated ownership structure" of the joint venture.  ¶¶ 130, 131(e), 132, 133(i), 138, 139.  Nova Scotia argues that the transaction was so complex that without such disclosure, investors would not be able to understand the transaction, which created a duty to disclose to make statements surrounding the transaction not misleading.  Doc. 122 at 21.  Specifically, Nova Scotia argues that investors would not be able to understand YGF MC's failure to meet its joint venture funding agreement obligations, that MINISO took over YGF MC's 80% funding for no apparent benefit, and how much Ye was overpaid in the buyout. *Id*.  But MINISO does not have a duty to disclose every detail of the transaction.  *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 366 (2d Cir. 2010) (discussing a topic "d[oes] not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding [it]").  Moreover, Nova Scotia does not point to any prior statements of MINISO that are rendered misleading by the alleged omission of the ownership structure.  *Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, No. 14-cv-9443, 2016 WL 2859622, at *11 (S.D.N.Y. May 16, 2016) (holding there is no duty to further disclosure details when "[p]laintiff does not identify how [d]efendants' failure to disclose these details renders any of the [c]ompany's prior statements misleading").

Moreover, Nova Scotia claims that MINISO's statements about the joint venture transaction were materially misleading half-truths because they did not disclose the joint venture entity YGF Investment is an "Interested Business" under MINISO's Code of Conduct.  ¶¶ 130, 131(f).  Nova Scotia fails to plead a theory on how the statements were misleading in any material way, as required by PSLRA, especially when the same statements disclosed that Ye and his wife were on the other side of the joint venture transaction.  *See Dura Pharmaceuticals, Inc.*, 544 U.S. at 345; ¶ 130(a).

Nova Scotia also challenges the statement that YGF MC will invest RMB 1,424 million into the joint venture. ¶¶ 130, 131(c)(d). According to Nova Scotia, this statement was materially misleading because neither YGF MC nor Ye would have sufficient liquidity to invest RMB 1,424 million into the joint venture, evidenced by the fact that YGF MC only contributed half of that amount in the end and a part of this contribution was made as a loan to the joint venture. ¶¶ 131(c)(d). The underinvestment, according to Nova Scotia, would make MINISO responsible for the total cost of the land used for the headquarters. ¶ 131(d). But Nova Scotia does not plead sufficient facts to show that YGF MC or Ye was not expected to have the ability to invest RMB 1,424 million into the joint venture at the time of the statement. *Dura Pharmaceuticals,* 544 U.S. at 345 (holding that PSLRA requires the complaint setting forth the factual basis for the plaintiff's belief that the statement is misleading). Standing alone, the fact that YGF MC ultimately did not invest RMB 1,424 million does not establish that YGF MC was not expected to have the ability to do so at the time of the statement.

According to Nova Scotia, the statement that the equity buyout was approved by MINISO's Audit Committee and Board was misleading because Ye did not recuse himself from the vote in violation of MINISO's Code of Conduct and the statement did not disclose such violation. ¶¶ 132, 133(c)(d), 138, 139. However, Nova Scotia is merely speculating when it asserts that Ye did not recuse himself. It makes the conjecture only based on the fact that MINISO did not disclose if Ye recused himself. ¶ 133(c). But to allege that a statement is misleading because of undisclosed misconduct, a plaintiff has to plead adequate facts to show that the misconduct actually occurred. *In re Mylan N.V. Securities Litigation*, No. 16-cv-7926 (JPO), 2018 WL 1595985, at *5 (S.D.N.Y. Mar. 28, 2018). Nova Scotia fails to do so.

Nova Scotia also alleges statements about the joint venture transaction were misleading because they did not disclose Ye's involvement in the interested transaction violated MINISO's Code of Conduct. ¶¶ 131(f), 139. Based on the TAC, it is unclear

30

whether the Code was violated.  In any event, MINISO does not have a duty to disclose the alleged violation because corporations do not have a general duty to disclose violations of internal codes of conduct unless its absence renders any particular statement false or misleading.  *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453, 465 (S.D.N.Y. 2010).  Nova Scotia does not allege any particular statement is rendered false or misleading, except for the statements that were "misleading" simply for not disclosing the alleged violations.

According to Nova Scotia, the statement that the buyout price "represent[ed] the lower of the actual investment amount" by YGF MC and was "confirmed by a third-party valuation firm" was misleading because it implied the price was determined by an objective reference point when in fact the price was the result of a negotiation between MINISO and YGF MC.  ¶¶ 132, 133(e), 138, 139.  Nova Scotia also alleges that the statement was misleading because the "third-party valuation firm" was in fact a "professional organization" instead of an accounting firm.  ¶¶ 132, 133(f).  But the statements match the procedure for determining the price under the Equity Transfer Agreement—the price was to be based on a RMB 700,414,240.1 benchmark, which is comparable to and lower than the amount that Ye invested in the joint venture, and adjusted by the appraisal result of the equity.  Doc. 116 at 20–21; Doc. 117-19 at 3–4.  In addition, the MINISO statement does not claim that the third-party valuation firm was an accounting firm.

Nova Scotia also alleges that the professional organization never actually confirmed the value of YGF MC's shares because a July 28, 2022 MINISO press release stated that Ye's equity interest in the joint venture was estimated to be "over 7 million" without specifying the value.  ¶¶ 132, 133(f).  In addition, no valuation report was disclosed to investors although MINISO claimed the professional organization would issue one.  *Id*.  But the fact that MINISO did not report the value of Ye's equity interest in a press release accurately, or that no valuation report was disclosed to the public, does not

plausibly support Nova Scotia's conclusion that the valuation never occurred.  This conclusion is merely speculative.  *Twombly*, 550 U.S. at 555 (holding that it is a plaintiff's obligation to plead factual allegations sufficient "to raise a right to relief above the speculative level.").  Moreover, Nova Scotia alleges the statement was misleading for not disclosing certain details, including the method of valuation and the dates when YGF MC contributed to the joint venture.  ¶¶ 132, 133(f)(g).  But without showing how the existing disclosure would be misleading without further details, Nova Scotia does not establish MINISO has a duty to disclose these details in the first place.  *Pehlivanian*, 2016 WL 2859622, at *11 (S.D.N.Y. May 16, 2016) (holding there is no duty to further disclosure details when "[p]laintiff does not identify how [d]efendants' failure to disclose these details renders any of the [c]ompany's prior statements misleading").

Nova Scotia claims that the statement that the RMB 700.4 million buyout price represents the lower of the actual investment amount by YGF MC was materially misleading because YGF MC only invested RMB 422.95 million into the joint venture and the rest of the contribution was a loan that needs to be repaid.  ¶¶ 132, 133(f).  It also alleges that the statement was misleading because it failed to explain why the loan cannot be repaid directly.  ¶¶ 132, 133(f).  But as laid out in the Equity Transfer Agreement, a part of the RMB 700.4 million buyout price would be used to repay the loan in full.  Doc. 117-19 at 4–5.  Nova Scotia does not allege the loan was or will be paid in any other manner.  No reasonable investor would find this statement misleading in the fashion Nova Scotia alleges since the statement matched the facts alleged.

In addition, Nova Scotia alleges that the statements about the equity buyout were materially misleading because it did not disclose that the buyout would risk breaching the land use contract with the Chinese government.  ¶¶ 132, 133(h), 138, 139.  The land use contract prohibits the equity of the land use right transferee to change within 10 years.  ¶ 133(h).  But in fact, the equity of the land use right transferee would not be changed by the buyout.  The buyout only changed the equity of the joint venture.  But the joint

venture is not the land use right transferee. ¶¶ 122(b), 129. Mingyou, a subsidiary of the joint venture, is, because Mingyou entered into the land use rights contract with the Chinese government. *Id*.

Moreover, Nova Scotia alleges that statements about increased general and administrative expenses attributable to depreciation and amortization of the land use right were materially misleading because they did not disclose that the funding obligation of the land acquisition was shifted to MINISO due to Ye's underinvestment. ¶¶ 134–137, Doc. 122 at 20 n.14. However, insufficient facts were plead as to how the statement was misleading because "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98–99 (2d Cir. 2021).

Nova Scotia also alleges that the statements announcing the equity buyout were misleading because it obscured the net effect of the transaction—that MINISO would become responsible for 100% of the cost for the land acquisition. ¶¶ 132, 133(b). But the allegedly obscured information was in fact stated in the same statement Nova Scotia finds misleading. The statement pointed out that: (1) the buyout price represented investment already made by YGF MC; (2) the second installment of land use right had not been paid; and (3) MINISO intended to support subsequent capital expenditure of the headquarters project with its cash surplus and future cashflows. ¶ 132.

b. *Number and Percentage of Retail Partner stores*

Nova Scotia alleges that MINISO's post-IPO statements on the number and percentage of Retail Partner stores were materially misleading because a material percentage of MINISO stores, both in China and internationally, were not Retail Partner

33

stores.[16]  ¶¶ 140–41.  It primarily relies on accounts of CWs, the Blue Orca report, and its own investigation confirming the Blue Orca report.  ¶ 141.  In the SAC, Nova Scotia relied on the same materials to allege that a material percentage of MINISO stores, both in China and internationally, were not Retail Partner stores at the time of IPO.  Doc. 95 at 20–23.  The Court held that through these materials, Nova Scotia failed to establish beyond speculative level that at any time, a material percentage of MINISO stores were not Retail Partner stores.  *Id*. at 21–23.  For similar reasons, Nova Scotia fails to establish through these sources that MINISO misrepresented the number and percentage of Retail Partner stores after IPO.

### C.  Nova Scotia Fails to Plead Scienter

The TAC does not sufficiently establish scienter.  To state a claim pursuant to § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege with particularity facts that would give rise "to a strong inference that the defendant acted with the required state of mind."  *ECA & Local 134 IBEW*, 553 F.3d at 198.  A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . .  but also competing inferences

---

[16] The TAC writes that "[a]s detailed by the CW accounts . . . MINISO owned significantly *fewer* stores post-IPO than it told the market, both in China and internationally." ¶ 141(a) (emphasis added).  The Court presumes the TAC meant MINISO owned *more* stores post-IPO than it disclosed to the market based on the totality of the TAC.  *See, e.g.,* ¶¶ 120–21.  If the TAC intends otherwise, the Court concludes that the TAC fails to plead any factual allegations to support the claim.

rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Resources Corp. Securities Litigation*, No. 13-cv-2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (citing *Tellabs*, 551 U.S. at 322–23).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).

### 1. Nova Scotia's Allegations of Motive are Insufficient

The TAC primarily relies on the following allegations to establish motive: (1) Ye sold MINISO shares during the class period and benefited from the allegedly artificial inflation of MINISO's securities prices; (2) Ye engaged in self-dealing in the joint venture transaction and equity buyout as the controller of MINISO; (3) Ye and Zhang were compensated more than other board members; and (4) MINISO applied for dual listing on Hong Kong stock exchange during the class period. ¶¶ 177–87. These allegations are insufficient.

To establish motive and opportunity, a plaintiff must allege that the defendant benefited in a "concrete and personal way" from the purported fraud. *ECA & Local 134 IBEW*, 553 F.3d at 198. The particular fraud must specifically enable the scheme leading to the benefit. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011). Universal motives, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, are insufficient. *ECA & Local 134 IBEW*, 553 F.3d at 198.

All the motive allegations in the TAC, even considered together, are unavailing. To establish motive through stock sale, Nova Scotia must establish that Ye's alleged sales

35

were "unusual" or "suspicious," and the "mere fact that insider stock sales occurred does not suffice." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772 (S.D.N.Y. 2019). But Nova Scotia does not plead any facts other than Ye having sold 0.64% of his stocks.[17] In terms of the self-dealing allegation, Nova Scotia does not plead sufficient facts to establish that Ye benefited from the transaction. Nova Scotia essentially alleges that MINISO overpaid YGF MC in the buyout because the buyout price was determined based on the amount YGF MC invested into the joint venture but a part of the investment was a loan that needs to be repaid. ¶¶ 182–84. But as discussed above, Nova Scotia does not allege any other repayment of the loan.

In addition, Nova Scotia argues that Ye and Zhang were compensated more than other directors, particularly the independent directors, and Zhang received high equity-based compensation in 2021. ¶ 185. But Ye and Zhang were not compensated unreasonably more than other inside directors.[18] Moreover, there are more compelling nonfraudulent explanations for the compensation. *Tellabs*, 551 U.S. at 314 (holding that fraudulent inference must be cogent and at least as compelling as any opposing inference of nonfraudulent intent). As a matter of common sense, it is reasonable for Ye and Zhang to be paid more than independent directors since Ye and Zhang had more responsibilities. It is also reasonable for executives to receive large amounts of equity-based compensation after the IPO. Another nondefendant director, Dou Na, received equity-

---

[17] The TAC alleges that Ye owned 881,991,109 shares of stock as of December 31, 2020 and sold 5,644,572 shares in 2021. ¶¶ 179, 181. Nova Scotia argues that "selling tens of thousands of shares during alleged fraud supports scienter" and cites *Goldman v. Belden*, 754 F.2d 1059, 1063 (2d Cir. 1985). But considering the number of shares sold without taking the total number of shares held by the defendant into account is meaningless. Courts in this district usually consider the percentage of shares sold, along with factors like profits realized, the number of insider defendants selling, timing of the sale, the volume of shares. *See e.g. Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (finding selling of 9.9% of shares held not unusual); *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 75 (2d Cir. 2001) (finding selling of 80% of defendants' share within a few days unusual). Here, Ye's selling of 0.64% of his stocks after the IPO was not unusual.

[18] In 2021, Ye's total compensation was RMB 1,648,000, and Zhang's total compensation was RMB 17,805,000, when other inside directors respectively earned RMB 1,668,000, RMB 60,000 and RMB 21,458,000. In 2022, Ye's total compensation was RMB 3,452,000 and Zhang's total compensation was RMB 2,012,000, when the other inside director Li earned RMB 2,928,000. ¶ 185.

based compensation that was 25% more than that received by Zhang in 2021.[19]  The last allegation regarding motive—that MINISO sought dual listing in Hong Kong and raised capital during the class period, is a universal motive.[20]  The allegations regarding motive are so speculative that even considered together, they fail to sufficiently establish scienter.

2.  *Nova Scotia's Allegations of Knowledge or Recklessness are Insufficient*

When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal citations omitted).  Novia Scotia must plead conduct that is "highly unreasonable" or reflects "an extreme departure" from the standards of ordinary care.  *Board of Trustees of City of Ft. Lauderdale General Employees' Retirement System v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  This requires pleading particularized facts that show the defendants had "knowledge of facts or access to information contradicting their public statements."  *Kalnit*, 264 F.3d at 142.  Plaintiffs "must specifically identify the reports or statements containing this information."  *Teamsters Loc. 445 Freight Divison Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

The TAC primarily relies on the following allegations to establish actual knowledge or recklessness:  (1) CWs claimed that MINISO exercised tight control over

---

[19] Nova Scotia cites *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260–61 (5th Cir.) to support its argument that the high compensation Zhang received establishes scienter.  Doc. 122 at 29–30.  But *Barrie* is distinguishable because the executive in *Barrie* received high bonus for achieving the company's target revenue which was fraudulently stated to the public.  *Id*.

[20] Nova Scotia cites *In re Time Warner Inc. Securities Litigation*, 9 F.3d at 270.  But *In re Time Warner* is distinguishable because the particular fraud there specifically and directly enabled the benefit alleged.  Time Warner allegedly concealed plans for issuing additional stock after announcing a beneficial business plan because the concealment would further extend the stock price boost brought by the business plan and offset the stock price dilution that the additional stock issuance would cause.  But here, Nova Scotia is arguing that the Exchange Act Defendants were motivated to make the misstatements that would increase MINISO's *U.S.* stock price in order to benefit MINISO's stock offering in *Hong Kong*.  ¶¶ 186–87.  The alleged benefit is too attenuated and is not specifically enabled by the purported fraud.  *Glaser*, 772 F. Supp. 2d at 586.

its operation and data, ¶ 164; (2) the Blue Orca report indicated that MINISO's public statements were materially false or misleading, ¶ 165; (3) Ye as the controlling shareholder, chairman, member of the Audit Committee, and owner of YGF MC, was in a position to know the statements were materially false or misleading, ¶ 166–69; (4) Ye and Zhang had a duty to familiarize themselves with the subject matter of the public statements and to speak truthfully, ¶¶ 192–93; (5) Ye and Zhang violated MINISO's Code of Conduct by concealing negative facts and engaging in insider selling and unjust self-enrichment, ¶¶ 194–98; and (5) MINISO's July 28, 2022 response to the Blue Orca report was vague, ¶ 170.  Nova Scotia also invites the Court to apply the core operations doctrine to bolster the inference of scienter, arguing that both the joint venture transaction and the Retail Partner model were "core" to MINISO.  Doc. 122 at 31.  These allegations, however, are unavailing.

The Court has held that the CWs' accounts, the Blue Orca report, the duty to familiarize themselves with the public statements and speak truthfully, and the duty under MINISO's code of conduct are not sufficient to demonstrate actual knowledge or recklessness.  *In re MINISO Group*, 2024 WL 759246, at *19.  In addition, the Blue Orca report issued on July 26, 2022 cannot be a "red flag" recklessly ignored by Exchange Act Defendants when they made the allegedly false statements.  Indeed, the TAC does not allege any misstatements or omissions made on or after July 26, 2022.

The TAC also fails to demonstrate actual knowledge or recklessness based on Ye's position.  Where plaintiffs allege defendants have access to contrary facts, they have to specifically identify the reports or statements containing the facts.  *Denny v. Canaan Inc.*, No. 21-cv-3299 (JPC), 2023 WL 2647855, at *13 (S.D.N.Y. Mar. 27, 2023) ; *In re DraftKings Inc. Securities Litigation*, 650 F. Supp. 3d 120, 177 (S.D.N.Y. 2023).  Here, the TAC only alleges Ye's corporate positions without identifying with specificity how he would have access to the contrary information.  Moreover, the TAC argues that MINISO failed to rebut allegations in the Blue Orca report, which indicates that the Exchange Act

38

Defendants knew their statements were false and thus supports an inference of scienter. ¶ 170. But even assuming the Exchange Act Defendants knew their statements were false at the time of the response, that assumption does not directly support an inference that they were aware of the falsity of the statements when the statements were made earlier.[21] *See Buhrke Family Revocable Trust v. U.S. Bancorp*, 726 F. Supp. 3d 315, 360 (S.D.N.Y. 2024). Accordingly, the allegations concerning actual knowledge or recklessness are so speculative that even considered together, and with the core operations doctrine, they fail to sufficiently establish scienter.

### D. Loss Causation

Pursuant to the Exchange Act, Novia Scotia must allege that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Similarly, the Securities Act claims are dismissed where "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue." *In re State St. Bank & Tr. Co. Fixed Income Funds Investment Litigation*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).

The corrective disclosure that the TAC primarily relies on is the Blue Orca report. ¶ 157. However, as discussed above, the report did not disclose any misstatements or omissions concealed from the market. Regarding partial corrective disclosures, in addition to the analyst reports the SAC relies on, the TAC adds three analyst reports issued by Goldman Sachs on January 26, 2022, February 23, 2022, and March 7, 2022 respectively. ¶¶ 142–56. These reports expressed concerns about MINISO's business performance for reasons such as increased cost, the disruption of COVID-19, and

---

[21] Cases cited by Nova Scotia are inapposite. *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (later admission of weakness in internal controls is indicative of scienter because in general, failure to maintain sufficient internal controls to avoid fraud is indicative of scienter); *In re CINAR Corp. Securities Litigation*, 186 F. Supp. 2d 279, 316–17 (E.D.N.Y. 2002) (direct admission of falsity in past financial statements, combined with the fact that CFO usually has continuous intimate knowledge of the statements, supports a finding of CFO's scienter)

seasonal weakness in overseas shipping. *Id*. These partial corrective disclosures have nothing to do with the alleged fraud. Accordingly, the TAC fails to allege loss causation.

### E. Leave to Amend

Nova Scotia has requested leave to amend in the case of dismissal. Doc. 122 at 35–36. Courts are instructed to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Motions to amend are ultimately within the discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted). This is a permissive standard since the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits" of the case. *Conley v. Gibson*, 355 U.S. 41, 48 (1957).

The Court has dismissed Nova Scotia's SAC, reconsidered its decision to dismiss the SAC, and granted Nova Scotia leave to file a TAC. Doc. 95, 109. However, as discussed above, the TAC adds minimal factual allegations and is deficient for substantially similar reasons as the SAC. The Court believes that another amendment of the complaint would be futile and DENIES Nova Scotia's request to amend the TAC.

### IV.  CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 115, and close the case.

It is SO ORDERED.

Dated:   March 31, 2026
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.